# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) <br> ) <br> ) |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | )     Civil Action No. 07-0990 (JR) <br> ) |
| UNITED STATES POSTAL SERVICE, | ) <br> ) |
| MAILERS TECHNICAL ADVISORY COMMITTEE, | ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

## FEDERAL DEFENDANT'S MOTION TO DISMISS

Defendant United States Postal Service hereby moves the Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss plaintiffs' Complaint for the reasons set forth in the accompanying Memorandum in support of this motion.

Dated: August 17, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney

/s/ Kathryn L. Wyer
ARTHUR R. GOLDBERG
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20530
Telephone: (202) 616-8475 / Fax: (202) 616-8202
kathryn.wyer@usdoj.gov
*Attorneys for Federal Defendant*
*United States Postal Service*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) | |
| | ) | |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0990 (JR) |
| | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| MAILERS TECHNICAL ADVISORY COMMITTEE, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney

/s/ Kathryn L. Wyer
ARTHUR R. GOLDBERG
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20530
Telephone: (202) 616-8475 / Fax: (202) 616-8202
kathryn.wyer@usdoj.gov
*Attorneys for Federal Defendant*
*United States Postal Service*

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     I.     The Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 . . . . . . . . . . . 2

     II.    The Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. §§ 101-5605 . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     I.     FACA DOES NOT APPLY TO USPS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          A.     Because Congress Intends The Postal Service To Be Run Like A
                 Business, The PRA Broadly Exempts The Postal Service From Laws
                 Regulating Other Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          B.     Whether Read Narrowly Or Broadly, § 410(a) Exempts USPS's
                 Consultation With MTAC From Federal Regulation Under FACA . . . . . . 13

          C.     There Is No Indication In FACA's Text Or Purpose That Congress
                 Intended USPS To Be Subject To FACA's Requirements . . . . . . . . . . . . . 14

          D.     Congress's Most Recent Legislation Evinces No Intent To Change
                 USPS's Businesslike Orientation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     II.    EVEN IF FACA APPLIES TO USPS, PLAINTIFFS HAVE NO PRIVATE
           RIGHT OF ACTION TO ENFORCE ITS PROVISIONS . . . . . . . . . . . . . . . . . . 17

          A.     FACA Does Not Provide a Private Right of Action . . . . . . . . . . . . . . . . . . 17

          B.     The Declaratory Judgment Act Does Not Provide A Right Of Action . . . . 19

C.    Plaintiffs Cannot Invoke APA Review To Enforce FACA
Against USPS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    PLAINTIFFS' CLAIM THAT FACA ENTITLES THEM TO ACCESS
MTAC WORK GROUP MEETINGS AND RECORDS IS NOT
COGNIZABLE INSOFAR AS MTAC WORK GROUPS DO NOT
QUALIFY AS ADVISORY COMMITTEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

IV.    PLAINTIFFS HAVE NO COGNIZABLE CLAIM OF ENTITLEMENT
TO MTAC MEMBERSHIP OR TO ACCESS MTAC'S MITS WEB SITE . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

Air Courier Conference v. APWU,
  498 U.S. 517 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Alexander v. Sandoval,
  532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Arbaugh v. Y & H Corp.,
  126 S. Ct. 1235 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,
  997 F.2d 898 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cannon v. Univ. of Chicago,
  441 U.S. 677 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Carlin v. McKean,
  823 F.2d 620 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4, 20

Ctr. for Arms Control & Non-Proliferation v. Lago,
  No. 05-682, 2006 WL 3328257 (D.D.C. Nov. 15, 2006). . . . . . . . . . . . . . . . . . . . . . . 20

Cheney v. Dist. Court for Dist. of Columbia,
  542 U.S. 367 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Cicippio-Puleo v. Islamic Republic of Iran,
  353 F.3d 1024 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

City of Thousand Oaks v. United States,
  396 F. Supp. 1306 (D.C. Cal. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Commodity Futures Trading Comm'n v. Schor,
  478 U.S. 833 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Corr. Servs. Corp. v. Malesko,
  534 U.S. 61 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Cummock v. Gore,
  180 F.3d 282 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 18

DePippo v. Chertoff,
    453 F. Supp. 2d 30 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Doris Day Animal League v. Veneman,
    315 F.3d 297 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

EEOC v. St. Francis Xavier Parochial Sch.,
    117 F.3d 621 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Fertilizer Inst. v. EPA,
    938 F. Supp. 52 (D.D.C. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Franchise Tax Bd. v. USPS,
    467 U.S. 512 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Int'l Brominated Solvents Ass'n v. Am. Conf. of Govt'l Indus. Hygienists, Inc.,
    393 F. Supp. 2d 1362 (M.D. Ga. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group,
    219 F. Supp. 2d 20 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18, 18

Kuzma v. USPS,
    798 F.2d 29 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 10, 14

Leonard v. USPS,
    489 F.2d 814 (1st Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

Lombardo v. Handler,
    397 F. Supp. 792 (D.D.C. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lowe v. Ingalls Shipbuilding,
    723 F.2d 1173 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Mail Order Ass'n of Am. v. USPS,
    986 F.2d 509 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 5, 9

*Nat'l Anti-Hunger Coal. v. Executive Comm.,
    557 F. Supp. 524 (D.D.C. 1983), aff'd, 711 F.2d 1071 (D.C. Cir. 1983). . . . . . . . . . . . 21

Nat'l Anti-Hunger Coal. v. Executive Comm.,
    711 F.2d 1071 (D.C. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 24

*Nat'l Easter Seal Soc'y v. USPS,
   656 F.2d 754 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 13, 15, 20

NRDC v. Abraham,
   223 F. Supp. 2d 162 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

NRDC v. Dep't of Energy,
   353 F.3d 40 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Pitney Bowes Inc. v. USPS,
   27 F. Supp. 2d 15 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Portmann v. United States,
   674 F.2d 1155 (7th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 15

Price v. Caruso,
   No. 07-117, 2007 WL 1521215 (W.D. Mich. May 22, 2007). . . . . . . . . . . . . . . . . . .19

*Public Citizen v. United States Dep't of Justice,
   491 U.S. 440 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 3, 15, 21

Rogers v. Johnson-Norman,
   466 F. Supp. 2d 162 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Sanchez v. Pena,
   17 F. Supp. 2d 1235 (D.N.M. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Schilling v. Rogers,
   363 U.S. 666 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Touche Ross & Co. v. Redington,
   442 U.S. 560 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

USPS v. Flamingo Indus. (USA) Ltd., et al.,
   540 U.S. 736 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Villasenor v. Am. Signature, Inc.,
   No. 06-5493, 2007 WL 2025739 (N.D. Ill. July 9, 2007). . . . . . . . . . . . . . . . . . . . . 19

Wickwire Gavin, P.D. v. USPS,
   356 F.3d 588 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

**STATUTES**

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 4, 7, 14

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 . . . . . . . . . . . . . . . . . . . . . . . 2, 18

Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 . . . . . . . . . . . . . . . . . . . . . . . .1, 2

5 U.S.C. app. 2 § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

5 U.S.C. app. 2 § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5 U.S.C. app. 2 § 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

5 U.S.C. app. 2 § 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. app. 2 § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5 U.S.C. app. 2 § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 14, 24

Declaratory Judgment Act, 28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

Postal Reorganization Act ("PRA"), 39 U.S.C. §§ 101-5605 . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

39 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

39 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

39 U.S.C. § 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

39 U.S.C. §§ 501-505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

39 U.S.C. § 3662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

 39 U.S.C. § 3663 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

39 U.S.C. § 3691 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, § 9(b)(2)(B),
    107 Stat. 1001 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Government in the Sunshine Act, Pub. L. No. 94-409, 90 Stat. 1241 (1976). . . . . . . . . . . . . .11

Older Americans Amendments of 1975, Pub. L. No. 94-135, § 308, 89 Stat. 713 . . . . . . . . . . 11

Act of Aug. 9, 1975, Pub. L. No. 94-82, tit. I, 89 Stat. 419 (1975) . . . . . . . . . . . . . . . . . . . . . . 11

Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 6, 88 Stat. 55 . . . . . . . . . . 11

Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435,
    120 Stat. 3198 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12-13, 14

## CONGRESSIONAL MATERIALS

116 Cong. Rec. 21,709 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 15

118 Cong. Rec. 1535 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

118 Cong. Rec. 22,016 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

152 Cong. Rec. H9160-02, H9182 (daily ed. Dec. 8, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 5

H.R. Rep. No. 1104, 2d Sess. 1104, <u>reprinted in</u> 1970 U.S.C.C.A.N. 3649). . . . . . . . . . . . . . . 10

S. Rep. 91-912, at 5 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

S. 1637, 92d Cong. § 11 (1971), <u>reprinted in</u> 117 Cong. Rec. 11,444 (1971). . . . . . . . . . . . . . 18

S. 2064, 92d Cong. § 14 (1971), <u>reprinted in</u> 117 Cong. Rec. 19,805 (1971). . . . . . . . . . . . . . 18

S. 2039, 102d Cong. § 15(a)(1), <u>reprinted in</u> 137 Cong. Rec. 34,603 (1991). . . . . . . . . . . . . . 18

## EXECUTIVE & ADMINISTRATIVE MATERIALS

Exec. Order No. 12,024 (Dec. 1, 1977), 42 Fed. Reg. 61445 . . . . . . . . . . . . . . . . . . . . . . . . . .12

OMB, Federal Advisory Committees: First Annual Report of the President (1973),
    <u>reprinted in</u> 119 Cong. Rec. 14,983-84 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## INDEX TO EXHIBITS

A       116 Cong. Rec. 21,707-21,709 (1970)

B       S. Rep. 91-912 (1970) (excerpt, pp. 1, 5)

C       118 Cong. Rec. 22,016 (1972)

D       118 Cong. Rec. 1535 (1972) (reprinting letter from David A. Nelson, USPS, to Chairman, Committee on Post Office and Civil Service)

E       119 Cong. Rec. 14,983-84 (1973) (reprinting OMB, Advisory Committee - Summary Data For Calendar Year 1972)

F       117 Cong. Rec. 11,443-11,444 (1971) (excerpt from S. 1637)
        117 Cong. Rec. 19, 803, 19,805 (1971) (excerpt from S. 2064)
        137 Cong. Rec. 34,597, 34,603 (1991) (excerpt from S. 2039)

## INTRODUCTION

Plaintiffs, the American Postal Workers Union and the Consumer Alliance for Postal Services ("CAPS"), allege that defendants the United States Postal Service ("USPS" or "Postal Service") and Mailers Technical Advisory Committee ("MTAC") have violated § 10(a) and (b) of the Federal Advisory Committee Act, 5 U.S.C. app. 2 ("FACA") by denying plaintiffs access to MTAC general session and work group meetings, certain MTAC records, and an on-line MTAC Issue Tracking System ("MITS") which houses some or all of these records. Plaintiffs seek declaratory and injunctive relief requiring defendants to provide access to these meetings and materials, to assign plaintiffs a MITS password, and to allow CAPS to become an MTAC member.

Plaintiffs' Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because, in keeping with its unique status under the Postal Reorganization Act ("PRA"), 39 U.S.C. §§ 101-5605, as a businesslike entity within the executive branch, USPS is not subject to FACA. By allowing USPS to operate without many of the procedural requirements that are imposed on other federal agencies as a means of ensuring accountability in the formulation of public policy, Congress sought to maximize Postal Service efficiency and competitiveness in carrying out its primary mission – the delivery of our mail. Consistent with this goal, in the more than thirty years since FACA's enactment, USPS has operated with the understanding that FACA's requirements were not meant to apply to it, and Congress' latest amendments to the PRA do not suggest any shift in the view that USPS should operate like a business. Holding USPS subject to FACA would unnecessarily interfere with USPS's efforts to stay current in the mail delivery market by working with and receiving input from mailer industry representatives, its business

customers.

Even if FACA does apply to USPS, there is no private right of action under FACA or the Declaratory Judgment Act, 28 U.S.C. § 2201, that allows plaintiffs to bring their claims of alleged FACA violations in federal court, nor is USPS subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Moreover, even if plaintiffs could identify a vehicle for their claims and were ultimately successful in establishing a right to access MTAC meetings and records, this right does not extend to the meetings and records of MTAC work groups that function as the equivalent of MTAC staff or to MTAC's internet site, nor does FACA provide a means for plaintiffs to obtain membership in MTAC.

## STATUTORY BACKGROUND

### I.    The Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2

FACA was enacted in 1972 as a result of Congress' "desire to assess the need for the numerous 'committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.'" Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 445-46 (1989) (quoting 5 U.S.C. app. 2 § 2(a)).  While Congress recognized that such entities "are frequently a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government," 5 U.S.C. app. 2 § 2(a), the measures set forth in FACA were designed "to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals."  Public Citizen, 491 U.S. at 453; see also Cummock v. Gore, 180 F.3d 282, 284 (D.C. Cir. 1999) (noting Congress' concern with "the proliferation of costly committees").  Through FACA, Congress aimed to ensure that advisory committees be

-2-

"established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature." Public Citizen, 491 U.S. at 446 (citing 5 U.S.C. app. 2 § 2(b)).

Advisory committees that are subject to FACA's requirements must hold their meetings "open to the public," 5 U.S.C. app. 2 § 10(a)(1), and must allow "[i]nterested persons" to "attend, appear before, or file statements with" them, subject to reasonable rules or regulations, id. § 10(a)(3). In addition, with the exception of any documents that are exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying." Id. app. 2 § 10(b).

## II.    The Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. §§ 101-5605

With the enactment of the PRA in 1970, Congress recognized that the "basic function" of the Postal Service is its "obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101(a). The practical nature of the Postal Service's mission to provide mail delivery services directly to the people, distinct from the policy-oriented regulatory and enforcement activities of other federal agencies, led Congress, through the PRA, to grant the Postal Service a degree of independence in order that it might "manage its operations in a professional, businesslike manner." Mail Order Ass'n of Am. v. USPS, 986 F.2d 509, 519 (D.C. Cir. 1993); see also Carlin

v. McKean, 823 F.2d 620, 621 (D.C. Cir. 1987) (USPS would "operate more along the lines of a

private company"). The PRA thus created USPS as an "'independent establishment of the

executive branch of the Government,'" renaming the former Post Office Department and

removing it from the Cabinet. USPS v. Flamingo Indus. (USA) Ltd., et al., 540 U.S. 736, 740

(2004) (quoting 39 U.S.C. § 201); accord Nat'l Easter Seal Soc'y v. USPS, 656 F.2d 754, 756

(D.C. Cir. 1981). The goal was "to produce a self-supporting, efficient structure that would

operate without congressional subsidies and also without excessive congressional regulation."

Id.; see also City of Thousand Oaks v. United States, 396 F. Supp. 1306, 1308 (D.C. Cal. 1974)

(Congress intended USPS to "be operated under the [PRA] free of many of the usual obstacles

facing most agencies").

     To this end, one PRA provision exempts USPS's exercise of its powers from any

"Federal law dealing with public or Federal contracts, property, works, officers, employees,

budgets, or funds," with the exception of those laws specified in the PRA. 39 U.S.C. § 410(a).

This section specifically exempts USPS from "the provisions of chapters 5 and 7 of title 5." Id.

The same section sets forth specific laws that "shall apply to the Postal Service." Id. § 410(b).

Subsection (b)(1) lists the FOIA, 5 U.S.C. § 552, as one law that does apply to USPS. See 39

U.S.C. § 410(b)(1). However, the PRA further provides that "[s]ubsection (b)(1) . . . shall not

require the disclosure of" certain categories of information, including "the reports and

memoranda of consultants or independent contractors except to the extent that they would be

required to be disclosed if prepared within the Postal Service." Id. § 410(c)(5).

     The one area where the PRA retained a check on USPS's independence is in connection

with setting postal rates. There, USPS remained subject to certain constraints due to the PRA's

-4-

creation of the Postal Rate Commission, an independent agency; the PRA "carefully crafted a unique ratemaking structure that created a deliberate tension between" the Commission, which is responsible for providing rate recommendations, and USPS, which has final rate approval authority.  Mail Order Ass'n, 986 F.2d at 520.

_____On December 20, 2006, Congress amended some sections of the PRA through the enactment of the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198.  These amendments were aimed at further modernizing the Postal Service and updating the ratemaking process.  See, e.g., 152 Cong. Rec. H9160-02, H9182 (daily ed. Dec. 8, 2006) (statements of Reps. Miller, Shays).  Among other things, the PAEA renamed the Postal Rate Commission as the Postal Regulatory Commission ("PRC") and expanded its oversight responsibilities over USPS activities.  See PAEA, Pub. L. No. 109-435, §§ 601-605 (codified at 39 U.S.C. §§ 501-505).  The PAEA also set forth the requirement that USPS, within a year of the PAEA's enactment, and in consultation with the PRC, "establish . . . a set of service standards for market-dominant products," id. § 301 (codified at 39 U.S.C. § 3691(a)), and submit a plan to Congress six months afterwards for meeting these new standards, id. § 302 (set forth at 39 U.S.C. § 3691 Note).  The PAEA provides that the service standards promulgated pursuant to this requirement may be challenged by filing a complaint with the PRC.  Id. § 301 (codified at 39 U.S.C. § 3691(d)).

## **FACTUAL BACKGROUND**

Defendant MTAC[1] was formed for the purpose of "shar[ing] technical information"

---

[1]Undersigned counsel do not represent MTAC in this action.  However, if this Court grants the federal defendant's motion to dismiss, the Complaint should be dismissed as to MTAC as well since there can be no FACA claim against MTAC if there is none against USPS.

between mailers and USPS and allowing mailers to provide USPS with "advice and recommendations on matters concerning mail-related products and services in order to enhance customer value and expand the use of these products and services for mutual benefit." Compl. ¶ 13. By letter dated November 16, 2006, plaintiff APWU submitted a request to USPS's Vice President for Customer Service, who is also the MTAC Co-Chair for the Postal Service, for information about MTAC's members and work groups, including copies of work group reports, agendas, updates, and recommendations. Compl. ¶ 29. APWU also requested a username and password for MTAC's on-line MITS system. Id. In addition, APWU sought information on how to arrange attendance at meetings of MTAC and its work groups. Id. APWU's letter was routed to John Dockins, the USPS Contract Administrator for APWU, who responded to APWU's request on December 8, 2006, asking APWU to explain the relevance of the information APWU requested to APWU's collective bargaining agreement. Compl. ¶ 30.

On January 9, 2007, legal counsel for APWU sent a letter in response to MTAC's December 8, 2006, letter, reiterating APWU's request and invoking FACA as a basis for USPS's and MTAC's obligation to provide the requested information and documents and to allow APWU to attend MTAC meetings. Compl. ¶ 31. In his January 26, 2007, reply, Mr. Dockins stated USPS's position that FACA does not apply to USPS. Compl. ¶ 32. He also noted that MITS user names and passwords are restricted to MTAC members and work group participants, and that attendance at MTAC and MTAC work group meetings is restricted to MTAC members and invited or approved guests. Id. Nevertheless, Mr. Dockins did provide APWU with some of the information it had requested that was publicly available, including lists of all MTAC members and work groups, descriptions of the subject areas of each work group, a schedule of

future MTAC meetings, MTAC General Session minutes from the prior year, and copies of work group reports, agendas, updates and recommendations from the prior year to the extent these were reported in the General Session minutes.  Id.  Mr. Dockins also indicated that APWU could obtain previous years' General Session minutes at USPS's cost to produce them.

On February 13, 2007, APWU's counsel responded that the documents produced "are of only limited utility since the most informative items, are merely descriptions of the subjects discussed, which in turn refer to more detailed presentations and reports that have not been produced."  Compl. ¶ 33.  APWU asked for these other documents and again asked for MITS access and to attend MTAC meetings.  Id.

USPS replied on April 2, 2007, indicating that it was treating APWU's February 13 letter "as an informal Freedom of Information Act (FOIA) request."  Compl ¶ 37.  In addition to the information USPS had previously released, USPS indicated it would "provide a list of active work group members and currently scheduled future meetings of active work groups."  However, it stated that other requested information would be withheld in accord with FOIA exemptions 3 and 5.  Compl ¶ 37.[2]  Specifically, it explained that the reports, agendas, updates, and recommendations of MTAC work groups are predecisional deliberative materials, within the FOIA exemption set forth at 5 U.S.C. § 552(b)(5).  Compl. ¶ 37.  In addition, it invoked a PRA provision, 39 U.S.C. § 410(c)(5), as a law that specifically exempts MTAC and MTAC work group records because MTAC qualifies as a "consultant" under § 410(c)(5).  Compl. ¶ 37.  USPS denied APWU's requests for MITS access and for attendance at MTAC meetings as outside the

_____

[2]The Complaint, ¶ 37, actually mentions FOIA exemption 5 twice; USPS understands plaintiffs to have intended the second occurrence of "FOIA exemption 5" to read "FOIA exemption 3, which exempts materials exempted by other statutes."  See 5 U.S.C. § 552(b)(3).

scope of what FOIA required.  Id.

According to the Complaint, at some point CAPS applied for membership in MTAC but was not admitted as a member.  Compl. ¶ 54.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), the court's decision whether to dismiss for failure to state a claim upon which relief may be granted is based on "the legal sufficiency of the complaint." DePippo v. Chertoff, 453 F. Supp. 2d 30, 32 (D.D.C. 2006).  The complaint must "giv[e] the defendant fair notice of the claim and the grounds upon which it rests," and the court should dismiss the complaint if the defendant "can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  Id.  In determining whether dismissal is warranted for failure to state a claim, a court may consider "'the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice.'"  Rogers v. Johnson-Norman, 466 F. Supp. 2d 162, 165 n.3 (D.D.C. 2006) (quoting EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997)).  "[T]he court must treat the complaint's factual allegations . . . as true and draw all reasonable inferences therefrom in the plaintiff's favor," but "the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations."  DePippo, 453 F. Supp. 2d at 33.

## ARGUMENT

## I.    FACA DOES NOT APPLY TO USPS

Congress' goal of streamlining Postal Service operations in order to allow it to run with businesslike efficiency is expressed in a PRA provision, 39 U.S.C. § 410(a), which, as discussed

above, exempts USPS from most laws that impose procedural and other regulatory requirements

on other federal agencies.  Neither the PRA nor FACA expressly provide that FACA applies to

USPS, nor would it serve the purposes of either of these laws for USPS to be held subject to

FACA.  As explained below, as an exercise of USPS's business discretion, and of its power to

seek external advice regarding budgetary, contracting, and other operational issues, USPS may

consult with MTAC without complying with FACA's requirements.

> **A.** **Because Congress Intends The Postal Service To Be Run Like A Business, The PRA Broadly Exempts The Postal Service From Laws Regulating Other Federal Agencies**

 Section 410(a) of title 39 provides that USPS may exercise its powers free from

regulation by federal laws that "deal[] with public or Federal contracts, property, works, officers,

employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5."  39 U.S.C.

§ 410(a).  The only exceptions to this exemption are those "provided by subsection (b)" of § 410

or elsewhere in the PRA, or "insofar as [any] such laws remain in force as rules or regulations of

the Postal Service."  Id.

The § 410(a) exemption should be broadly understood in accord with the overall purpose

of the PRA.  As is well established, Congress's intent in enacting the PRA was to convert the

Postal Service from a typical federal agency into an entity that, though focused on the public

service of delivering mail, would operate with the efficiency of a private business.  See Mail

Order Ass'n of Am., 986 F.2d at 519; see also Kuzma v. USPS, 798 F.2d 29, 31 (2d Cir. 1986)

(recognizing Congress' intent that USPS "'be run more like a business'" (quoting Franchise Tax

Bd. v. USPS, 467 U.S. 512, 520 (1984))); Wickwire Gavin, P.D. v. USPS, 356 F.3d 588, 590

(4th Cir. 2004) (same); Portmann v. United States, 674 F.2d 1155, 1168 (7th Cir. 1982) (PRA

was intended to make USPS "capable of delivering the mail in an efficient and 'business like' manner" (quoting H.R. Rep. No. 1104, 2d Sess. 1104, reprinted in 1970 U.S.C.C.A.N. 3649, 3650)).  Legislative history confirms that the phrase "contracts, property, works, officers, employees, budgets, or funds" in § 410(a) encompasses USPS's overall operations as a businesslike entity: "Except as specified in [39 U.S.C. § 410], all laws relating to public works, contracts, employment, appropriations, budgeting, and any other laws governing agency operations are made inapplicable to the Postal Service."  116 Cong. Rec. 21,709 (1970) (ex. A) (emphasis added).  This is because "[l]aws which are appropriate to governmental management generally, which insure compliance with policies which Congress has determined to be in the best public interest for Government agencies generally, are not the best method of control in the case of the post office" and "have proven to be a hindrance to postal modernization."  Id.

Section 410(a) thus exempts USPS from federal regulation by laws that are otherwise generally applicable to federal agencies, other than those laws specified in the PRA, particularly when such regulation would interfere with USPS's business operations or the exercise of its business discretion.  See Kuzma, 798 F.2d at 31 (recognizing that § 410(a) protects USPS's business discretion by exempting USPS from any general laws that would infringe on "the internal operations and managerial functions of the Postal Service"); Leonard v. USPS, 489 F.2d 814, 815 (1st Cir. 1974) (recognizing § 410(a) as subjecting USPS operations to generally applicable federal laws only "by specific reference," otherwise  "vest[ing] [USPS] with considerable autonomy to carry out its mission").  Again, this interpretation is supported by legislative history.  See S. Rep. 91-912, at 5 (1970) (ex. B) (explaining that the USPS's "Board of Governors shall have broad authority and shall not, except as specified, be subject to Federal

-10-

laws dealing with contracts, property, the civil service system, the Budget and Accounting Act of 1921, apportionment of funds, and other laws which in most instances apply to Government agencies and functions"); 118 Cong. Rec. 22,016 (1972) (ex. C) ("Section 410 . . . says that no law is applicable to the Postal Service unless it is set out in title 39 or unless the law is made specifically applicable to the Postal Service."). Consistent with these statements, Congress has regularly ensured that various enactments would apply to USPS by explicitly including USPS in the relevant definitions or by amending 39 U.S.C. § 410(b).[3]

This view is also consistent with USPS's own longstanding interpretation of § 410(a) as exempting it from subsequent legislation that imposes general requirements on federal agencies unless the legislation expressly indicates to the contrary. In 1972, the same year FACA was enacted, a Postal Service representative suggested to Congress that "[t]he Courts would be hard put . . . to impute to Congress an intent to bring the Postal Service within the coverage of [subsequent legislation] that makes no reference to the Postal Service, that is inconsistent with the principles underlying the P[RA], and that deals with subjects not covered in the provisions" expressly mentioned in § 410(b) as applicable to USPS. 118 Cong. Rec. 1535 (1972) (ex. D) (reprinting letter from USPS to the Chairman of the Committee on Post Office and Civil

---

[3] See, e.g., Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, § 9(b)(2)(B), 107 Stat. 1001 (1993) (adding 39 U.S.C. § 410(b)(11)); Government in the Sunshine Act, Pub. L. No. 94-409, 90 Stat. 1241 (1976) (amending 39 U.S.C. § 410(b)(1) to provide for applicability to USPS of Privacy Act and Sunshine Act); Older Americans Amendments of 1975, Pub. L. No. 94-135, § 308, 89 Stat. 713 (defining "Federal department or agency" to mean "any agency . . . includ[ing] [USPS]"); Act of Aug. 9, 1975, Pub. L. No. 94-82, tit. I, 89 Stat. 419 (1975) (adding 39 U.S.C. § 410(b)(7) to provide for applicability to USPS of Occupational Safety and Health Act of 1970); Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 6, 88 Stat. 55 (adding definition of "public agency" that includes "any agency of the United States (including [USPS] . . . )").

Service).

USPS has regarded itself as exempt from FACA from the time of FACA's enactment, and the Office of Management and Budget ("OMB"), accepting this interpretation, has never included USPS advisory committees in the President's annual reports to Congress, required under FACA provision 5 U.S.C. app. 2 § 6.[4]  See OMB, Federal Advisory Committees: First Annual Report of the President (1973), reprinted in 119 Cong. Rec. 14,983-84 (1973) (ex. E)[5] (explaining in a Note at the end of the Summary Data table that USPS "is excluded" from the report based on USPS's position that FACA "is one of the laws from which the Postal Service is exempted by virtue of the P[RA]").  The fact that Congress was informed of USPS's interpretation of § 410(a), yet failed to provide that FACA applies to USPS during subsequent amendments to the PRA, suggests that USPS's interpretation is entitled to judicial deference even if the language of § 410(a) is deemed unclear.  See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 846 (1986) (recognizing that "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress'"); accord Doris Day Animal League v. Veneman, 315 F.3d 297, 300 (D.C. Cir. 2003).

---

[4]The duty to prepare these reports was subsequently transferred to the General Services Administration.  Exec. Order No. 12,024 (Dec. 1, 1977), 42 Fed. Reg. 61445.

[5]The full text of this report is also available at http://www.fido.gov/facadatabase/ PrintedAnnualReports.asp .

**B.**    **Whether Read Narrowly Or Broadly, § 410(a) Exempts USPS's Consultation With MTAC From Federal Regulation Under FACA**

USPS's association with MTAC falls squarely within the category of USPS activities that § 410(a) exempts from laws that otherwise regulate federal agencies. MTAC's Charter, referenced in plaintiffs' Complaint, Compl. ¶ 13, indicates that USPS uses MTAC as a means of sharing information between itself and the mailing industry on mail-related technical issues and mail-related products and services. MTAC's members are comprised of representatives from USPS and from mailer associations and other mailing industry organizations. MTAC thus helps USPS to enhance its customer service and its competitiveness in the mailing market. As described in the Complaint, MTAC work groups "study mail industry problems and issues," and MTAC gives advice to USPS based on these work groups' proposals and recommendations. Compl. ¶ 12. Because MTAC's advice and recommendations concern mailing industry issues, USPS's association with MTAC undoubtedly impacts USPS's contracting, budgeting, and funding operations – all specifically mentioned in § 410(a) as exempt from federal laws that otherwise generally regulate federal agencies. USPS's use of MTAC as a source of information and advice concerning the mailing industry is an exercise of USPS's business discretion, aimed at enhancing its business operations, and is therefore exempt under § 410(a) on that basis as well.

There is support for this view in other provisions of § 410. For example, as the D.C. Circuit has recognized, USPS is exempt under specific language in § 410(a) from the APA provisions that require other federal agencies to engage in public notice and comment procedures as part of their rulemaking process. Nat'l Easter Seal Soc'y, 656 F.2d at 766. In support of this conclusion, the D.C. Circuit cited Congress' concern "that postal efficiency and modernization

-13-

not be hampered by laws that would limit the discretion of the Postal Service's management."

Id. at 767.  If Congress viewed public participation in the actual formulation of USPS's rules as

an unnecessary interference with USPS's business practices, surely Congress did not intend that a

USPS advisory committee such as MTAC, which only provides USPS with recommendations

and is thus at least one step removed from the rulemaking process itself, to be subject to such

requirements.[6]

Moreover, as USPS indicated in its April 2 response to APWU, MTAC qualifies as a

"consultant" to USPS under § 410(c)(5).  MTAC records are thus exempt from disclosure under

FOIA to the same extent that they would be "if prepared within the Postal Service."  39 U.S.C. §

410(c)(5).  Under FOIA's exemption 5, 5 U.S.C. § 552(b)(5), this would include predecisional

deliberative materials prepared by MTAC.  However, this express provision of the PRA would

be rendered meaningless if MTAC were required under FACA, 5 U.S.C. app. 2 § 10(b), to

disclose these very records.

C.    **There Is No Indication In FACA's Text Or Purpose That Congress Intended USPS To Be Subject To FACA's Requirements**

Though FACA was enacted two years after the PRA, FACA does not expressly state that

it applies to USPS.  As discussed above, this omission indicates that Congress intended the

exemption in § 410(a) to apply.  See Kuzma, 798 F.2d at 32 (holding that Congress's failure to

refer expressly to USPS in the Paperwork Reduction Act, enacted ten years after FACA, evinced

---

[6]Congress has subjected USPS to some laws that advance the principle of open government, such as FOIA and the Sunshine Act.  See 39 U.S.C. § 410(b)(1).  The determination of the appropriate balance between the interest in applying a particular law to USPS and the possible burden that law might impose on the efficiency of USPS operations is properly left to Congress.

a lack of intent that the Act apply to USPS).

Significantly, recognizing USPS's exemption from FACA under § 410(a) does not undermine the achievement of FACA's purposes. As discussed above, FACA was intended to address "the wasteful expenditure of public funds" by federal agencies on the production of "biased proposals" by advisory committees dominated by special interest groups. Public Citizen, 491 U.S. at 453. However, the PRA to a large extent removed USPS's operations from budgetary oversight, placing USPS "on an independent financial basis" by establishing a "self-sustaining Postal Service Fund within the Treasury Department, and by entrusting the Service with broad financing powers." Portmann, 674 F.2d at 1168 (citing 39 U.S.C. §§ 2003-2009); see also Leonard, 489 F.2d at 817 (recognizing USPS's authority to settle a case independent of the Department of Justice where the settlement funds "are to come from the special Postal Service Fund").

Moreover, FACA's concern with ensuring unbiased government policymaking is not implicated by USPS's association with MTAC. As the D.C. Circuit has recognized, "'[d]elivering the mail is simply not in the same category of policymaking and program-development as foreign policy, national defense, housing, highway construction, or health and education assistance to State and local governments. It is an essential, business-oriented service.'" Nat'l Easter Seal Soc'y, 656 F.2d at 767 (quoting 116 Cong. Rec. 21,709 (1970)). In accord with USPS's "business-like" character, any advice provided by MTAC is, as stated in MTAC's charter, intended to enhance USPS's customer service and postal service products. Nothing in FACA suggests that Congress intended to subject this type of business-oriented decisionmaking to FACA's records access and open participation requirements, and to do so

-15-

would merely undermine the efficient operation of the Postal Service that Congress intended to achieve through the PRA.

### D.    Congress's Most Recent Legislation Evinces No Intent To Change USPS's Businesslike Orientation

Plaintiffs' Complaint appears to suggest that Congress' recent enactment of the PAEA, amending PRA provisions as discussed above, should heighten public concern over the possibility that MTAC might unduly influence USPS decisionmaking, particularly in regard to the new "service standards" that USPS is required to establish. Compl. ¶¶ 42-51. However, nothing in the PAEA indicates that Congress has changed its position that USPS should retain autonomy in exercising its business discretion and conducting its affairs in a business-like manner. Moreover, while Congress could have taken the opportunity, during its 2006 revision of Postal Service laws that culminated in the PAEA, to add FACA to the list in § 410(b) of statutes that apply to USPS, it did not do so.

Rather than subjecting USPS to the requirements of FACA, the provisions of the PAEA suggest that any additional oversight that Congress might have contemplated in regard to USPS's establishment of service standards is to be conducted through the PRC. The PAEA provides that the USPS must consult with the PRC when establishing the required service standards. 39 U.S.C. § 3691(a). Subsequently, any complaints regarding the service standards are to be reviewed initially by the PRC, and PRC decisions may be appealed to the U.S. Court of Appeals for the District of Columbia. See id. § 3691(d) (directing that complaints be reviewed in accord with 39 U.S.C. §§ 3662 and 3663). The PAEA is thus entirely consistent with USPS's longstanding position that it may consult with business customers without adhering to FACA.

-16-

The requirements set forth in FACA therefore do not apply to USPS or MTAC. Because the only causes of action alleged in plaintiffs' Complaint are based on FACA, the Complaint should be dismissed for failure to state a claim.

## II. EVEN IF FACA APPLIES TO USPS, PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE ITS PROVISIONS

### A. FACA Does Not Provide a Private Right of Action

Even assuming plaintiffs could establish that FACA was violated, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." Cannon v. Univ. of Chicago, 441 U.S. 677, 688 (1979). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." Alexander v. Sandoval, 532 U.S. 275, 286 (2001). Thus, in determining whether a federal statute provides a private right of action, "'[t]he ultimate question is one of congressional intent.'" Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004) (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 577 (1979)). In its more recent decisions, the Supreme Court "has declined to construe statutes to imply a cause of action where Congress has not expressly provided one." Id. (citing Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 67 n.3 (2001); Alexander, 532 U.S. at 286). Rather, the Court has examined "the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Alexander, 532 U.S. at 286.

"Nothing in the text of FACA supports a finding that Congress intended to create a private right to sue." NRDC v. Abraham, 223 F. Supp. 2d 162, 176 (D.D.C. 2002), set aside on unrelated grounds by NRDC v. Dep't of Energy, 353 F.3d 40 (2004); see also Judicial Watch,

-17-

Inc. v. Nat'l Energy Policy Dev. Group, 219 F. Supp. 2d 20, 33 (D.D.C. 2002) (recognizing that it "ha[d] no choice but to hold that FACA creates no private right of action"), vacated and remanded on unrelated grounds by Cheney v. Dist. Court for Dist. of Columbia, 542 U.S. 367 (2004); Int'l Brominated Solvents Ass'n v. Am. Conf. of Govt'l Indus. Hygienists, Inc., 393 F. Supp. 2d 1362, 1377-78 (M.D. Ga. 2005) ("The Court has carefully studied FACA's text and structure and concludes that neither evinces a congressional intent to confer on private litigants a right to enforce the statute's requirements.").[7]  Significantly, Congress has at least twice, in 1971 and in 1991, rejected legislation that would have provided a right to sue under FACA.  See S. 1637, 92d Cong. § 11 (1971), reprinted in 117 Cong. Rec. 11,444 (1971); S. 2064, 92d Cong. § 14 (1971), reprinted in 117 Cong. Rec. 19,805 (1971); S. 2039, 102d Cong. § 15(a)(1), reprinted in 137 Cong. Rec. 34,603 (1991) (ex. F).  Evidently, Congress considered a private right of action to be unnecessary in light of the mechanisms for congressional and executive oversight built into the statute.  See 5 U.S.C. app. 2 § 5(b)(1)-(3) (providing for continuing congressional review of advisory committee activities); id. § 7 (charging General Services Administration Administrator with maintaining a committee "responsible for all matters related to advisory committees").  "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  Alexander, 532 U.S. at 290.  Because FACA fails to provide a private right of action, plaintiffs cannot maintain a claim against USPS alleging FACA

---

[7]In Cummock, the D.C. Circuit took the opposite view, suggesting that "there is no question under our precedent that members of the public possess enforceable rights to obtain information under FACA."  180 F.3d at 292.  However, this conclusion appears to be based on an assumption rather than an analysis of the text and structure of FACA.  In light of the Supreme Court's intervening decision in Alexander v. Sandoval, members of this Court in NRDC v. Abraham and Judicial Watch correctly determined that the court's conclusion in Cummock must be reexamined.

violations unless some other statutory provision provides a right of action.

### B. The Declaratory Judgment Act Does Not Provide A Right Of Action

Plaintiffs allege in their Complaint that the Declaratory Judgment Act, 28 U.S.C. § 2201, provides a jurisdictional basis for this Court to provide the relief they seek. However, the Declaratory Judgment Act does not itself provide a private right of action and therefore cannot be the vehicle that enables plaintiffs' claims, regardless of the form of their requested relief. See Schilling v. Rogers, 363 U.S. 666, 677 (1960) (holding that plaintiffs had no right of action under the Trading With the Enemy Act and that "the availability of . . . relief [under the Declaratory Judgment Act] presupposes the existence of a judicially remediable right"); Villasenor v. Am. Signature, Inc., No. 06-5493, 2007 WL 2025739, at *6 (N.D. Ill. July 9, 2007) ("Where, as here, there is no private right of action available for an alleged statutory violation, a declaratory judgment claim cannot proceed."); Price v. Caruso, No. 07-117, 2007 WL 1521215, at *1 (W.D. Mich. May 22, 2007) (recognizing as "well established" that the Declaratory Judgment Act "'is procedural only, not substantive, and hence the relevant cause of action must arise under some other federal law'" (quoting Lowe v. Ingalls Shipbuilding, 723 F.2d 1173, 1179 (5th Cir. 1984)).

### C. Plaintiffs Cannot Invoke APA Review To Enforce FACA Against USPS

Plaintiffs do not purport to bring their claims pursuant to the APA, 5 U.S.C. §§ 701-706, nor can they do so. While judicial review of alleged FACA violations may be available under the APA in some cases, see, e.g., Fertilizer Inst. v. EPA, 938 F. Supp. 52, 54 (D.D.C. 1996) (recognizing that FACA claims "must derive from the APA," if they exist at all), USPS is not subject to APA review. As previously noted, the PRA states that "the provisions of chapters 5

-19-

and 7 of title 5[] shall [not] apply to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a). These chapters "constitute the judicial review provisions of the APA." <u>Pitney Bowes Inc. v. USPS</u>, 27 F. Supp. 2d 15, 21 (D.D.C. 1998). Pursuant to this express language, "'the APA is not applicable to the exercise of the powers of the Postal Service.'" <u>Id.</u> (quoting <u>Carlin</u>, 823 F.2d at 622) (internal quotation omitted); <u>see also</u> <u>Nat'l Easter Seal Soc'y</u>, 656 F.2d at 766 (concluding that "Congress intended to make clear" through the language of § 410(a) "that the Postal Service would not be subject to the APA"). In <u>Air Courier Conference v. APWU</u>, 498 U.S. 517 (1991), the three Supreme Court Justices to reach the issue came to the same conclusion. <u>See id.</u> at 531 (Stevens, J., concurring in the judgment, joined by Marshall and Blackmun, JJ.) ("There is no ambiguity in the text of 39 U.S.C. § 410(a). That section . . . provides that the judicial review provisions of the [APA] do not apply to the exercise of the powers of the Postal Service."). The APA therefore cannot provide plaintiffs with a cause of action against USPS for alleged FACA violations.

## III. PLAINTIFFS' CLAIM THAT FACA ENTITLES THEM TO ACCESS MTAC WORK GROUP MEETINGS AND RECORDS IS NOT COGNIZABLE INSOFAR AS MTAC WORK GROUPS DO NOT QUALIFY AS ADVISORY COMMITTEES

In order for plaintiffs' Complaint to state a claim for which relief may be granted, it must allege facts that, if proven, would establish that the defendants are "bound by the federal law" that plaintiffs invoke as the source of their claims. <u>Arbaugh v. Y & H Corp.</u>, 126 S. Ct. 1235, 1242 (2006). In order to fulfill that obligation here, plaintiffs must assert facts sufficient to establish that the entity whose records and meetings plaintiffs seek to access qualifies as an "advisory committee" for purposes of FACA. <u>See</u> <u>Ctr. for Arms Control & Non-Proliferation v.</u>

-20-

Lago, No. 05-682, 2006 WL 3328257, at *1 (D.D.C. Nov. 15, 2006) (dismissing a complaint under Rule 12(b)(6) where plaintiffs were unable to prove the existence of an "advisory committee" subject to FACA). Under FACA, an entity qualifies as an "advisory committee" if it is "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations," subject to exceptions inapplicable here. 5 U.S.C. app. 2 § 3(2)(C). The Supreme Court has recognized that the terms "established" and "utilized" must be read narrowly so that FACA does not sweep more broadly than Congress intended. Public Citizen, 491 U.S. at 462-65. Thus, a committee must actually have been formed by the agency itself or must be within the agency's strict management and control in order to meet FACA's definition. Id. at 456-58.

Here, plaintiffs assert that MTAC was established by USPS and that "MTAC may not meet without a representative of the USPS and approval of the USPS, and the USPS provides administrative support for MTAC." Compl. ¶¶ 11-12. Even if these allegations are sufficient for purposes of plaintiffs' demands for access to MTAC meetings and records, they do not support plaintiffs' assertions in regard to the meetings and records of MTAC work groups.

Plaintiffs have failed to state cognizable claims insofar as they allege defendants violated FACA by failing to grant access to MTAC work group meetings and records because FACA does not apply to work groups unless the work groups themselves qualify as advisory committees. FACA "applies only to committees 'established or utilized *by*' the President or an agency 'in the interest of obtaining advice or recommendations *for* the President or one or more agencies." Nat'l Anti-Hunger Coal. v. Executive Comm., 557 F. Supp. 524, 529 (D.D.C. 1983) (quoting previous version of 5 U.S.C. app. 2 § 3(2)), aff'd, 711 F.2d 1071 (D.C. Cir. 1983). Subgroups,

such as task forces or work groups, that "do not directly advise the President or any federal agency, but rather provide information and recommendations for consideration to" an advisory committee or other nongovernmental entity, are not subject to FACA's requirements.  Id. (holding that task forces that provided advice to an advisory committee but not to the agency were not subject to FACA); see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton, 997 F.2d 898, 913 (D.C. Cir. 1993) (recognizing that when an advisory committee is covered by FACA, it is the committee "that will give the advice to the government," and any "subordinate advisers or consultants . . . are presumably under the control of the" committee); Lombardo v. Handler, 397 F. Supp. 792, 800 (D.D.C. 1975) (a National Academy of Sciences subcommittee was not subject to FACA because the EPA was utilizing the Academy itself, not the subcommittee).  Rather, such subgroups may appropriately be considered staff of an advisory committee where their role is simply to "gather information, explore options . . . , and evaluate alternatives," and to present the product of their labor to the committee for its consideration; the committee, not the subgroup, then engages in producing "ultimate policy recommendations" for the government.  Nat'l Anti-Hunger Coal., 557 F. Supp. at 529.

The only situation in which the D.C. Circuit has held that a subordinate group may independently constitute an advisory committee subject to FACA is where – unlike the situation here – the committee to which it reports is itself "wholly composed of government officials." Ass'n of Am. Physicians & Surgeons, Inc., 997 F.2d at 913.  In that context, the committee is "considered part of the government," and "it is the working group now," rather than the committee, "that is the point of contact between the public and the government."  Id.  The court therefore required further evidence of the working group's status in order to determine whether

FACA applied.  Id.

Here, it is clear that MTAC is not part of the government.  If the Court holds that MTAC does not qualify as an advisory committee because MTAC is not subject to strict USPS management and control, the Court must hold that neither MTAC nor its work groups are subject to FACA.  However, even if the Court holds that MTAC is an advisory committee under FACA, plaintiffs' Complaint fails to allege, or provide any basis for concluding, that MTAC's work groups are themselves advisory committees subject to FACA's requirements.  To the contrary, plaintiffs' Complaint acknowledges that MTAC work groups "study mail industry problems and issues, and propose actions and solutions to MTAC," and that MTAC "in turn gives advice and makes recommendations to the USPS."  Compl. ¶ 12.  Insofar as USPS has not established or utilized MTAC work groups, plaintiffs may not assert entitlement to work group meetings and records under FACA.  These claims must therefore be dismissed under Rule 12(b)(6).

## IV.  PLAINTIFFS HAVE NO COGNIZABLE CLAIM OF ENTITLEMENT TO MTAC MEMBERSHIP OR TO ACCESS MTAC'S MITS WEB SITE

Plaintiffs have failed to state any legal basis for their asserted right to MTAC membership or to access the on-line MTAC Issue Tracking System (MITS).  These claims must therefore be dismissed under Rule 12(b)(6).

In regard to plaintiffs' assertion that defendants violated FACA "by refusing to admit CAPS to membership," Compl. ¶ 27, plaintiffs have failed to identify any legitimate source for such a right.  Plaintiffs have pointed specifically to the FACA provisions that require that advisory committee meetings be "open to the public," that "[i]nterested persons . . . be permitted to attend" such meetings, and that advisory committee records be "available for public inspection

-23-

and copying."  Compl. ¶¶ 58-62 (citing 5 U.S.C. app. 2 § 10(a)-(b)).  However, as the D.C.

Circuit has recognized, neither these nor any other FACA provisions "confer[] [a] cognizable

personal right to an advisory committee appointment."  Nat'l Anti-Hunger Coal., 711 F.2d at

1074 n.2.  Rather, FACA grants agencies discretion in regard to selecting or approving advisory

committee members, so long as the membership is "fairly balanced in terms of the points of view

represented and the functions to be performed."  5 U.S.C. app. 2 § 5(b)(2); see Sanchez v. Pena,

17 F. Supp. 2d 1235, 1238 (D.N.M. 1998) (holding that "the task of creating a 'fair balance' in a

board created pursuant to the FACA is a political one left to the discretion of the agency by

statute").  Plaintiffs cannot therefore obtain MTAC membership through a FACA action, nor is

the assertion of a wrongful denial of membership a cognizable claim under FACA.

Similarly, while plaintiffs assert that they are entitled to access the MITS system under

FACA, 5 U.S.C. app. 2 § 10(b), nothing in FACA could entitle plaintiffs to such access even

assuming that FACA applies to USPS and that MTAC or its work groups are subject to FACA's

requirements.  Section 10(b) provides that advisory committee records "shall be available for

public inspection and copying at a single location in the offices of the advisory committee or the

agency to which the advisory committee reports until the advisory committee ceases to exist."  5

U.S.C. app. 2 § 10(b).  Nothing in this language obligates an agency or an advisory committee to

provide the general public with passwords in order to access an internet site that the advisory

committee elects to maintain for the benefit of its members.   Rather, FACA leaves the manner of

providing access, and the location in which it will be provided, up to the agency or advisory

committee.

Because FACA provides no basis for plaintiffs' assertions of entitlement to MTAC

-24-

membership or a MITS password, these claims are subject to dismissal under Rule 12(b)(6).

## <u>CONCLUSION</u>

For the foregoing reasons, this action should be dismissed in its entirety.

Dated: August 17, 2007          Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney

/s/ Kathryn L. Wyer
ARTHUR R. GOLDBERG
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C.  20530
Telephone: (202) 616-8475 / Fax: (202) 616-8202
kathryn.wyer@usdoj.gov
*Attorneys for Federal Defendant*
*United States Postal Service*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES POSTAL SERVICE, | ) ) |
| MAILERS TECHNICAL ADVISORY COMMITTEE, | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 07-0990 (JR)

**[Proposed] ORDER**

Upon the Court's consideration of the federal defendant's motion to dismiss and the

opposition thereto, it is, this _____ day of _____, 2007,

ORDERED that the federal defendant's motion to dismiss is granted; and it is

FURTHER ORDERED that plaintiffs' Complaint is dismissed with prejudice in its

entirety.

_____
The Honorable James Robertson
United States District Judge

Nation, and from 87 countries of the world. Enrollment in this centennial year will reach 50,000 students. The number of living graduates will reach 150,000 as Ohio State annually adds new alumni to serve in all the major fields of business and professional endeavor.

The university is a major resource for the future progress and well-being of the people of Ohio and of the Nation. To help insure that the full benefits of this great resource are available to the people, Ohio State has undertaken a centennial development fund. The fund is designed to make possible, through private gifts, the extra measure of financial support which can open the way to a new century of unprecedented service.

For its record of accomplishment during its first century; for its great potential for future contributions; for its able faculty and staff and its distinguished president, Dr. Novice G. Fawcett, the Ohio State University merits the commendation and support of the people of Ohio and of the Nation.

The committee is of the opinion that this concurrent resolution has a meritorious purpose and accordingly recommends favorable consideration of House concurrent resolution 573 without amendment.

## CONGRATULATIONS AND GREETINGS TO OHIO NORTHERN UNIVERSITY ON THE 100TH ANNIVERSARY OF ITS FOUNDING

The concurrent resolution (H. Con. Res. 575), that the Congress sends congratulations and greetings to Ohio Northern University on the occasion of the 100th anniversary of its founding and extends the hope of the people of the United States that Ohio Northern University will continue to grow and prosper in centuries yet to come, was considered and agreed to.

Mr. MANSFIELD. Mr. President, I ask unanimous consent to have printed in the RECORD an excerpt from the report (No. 91-964), explaining the purposes of the measure.

There being no objection, the excerpt was ordered to be printed in the RECORD, as follows:

PURPOSE

Purpose of the concurrent resolution is to provide that the Congress sends congratulations and greetings to Ohio Northern University on the occasion of the 100th anniversary of its founding and extends the hope of the people of the United States that Ohio Northern University will continue to grow and prosper in centuries yet to come.

STATEMENT

Ohio Northern University, of Ada, Ohio, will observe its centennial year from August 14, 1970, through August 13, 1971. The university of the United Methodist Church has 2,300 students enrolled in colleges of liberal arts, engineering, pharmacy, and law. It is one of the few institutions in the country combining a liberal arts curriculum with colleges of engineering, pharmacy, and law.

Since it was founded in 1871 by Dr. Henry Solomon Lehr, Ohio Northern University has graduated more than 20,000 persons. Today there are more than 11,000 living alumni serving their communities and the Nation in all 50 States in the Nation and in many foreign countries.

The following Ohio Northern University degree holders are currently serving in the U.S. Congress: William M. McCulloch, Delbert Latta, Frank T. Bow, and Jackson Betts. At one time four Ohio Northern University graduates were concurrently U.S. Senators: Frank B. Willis, Simeon D. Fess, Arthur J. Robinson, and John M. Robison.

One-third of the pharmacists in Ohio completed their college work at Ohio Northern University. More than 1,100 attorneys with law degrees from Ohio Northern University are serving in Ohio and neighboring States. In excess of 12,000 engineering graduates are employed by private industries, State, and county offices, as well as at the Federal level. And many hundreds of teachers, business leaders, and housewives are devoted alumni of this independent university.

The university has grown from a normal school serving northwest Ohio to one of the complex private universities in the State of Ohio. It has survived depressions which threatened it financially; it has survived wars which took its students; it has survived today's campus turmoil by standing on its principles. The university seeks to graduate students imbued with Christian ideals, accomplished in scholastic achievement, inspired with a desire to contribute to the good of mankind, and committed to a way of life that will result in a maximum of personal and social worth.

In recent years, the university has grown at an unprecedented rate in every way: academically, physically, and financially. A new liberal arts curriculum has gained widespread interest among educators. More than 42 percent of the 168 full-time faculty members have the doctorate degree and have attended more than 150 different colleges and universities. Ohio Northern University has a teaching faculty with research playing a secondary role.

The university is governed by a board of trustees of 42 members who determine the major basic policies. The trustees select the president of the university, who is Dr. Samuel L. Meyer, and delegate to him the authority and responsibility for the operation of the university.

The university is in the midst of a $6,910,000 development campaign. The campaign is expected to be successfully completed by the end of the centennial year in August of 1971. Funds will provide new buildings, operating funds, and more endowment.

The committee is of the opinion that this resolution has a meritorious purpose and accordingly recommends favorable consideration of H. Con. Res. 575.

## THE POSTAL REORGANIZATION ACT

The Senate resumed the consideration of the bill (S. 3842) to improve and modernize the postal service, to reorganize the Post Office Department, and for other purposes.

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER (Mr. COOK). The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. McGEE. Mr. President, may I ask the Chair, what is the pending business?

The PRESIDING OFFICER (Mr. COOK). The pending business is S. 3842, an act to reform the postal service.

Mr. McGEE. Mr. President, I send to the desk a series of amendments to the bill S. 3842, and ask that they be considered en bloc.

All but two of these amendments are technical, correcting typographical errors in the bill as reported.

Two amendments are substantive: One to limit the 8 percent salary increase for

employees in the postal field service to a rate not higher than the rate now in effect for level V of the Executive Salary Schedule, which is $36,000 a year; and the other to permit a retired employee of the Government of the United States who is receiving a civil service retirement annuity to serve as a Governor on the Board of Governors of the U.S. Postal Service without having his salary reduced by the amount of his civil service retirement annuity, as is now done in the case of any reemployed annuitant.

The purpose of this amendment, in essence, is to permit the appointment of a retired postal officer or employee, whose expertise would undoubtedly serve the new agency well, to the Board of Governors without charging him a very substantial, or in some cases, a complete, reduction in his $10,000 a year salary as a Governor on the Board. By the same token, the amendment would prohibit such a reemployed annuitant to receive additional retirement credit based on his service as a Governor of the Board of Governors.

I ask that the amendments be agreed to.

The PRESIDING OFFICER (Mr. COOK). Without objection, the amendments will be printed in the RECORD, and without objection, the amendments are considered and agreed to en bloc.

The amendments agreed to en bloc are as follows:

On page 188, line 4, amend paragraph (6) so as to read:

"(6) may be redeemable before maturity in such manner, at such times, and at such redemption premiums as the Board may determine;".

On page 189, line 8, after the word "inheritance" delete the period and insert a comma in lieu thereof.

On page 196, between lines 1 and 3, in the small type indicating the subjects of the sections, in the line beginning "2701., delete the final "s" in the word "adjustments".

On page 209, line 14, delete the comma after the word "address".

On page 227, line 24, delete the hyphen between the words "upper" and "right-hand" so as to read "upper right-hand".

On page 230, line 16, strike out "other than any" and insert in lieu thereof "less an amount equal to the".

On page 237, lines 10 and 11, delete the words "recommended decision to the Commission for reconsideration and a further".

On page 244, line 6, strike out the number "3707" and insert in lieu thereof the number "3708".

On page 246, at line 15, strike out "(6)" and insert "(7)" in lieu thereof.

On page 251, line 3, delete the word "and".

On page 255, at line 25, insert the words "carrier or" after the word "any".

On page 256, at line 5, insert the words "carriers or" after the word "other".

On page 265, line 17, insert after the word "the" after the word "of".

On page 268, between lines 18 and 19, insert the following:

"(16) Section 8331(1) is amended—

"(A) by striking out "or" at the end of clause (viii);

"(B) by striking out the period at the end of clause (ix) and inserting in lieu thereof a semicolon and the following: "and"; and

"(C) by adding at the end thereof the following:

"(x) a Governor of the Board of Governors of the United States Postal Service.".

(17) Section 8344 is amended by adding at the end thereof the following new subsection:

"(c) This section does not apply to an individual appointed to serve as a Governor of the Board of Governors of the United States Postal Service."

On page 271, lines 18 and 24, delete the word "the".

On page 280, line 22, insert "(a)" before "The".

On page 281, between lines 4 and 5, insert the following new subsection:

"(b) No rate of basic pay or compensation, in excess of the rate of basic pay for level V of the Executive Schedule in section 5316 of title 5, United States Code, shall be paid by reason of the enactment of this section."

On page 283, line 8, add the letter "s" to the word "section".

On page 232, line 11, after the period insert the following:

"The rate for each such class shall be uniform throughout the United States, its territories and possessions.".

On page 232, line 13, insert "of such a class" after the word "letter" and strike out all after the word "origin" down through the word "addressee" in line 16.

On page 232, line 19, strike out the words "or parcel".

Mr. McGEE. Mr. President, I am reluctant to read a statement on the floor of the Senate because it violates a deep principle of mine, and I have never been caught in that act before. However, because of the occasion this is, and the subject at hand, it is especially forgivable that I do so because there are so few Senators in the Chamber at this late hour that it would do no violence to anyone's patience and I believe it is important that the carefully worded language of the description of this measure and its implications, in light of the committee's action, be made explicitly clear.

For all these reasons, I shall read the draft in order to lay the groundwork for the debate that will follow in the wake of laying down this bill, debate that will get underway, by agreement, sometime on Monday next.

Mr. President, the bill which the Committee on Post Office and Civil Service recommends for enactment by the Senate today, S. 3842, to improve and modernize the postal service and to establish the U.S. Postal Service is based on the critical needs which our Nation's postal system has faced for several years and the answers to these problems which the committee considers to be the most effective resolution to insure long-range improvement of all aspects of postal operations.

For many, many years officials of the Government and the public generally have taken too little notice of the gradually increasing problems of the Post Office. We have relied upon inefficient and expensive solutions of a short-range nature. It is neither relevant nor helpful to cite that 30 years ago, postal clerks and letter carriers were often recruited from among the ranks of college graduates; or that a postal job in a town of 5,000 or 6,000 people was always eagerly sought after because of its pay and security; or that the postal system will run itself if management will just leave the workers alone; or any of the other meaningless homilies, however well intended, which have been uttered in reference to the postal service in the past, as well as the present.

To paraphrase Mark Twain on the weather, everybody talks about poor postal service, but nobody does anything about it. I might inject the extra complication that we have about 200 million postmasters general in the United States. Each person has his own solution for the one part that seems to affect him. The legislation we recommend in S. 3842 will reverse that—we will do something about it.

The recent history of the Post Office Department is fairly well known. The Chicago mail strike at Christmas, 1966, alerted the Nation to the problem of a serious mail service breakdown. Larry O'Brien, then the Postmaster General, recommended the conversion of the Post Office Department from its historic position as a Cabinet-level executive department with a Postmaster General nominated by the President and confirmed by the Senate, and with most of its managerial officials appointed on the basis of political affiliation, to an independent, government-controlled corporation divorced as far as possible from the influence and pressures of partisan political considerations.

President Johnson appointed a Presidential commission, known as the Kappel Commission, which conducted a searching inquiry into all aspects of postal operations. In May 1968, the Commission confirmed Mr. O'Brien's recommendation that the Post Office be established as a public service agency outside of the normal channels of political government.

After several months' study in 1969, the Post Office Department in the Nixon administration endorsed the O'Brien-Kappel recommendation, proposing a government corporation to operate the postal service. In October 1969 the Senate committee began its public hearings and during most of this year the committee, either formally or informally, has been developing legislation to enact into law basic structural reform and reorganization.

In March of this year, postal workers in New York City and a few other large metropolitan areas walked off the job, and the Nation felt the first real paralysis of a postal strike. The Postmaster General and Deputy Postmaster General sat down with the representatives of the AFL-CIO craft unions in the postal service and negotiated an agreement to resolve the dispute. The first portion that agreement, a 6-percent increase in postal pay retroactive to the last pay period in December, was enacted into law in April, Public Law 91-231. The last portion of the agreement, establishing a new postal system and a further 8-percent increase in postal pay, is embodied in H.R. 17070, which recently passed the House, and S. 3842, the pending bill.

In the meantime, on March 19, the ranking minority member of the Senate Committee on Post Office and Civil Service (Mr. FONG) and I jointly sponsored S. 3613, a postal reorganization bill of our own making, and after numerous executive sessions and considerable discussion with the Postmaster General and the Deputy Postmaster General, the bill evolved into the form presented in S. 3842, as we introduced that measure on May 14. On June 3, the committee reported S. 3842 with an amendment in the nature of a substitute, but only the provisions relating to transportation of mail differ significantly from the bill as it was originally introduced by the Senator from Hawaii and me.

In the committee's judgment, there are four general problem areas in the postal system today that need to be resolved. Our bill is designed to meet those specific needs and give the new U.S. Postal Service the power, as well as the duty, to fulfill their delegated responsibility to operate a postal system as Congress, by article 1, section 8, of the Constitution is empowered to establish.

The four problem areas are these:

First. The organization of the Post Office as a Cabinet-level department of the executive branch, under the control of the incumbent political administration and subject to annual reviews of programs and spending by the Congress through its legislative oversight as well as its appropriations process;

Second. The lack of any significant control by the Postmaster General over either revenues or expenditures of the postal system;

Third. The inability to develop long-range postal modernization planning and to finance such planning on other than an annual basis subject to review by the Bureau of the Budget and the appropriations process; and

Fourth. The frequent change of the individuals serving in policymaking and administrative positions in the headquarters and regional offices of the Postal Service, which diminishes the effectiveness of management to understand and resolve problems.

My statement this afternoon will relate to the nature and effect of these problems and how the committee recommendation in S. 3842 proposes to solve them.

POSTAL ORGANIZATION

Mr. President, the first broad area requiring legislative change is that of the basic organization and structure of the Post Office Department. Since before the Constitution was ratified and our Government was established, the Post Office has existed as a Cabinet-level Department of the executive branch. The Postmaster General has always been a Member of the President's Cabinet and the dignity of his office has always been equated with the highest level of presidential appointments. To change that system involves a major policy judgment, but unless that system is changed we believe that the nature of our political institution will continue to make the Post Office heavily reliant upon the policies and programs of the incumbent political party and administration. Because we believe that policies and program developments are a negligible factor in the operation of the Post Office, we recommend the transfer of the postal service from a Cabinet department to an independent agency.

As part of the reorganization of the

system, another problem we faced was that of removing the post office from what is called partisan politics. As a politician, I find nothing wrong with politics in Government, any more than there is anything wrong with politics in business or education or anywhere else. I am confident that there will be politics in the Post Office whether it is a Government corporation or a subcommittee of the PTA. But what we specifically attempt to achieve, first of all, is to eliminate political affiliation or political recommendations from being a predominant or even an influential factor in the selection of people to work in the Post Office, whether such a person is the son of a county chairman or the president of a bank.

No Postmaster General, including Benjamin Franklin, was ever appointed to the job because he was an expert in postal operations. The role of political endorsement in the selection of postmasters and rural carriers and even the promotion of employees to supervisory positions, is historic and well known. In some cases, the selection from the civil service register as a clerk or carrier has been made on the basis of political endorsement over other equally well-qualified applicants. Regional directors, high-level headquarters officials, and most other jobs or positions above the rank-and-file echelon have been filled, at least most of the time, on the basis of what national party won the most recent election.

The Senate has expressed its judgment on this point on several occasions. In 1967, S. 355, which passed this Chamber by a vote of 72 to 9, included a provision to abolish the Senate confirmation of postmasters. In 1969, S. 1583 passed the Senate unanimously, eliminating political considerations in the appointment of all postal employees.

Establishing a system for nonpolitical appointments of individuals to positions in the Postal Service is just the first step in creating the agency structure necessary to insure postal modernization. Federal statutes relating to contracts, employment policies, apportionment of appropriations, the development and submission of budgetary requests to the Congress for its consideration, and the acquisition and disposition of real and personal property impose restrictions which in our view are not desirable if we intend to operate the Post Office as an independent public service agency of the Government. Laws which are appropriate to governmental management generally, which insure compliance with policies which Congress has determined to be in the best public interest for Government agencies generally, are not the best method of control in the case of the post office. They have proven to be a hindrance to postal modernization.

Annual budgets and annual appropriations for all aspects of postal operations prevent the Postmaster General from establishing long-range modernization programs and a blueprint for postal progress which he and his subordinates can be assured will continue in effect beyond the fiscal year. Until just a few years ago, there was no such thing as a 5-year plan in the post office, such as

characterizes the planning of every major industry in the United States. The irony of this is that the post office is the largest business enterprise in the country. It has more than 30,000 post offices, about 10,000 additional contract stations, some 30,000 rural routes and more than three-quarters of a million employees; it handles more than 80 billion pieces of mail a year, and will next year spend close to $8 billion. Yet planning for the future is extremely difficult and in all cases subject to the restrictions, limitation, modification, and personal predilections of the Bureau of the Budget and the four committees of the Congress which render the final judgment on postal operations.

Critics of postal reorganization point out that all other agencies of the Federal Government operate under the restrictions of applicable law and annual budgetary review and appropriations procedures. The committee's judgment is that that point is not really an answer, and that even if it were, the nature of the postal service is such that it will be improved by removing it from that process. Delivering the mail is simply not in the same category of policymaking and program-development as foreign policy, national defense, housing, highway construction, or health and education assistance to State and local governments. It is an essential, business-oriented service. The committee has no intention of establishing any postal system which does not have a direct and continuing responsibility to the people and to Congress, but we do believe that its role can be fulfilled with a greater degree of efficiency if it is removed from the ordinary channels, administrative controls, and legislative restrictions of other agencies in the executive branch.

S. 3842 does that by establishing the U.S. Postal Service as, an independent establishment of the executive branch—neither an ordinary Federal agency or Department nor a Government corporation. The executive authority shall be vested in a nine-man Board of Governors nominated by the President and confirmed by the Senate to serve a term of 9 years each, with a new member being appointed every year. The Governors, in turn, will appoint the Postmaster and the Deputy Postmaster General to serve as the chief executive officers of the Postal Service.

The purpose of this system of organization is to establish a buffer between operating management in the Post Office and either the President in the executive branch or the Congress in the legislative branch. The function of the Board of Governors is to insure independence for operating management. All authority shall be vested in the Board, and almost all authority may be designated to the Postmaster General or other subordinate officers. The only matters in which the Governors themselves must in all cases exercise their responsibility is in the approval of postal rate commendations are made inapplicable to the Post Office and in the selection or removal of the Postal Rate Commission, and in the selection or removal of the Postmaster General and the Deputy Postmaster General.

Except as specified in the bill, all laws relating to public works, contracts, employment, appropriations, budgeting, and any other laws governing agency operations are made inapplicable to the Post Office. The laws which are retained and made applicable include Federal standards for wages and hours, employment of retired military officers, security clearance and employment checks on applicants, the prohibition against employees striking against the Government, freedom of information for the public, veterans preference, and laws relating to labor management, which will be discussed in greater detail in a moment.

We believe this organizational structure will work. The key factor in reaching our decision has been the committee's desire that the Post Office be freed from its own past; that the new U.S. Postal Service be given a clean slate, and a real opportunity to correct all of the errors, as well as to benefit by all of the experiences of the past, and to plan anew to establish a postal system that will do the job well.

CONTROL OVER EXPENDITURES AND REVENUES

The second major area of postal reform is that the Postmaster General and his subordinate officers do not have the power to control to any significant degree either the expenditures or the revenues of the postal system. They do not set the rates charged users of the mail except for the relatively small, and legislatively controlled, costs attributable to parcel post operations and a few fees for special delivery stamps and things like that; and they do not set wages or any other monetary benefits for postal employees. This, I ought to add, refers to the existing Postmaster General and his subordinate officers. Wages, including fringe benefits, for fiscal year 1969 cost $5,826 million; while revenues in the same fiscal year amounted to $6,114 million. So it is obvious that the lack of control can present a very serious problem for the Postmaster General.

Except when a postal emergency arises of catastrophic proportions, he cannot embargo mail because the volume is overwhelming. He has only limited authority, and most of that through persuasion, to require large volume mailers to comply with the demands of peaks and valleys and the day-to-day operations of the Post Office. He is subject to the whim of the public—often difficult to anticipate—which may flood the mails with packages at Christmastime, cards on Valentine's day, or letters to Members of Congress complaining about poor postal service. As Postmaster General O'Brien told the House Appropriations Subcommittee several years ago, he has virtually no control over the business which he is appointed to operate.

About 80 percent of postal costs are for the payroll of 750,000 postmasters, supervisors, clerks, letter carriers, mail handlers, rural mail carriers, and other employees, all of whom are paid at rates established by law enacted by Congress. If the Congress decides that postal employees are entitled to a 6- or 8-percent-pay increase, then we enact it; and unless the President vetoes it and Congress does not override the veto, the Post-

# Calendar No. 913

| 91st Congress ⎰<br>2d Session ⎱ | SENATE | ⎱ Report<br>No. 91–912 |
|---|---|---|

## POSTAL REORGANIZATION

JUNE 3, 1970.—Ordered to be printed

Mr. McGEE, from the Committee on Post Office and Civil Service, submitted the following

## REPORT

[To accompany S. 3842]

together with

## INDIVIDUAL AND SUPPLEMENTAL VIEWS

The Committee on Post Office and Civil Service, to which was referred the bill (S. 3842) to improve and modernize the postal service and to establish the United States Postal Service, having considered the same, reports favorably thereon with an amendment and recommends that the bill (as amended) do pass.

### STATEMENT

The provisions of S. 3842 result from one of the longest and most intensive studies in the committee's history. After public hearings extending over 2 months, the committee has met in a continuing series of working sessions in which solutions, alternative solutions, and new approaches have been tested in incisive discourse ranging across the broad scope of postal activities and postal problems.

In addition to formal executive sessions, the chairman, the ranking minority member, other members, and staff have met repeatedly with the Postmaster General, the Deputy Postmaster General, the General Counsel, and other Department representatives to weigh the questions together and to seek reasonable solutions. The bill as reported, representing only the views of the committee, thus incorporates a substantial number of Administration recommendations, and, in toto, reflects the committee's careful evaluation of the Department's position on each issue. Mailers have been consulted and heard. Employee organization leaders, having agreed to support postal reform, have presented their views on a variety of postal questions, including labor-management relations, for committee consideration.

37–010—70——1

5

## ORGANIZATION OF POSTAL SERVICE

The committee recommends that all authority for operations be vested in the Board of Governors of the U.S. Postal Service. Nine of the members of the Board, who are Governors, shall be appointed by the President, with Senate confirmation, on a bipartisan basis. The Governors appoint a Postmaster General, who will be a voting member of the Board of Governors, and the Governors with the Postmaster General appoint a Deputy Postmaster General, who will also be a voting member of the Board of Governors. Four additional nonvoting members of the Board shall be Members of Congress—two Senators and two Representatives.

The Board of Governors shall have broad authority and shall not, except as specified, be subject to Federal laws dealing with contracts, property, the civil service system, the Budget and Accounting Act of 1921, apportionment of funds, and other laws which in most instances apply to Government agencies and functions. Among other powers, the Board may issue rules governing the Postal Service, provide for the collection and delivery of mail, establish postal rates and mail classification, establish postal facilities and services, investigate postal offenses, sell property, borrow money, hire and direct its employees, and take such other actions as it deems necessary and proper to operate the Postal Service.

Except for the powers specifically vested in the Governors themselves, as distinguished from the Board of Governors, the Governors may delegate their executive authority to the Postmaster General or such other officers or employees of the Postal Service as they wish. The power to decide on postal rates and mail classifications shall not be delegated, and the Postmaster General and the Deputy Postmaster General are not permitted to vote on those issues.

The committee recommends the administration's proposal for a Postal Service Advisory Council, consisting of representatives from postal labor unions, organized mail users, and the general public, which shall have the privilege of consulting with and giving advice to the Board of Governors.

## EMPLOYEE RELATIONS

The committee recommends the enactment of the labor-management agreement made between the Post Office Department and the AFL.–CIO postal unions in April 1970.

The committee recommends that upon the establishment of the U.S. Postal Service, all employees of the Post Office Department be transferred to the U.S. Postal Service. Employees who have competitive status under the Civil Service Act of 1883 shall automatically achieve career tenure under the postal career system, but thereafter the provisions of title 5, United States Code, relating to the competitive service shall not apply to officers and employees of the Postal Service. The Postal Service shall establish, pursuant to its collective bargaining agreements with postal labor unions and its programs developed for the offices and employees not subject to such agreements, a system which will assure career development and protection of employment rights. The postal career service shall be a part of the "civil service" as

ROTH). Under the rules of the Senate, visitors in the galleries will please not demonstrate in any way.

The Senator from Wyoming may proceed.

Mr. McGEE. Mr. President, I wanted to make sure that all of the possibilities were clear in relation to each other on this bill.

Mr. President, although I support the enactment of S. 3001 to establish a Federal Financing Bank and improve coordination in the issuance of government obligations, I would like to make it clear that the authority vested in the Secretary of the Treasury to control issuances should not be construed to override the authority vested in the Postal Service to issue obligations under the financing provisions of the Postal Reorganization Act.

Getting the money to finance construction of modern postal facilities was a major reason for the enactment of the Postal Reorganization Act. As long ago as 1953 Congress attempted to establish an independent means of financing new construction in the post office without having to secure the blessings of the Bureau of the Budget and attain from the Congress annual appropriations to finance such projects. In my statement to the Senate on the Postal Reorganization Act, a little more than 2 years ago, I dwelled at some length on the problem of obtaining no-year money and the need for authorizing long-term borrowing at the post office. Chapter 20 of title 39, as enacted in the Postal Reorganization Act, authorizes the Postal Service to issue up to $10 billion in its own bonds outstanding at any one time.

The provisions of section 2006 of title 39 sets out in detail the procedure for bond issuance. Under that law the Postal Service is required to consult with the Secretary of the Treasury at least 15 days before it intends to issue a bond and the Secretary of the Treasury is empowered to recommend coordination of the time and place and conditions of the sale. However, the only control over the sale is that if he does not want the post office to go into the marketplace to sell its bonds he may preempt the issue, that is, buy it up himself. Otherwise, the Postal Service is free to go ahead and market the obligations if there are any buyers.

Section 410 of title 39 related to the applicability of Federal laws to the Postal Service. Among other things that section says that no law is applicable to the Postal Service unless it is set out in title 39 or unless the law is made specifically applicable to the Postal Service. One of the problems you encounter is that after the enactment of a law both the legislative and executive branches tend to forget what is or what is not applicable and might inadvertently make a provision applicable to an agency of the Government which is inappropriate. It is my conviction that the Congress, having authorized the Postal Service to handle its own financial affairs without a veto being vested in anyone else, including the President of the United States, would not now wish to impose the authority vested in the Secretary

under S. 3001 to impair the authority of the Postal Service enacted just 2 years ago.

Let me point out that the Secretary has authority to control the Postal Service bonds. The Postmaster General is not free to deal as he wishes. He must consult with the Secretary before attempting to sell and the Secretary can, if he wishes, preempt the entire issue. Those provisions of law were very carefully thought out in 1970, and I believe they are quite workable.

Mr. President, under the terms of chapter 20 of title 39, as enacted by the Postal Reorganization Act of 1970, the Postal Service is authorized, within certain limitations and under certain conditions, all of which are carefully spelled out in law, to issue obligations on the market for postal modernization.

Does the Senator believe that that authority is impaired by the provisions of S. 3001?

Mr. SPARKMAN. No.

Mr. McGEE. Can the Postal Service itself stand, perhaps, to gain from this bill in the sense that it would be able to borrow money under this new Federal financing agency?

Mr. SPARKMAN. Yes. As a matter of fact, it gives the Postal System a new marketing area for its securities. It does not compel the system to use it, but it is its choice if it wants to use it.

Mr. McGEE. In the Postal Reorganization Act, we did specify that before it could go on the private bond market, it had to offer to the Treasury Department, should the Treasury prefer, those bonds for itself. So there was that limitation on it in that legislation.

There is a general rule of law that a specific statute, such as the Postal Reorganization Act, provides certain powers for a governmental agency, and a general statute seems to modify that power, the specific will be favored over the general, regardless of the sequence of enactment.

Does the Senator agree that the law included in the Postal Reorganization Act supersedes any general provisions of S. 3001?

Mr. SPARKMAN. Let me answer in this way: In the case of the Postal Reorganization Act, there are specific provisions relating to financing coordination by the Secretary of Treasury. In view of this, the more general law—the Federal Financing Bank—would merely modify the Secretary's authority to coordinate financing under the Postal Reorganization Act.

The exemptions under the bill are clearly spelled out in the committee report on page 3. The fourth paragraph states:

The coverage of this bill is limited to entities established by the Congress which are owned in whole or in part by the United States. Thus the bill does not cover nor does the committee intend it to cover the Federal Reserve System or the five federally sponsored but wholly privately owned agencies, including the Federal land banks, banks for cooperatives, Federal intermediate credit banks, Federal home loan banks (including the Federal Home Loan Bank Board and the Federal Home Loan Mortgage Corporation), and the Federal National Mortgage Association.

I make that statement in my presentation.

May I say to the distinguished Senator from Wyoming that I have a letter from the Secretary of the Treasury, a copy of which has been supplied to him, and I ask unanimous consent at this point to insert the letter in my remarks.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

THE SECRETARY OF THE TREASURY,
*Washington, D.C., June 22, 1972.*
Hon. JOHN SPARKMAN,
*Chairman, Committee on Banking, Housing and Urban Affairs, Washington, D.C.*

DEAR MR. CHAIRMAN: I understand that Senate floor action on S. 3001, the bill to establish a Federal Financing Bank is scheduled for Thursday, June 22. We appreciate the prompt favorable action by your Committee on this important legislation to improve efficiency in financing Federal agency programs.

It is my understanding that some confusion may exist regarding the position of the Administration on the question of the relationship of the Postal Service to the Federal Financing Bank. As you know, Mr. Chairman, the position of this Administration on this matter is that the Postal Service should not be excluded from obtaining the benefits of the financing efficiencies we expect to achieve through the Federal Financing Bank.

As the Treasury Department outlined in its transmittal letter of December 9, 1971, to Congress, the proposed legislation does not require or intend that the Treasury have any role in or any veto power over the programs of Federal agencies. Thus the legislation contemplates no involvement by the Treasury or the Federal Financing Bank which would affect the structure or scope of agency programs. The legislation does provide that the Treasury will coordinate the timing and nature of Federal agency borrowing activities. Effective coordination requires that all such agencies including the Postal Service be covered by the proposed legislation. Also, to exclude the Postal Service from this legislation might encourage other agencies to press for exemption.

We believe that coordination of Federal agency financing through the Federal Financing Bank will facilitate the smooth functioning of the private credit markets and will thus be advantageous to the Government's financing efforts in general as well as to the Postal Service. Such coordination will reduce borrowing costs and will shift many debt management problems to the Federal Financing Bank, relieving the agencies of this burden.

In the specific case of the Postal Service, it now has the authority to sell its securities in the market. The Secretary of the Treasury now has the authority to preemptively purchase the debt obligations of the Postal Service. Neither of these features of the Postal Reorganization Act will be changed by the Federal Financing Bank legislation. However, excluding the Postal Service from this legislation limits its financing options since it would not be able to sell its securities to the Federal Financing Bank. I assure you that the Federal Financing Bank is intended to facilitate and not to hinder agency programs.

Again, thank you for your support of the Federal Financing Bank. I hope it will be possible to obtain passage of this bill without excluding the Postal Service.

Sincerely yours,

(S)  GEORGE P. SHULTZ.

Mr. McGEE. Mr. President, I want to thank the chairman for clarifying these questions, and I would like to add for the

Copies of the material to which I have referred are enclosed for your information.

With kindest personal regards,

Sincerely yours,

THADDEUS J. DULSKI,
*Chairman.*

---

U.S. POSTAL SERVICE,
*Washington, D.C., September 28, 1971.*

Hon. THADDEUS J. DULSKI,
*Chairman, Committee on Post Office and Civil Service, House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: The Postmaster General has asked me to respond to your letter of September 17, 1971, requesting our comments on the question whether certain proposed revisions in chapter 71 of title 5, United States Code, would, if enacted, apply to the Postal Service.

We agree with your conclusion that the exclusion of the Postal Service from the definition of an "independent establishment" in 5 U.S.C. § 104 does not provide a complete answer to the question of how far the Postal Service might be bound by amendments to those provisions of title 5 that now apply to the Postal Service. 39 U.S.C. § 410(b) makes chapter 71 of title 5 applicable to the Postal Service, and insofar as this provision may manifest a Congressional intent that the Postal Service be subject to subsequent amendments of chapter 71, the statutory exclusion of the Postal Service from the definition of an independent establishment for the purpose of title 5 would appear to be immaterial.

The scope of 39 U.S.C. § 410(b) cannot be properly assessed, it seems to me, without reference to the considerations that led to the enactment of section 410(a). That section, which exempts the Postal Service from all but a limited number of Federal laws "dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds," was manifestly designed to help the Postal Service improve the quality and efficiency of its services by granting the new independent establishment broad relief from the intricate network of public laws and administrative regulations to which the Post Office had been subject as an executive department. In the light of that objective, I would not interpret section 410(b) as meaning that any and all amendments to the provisions cited in that section will automatically apply to the Postal Service, regardless of the consistency of such amendments with the framework created by the Postal Reorganization Act and regardless of whether they have a logical connection with the provisions to which the Postal Service was made subject at the outset. If Congress amended chapter 71 of title 5 to prohibit executive agencies from negotiating agreements with labor organizations, for example—an amendment that would conflict with the employee-management provisions of the Postal Reorganization Act and would introduce a subject not within the purview of chapter 71 as in effect at the time of adoption of the Postal Reorganization Act—I do not believe that the amendment could reasonably be read as applying to the Postal Service unless the amendment itself contained language expressly bringing the Postal Service within its terms.

On the other hand, an amendment to chapter 71 dealing with matters that were covered by that chapter when the Postal Reorganization Act was passed, and doing so in a manner not inconsistent with the provisions of the Act, might well be deemed to apply to the Postal Service even though the amendment did not so state.

It is a close question, I think, whether the Postal Service would be covered by H.R. 8085, if that bill were enacted in the form in which it was reported by your Committee. In prohibiting arbitrary maximum-age requirements for entrance into the Federal service, the bill deals with a type of discrimination

that was not covered by chapter 71 of title 5 when the Postal Reorganization Act was passed. On the other hand, the amendment is in harmony with the Age Discrimination in Employment Act of 1967, and its extension to the Postal Service would thus not be inconsistent with the concept that employment within the Postal Service should in general, be made more nearly comparable to employment in the private sector. As a practical matter, I suspect that the Postal Service would try to comply with the policy embodied in H.R. 8955 regardless of its legal obligation to do so; but if—it—is the intent of Congress that the Postal Service be subject to the bill as a matter of law, it would seem desirable to include an express provision to that effect.

With respect to the proposed addition to chapter 71 of a new subchapter III, defining a broad new category of employee rights and establishing a detailed statutory mechanism for handling complaints of violations of such rights, I do not believe that the proposed subchapter, as presently drafted, would apply to the Postal Service. The subject matter of the new subchapter has little in common with that of the two subchapters that were in effect when the Postal Reorganization Act was passed, and it has no analogue in the body of federal law applicable to private employers. If the measure were held to be applicable to the Postal Service, moreover, it would have the effect of withdrawing from the collective bargaining process a number of matters—both substantive and procedural—that would have been subject to collective bargaining under the Postal Reorganization Act. Such an intent should not, I think, be inferred lightly.

The applicability of the Postal Service or any amendment to the provisions specified in 39 U.S.C. § 410(b) depends, in the final analysis, upon an interpretation of the intent of Congress in adopting the amendment. The Courts would be hard put, I believe, to impute to Congress an intent to bring the Postal Service within the coverage of an amendment that makes no reference to the Postal Service, that is inconsistent with the principles underlying the Postal Reorganization Act, and that deals with subjects not covered in the provisions that were made applicable to the Postal Service when section 410(b) was enacted. The question raised in your letter is not an easy one, and I hope that you will find these comments helpful.

With kindest personal regards,

Sincerely.

DAVID A. NELSON.

At the present time, there is no prohibition against establishing a maximum age limit for appointments to positions in the excepted service. The existing statutory prohibition—5 U.S.C. 3307—applies only to positions in the competitive service.

Under the provisions of this bill, maximum age requirements for positions in both the competitive service and the excepted service could be established only by the President or his agent.

All positions in the FBI are in the excepted service. A maximum age requirement of 40 years has been established for an appointment to the position of special agent in the FBI. Under the provisions of this bill, the maximum age limit of 40 would have to be established by the President or his agent, subject to congressional approval. The FBI could no longer exercise such authority.

Under the authority of Public Law 91–73, the Secretary of the Interior has established a maximum age limit of 30 years for appointments to the U.S. Park Police. This authority is repealed by

H.R. 8085. Such age limit would have to be established by the President or his agent.

The committee has received letters from two agency heads seeking authority to establish maximum age limits for appointments to certain positions.

One letter is from the Attorney General, seeking authority to establish minimum and maximum age limitations for appointments to the following positions—

First. Border Patrol Agent—Immigration and Naturalization Service;

Second. Criminal Investigator—Bureau of Narcotics and Dangerous Drugs;

Third. Correctional Officer—Bureau of Prisons; and

Fourth. Deputy U.S. marshal.

The other letter is from the Secretary of Transportation, seeking authority to establish a maximum age limit for appointments to the position of Air Traffic Controller.

Mr. HALL. Mr. Chairman, will the distinguished gentleman from North Carolina yield?

Mr. HENDERSON. I am delighted to yield to the gentleman from Missouri.

Mr. HALL. I appreciate the gentleman's statement. I have listened intently. I must say that this is a problem that has bothered me for a long time. In the days of my active practice of medicine and surgery, when I was of necessity required to advise people to retire and live graciously, and try to explain to them why, as well as how, to live graciously, I would often say that a man has a right to elect to die with his boots on. But unfortunately it is not always given to us to know when we are going to continue to be able to pull our boots on or even take them off.

There is nothing that is more sad than perhaps a self-appointed indispensable individual who has the ravages of physical disease to the point where he is no longer rational, equitable, or exercises good judgment. By the same token, I would hasten to add that there is nothing more beautiful than some grandmother who is an octogenarian, who may be ravaged physically, but who remains mentally acutely aware, awake, and agile.

I do not know how we can fix this. I am worried about three things. I wonder if we are not giving to the executive agency and to the Chief Executive, the various heads of the departments and bureaus, a power which rightly should remain in the Congress to the point where we are eliminating management's tools of discernment.

I am conscious of the fact, as I am sure the distinguished gentleman is, that in recent months and years we have taken away practically all bars to Federal employment—in turn, race, social and national origin, sex—and now we are taking away, in fact, age as a bar to employment—not in the exceptional case alone, but by this action, as I read it, in all cases. It would seem to me that management, whether it be in public trust or whether it be in private enterprise, should have some rules of discernment based on means or averages, with which they could lay an average or make a generally applicable rule.

*May 9, 1973*  CONGRESSIONAL RECORD — SENATE  14983

committees has increased substantially, due to the initiative of both the executive and legislative branches. This growth led President Kennedy to issue an executive order (11007) in February 1962 establishing regulations for their use. Further, experience with such committees led the President to issue an executive order (11671) in June 1972 which rescinded earlier advisory committee regulations and established a centralized management system. During the time the executive branch was establishing these new procedures, the House Government Operations Subcommittee on Legal and Monetary Affairs and the Senate Government Operations Subcommittee on Intergovernmental Relations were examining advisory committee management. Based on their examination, the Congress passed the Federal Advisory Committee Act (P.L. 92–463) which the President approved and signed on October 6, 1972.

Of the 1439 advisory committees in existence on December 31, 1972, 251 or about 18 percent were created by statute. During calendar year 1972, 211 new committees were created of which 19 were statutory. In the same year, 187 committees were terminated, making a net gain of 24 committees. The Act's applicability is broader than that of previous advisory committee regulations, and because of that, the numbers reported are not directly comparable with those previously provided to the Congress (for example, subcommittees are now reported individually: in 1972 the Federal Power Commission established two new committees having 28 subcommittees—a total of 30 new committees). In the current calendar year, we expect to reduce advisory committees to the minimum essential number.

The Federal costs for these committees, as reported by the individual agencies, totaled $25,215,882. Federal costs for individual committees in calendar year 1972 varied widely, ranging from no Federal cost for a few committees to $1,750,000 for the Department of Justice National Advisory Commission on Criminal Justice Standards and Goals. The average annual cost per committee in calendar year 1972 was $15,508.

The greatest numbers of committees were concentrated under the jurisdiction of 12 departments and agencies as follows:

Health, Education, and Welfare ......... 367
Agriculture ............................. 172
Interior ................................ 126
Defense ................................. 95
Commerce ................................ 76
Small Business Administration ........... 66
Transportation .......................... 55
Commission on Civil Rights .............. 51
Federal Power Commission ................ 47
Labor ................................... 46
State ................................... 42
National Science Foundation ............. 41

The tabulations which follow present summary data on committee numbers and costs for the individual agencies for calendar year 1972. It should be pointed out that these data summarize advisory committee activities before the Act became effective, and that as a result, the data are subject to minor variations. Through the Committee Management Secretariat of the Office of Management and Budget, each agency has been required to submit its own annual review of advisory committees by July 2, 1973.

The annual review of each advisory committee is to determine—

(1) whether such committee is carrying out its purpose;

(2) whether, consistent with the provisions of applicable statutes, the responsibilities assigned to it should be revised;

(3) whether it should be merged with other advisory committees; or

(4) whether it should be abolished.

The results of this review will be included in the next annual advisory committee report to the Congress.

In addition, the Office of Management and Budget has issued committee management guidelines to all executive branch departments and agencies. These guidelines were issued through two documents: (1) OMB Circular A-63 on Advisory Committee Management and (2) a joint OMB/Department of Justice Memorandum on Implementation of the Federal Advisory Committee Act. These documents were issued for execution by each agency pending their review by all agencies and their reproduction in final form. They were published in the Federal register for public comment, as well.

The detailed information required by Sec. 6(c) of the Act is forwarded herewith, under separate cover, to the Congress and the Library of Congress. This detailed information approximates 6,000 pages of material. For reasons of national security, detailed information concerning one Department of Defense committee is not included in this report. Members of the public desiring information concerning specific committees may obtain it from the Library of Congress, or from the agency having jurisdiction over the committee.

ADVISORY COMMITTEE—SUMMARY DATA FOR CALENDAR YEAR 1972

| Agencies | Numbers current, Dec. 31, 1972 | Numbers statutory, Dec. 31, 1972 | Numbers terminated, calendar year 1972 | New committees, calendar year 1972 | | Changes in numbers, calendar year 1972 | Total cost | Average cost |
|---|---|---|---|---|---|---|---|---|
| | | | | Total numbers | Numbers statutory | | | |
| Presidential advisory committees [1] | [2](21) | (12) | NA | (20) | (1) | NA | ($4, 214, 233) | ($200, 678) |
| Executive Office of the President: | | | | | | | | |
| Office of Management and Budget | 4 | 0 | 0 | 0 | 0 | 0 | [3]386, 500 | 96, 625 |
| Office of Emergency Preparedness | 16 | 0 | 0 | 0 | 0 | 0 | 15, 582 | 974 |
| Council of Environmental Quality | 3 | 0 | 1 | 1 | 0 | 0 | 9, 300 | 3, 100 |
| Office of Telecommunications Policy | 1 | 0 | 0 | 0 | 0 | 0 | 5, 700 | 5, 700 |
| Office of Consumer Affairs | 1 | 0 | 0 | 0 | 0 | 0 | 25, 000 | 25, 000 |
| Office of Drug Abuse Prevention | 1 | 1 | 0 | 0 | 0 | 0 | 180, 000 | 180, 000 |
| Office of Economic Opportunity | [4]31 | 0 | 0 | 27 | 0 | 27 | 42, 950 | 1, 385 |
| Departments: | | | | | | | | |
| Agriculture | 172 | 80 | 46 | 5 | 1 | −41 | 328, 260 | 1, 506 |
| Commerce | 76 | 4 | 7 | 7 | 0 | −6 | 1, 318, 522 | 15, 887 |
| Defense | [5]95 | 6 | 14 | 16 | 0 | 20 | 2, 531, 338 | 23, 438 |
| Health, Education, and Welfare | 367 | 45 | 49 | 69 | 8 | 20 | 10, 355, 403 | 24, 893 |
| Housing and Urban Development | 4 | 4 | 1 | 1 | 0 | 0 | 64, 658 | 4, 932 |
| Interior | 126 | 78 | 1 | 9 | 4 | 6 | 472, 280 | 3, 661 |
| Justice | 7 | 1 | 1 | 4 | 4 | 3 | [6]1, 781, 000 | 222, 625 |
| Labor | 46 | 3 | 2 | 4 | 4 | 2 | 968, 691 | 21, 058 |
| State | 42 | 0 | 5 | 3 | 0 | −2 | 310, 162 | 6, 599 |
| Agency for International Development | 5 | 0 | 0 | 1 | 0 | 1 | 167, 500 | 33, 500 |
| Transportation | 55 | 0 | 11 | 5 | 0 | −6 | 537, 341 | 8, 142 |
| Treasury | 29 | 1 | 2 | 0 | 0 | −2 | 27, 958 | 1, 864 |
| Independent agencies: | | | | | | | | |
| Administrative Conference of the United States | 1 | 1 | 0 | 0 | 0 | 0 | 450, 000 | 450, 000 |
| Atomic Energy Commission | 12 | 2 | 0 | 0 | 0 | 0 | 1, 084, 200 | 90, 350 |
| Civil Aeronautics Board | 2 | 0 | 3 | 0 | 0 | −3 | 4, 365 | 872 |
| Environmental Protection Agency | 20 | 3 | 6 | 8 | 1 | 2 | 598, 416 | 23, 016 |
| Export-Import Bank | 1 | 1 | 0 | 0 | 0 | 0 | 24, 237 | 24, 237 |
| Federal Communications Commission | 7 | 0 | 0 | 3 | 0 | 3 | 255, 261 | 36, 466 |
| Federal Home Loan Bank Board | 1 | 1 | 0 | 0 | 0 | 0 | (7) | ........ |
| Federal Mediation and Conciliation Service | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Federal Power Commission | 47 | 0 | 8 | 30 | 0 | 22 | 261, 923 | 4, 762 |
| Federal Trade Commission | 3 | 0 | 0 | 0 | 0 | 0 | 5, 200 | 1, 733 |
| General Services Administration | 31 | 1 | 1 | 5 | 0 | 4 | 69, 380 | 2, 168 |
| Interstate Commerce Commission | 3 | 0 | 0 | 0 | 0 | 0 | 1, 278 | 426 |
| National Aeronautics and Space Administration | 17 | 1 | 1 | 0 | 0 | −1 | 363, 600 | 20, 200 |
| National Credit Union Administration | 1 | 1 | 0 | 0 | 0 | 0 | 8, 000 | 8, 000 |
| National Endowment for the Arts | 11 | 1 | 0 | 0 | 0 | 0 | 365, 975 | 33, 270 |
| National Endowment for the Humanities | 6 | 1 | 0 | 0 | 0 | 0 | 255, 460 | 42, 532 |
| National Science Foundation | 41 | 1 | 10 | 7 | 0 | −3 | 231, 297 | 4, 535 |
| Railroad Retirement Board | 1 | 1 | 0 | 0 | 0 | 0 | 1, 400 | 1, 400 |
| Securities and Exchange Commission | 2 | 0 | 8 | 10 | 0 | 2 | 1, 944 | 972 |
| Small Business Administration | 66 | 0 | 0 | 0 | 0 | 2 | 120, 631 | 1, 828 |
| Smithsonian Institution | | | | | | | | |
| U.S. Arms Control and Disarmament Agency | 2 | 0 | 0 | 0 | 0 | 0 | 116, 607 | 58, 364 |
| U.S. Civil Service Commission | 8 | 5 | 1 | 1 | 1 | 0 | 132, 458 | 14, 718 |
| U.S. Information Agency | 2 | 1 | 0 | 0 | 0 | 0 | 84, 130 | 42, 065 |
| U.S. Postal Service | | | | | | | | |
| Veterans' Administration | 6 | 1 | 7 | 0 | 0 | −7 | 65, 692 | 5, 053 |

Footnotes at end of table.

14984 · CONGRESSIONAL RECORD — HOUSE *May 9, 1973*

ADVISORY COMMITTEE—SUMMARY DATA FOR CALENDAR YEAR 1972—Continued

| Agencies | Numbers current, Dec. 31, 1972 | Numbers statutory, Dec. 31, 1972 | Numbers terminated, calendar year 1972 | New committees, calendar year 1972 | | Changes in numbers, calendar year 1972 | Total cost | Average cost |
|---|---|---|---|---|---|---|---|---|
| | | | | Total numbers | Numbers statutory | | | |
| Selected committees, commissions, and councils: | | | | | | | | |
| Advisory Council on Historic Preservation | 1 | 1 | 0 | 0 | 0 | 1 | $439,600 | $439,600 |
| American Revolution Bicentennial Commission | 12 | 0 | 0 | 1 | 0 | 0 | 88,200 | 7,350 |
| Cabinet Committee on Opportunities for Spanish-Speaking People | 1 | 0 | 0 | 0 | 0 | 0 | 20,000 | 20,000 |
| U.S. Commission on Civil Rights | 51 | 0 | 0 | 0 | 0 | 0 | 669,202 | 13,122 |
| U.S. Water Resources Council | 1 | 0 | 0 | 0 | 0 | 0 | 1,500 | 1,500 |
| Total | 1,439 | 257 | 187 | 211 | 19 | 24 | 25,215,882 | 15,508 |

¹ These Presidential advisory committees are included in the numbers below for those agencies having jurisdiction.
² This number may be affected by some legal decisions on whether certain committees are Presidential advisory committees.
³ $385,600 for Presidential Advisory Committee on Management Improvement.
⁴ All abolished effective Feb. 1, 1973.
⁵ Includes 28 committees under Secretary of Defense, Joint Chiefs of Staff, and Defense agencies; 16 committees under Air Force; 31 committees under Army; and 20 committees under Navy.
⁶ $1,750,000 for National Advisory Commission on Criminal Justice and Standards.
⁷ Cost of $74,893 not borne by Federal Government.

Note: Smithsonian Institution is excluded because the Smithsonian Secretary states "Given the Institution's independent authority and responsibility, it is believed that the boards and committees of the Smithsonian would not be deemed to fall within the purview of Public Law 92–463 since these groups provide advice and recommendations to the Board of Regents and none of them, neither of which are in the executive branch of the Federal. Government."
U.S. Postal Service is excluded because its Assistant General Counsel states "In our opinion the Federal Advisory Committee Act—to the extent it grants certain advisory committee management review functions to the Office of Management and Budget to be exercised over Federal Government agencies—is one of the laws from which the Postal Service is exempted by virtue of the Postal Reorganization Act."

## MORE BELLS NEEDED

Mr. MANSFIELD. Mr. President, two of our distinguished colleagues, the Senator from Kentucky (Mr. HUDDLESTON) and the Senator from South Dakota (Mr. McGOVERN), were in a meeting in EF-100 conducting Agricultural Subcommittee hearings at the time of the final vote on S. 352. They were not informed that the vote was in progress—there are no bells in that room—but had they been here, they would have voted in the affirmative on the bill (S. 352).

I make this statement just to make certain that the record is clear as to what their intentions were, and I also wish to state that, as a result of this experience, I have requested the Sergeant at Arms to look into the possibility of setting up a system of bells, such as we have in our offices and all committees have, in EF-100, so that Senators who hold hearings there hereafter will not be caught short because of something over which they had no control, but will be in a position to be able to attend to their responsibilities on the Senate floor like the rest of us.

I am sorry that it is not possible, in view of the circumstances, to ask that both Senator HUDDLESTON and Senator McGOVERN be recorded as having voted "yea," but I do wish to state that had they been here, their votes would have been in the affirmative, and they were not here because of official duties connected with their membership on the Committee on Agriculture and Forestry.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The second assistant legislative clerk proceeded to call the roll.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ADJOURNMENT TO 10 A.M.

Mr. MANSFIELD. Mr. President, if there be no further business to come before the Senate, I move, in accordance

with the previous order, that the Senate stand in adjournment until the hour of 10 o'clock tomorrow morning.

The motion was agreed to; and at 4:54 p.m. the Senate adjourned until tomorrow, Thursday, May 10, 1973, at 10 a.m.

## NOMINATIONS

Executive nominations received by the Senate May 9, 1973:

INTERNATIONAL ATOMIC ENERGY AGENCY

Gerald F. Tape, of Maryland, to be the Representative of the United States of America to the International Atomic Energy Agency, with the rank of Ambassador.

DEPARTMENT OF LABOR

Carmen Maymi, of the District of Columbia, to be Director of the Women's Bureau, Department of Labor, vice Elizabeth Duncan Koontz, resigned.

IN THE NAVY

Vice Adm. John V. Smith, U.S. Navy, for appointment to the grade of vice admiral, when retired, pursuant to the provisions of title 10, United States Code, section 5233.

# HOUSE OF REPRESENTATIVES—*Wednesday, May 9, 1973*

The House met at 12 o'clock noon.
The Chaplain, Rev. Edward G. Latch, D.D., offered the following prayer:

*See that none render evil for evil unto any man; but ever follow that which is good, both among yourselves and to all men.*—I Thessalonians 5: 15.

Almighty God, our Heavenly Father, who art always ready to do exceeding abundantly above all that we ask or think, grant unto us Thy wisdom and the guidance of Thy spirit in the plans and purposes of this day. May we be men and women of vision, possessed by clear minds and courageous hearts as we endeavor to carry our responsibilities and to meet the daily challenge of arduous tasks.

Increase our faith and our hope as we seek to find right solutions for our national and our international problems.

Keep alive our concern for the needy in our land and gird us with confidence that we may work to build a world fellowship ruled by high principles, enduring peace, and abiding good will.

Not for ourselves alone may our prayer be;

Lift Thou Thy Word, O God, closer to Thee.

Cleanse it from guilt and wrong, teach it salvation's song,

Till earth, as heaven, fulfill Thy Holy Will.

Amen.

## THE JOURNAL

The SPEAKER. The Chair has examined the Journal of the last day's proceedings and announces to the House his approval thereof.

Without objection, the Journal stands approved.

There was no objection.

## MESSAGE FROM THE PRESIDENT

A message in writing from the President of the United States was communicated to the House by Mr. Marks, one of his secretaries.

## MESSAGE FROM THE SENATE

A message from the Senate by Mr. Arrington, one of its clerks, announced that the Senate had passed with amendment in which the concurrence of the House is requested, bills of the House of the following titles:

H.R. 2246. An act to amend the Public Works and Economic Development Act of

conflict of interest inherent in this situation.

DEFENSE INDUSTRY ADVISORY COMMITTEE

The Defense Department's Industry Advisory Committee was created by Executive order in May 1962. Its "mission," as described by a 1968 DOD directive, is to provide a forum for top level Pentagon and industry executives to discuss policies, practices and the findings of industry study groups. Though "membership may also include representation from nondefense industry, the educational community and the professions" these groups are not represented. Most members are chairmen or president of major defense contracting firms. As of mid-1970, 12 of the 24 IAC members were from corporations in the top 40 defense contractors. Their companies held $6.12 billion of the military prime contracts let that year.

IAC is chaired by Deputy Secretary of Defense Packard. The vice chairman until recently was Paul A. Gorman, president of Penn-Central Transportation. The IAC excludes the public and press from its meetings and keeps only summary minutes which have not been available to the public.

Members who are interested in the recent General Accounting Office study of defense profits, and who had difficulty in obtaining the report, should know that the IAC received the report and a briefing on it from the Comptroller General, after which the report was revised, the criticism softened. This is the group that worries more about congressional interest in cost overruns and excess profits than about methods to eliminate the excessive costs and profits.

RAIL AND MINE SAFETY ADVISORY COMMITTEES

Mr. President, congressional directive that public members be included on advisory committees, in order to balance the advice given by industry representatives, is not carried out. Congress provided in the Rail Passenger Service Act of 1970 that the financial advisory panel would consist of two Government representatives, six representing the business of investment banking, commercial banking, and rail transportation and seven to represent the public. Nevertheless, the President went to the banking and investment community to find several of the public members, with the result that the advisory committee does not have the diversity and balance which Congress said it should have. Similarly, the administration casually disregarded the congressional directive, in the Coal Mine Safety Act of 1969, that persons "knowledgeable in the field of coal mine safety research" be appointed to the Advisory Committee on Coal Mine Safety Research. The lack of knowledge about this most important subject was admitted by some of the embarrassed appointees, who subsequently resigned.

Mr. President, I have spoken briefly about several advisory committees to illustrate the point that our whole structure of Government advisory committees needs attention. I am inclined to think we would be better off without any of them. If in some cases they can

be justified they should operate openly, under the control of Government officials, and include persons with no financial interest in the business regarding which they advise. I believe the bill I am introducing today would accomplish these objectives.

I ask unanimous consent that the text of the bill along with the article and minutes to which I have referred be printed in the RECORD at this point.

There being no objection, the bill and material were ordered to be printed in the RECORD, as follows:

S. 1637

A bill to establish uniform standards and procedures for Government advisory committees

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Open Advisory Committee Act."

DECLARATION OF FINDINGS

SEC. 2. The Congress finds and declares—

(1) that advisory committees should be established and used only when they are absolutely essential, and that their number should be kept to the minimum necessary;

(2) that such committees shall be subject to rules of public notice of meetings and disclosure of their number should be kept to the minimum necessary;

(3) that their membership should include a substantial number of representatives from the public;

(4) that the Congress and the public should be kept fully and currently informed with respect to the number, purpose, membership, and activities of such committees; and

(5) that the function of such committees shall be advisory only, and that all matters under their consideration shall be determined, in accordance with law, by the Federal agency involved.

DEFINITIONS

SEC. 3. As used in this Act—

(1) "Federal agency" means any Executive department, military department, independent establishment, or agency in the executive branch of the Government of the United States, including Government owned or controlled corporations;

(2) "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof, which is established for the purpose of furnishing advice or recommendations to a Federal agency, or for any other purpose, and which is not composed wholly of officers or employees of the Government.

APPLICABILITY

SEC. 4. This Act shall not apply to an advisory committee—

(1) which furnishes advice or recommendations only with respect to national security or intelligence matters;

(2) to the extent that Congress has by statute specifically provided that such committee shall be subject to provisions which are different from the provisions of this Act with respect to restrictions, purposes, or standards of conduct or disclosure; or

(3) which is composed wholly of representatives of State or local agencies or charitable, religious, educational, civic, social welfare, or other similar nonprofit organizations.

AUTHORITY; COMPOSITION

SEC. 5. No Federal agency shall establish or use an advisory committee unless—

(1) such establishment or use is specifically authorized by law, or the President has determined, as a matter of record, that such establishment or use is essential to such Fed-

eral agency's performance of its statutory functions; and

(2) at least one-third of the members of such committee shall be persons appointed from private life who are knowledgeable and competent to represent the interests of the public with respect to the subject matter of such committee; or in the case of an advisory committee composed substantially of members or representatives of an industry or of a type or group of industries, not less than one-third of the members of such committee shall be persons appointed from private life who have no direct or indirect economic, financial, or other interest in such industry or type or group of industries and who are knowledgeable and competent to represent the interests of the public with respect to the subject matter of such committee.

RESTRICTION OF FUNCTIONS

SEC. 6. The function of an advisory committee shall be exclusively advisory. The determination of Federal agency action to be taken or the decision of any matter with respect to such action shall be made solely by officers or employees of that agency.

AGENCY RESPONSIBILITY

SEC. 7. Any Federal agency which establishes or uses an advisory committee shall—

(1) appoint or designate an officer or employee of that agency who shall call, chair, and prescribe the agenda for each meeting of such committee;

(2) give timely and conspicuous notice of each meeting of such committee and of the agenda of each such meeting by publication in the Federal Register and by such other means as may be appropriate; and

(3) provide within that agency a process by which interested persons may appeal any ruling of the chair at any meeting of such a committee to the head of that agency.

ADVISORY COMMITTEE PROCEDURE

SEC. 8. (a) Each meeting of an advisory committee shall be open to the public, and a verbatim transcript shall be taken at each such meeting. The transcript shall include the names and affiliations of all persons present at such meeting and the capacity in which they attend. The chairman of the meeting shall certify the accuracy of the transcript.

(b) No advisory committee shall receive, compile, or discuss data or reports showing the current or projected commercial operations of identified business enterprises.

TERMINATION

SEC. 9. Except as otherwise provided by law, an advisory committee shall cease to exist not later than two years after the date of its establishment, unless the head of the Federal agency which established that committee determines in writing not more than sixty days prior to the expiration of such two-year period that its continued existence is absolutely essential to the performance of duties imposed on such agency by law. Except as otherwise specifically provided by law, no advisory committee shall continue to exist for a period longer than four years after the date of its establishment.

REPORTS AND RECORDS

SEC. 10. (a) Any Federal agency which establishes or uses an advisory committee shall include in its annual report or shall make a separate report to include—

(1) the name and function of each such committee;

(2) the names and affiliations of the members of each such committee; and

(3) a list of the time and place of each meeting of each such committee during the period covered by that report. Such Federal agency shall furnish copies of its report to the Library of Congress, where they shall be available for public inspection.

(b) Each Federal agency shall make available to the public for inspection and copying

the records and files, including agenda, transcrips, studies, analyses, reports, and any other data compilations and working papers, which were made available to or prepared for or by each advisory committee. Such records shall be maintained at a single location in each agency for a period of five years after the committee ceases to exist.

#### JUDICIAL REVIEW

SEC. 11. (a) Any person may bring a suit against a Federal agency if—

(1) that person is or was adversely affected or aggrieved by an action of a Federal agency; and

(2) that action is or was related to a matter considered by an advisory committee subject to the provisions of this Act; and

(3) that advisory committee is or was not operating in accordance with the provisions of this Act.

Any such suit may be brought in the United States district court for the district in which the person bringing such suit resides or has his principal place of business or in the United States District Court for the District of Columbia.

(b) The court having jurisdiction of a suit brought under this section may enter such order as may be appropriate to enforce compliance with the provisions of this Act, and to set aside any agency action in violation of such provisions.

#### EXECUTIVE ORDERS AND REGULATIONS

SEC. 12. To the extent that any Executive Order or regulation is inconsistent with provisions of this Act, such Executive Order or regulation is superseded.

---

CIVIL AERONAUTICS BOARD, ADVISORY COMMITTEE ON FINANCE, MINUTES OF MEETING OF NOVEMBER 2, 1970

The organizational meeting of the Civil Aeronautics Board's Advisory Committee on Finance was held at the offices of its Chairman, James P. Mitchell, at One Chase Manhattan Plaza, New York, New York on Monday, November 2, 1970.

The meeting, pursuant to notice, was convened at 10:00 A.M., Mr. Mitchell, presiding. The following members of the committee were present:

James P. Mitchell.
William A. McCurdy.
Blake W. Irons.
Frederick F. Robinson.
Harper Woodward.
Milo Vesel.
S. Kenric Lessey.
Webster B. Todd, Jr.

Also present was Monte Lazarus, Administrative Assistant to CAB Chairman Secor D. Browne.

The meeting opened with a discussion as to whether or not a verbatim transcript was necessary, or whether general minutes would suffice. It was decided, after much discussion, that a transcript was not necessary to the conduct of business and that this matter would be taken up with Chairman Browne. With the Chairman's concurrence the necessary steps would be taken to amend the Committee's charter to authorize the use of minutes.

The next subject was the proper province of committee operation. Both the Executive Order (11007) and the memorandum from the Office of the General Counsel were reviewed and it was agreed that the Board could request the Committee's aid in all appropriate areas except where a matter was ending before the Board.

It was also agreed that the Committee would bring matters to the attention of the Board and would make recommendations on the procedural and philosophical conduct of the Board's business and the committee could request that other appropriate members of the CAB staff attend meetings.

It was decided that the meetings of the committee would be closed to the Press and the public. The Committee would, as it deemed necessary and upon invitation, request the participation of outside persons.

The next item concerned the Board's collection and tabulation of financial information of the carriers. The feeling was expressed that the Board was dealing more with historical data rather than current or projected positions. It was agreed that in order for the Board to truly discharge its obligations, its financial information must be of the most up-to-date nature.

The Committee agreed to review the Board's methodology of compiling financial reports and would recommend changes in these procedures in the future.

There then followed a broad discussion of why the advisory groups were formed, what was expected of them, and how they fit into the general scheme of Board operations.

It was pointed out that Chairman Browne had the deepest concern with direct communication between the government and those affected by its operations and that this was the primary reason for the committees: to provide a direct informal flow of ideas. At this time there were no specific projects that the Board has set down for committee action.

The *Domestic Passenger Fare Investigation* was discussed as to format and timing without any discussion of the merits, and particular attention was paid to the *Moss* case and the necessity for legal tariffs. The details of the *Moss* case were discussed as was the Board's most recent fare order (70–9–123) and the reasons behind it.

The general economic posture of the airlines and the industry as a whole was reviewed. The Committee expressed grave concern as to the seriousness of the current situation and urged the Board to address this problem swiftly. The Committee suggested several questions which should be asked of the carriers in order to get a more precise reading of their condition. The list is attached as Appendix A.

The next meeting of the Committee was set for December 4, 1970 at Mr. Mitchell's offices.

The meeting adjourned at 12:30 P.M.
WEBSTER B. TODD, JR.,
*Secretary.*

---

AIR TRANSPORT: NEW PRESSURES FACE LOCAL CARRIERS: DETERIORATING WORKING CAPITAL POSITIONS OF REGIONAL CARRIERS FORCE MERGER, RAISE FEARS OF OUTSIDE CONTROL IN SOME AREAS

(By Laurence Doty)

NEW YORK.—Deteriorating working capital position of the local service industry is forcing a proposed merger between Allegheny and Mohawk airlines and is generating new pressures on the group by creditors, which some observers fear may result in outside control of several carriers.

Deeply involved in the latest moves to protect outstanding loans is the Chase Manhattan Bank here, which is the major creditor for five of the nine local service carriers. The merger plan is being instigated by the Sid W. Richardson Foundation of Texas which holds a substantial interest in Mohawk.

The merger would call for an exchange of one-share of Allegheny common stock for four of Mohawk.

Question of whether actual control of some carriers by banks or loan groups now exists is being studied closely by a number of Washington, D.C., attorneys associated with the industry. Many now believe that a statutory problem may be present in that some banks could be found to hold excessive control over carriers and be in much the same position as a holder of large amounts of equity who could direct the activities of a carrier.

Several locals are resisting what they view as a growing dominance of creditors. This has created a state of ambivalence for all parties involved. The airlines cannot afford to wipe out a major source of capital. Nor do they wish to accept foreclosure because of default.

The banks must protect their loans and are forced to take some action when a carrier's debt/equity ratio and working capital positions reach dangerous levels. Foreclosure would be anathema to them because of the dubious resale value of major assets such as flight equipment.

#### THE 1971 PROSPECTS

Anxiety in financial circles over the slumping air travel business, which has darkened prospects for the locals in 1971, has been compounded by a recent Transportation Dept. study. This report warned that "it should be evident upon examination of the exhibits [contained in the study] that every local service carrier for one reason or another could be in a bankruptcy court."

The Civil Aeronautics Board considers this an "extreme" judgment but concedes that the debt situation is severe (AW&ST Feb. 22, p. 13).

Chase Manhattan's James P. Mitchell, vice president directly concerned with aerospace activities, thus concluded that the short-term solution lay in increased federal subsidy. Office of Management and Budget placed severe limits on the local carrier's subsidy for fiscal years 1971 and 1972.

But the CAB decided to rebuff the OMB and proposed a Fiscal Year 1971 subsidy of $58.1 billion (AW&ST Feb. 8, p. 23). Mitchell has indicated that an annual subsidy rate of between $80 million and $90 million would be the amount necessary to rescue the locals from their current fiscal dilemma.

For long-range purposes, Mitchell first publicly disclosed his thinking in an address before the Wings Club here on Nov. 18, 1970. He noted that "something is obviously wrong with the design of the local carrier system," and added:

"What is called for is a broad systems approach that will examine the entire positive regulatory practices and policies; equipment adequacy; competition; the relative roles of trunks, regionals and third-level carriers; the inter-play with other transport modes. . . ."

Specifically, he called for research and development which would raise economic techniques to the same efficient level attained in the technological area.

It was on this point and the subsidy issue that Mitchell met with the presidents of five local service companies here on Dec. 15, 1970. These were the carriers most heavily obligated to Chase.

The overall situation was discussed but, since the entire industry was involved, the five did not feel they were in a position to commit the other four carriers to any major program and a second meeting was arranged to be held in St. Louis on Jan. 11.

Presidents of seven locals reported at this session. Piedmont Airlines was not represented. Allegheny Airlines was represented by Edwin I. Colodny, vice president-legal affairs and economic research.

Paul Cherington, Harvard professor and former assistant secretary of Transportation under John A. Volpe, was present and emerged as a key figure in the meeting. Heads of Mohawk, Southern Airways and RKO, which holds control of Frontier Airlines, had proposed Cherington to head the long-range analysis of the industry which Mitchell had called for in his address.

In addition, because of his close association with the Nixon Administration, Cherington was felt to be the logical choice to approach the OMB and clarify the industry's immediate requirement for additional subsidy.

#### CONSULTING FIRMS

Cherington proposed that two consulting firms be retained: Simat, Helliesen and Eichner, and Temple, Barker and Sloan, Inc., in which Cherington has an interest. The

advisory committees set up under the Federal Reports Act to advise the Office of Management and Budget on questionnaires Government agencies can send to business. Presidential advisory committees are committees which include private citizens, which are created to advise the President or Congress, or both.

Section 4 requires congressional committees to make a continuing review of the activities of advisory committees under their jurisdictions, requires that in establishing new advisory committees Congress insure that they are not overlapping with existing advisory committees, and that new advisory committees have a clearly defined mission.

Section 5 gives the OMB jurisdiction over agency advisory committees, and instructs the Director of OMB to evaluate the existing committees and make recommendations to the heads of the agencies that have created them to continue them, revise their mandates, or discontinue them. Agency heads are required to report annually on the operation of advisory committees reporting to them. The Director shall provide management assistance and provide administrative guidelines for agency advisory committees.

Sections 6 and 7 apply to the special group of advisory committees that advise OMB on the administration of the Federal Reports Act. It requires that such committees, established to advise the OMB in this capacity, contain representatives of consumers, labor, and small business, as well as large industry.

Section 8 makes the Domestic Council the watchdog for Presidential advisory committees, and asks it to make annual reports on the status and work product of each of them.

Section 9 creates a depository for the reports and working papers of Presidential advisory committees in the Library of Congress.

Section 10 instructs agency heads to cooperate with the OMB in establishing uniform systems for administering agency advisory committees.

Section 11 directs that each existing advisory committee shall terminate 1 year from passage of the act, unless the appropriate action is taken to continue the committee. It establishes as general practice that each committee shall terminate after 2 years, unless specifically extended.

Section 12 establishes uniform rates of compensation for advisory committee members, requires uniform accounting of funds expended for advisory committee meetings mandatory, and opens them to public inspection. Records of funds expended for advisory committees must be kept.

Section 13 amends the Freedom of Information Act to make verbatim transcripts of agency proceedings more freely available to the public. The private stenographic services that record the hearings now contract for the right to sell them at very high rates, making them, in effect, unavailable to the general public.

Section 14 provides for judicial review; section 15 provides that inconsistent Executive orders and regulations are superseded by the act; and section 16 provides that the act becomes effective 90 days after enactment.

Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD immediately following these remarks.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 2064

A bill to authorize the Office of Management and Budget and the Domestic Council to establish standards and procedures governing the operation of existing government advisory committees and the creation of new ones; to provide consumer representation on certain Federal advisory committees to expand public access to advisory committee deliberations, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Federal Advisory Committee Efficiency Act."

FINDINGS AND PURPOSES

SEC. 2. The Congress finds and declares that committees of citizens formed to advise the President, Congress, and the agencies of the Executive Branch are frequently a useful and beneficial means of bringing to bear the expert advice, ideas, and diverse opinions existing in the private community on government decision-making. However, Congress also finds and declares:

(1) that a large but undetermined number of such committees, boards, commission, councils, and similar groups exist which were established to advise officers and agencies in the executive branch of the Federal Government or the Congress or both, and that the present need for some of these bodies has not been established;

(2) that standards and procedures are necessary to govern the administration, operation, and termination of advisory committees,

(3) that new committees be established only when they are determined to be necessary to provide needed advisory functions,

(4) that their number be kept to the minimum necessary,

(5) that they be representative of the broad interest of the society including the consumer interest, rather than of a narrow, parochial interest, and

(6) that their meetings and proceedings be open to public scrutiny, and their reports retained in an accessible depository for public reference.

DEFINITIONS

SEC. 3. For purposes of this Act—

(1) The term "Director" means the Director of the Office of Management and Budget.

(2) The term "agency advisory committee" means a committee, council, board, commission, task force, or similar group established or organized under a statute, an Executive order, or any other means, to advise and make recommendations to an officer or agency of the executive branch of the Federal Government, but such term excludes standing or special committees of the Congress, any local civic group whose primary function is that of rendering a public service in relation to a Federal program, as well as any State or local committee, council, board, commission, or similar group established to advise or make recommendations to State or local officials or agencies.

(3) The term "Presidential advisory committee" means an advisory committee any

members of which are private citizens appointed by the President, and which advise the President or the Congress.

RESPONSIBILITIES OF COMMITTEES OF CONGRESS

SEC. 4. (a) In the exercise of its legislative review function, each standing committee of the Senate and House of Representatives shall make a continuing review of the activities of each advisory committee under its jurisdiction with a view to determining whether the responsibilities assigned it should be revised, whether it should be merged with any other advisory committee or whether it any longer performs a necessary function. The committee shall take appropriate action to obtain the enactment of the legislation necessary to effectuate the results of its reviews under this subsection.

(b) In its consideration of legislation creating, or authorizing the creation of, an advisory committee, each standing committee of the Senate and of the House of Representatives shall have the responsibility of satisfying itself and certifying to the Senate and House of Representatives that the new committee is necessary, and of assuring that no advisory committee will be created if its functions are being or will be performed by an advisory committee already in existence, or could be performed by enlarging the mandate of an existing advisory committee, or by the committee itself, and that any such legislation—

(1) shall contain a clearly defined mission for the advisory committee,

(2) shall require the membership of the advisory committee to be representative of all those who are legitimately interested in the responsibilities and functions of the committee,

(3) shall contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority, but will instead be the result of its independent judgment,

(4) shall contain provisions dealing with authorization of appropriations, the date for submission of reports (if any), the duration of the advisory committee, the publication of reports and other materials, and the authorization for, and limitation on the use of, subpenas, to the extent that the standing committee determines the provisions of section 12 dealing with such matters to be inadequate,

(5) shall contain provisions which will assure that the advisory committee will have adequate staff (either supplied by an agency or employed by it), will be provided adequate quarters, and will have funds to meet its other necessary expenses.

RESPONSIBILITIES OF THE DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET

SEC. 5. (a) The Director shall establish and maintain within the Office of Management and Budget a Committee Management Secretariat, which shall be the principal agency within such office having responsibility for matters relating to advisory committees both agency and Presidential.

(b) The Director shall, immediately upon the enactment of this Act, institute in cooperation with agency heads a comprehensive review of the activities and responsibilities of each agency advisory committee then in existence with a view to determining what results have been achieved and whether, consistent with the provisions of applicable statutes, the responsibilities assigned to it should be revised; whether it should be merged with other advisory committees; and whether it should be disestablished. Upon the completion of the Director's review he shall make recommendations to the Secretary of the relevant department with respect to action he believes should be taken. Thereafter, the head of each agency shall carry out a

matters set forth in section 553 (b) of title 5, United States Code.

(1) "agency means any agency as defined in section 551 (1) of title 5 United States Code; and

(2) "agency proceeding" means any proceeding as defined in section 551 (12) of such title.

JUDICIAL REVIEW

SEC. 14. (a) Any person may bring a suit for injunction against a Federal agency if—

(1) that person is or was adversely affected or aggrieved by an action of a Federal agency; and

(2) that action is or was pursuant to a recommendation of an agency advisory committee subject to the provisions of this Act; and

(3) that agency advisory committee is improperly constituted or was otherwise not operating in accordance with the provisions of this Act.

Any such suit may be brought in the United States district court for the district in which the person bringing such suit resides or has his principal place of business or in the United States District Court for the District of Columbia.

(b) The court having jurisdiction of a suit brought under this section may enter such order as may be appropriate to enforce compliance with the provisions of this Act, and to set aside any agency action in violation of such provisions.

EXECUTIVE ORDERS AND REGULATIONS

SEC. 15. To the extent that any Executive Order or regulation is inconsistent with provisions of this Act, such Executive Order or regulation is superseded.

EFFECTIVE DATE

SEC. 16. This Act shall become effective ninety days after the date of its enactment.

By Mr. CHURCH:

S. 2066. A bill to extend the provisions of the act of October 23, 1962, relating to relief for occupants of certain unpatented mining claims. Referred to the Committee on Interior and Insular Affairs.

EXTENSION OF THE MINING CLAIMS OCCUPANCY ACT

Mr. CHURCH. Mr. President, I introduce for appropriate reference a bill to extend the provisions of the act of October 23, 1962, relating to relief for occupants of certain unpatented mining claims.

Representative HAROLD T. "BIZZ" JOHNSON and I sponsored this legislation in the 87th Congress to provide relief for certain people who have lived for years in homes on some unpatented mining claims.

The period for making application under the act was extended by the 90th Congress from October 30, 1967, until June 30, 1971. This bill provides for a 3-year extension. Representative JOHNSON is sponsoring a similar bill in the House.

In many instances in the West, persons have staked or bought claims and lived for many years on the land without making a discovery of valuable minerals in order to "prove up" on the property. Sometimes such claims have been mined out without patent and are no longer valid. Persons unfamiliar with the mining laws often have purchased quitclaim deeds to unpatented claims mistakenly believing they were obtaining fee title to such property.

Through Public Law 87–851 persons living on such claims, under certain circumstances can acquire an interest in the land.

While the Public Land Law Review Commission has made its report and recommendations regarding the mining laws, it will be some time before the Congress can obtain a permanent solution to such problems. This emphasizes the need to extend this program, Mr. President, and I hope the Congress will agree to do so.

By Mr. MOSS:

S. 2071. A bill to provide for the care, housing, education, training, and adoption of certain orphaned children in Vietnam. Referred to the Committee on the Judiciary.

VIETNAMESE-AMERICAN WAR ORPHANS

Mr. MOSS. Mr. President, there is no more tragic consequence of that most unwanted war in Vietnam than the illegitimate child who is an offspring of an American father and a Vietnamese mother.

The child is not recognized officially by either the U.S. Government or the Vietnamese Government. It is truly a child in limbo—stateless and homeless.

But this little bit of human flotsam bears an even greater burden than that of being a "child without a country." It is both illegitimate and of mixed blood. Illegitimacy carries more of a stigma in Vietnam than it does in most other places. When an illegitimate child is not of pure blood in race-conscious South Vietnam—when it is half white or half black—then it faces a degree of disgrace and ostracism which is insurmountable. The child of an American father and a Vietnamese mother born out of wedlock is an outcast, and it has no hope of ever being fully accepted in Vietnamese society.

I believe that such a child is an American responsibility. It is as much a casualty of war as a soldier who has been killed or wounded, a peasant who has been shot, or a group of villagers whose homes have been burned down.

Even more so, perhaps, because if America had not embarked on its Vietnam venture, this little halfbreed American-Vietnamese child would not have been born.

We cannot—we must not—leave these children to shift for themselves. The Department of Defense has informed me that it has a survey underway to find out how many illegitimate children of American and Vietnamese parentage are now stranded in Vietnam. Results should be available shortly.

It will not be an easy count to make. Parentage will be difficult to prove. Even what kind of mixed heritage a child has will be questionable in some instances. And the children are everywhere—with their Vietnamese mother; or some member of her family, or some friend or neighbor, in orphanages, abandoned in the streets, discarded into garbage cans as mere infants.

More than often their fathers do not even know they exist, although in some instances their American fathers are helping out financially.

As soon as these children can be found and authenticated, especially if they are abandoned or are orphans, or if they have a parent who is unable to provide for them and is willing to give them up, they should be brought to the United States where their heritage will not be despised and where they can be adopted into American families and grow up on an equal basis with other American children.

Purity of race is not an issue in this "melting pot" country of ours. We already have millions of citizens of mixed heritage—citizens of all races, colors, and creeds, and all combinations of them. We have opened our arms to the homeless and the hopeless and oppressed in the past; now we must open our arms again to these war orphans who were born a part of us. They will have a chance for a decent life in America.

We can learn much from France, which faced the same problem America now faces in Vietnam, during French colonial rule and the later French military action. The French met their problem with admirable dispatch and practicality. When a child of French Vietnamese paternity was found to be unwanted, it was repatriated to France through a French children's association which is supported by the Government.

Some 5,000 children were sent to France under this program with the massive evacuation taking place in 1954 and 1955 at the end of French colonial rule. The children were dispersed throughout France in several hundred religious or lay schools in groups of two or three so they could learn to mix with French children. Many are now being given scholarships to universities. The children who remained in Vietnam with their mothers have been sent to French schools there. Thus, the French have accepted the responsibility for this human consequence of French colonialism and war.

We can do no less than accept into our country the children who are half American. They are on our conscience as much as is their war-scarred country, and their burned villages, which we are attempting to rehabilitate. They are one of the hazards of war and they must be treated as such.

I am, therefore, today introducing a bill to authorize the President or his designee to negotiate with the Vietnamese Government to release these children, to admit them to the United States, and to care for them and place them in the hands of private and State agencies for adoption. Those who are not adopted are to be housed and educated until they are 22 years of age. Immigration quotas are relaxed to allow the permanent admission of the children into this country. Later they may choose to become citizens.

Mr. President, I must point out that the desperate situation of the half-breed American-Vietnamese child in South Vietnam was called to my attention by TV broadcasts—first by the National Broadcasting Co., and later by the Columbia Broadcasting System. I commend these two broadcast facilities for this type of coverage of the war; it is a service to the American people.

President, and subject to confirmation by the Senate. The Commissioner would be compensated at the rare for level I of the Executive Schedule (equivalent to the pay of Cabinet officers). The Commissioner would be selected on the basis of proven competence as a manager, and would be responsible for the exercise of all powers and discharge of all duties of the Social Security Administration, have authority and control over all personnel and activities of the agency, and serve as a member of the Social Security Board of Trustees.

The Commissioner would be advised by a 7-member, part-time Advisory Board. Members of the Board would be appointed for 6-year, staggered terms. Three members, including the chairman, would be appointed by the President and confirmed by the Senate; no more than 2 could be from the same political party) would be appointed by the Speaker of the House (in consultation with the Chairman and Ranking Minority Member of the Committee on Ways and Means) and by the President pro tempore of the Senate (in consultation with the Chairman and Ranking Minority Member of the Committee on Finance).

Specific functions of the Board would include: studying and making recommendations on the most effective methods of providing economic security through the Social Security and Supplemental Security Income programs; making recommendations relating to the coordination of such programs with other programs providing economic and health security; making an independent assessment of the annual report of the Board of Trustees and advising the President and the Congress on the implications of the assessment; recommending to the President candidates to consider in selecting his nominees for the positions of Social Security Commissioner and Deputy Commissioner; reviewing and assessing the quality of service that the agency provides to the public; periodically assessing the adequacy of the agency's computer technology; reviewing and assessing the agency's progress in developing needed management improvements; increasing public understanding of the Social Security system; reviewing the development and implementation of a long-range research and program evaluation plan for the agency; reviewing and assessing any major studies of social security; and conducting such other reviews and assessments as may be appropriate.

In addition to the Commissioner, the President would also appoint a Deputy Commissioner, who would be subject to Senate confirmation. Other positions established within the agency (and appointed by the Commissioner) include: a Beneficiary Ombudsman to sponsor and support beneficiary interests; a Solicitor of Social Security to provide legal advice to the Commissioner and to manage the agency's litigation workload; and a Chief Administrative Law Judge. An independent panel would nominate candidates for the latter position. In addition, the proposal establishes in law the positions of Chief of Computer System Operations, Director of Research, Inspector General, and Chief Actuary. The Chief Actuary will consult, on an ongoing basis, with the Commissioner, the Chairman of the Committee on Finance in the Senate, and the Chairman of the Committee on Ways and Means in the House of Representatives, concerning the financial status of the Social Security trust funds.

The Commissioner would be directed to consult on an on-going basis with the Secretary of Health and Human Services to en-

sure coordination between the programs administered by the Social Security Administration and the Medicare and Medicaid programs, and to ensure that adequate information about benefits under Medicare and Medicaid is available to the public.

The Commissioner, jointly with the Director of the Office of Personnel Management and the Administrator of General Services, as appropriate, would be directed to carry out various demonstration programs. These programs would be focused on improving methods for recruiting, paying, and retaining computer specialists and other employees, and on improving procedures for the acquisition, operation, and maintenance of facilities and automated data processing equipment.

The Director of OPM would be directed to authorize for the Social Security Administration a substantially larger number of Senior Executive Service positions than were authorized on the date of enactment. In addition, at no time could more than ten positions in the agency be excepted from the competitive service because of their confidential or policy-determining nature.●

By Mr. GLENN (for himself, Mr. LEVIN, Mr. AKAKA, Mr. PRYOR, Mr. KOHL, Mr. LIEBERMAN, and Mr. SASSER):

S. 2039. A bill to amend the Federal Advisory Committee Act; to the Committee on Governmental Affairs.

FEDERAL ADVISORY COMMITTEE ACT
AMENDMENTS OF 1991

● Mr. GLENN. Mr. President, I join with my distinguished colleagues on the Governmental Affairs Committee, Senators LEVIN, AKAKA, PRYOR, KOHL, LIEBERMAN, and SASSER, to introduce the Federal Advisory Committee Act Amendments of 1991. This bill represents a modified version of legislation the committee favorably acted on in the 101st Congress (S. 444) to amend the Federal Advisory Committee Act as part of its comprehensive review of the operation of this important open Government law.

The Federal Advisory Committee Act, popularly known as FACA, was enacted 19 years ago to provide a means for the Federal Government to account for and manage Federal advisory committees. In 1971, when the FACA legislation was first introduced, Congress didn't even know how many advisory committees there were, how much they cost, or what they did; and there was no way to find out. Educated guesses on the number of advisory committees in existence ranged from 1,000 to 3,000 and no agency had responsibility to monitor them.

In addition, there were no guarantees of public access to the deliberations of these advisory committees. Some met in closed sessions, and there was no requirement that public notice be given of advisory committee meetings. Concern was voiced that special interests, acting through advisory committees, could exercise undue influence on Government decisions without scrutiny.

These issues were addressed in FACA. The act originally provided for the Of-

fice of Management and Budget to conduct an annual review of all advisory committees, whether they were created by the executive branch or the Congress, and for OMB to review the charters of agency-created committees before they were established. President Carter transferred this responsibility to the General Services Administration in 1977. FACA required that advisory committee meetings be open to the public, subject to certain exceptions which are set forth in the Government in the Sunshine Act. FACA also required that advisory committees be terminated after 2 years unless their charter was renewed by the parent agency. This was intended to slow the proliferation of unnecessary and duplicative committees, which were perceived as the largest problem area with advisory committees.

I think it is fair to say that FACA has served the Government and the public quite well. The real costs to the public have been held reasonably stable, as evidenced by a few very telling statistics. For instance, the total number of chartered advisory committees has remained relatively constant since 1979 with approximately 1,000 committees, councils, and advisory groups of one type or another in existence at any one time. During fiscal year 1990 alone, 22,391 individuals served on 1,128 committees providing advice and recommendations to 64 departments and agencies. The total committee costs have fluctuated, rising from $25 million in 1972 to over $112 million in 1990. However, when we convert these cost figures to account for inflation, the increase is much smaller.

However, the story of FACA is not contained in the number of committees, their costs, or the number of people involved. There is still, even after 19 years, considerable confusion concerning the interpretation of the most fundamental provisions of the act. I am disturbed to find continued litigation over basic questions such as: Whether a specific group is an advisory committee as defined by the act; whether the group meets the act's balanced membership requirement; and whether, and to what extent, advisory committees utilized but not established by an agency are subject to the act.

Over the years portions of the act have been criticized by several Federal court judges called upon to interpret its provisions and ascertain Congress' legislative intent. Indeed, one Federal judge commenting on FACA described it as "obscure, imprecise, and open to broad interpretations." He added that:

If more expertise were applied to such enactments to ensure that Congress states with more precision what it intends, the rules of the game would be more sharply drawn and court involvement could be less.

In another case involving a dispute over balanced membership, a federal district court judge commented that

"(c) The Administrator shall—

"(1) promulgate regulations to prescribe administrative guidelines and management controls applicable to advisory committees and to interpret the provisions of this Act;

"(2) to the maximum extent feasible, provide advice, assistance, and guidance to the President, agency heads, advisory committees, and committee members to ensure compliance with this Act;

"(3) establish guidelines for the annual report required of each agency under section 11(d);

"(4) review committees or other groups established, utilized, or contracted for by an agency to determine whether any are advisory committees subject to this Act and, if so, to bring such committees or groups into compliance with the requirements of this Act; and

"(5) when designated by the President, appoint a designated Federal official for Presidential advisory committees.

"(d)(1) The Administrator shall periodically conduct a comprehensive review of each existing advisory committee to determine whether—

"(A) such committee is carrying out its purpose;

"(B) consistent with the provisions of applicable statutes, the responsibilities assigned to the committee should be revised;

"(C) such committee should be merged with other advisory committees; or

"(D) such committee should be abolished before its specified termination date.

"(2) Upon the completion of a review, the Administrator may make recommendations to the President, an agency head, or the Congress with respect to any action that should be taken.

"(e)(1) The Administrator shall establish guidelines with respect to uniform fair rates of pay for comparable services of members, staffs, and consultants of advisory committees in a manner which gives appropriate recognition to the responsibilities and qualifications required and other relevant factors. Such regulations shall provide that—

"(A) no member of any advisory committee or of the staff of any advisory committee shall receive compensation at a rate in excess of the maximum rate specified under section 5376 of title 5, United States Code;

"(B) such members, while engaged in the performance of their duties away from their homes or regular places of business, may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, United States Code, for persons employed intermittently in the Government service; and

"(C) services may be provided pursuant to section 3102 of title 5, United States Code, for members while in performance of advisory committee duties who—

"(i) are blind or deaf or who otherwise qualify as handicapped individuals (within the meaning of section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 794)); and

"(ii) do not otherwise qualify for assistance under section 3102 of title 5, United States Code, by reason of being an employee of an agency (within the meaning of section 3102(a)(1) of such title).

"(2) Nothing in this subsection shall prevent—

"(A) an individual who (without regard to service with an advisory committee) is a full-time employee of the United States; or

"(B) an individual who immediately before service with an advisory committee was such an employee, from receiving compensation at the rate at which such individual other-

wise would be compensated (or was compensated) as a full-time employee of the United States.

"(f) If there is disagreement on a material matter between the Administrator and an agency head regarding the establishment, management, or termination of advisory committees, the agency head shall have final authority, but a notice and description of the areas of such disagreement may be placed in the annual summary report required under section 10(d).

"ADVISORY COMMITTEE PROCEDURES

"SEC. 13. (a)(1) Each advisory committee meeting shall be open to the public and held—

"(A) at a reasonable time and in a place reasonably accessible to the public; and

"(B) in a meeting room sufficient to accommodate advisory committee members, committee or agency staff, and interested members of the public.

"(2) Except when the President determines otherwise for reasons of national security, timely notice of each such meeting shall be published in the Federal Register, and the Administrator may prescribe regulations to provide for other types of public notice to ensure that all interested persons are notified of such meeting prior thereto.

"(3) Interested persons shall be permitted to attend meetings of, appear before, or file statements with any advisory committee, subject to such reasonable rules or regulations as the Administrator may prescribe.

"(b) An advisory committee may not report advice or recommendations to the President or one or more agencies or officers or employees of the Federal Government without first holding a meeting at which a majority of the committee members approve the advice or recommendations to be reported.

"(c)(1) Subject to the provisions of section 552(b) of title 5, United States Code, records of an advisory committee, including reports, transcripts, minutes, appendices, working papers, drafts, studies, agendas, or other recorded information, shall be available for public inspection and copying—

"(A) at a single location in the offices of the advisory committee or the agency which established or provides support services to the advisory committee during the existence of the advisory committee; and

"(B) at a single location to be specified in the committee's charter for at least 1 year after the committee ceases to exist.

"(2) Any record that is to be discussed or acted upon at a public meeting of an advisory committee shall be made available for public inspection and copying at least 48 hours in advance of such meeting.

"(3) Notwithstanding the provisions of paragraph (1), the provisions of section 552(b)(5) of title 5, United States Code, shall not apply to withhold the disclosure of any advisory committee record.

"(4) The disposition of such records, including transfer to the National Archives and Records Administration, shall be scheduled and carried out in accordance with the National Archives and Records Administration Act of 1984.

"(d) Detailed minutes of each meeting of each advisory committee (including each subcommittee or other subgroup as defined in section 3(3)) shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee. The accuracy of all minutes shall be certified by the

chairman of the advisory committee, or if appropriate, the chairman of the subcommittee or other subgroup, within 45 days after the meeting.

"(e) Subsections (a) (1) and (3) of this section shall not apply to any advisory committee meeting which the President, or the head of the agency to which the advisory committee reports, determines that such portion of such meeting may be closed to the public in accordance with subsection (c) of section 552b of title 5, United States Code. Any such determination shall be in writing and shall contain the reasons for such determination. If such a determination is made, the advisory committee shall issue a report at least annually setting forth a summary of its activities and such related matters as would be informative to the public consistent with the policy of section 552b of title 5, United States Code.

"(f)(1) Unless otherwise provided by statute, Presidential directive, or agency directive, the designated Federal official appointed under section 11(c)(4) or section 12(c)(5) shall attend the meetings of an advisory committee and no advisory committee shall conduct any meeting in the absence of such official. The designated Federal official is authorized to—

"(A) adjourn the meetings when such official determines that adjournment is in the public interest;

"(B) approve or call the meeting;

"(C) chair the meeting when so determined by the involved agency head; and

"(D) except for Presidential advisory committees, approve the agenda of the meeting.

"AVAILABILITY OF TRANSCRIPTS

"SEC. 14. (a) Agencies and advisory committees shall make available to any person, at actual cost of duplication, copies of transcripts and minutes of agency proceedings or advisory committee meetings.

"(b) As used in this section 'agency proceeding' means any proceeding as defined in section 551(12) of title 5, United States Code.

"PRIVATE RIGHT OF ACTION AND ATTORNEYS' FEES

"SEC. 15. (a)(1) Whenever any advisory committee is not in compliance with any provision of this Act, or any rule promulgated thereunder, any person may bring a civil action against the agency which has established, chartered, or utilized the advisory committee and the district courts of the United States shall have jurisdiction over such actions.

"(2) In the case of Presidential advisory committees that have not been chartered, established, or utilized by an agency, any person may bring an action against the President in order to obtain compliance with this Act, and the district courts of the United States shall have jurisdiction over such actions.

"(b) Venue in actions brought under this section lies in either the United States District Court for the District of Columbia or the district court of the United States in the district in which the complainant resides or has his principal place of business.

"(c)(1) Prior to filing any action under this section, the complainant shall make a request for relief, in writing, to the agency that has chartered, utilized, or established the advisory committee as to which relief is sought, and such request shall also be sent to the General Services Administration.

"(2) In the case of Presidential advisory committees which have not been chartered, established or utilized by an agency, such requests shall be made to the Counsel to the