# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, ) | |
| ) | |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 07-0990 (JR) |
| v. ) | |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| MAILERS TECHNICAL ADVISORY COMMITTEE, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS

1

# Table of Contents

**Page**

I.  INTRODUCTION................................................................................................ 1

II. FACTS ............................................................................................................. 2

A. PARTIES ......................................................................................................... 2

B. MTAC FUNCTIONS, STRUCTURE, ACTIONS ............................................. 5

C. ACTUAL AND POTENTIAL IMPACT OF MTAC RECOMMENDATIONS
   ON APWU AND CAPS................................................................................... 7

D. APWU AND CAPS EFFORTS TO GAIN ACCESS TO MTAC MEETINGS
   AND MATERIALS......................................................................................... 8

III. STATUTORY BACKGROUND ...................................................................... 11

A. THE FEDERAL ADVISORY COMMITTEE ACT............................................ 11

B. THE STATUS OF THE USPS UNDER THE POSTAL REORGANIZATION

AND APPLICATION OF FEDERAL LAW TO THE USPS ................................ 15

IV. STANDARDS ON MOTION TO DISMISS...................................................... 16

V. ARGUMENT................................................................................................... 17

A. THE FEDERAL ADVISORY COMMITTEE ACT APPLIES TO THE
   POSTAL SERVICE ....................................................................................... 17

1.  The USPS is covered by FACA ................................................................. 17

2.  The PRA does not exempt USPS from FACA.............................................. 18

B.  MTAC WORK GROUPS ARE COVERED BY THE FACA.......................... 22

C. APWU AND CAPS HAVE A RIGHT OF ACTIONS FOR ENFORCEMENT
OF FACA ..................................................................................................... 25

D. EVEN IF PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION UNDER
THE FACA, THEY STILL HAVE A RIGHT OF ACTION FOR REVIEW OF
UNLAWFUL AGENCY ACTION........................................................................ 39

E. IF PLAINTIFFS DO NOT HAVE A PRIVATE RIGHT OF ACTION UNDER
FACA, OR THE ABILITY TO CHALLENGE THE USPS ACTIONS UNDER
THE COMMON LAW OF JUDICIAL REVIEW OF AGENCY ACTION, THE
COURT HAS JURISDICTION TO REQUIRE THE USPS TO COMPLY
WITH THE FACA UNDER THE FEDERAL MANDAMUS ACT ..................... 41

CONCLUSION ....................................................................................... 44

Table of Authorities

Page

*Abbott Laboratories v. Gardner,*
387 U.S. 136 (1967) ................................................................. 41

*Aid Association for Lutherans v. United States Postal Service,*
321 F.3d 1166 (D.C. Cir. 2003) ................................................ 40

*Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior,*
26 F. 3d 1103 (11th Cir. 1994) ................................................ 26

*Allen v. Wright,*
468 U.S. 737(1984) .................................................................. 33

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................. 36

*American Library Ass'n v. FCC,*
406 F. 3d 689 (D.C. Cir. 2005) ................................................ 22

*Animal Legal Defense Fund v. Shalala,*
104 F. 3d 424 (D.C. Cir. 1997) ................................................ 26

*Assoc. Of Am. Physicians and Surgeons v. Clinton,*
997 F.2d 898 (D.C. Cir. 1993) ........................................ 14,20,25

*Beatty v. Washington Metro. Area Transit Auth.,*
860 F.2d 1117 (D.C. Cir. 1988) ................................................ 42

*Bensman v U.S. Forest Service,*
408 F. 3d 9458 (6th Cir. 2005) ................................................ 33

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979) ....................................... 25,27,28,32,34,37,38,39

*Carlin v. McKean,*
823 F.2d 620 (D.C. Cir. 1987) ........................................................... 14,16

*Center for Arms Control and Non-Proliferation v. Lago*
2006 WL 3328257 (D.D. C. 2006) ............................................................ 27

*Center for Auto Safety v. Tiemann,*
414 F. Supp. 217 (D.C. C. 1976) .............................................................. 39

*Combined Communications v. United States Postal Service,*
891 F.2d 1221 (6th Cir. 1989) .................................................................. 40

*Cort v. Ash,*
422 U.S. 66 (1975) ............................................... 27,28,32,34,37,38,39

*Cummock v. Gore,*
180 F.3d 282 (D.C. Cir. 1999) ....................................................... 14,25,31

*Depippo v. Cehertoff,*
453 F. Supp. 2d 30 (D.D.C. 2006) ............................................................ 17

*Food Chem. News v. DHHS,*
980 F. 2d 1468 (D.C. Cir. 1992) ......................................................... 25,44

*Holy Land Found for Relief & Dev. v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003) .................................................................. 15

*International Brominated Solvents Ass'n. v. American Conference of*
*Governmental Industrial Hygienists,*
393 F. Supp. 2d 1362 (M.D. Ga 2005) .................................................. 33,34

*Judicial Watch, Inc. v. National Energy Policy Development Group,*
219 F. Supp. 2d 20 (D.D. C. 2002) ........................................................ 33,34

*Kendall v. United States,*
37 U.S. 524 (1838) .................................................................................. 38

*Kuzma v. United States Postal Service,*

798 F. 2d 29 (2d Cir. 1986) ..................................................................... 18
*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .......................................................................... 33,34

*Macharia v. United States,*
334 F.3d 61(D.C. Cir.2003) .................................................................. 16

*Mail Order Ass'n. Of America v USPS,*
986 F. 2d 509 (D.C. Cir. 1993) ............................................................. 3,18

*Manshard v. Fed. Judicial Qualifications Comm.,*
408 F.3d 1154(9th Cir.2005)................................................................. 34

*Medicare Reimbursement Litigation,*
414 F.3d 7 (D.C. Cir. 2005) ................................................................. 42

*Miccosukee Tribe v. Southern Everglades Restoration Alliance,*
304 F. 3d 1076 (11th Cir. 2002)........................................................... 26,39

*National Easter Seal Society v. USPS,*
656 F. 2d 754( D.C. Cir. 1981) ............................................................. 20,21

*National Association of Postal Supervisors v. United States Postal Service,*
602 F.2d 420, 429 (D.C. Cir. 1979) ......................................................... 40

*Natural Resources Defense Council v. Abraham,*
233 F. Supp. 2d 162 (D.D.C. 2002) ......................................................... 37

*Natural Resources Defense Council v. Pena,*
147 F 3d 1012 (D.C. Cir. 1998) ............................................................. 26

*Northern States Power Co. v. U.S. Dep't of Energy,*
128 F.3d 754 (D.C. Cir. 1997) ............................................................. 37,42

*Pitney Bowes, Inc. v. USPS,*
27 F. Supp. 2d 15(D.D.C. 1998) ........................................................... 15,17

*Power v. Barnhart,*

292 F.3d 781 (D.C. Cir. 2002) ............................................... 42

*Public Citizen v. U.S. Dept of Justice,*
491 US 440 (1989) ............................................ 13,26,27,33,38,39

*School of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ................................................................. 41

*Stark v. Wickard,*
321 U.S. 288 (1944) ............................................................... 41

*Sofamor Danek v. Gous,*
 61 F3d 929 (D.C. Cir. 1995) ............................................... 14

*Swan v. Clinton,*
100 F.3d  973 (D.C. Cir. 1996) ........................................... 42

*T&S Products, Inc. v. United States Postal Service,*
1994 WL 1026493 (D.D.C.)................................................... 40

*United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson,*
255 U.S. 407 (1921) ............................................................... 41

*United States Postal Service v. Flamingo Industries,*
540 U.S. 736 (2004) .......................................................... 15,17

*Warth v. Seldin,*
422 U.S. 490 (1975) ............................................................... 33

*Washington Legal Foundation v. American Bar Ass'n.,*
648 F. Supp 2d 1353, 1361 (1986)........................................ 26

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
89 F.3d 901 ........................................................................... 44

*Zivotofsky v. Secretary of State,*
44 F. 3d 614(2006) ................................................................ 33

**Statues**                                                            **Page**

5 U.S.C. §551(a) ................................................................................ 11,17

5 U.S.C. §552 (a) (b) ...................................................................... 13,14,18

28 U.S.C. § 1331 (a) and 1339 ........................................................... 39,40

28 U.S.C. § 1361 ..................................................................................... 42

39 U.S.C. §101 ......................................................................................... 2

39 U.S.C. §201 ................................................................................ 2,15,17

39 U.S.C. § 409 ...................................................................................... 39

39 U.S.C. §410 ................................................................................... 10,40

# I. INTRODUCTION

This brief is submitted by plaintiffs the American Postal Workers Union, AFL-CIO ("APWU"") and Consumer Alliance for Postal Services ("CAPS") in opposition to the motion of defendant United States Postal Service ("USPS") for dismissal of the APWU/CAPS complaint for enforcement of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 §§1-15, with respect to the USPS-created Mailers Technical Advisory Committee ("MTAC"). APWU and CAPS respectfully submit that the USPS has not shown that the complaint should be dismissed. They further submit that, when the allegations of the complaint, and other facts set forth in declarations submitted with this brief are accepted as true, and viewed in the light most favorable to the plaintiffs, they have shown that the Court has jurisdiction over their complaint. In particular, this brief demonstrates that the FACA applies to the USPS, that the USPS is not exempt from the FACA, that APWU and CAPS can enforce the FACA through a private right of action before this Court and that, alternatively, the Court has jurisdiction over their complaint for enforcement of the FACA pursuant to a common law right of judicial review of agency actions in violation of law, or under the Federal mandamus act.

## II. FACTS

### A.    PARTIES

Pursuant to the Postal Reorganization Act ("PRA"), 39 U.S.C. §101 et seq., the USPS was created as "an independent establishment of the executive branch of the Government of the United States... ." 39 U.S.C. §201. The PRA assigned to the USPS the mail processing and delivery functions of the United States Post Office while removing certain political influences

2

and relieving the USPS of certain legal restraints. While the Postal Service is no longer a cabinet agency, the USPS is still part of the executive branch; it is governed by the Postal Board of Governors, the overwhelming majority of whom (9 of 11) are appointed by the President; and various of its major decisions are subject to approval by the Presidentially appointed Postal Rate Commission ("PRC"). The USPS is still managed by the Postmaster General who now is appointed by the Board of Governors. *Mail Order Ass'n. Of America v USPS*, 986 F. 2d 509, 512-513 (D.C. Cir. 1993).

MTAC was established by the USPS as an advisory committee to provide advice and recommendations to the USPS. It is composed of USPS officials, mailers and mailer associations, and other associations and organizations interested in the mail industry and postal policies and procedures. MTAC's Charter and Bylaws describe MTAC as "a joint effort between mailers and the US Postal Service to share technical information, advice and recommendations on matters concerning mail-related products and services in order to enhance customer value and expand the use of these products and services for mutual benefit". MTAC meets at least quarterly at the USPS headquarters and has its mailing address at the USPS headquarters at 475 L'Enfant Plaza, SW, Washington, DC  20260. Complaint ¶s 11-15; Declaration of Phillip A. Tabbita (APWU/CAPS Exhibit 1) ¶s3-4 and Ex. 1.

APWU is an unincorporated labor organization that represents approximately 300,000 employees of the Postal Service for purposes of collective bargaining and in other efforts for their mutual aid and benefit. APWU represents Postal employees who perform various types of work including  Clerks, Mail Equipment Shop Employees, Maintenance Employees, Material Distribution Centers Employees, Motor Vehicle Service Employees, Operating Services

Employees, and Information Technology/Administrative Assistance Center Employees. Tabbita

Dec. ¶ 2. The Union is a party to collective bargaining agreements with the Postal Service

covering those employees. APWU maintains offices and conducts business throughout the

United States and has Local affiliates in every state and territory of the United States which

provide representation to its members at Postal facilities and installations through the Nation.

Tabbita Dec. ¶ 2; Declaration of Clifford J. Guffey (APWU/CAPS Ex. 2) ¶s3-6. APWU has been

an active participant in proceedings before the Postal Rate Commission and now the Postal

Regulatory Commission (both referred to herein as "PRC"). APWU has appeared before the

PRC to advocate on behalf of itself, its members, individual mailers and small mailers; and to

oppose efforts by certain large mailers to alter Postal processes and operations in ways that

would increase costs and decrease services for individual mailers and small businesses , and

decrease revenue for the USPS. Tabbita Dec. ¶ 18. The APWU also sponsors a health plan that,

under contract with the U.S. Office of Personnel Management, provides health insurance

services to federal and postal employees through the Federal Employees Health Benefits

Program. The APWU, its locals and the APWU Health Plan collectively mail more than five

million pieces of mail each year. APWU sends mail in, and receives mail from, every U.S. State

and territory. Guffey Dec. ¶s 4-6.

　　CAPS was founded in 2003 to protect affordable and dependable mail service for all

Americans through participation in the legislative and regulatory process as it affects postal

services. CAPS members are nonprofit organizations that regularly communicate with their

members by using postal services. CAPS members and the constituents of CAPS members have

a direct interest in access to affordable and efficient postal services, and CAPS engages in

4

various advocacy activities to support postal services for its members and other individuals and small businesses. Declaration of Richard Farrell (APWU/CAPS Ex. 3) ¶s2-7.

## B.    MTAC FUNCTIONS, STRUCTURE, ACTIONS

The MTAC Charter and Bylaws states that it is a "joint effort between mailers and the US Postal Service to share technical information, advice and recommendations on matters concerning mail-related products and services in order to enhance customer value and expand the use of these products and services for mutual benefit". MTAC may not meet without a representative of the USPS and approval of the USPS, and the USPS provides administrative support for MTAC. Meetings of the full committee are generally held on a quarterly basis each calendar year or at the call of the Postal Service Co-Chair. The Vice President, Service & Market Development is the MTAC Co-Chair for the Postal Service. The Postal Co-Chair appoints two Vice-Chairs from the Postal Service. The industry Co-Chair and Vice-Chair are elected from the MTAC industry representatives. MTAC quarterly meetings are typically attended by MTAC members and their invitees, MTAC work group members, Postal Service officials and persons invited by the USPS. MTAC keeps minutes of its quarterly meetings and such minutes are verified by the MTAC USPS representatives. MTAC also receives work group reports and recommendations. MTAC minutes, MTAC recommendations and reports, MTAC work group notes, and MTAC work group reports are posted on the MTAC Issue Tracking System ("MITS"). Access to MITS is restricted to MTAC members with MITS usernames and log-in codes. Non-members may attended general session meetings of MTAC only at the specific invitation of a member representative and with advance approval by MTAC. Complaint ¶13, Tabbita Ex. 1.

5

MTAC functions primarily through issue-focused work groups that are chartered, established and monitored by the MTAC Steering Committee. The work groups study mail industry problems and issues, and propose actions and solutions to MTAC. MTAC has work group guidelines which provide that any MTAC representative or USPS executive can propose an issue that would require the formation of a new work group. MTAC work groups generally meet at least quarterly and often in conjunction with MTAC meetings. MTAC work groups keep notes of their meetings and make reports and recommendations to MTAC. MTAC and MTAC work groups have investigated, studied, reported-on, offered opinions on, and provided advice and recommendations to, the USPS on various subjects involving Postal operations, and they are currently investigating and studying various subjects involving Postal operations. Among other things, MTAC work groups have investigated and studied, or are investigating and studying: changes in design for flat mail, proposals for productivity improvements generally, drop shipments and "mail induction", flat sequencing system, changes in locations for regional distribution centers, optimization of mailer discounts, co-palletization of trays, adoption of vote-by-mail systems, changes in bar codes, alternative packaging, workshare discounts, Destinating Delivery Unit (DDU)) induction, pricing changes, new labeling standards, seamless acceptance programs, distribution center relocation, and service standards. Complaint ¶21, Tabbita Dec. ¶s 6-8.

The USPS receives and may act on MTAC and MTAC work group recommendations; and has done so in the past. Tabbita Dec. ¶¶ 7-14. The USPS has also presented issues to the PRC where the USPS position adopted MTAC recommendations or was influenced by MTAC recommendations. The PRC has held proceedings concerning matters on which MTAC has made

6

recommendations to the USPS, and on USPS policies, proposals and positions recommended by, or influenced by MTAC. Complaint ¶25, Tabbita Dec.¶7.

### C.    ACTUAL AND POTENTIAL IMPACT OF MTAC RECOMMENDATIONS ON APWU AND CAPS

The Postal Service has sought, and/or received recommendations from MTAC on numerous issues of major importance in postal affairs. These issues have run the gamut from implementation of the ZIP Code to mail preparation to the forms used by the Postal Service in its daily business affairs. Tabbita Dec. ¶s 7-8. The Postal Service has adopted many MTAC recommendations, including altering rules for the preparation of mail pieces and the requirements for entering the mail into the postal system and how the mail will be processed once it is entered. Tabbita Dec. ¶ 7. Many of these recommendations have the actual or potential effect of lowering mail processing costs for large mailers and shifting the burden of bearing some additional postal costs to individuals and other small mailers. See Tabbita Dec. ¶¶ 11-20.

APWU and APWU members are impacted by the implementation of MTAC recommendations. Many of the recommendations involve either a reduction in the size of the mail processing network or the reduction in postal service revenues (through an increase in discounts provided to mailers) or a reduction in the amount of work available to APWU members. For example, by entering mail deeper into the postal system large mailers bypass certain processing facilities and functions, including mail sorting and transportation. APWU represents the workers who would normally perform this work. Tabbita Declaration ¶ 9. MTAC recommendations can impact the work environment of postal employees, implicating work safety and ergonomic issues of great importance to the APWU and its members. Tabbita

7

Declaration ¶10. Additionally, the money mailers save as a result of the implementation of MTAC recommendations is money lost to the Postal Service. Anything that affects the Postal Service financially affects the collective bargaining position of the APWU. Tabbita Declaration ¶ 10.

The APWU, separate and apart form being a labor union, is also a mailer. The APWU spends approximately $5 million a year on postage. The APWU has approximately 20 national field offices and roughly 1400 local offices throughout the United States and territories. However, the APWU , like many small business mailers, is not a large enough mailer to take advantage of the discounts and other programs large mailers enjoy. Guffey Dec. ¶¶ 5-8. To the extent that the Postal Service provides bigger discounts to larger mailers, these actions increase the relative cost of APWU postage and adversely impact the APWU as a mailer. *Id.*

CAPS s is an umbrella organization comprised primarily of small and medium size non-commercial mailers. Farrell Dec. ¶ 3. CAPS members regularly communicate with their constituents through the Postal Service and have a direct interest in efficient and affordable postal services. However, CAPS is not a large mailer organization. To the extent that large mailers benefit by the decisions and recommendations of MTAC, CAPS and its member organizations are disadvantaged because CAPS and its members are unable to take advantage of programs and policies designed by large mailers for the benefit of large mailers. Farrell Dec. ¶s 4-7.

### D. APWU AND CAPS EFFORTS TO GAIN ACCESS TO MTAC MEETINGS AND MATERIALS

On November 16, 2006, APWU President William Burrus wrote to the Postal Service Chair of MTAC requesting information about MTAC members and MTAC work groups;

descriptions of the subject areas of each work group; copies of minutes of prior MTAC and

workgroup meetings; copies of reports, agendas, updates and recommendations of work groups;

and an MITS username and password for access to that system. APWU also sought to make

arrangements to attend MTAC and work group meetings. The USPS responded to this letter by

letter dated December 8, 2006, requesting an explanation of the relevance of the requested

information to collective bargaining. Sometime during the last months of 2006, the MTAC

website was changed so that MTAC materials that previously had been available were no longer

available without an MITS password. Complaint ¶s 29-30.

On January 9, 2007, APWU's counsel wrote to MTAC and the USPS stating that APWU

had assumed that the Postal Service and MTAC would have no hesitation about providing the

information and documents the Union had requested but that APWU also sought the information

and documents pursuant to the Federal Advisory Committee Act.  On January 26, 2007 the

Postal Service sent another letter APWU which asserted that the FACA is inapplicable to the

Postal Service, but that the USPS would provide certain information including the members and

work groups, the subject areas of the work groups, the dates of future MTAC meetings, and

copies of minutes from some meetings. The January 26 USPS letter also stated that "Attendance

at MTAC General Session and individual work group meetings is restricted to MTAC members,

member-invited and approved MTAC guests". On February 13, 2007, counsel for the APWU

again wrote to  MTAC and the USPS repeating APWU's  requests for the reports, agendas,

updates and recommendations of MTAC work groups, the full materials made available to

MTAC members and others who attend MTAC meetings, and MITS access authority.  Also in

February of 2007, Phillip Tabbita, APWU Manager of Negotiation Support made e-mail requests

9

for information to the MTAC Postal Chair stating that he was no longer able to access certain MTAC information that had been publicly available in the past and requesting access to such information. An MTAC official responded to Mr. Tabbita by referring him to the USPS letter of January 26, 2007, and by advising him that access to any MTAC website materials required an MITS password. Complaint ¶s 31-35.

On April 2, 2007, the USPS co-chairperson of MTAC responded to the February 13, 2007 letter of APWU's counsel and stated that "[w]e are treating your letter as an informal Freedom of Information Act (FOIA) request. She then refused to produce the information sought, beyond what had already been provided, asserting that it was exempt from disclosure under certain exemptions to the FOIA. Among other things, the April 2 letter asserted that MTAC reports, agendas, updates and recommendations are exempt from disclosure under FOIA exemption 5 covering pre-decisional and deliberative process materials. The April 2 letter also asserted that the requested materials were exempt from disclosure pursuant to FOIA exemption 5, which exempts materials exempted by other statutes, 39 U.S.C. §410(c)(5) which in turn, the letter said, allows the USPS to withhold consultant reports from disclosure under the FOIA. Finally, the April 2 letter denied APWU an MITS password and ability to attend MTAC meetings on the basis that these requests were outside the scope of the FOIA. Complaint ¶37.

As part of its activities to support postal services for individuals and small businesses, CAPS applied for membership in MTAC, using the procedures established by MTAC for that purpose. MTAC refused to admit CAPS into membership. CAPS subsequently made a request to attend MTAC meetings and obtain MTAC documents but has received no response to these requests. Farrell Dec. ¶S 8-9 and Farrell Ex. 1. As a result of the USPS and MTAC refusal to

10

admit CAPS as a member, and as a result of their failure to permit CAPS to attend meetings and obtain documents, CAPS and its member organizations have been deprived of knowledge of MTAC and MTAC work group activities and plans, deprived of access to MTAC documents and papers, and deprived of knowledge of MTAC and MTAC work group recommendations. CAPS and its member organizations have been denied the ability to attend, appear before, and/or file statements with MTAC and MTAC work groups on issues of interest to CAPS and its member organizations with respect to MTAC and MTAC work group advice and recommendations to the USPS on subjects where CAPS and its member organizations are, or are likely to be, affected by USPS adoption of MTAC recommendations, or reliance on MTAC advice. Complaint ¶s 41, 53, 56.

### III. STATUTORY BACKGROUND

### A.    THE FEDERAL ADVISORY COMMITTEE ACT

In its statement of findings and purpose in creating FACA, Congress declared, among other things, that, "Congress and the public should be kept informed with respect to the number, purpose, membership activities and cost of advisory committees" and that "the function of advisory committees should be advisory only and that all matters under their consideration should be determined, in accordance with law, by the official, agency or officer involved". 5 U.S.C.A. app. 2 § 2(5) and (6) .

By its express terms the FACA applies to government agencies. Section 3 of the FACA states that for purposes of the Act, agency "has the same meaning as in section 551(1) of Title 5 United States Code." 5 U.S.C.A. app. 2 § 3(3). Section 551(1) of Title V of the U.S. Code, which is part of the Administrative Procedure Act ("APA"), defines "agency" as: "...each

11

authority of the United States, whether or not it is within or subject to review by another agency, but does not include..." [certain exceptions, the USPS is not one of the identified exceptions].[1] FACA Section 4 then explicitly excludes from its coverage advisory committees established by two specific agencies: the Central Intelligence Agency and the Federal Reserve Board. FACA Section 8 makes agency heads responsible for establishing rules and regulations for advisory committees established by their agencies and directs agency heads to designate officers to control and supervise advisory committees.

FACA Section 10 establishes certain statutory mandates for advisory committee procedures, meetings, reports and disclosures of information. Among other things, FACA Section 10 requires that all advisory committee meetings "shall be open to public", except in

---

[1] 5 U.S.C. §551 (1) provides (emphasis added):

"agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include - (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia; or except as to the requirements of section 552 of this Title - (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them; (F) courts martial and military commissions; (G) military authority exercised in the field in time of war or in occupied territory; or (H) functions conferred by sections [dealing with banking, mortgage insurance, war time contracts, etc.].

certain situations; that "all interested persons shall be permitted to attend, appear before and file statements with any advisory committee", subject to reasonable rules and regulations and certain express exceptions; that advisory committee records, reports, agendas, minutes, transcripts and studies "shall be available for public inspection and copying, subject to 5 US §552 rules and exceptions; that advisory committees must keep detailed and accurate minutes; and that advisory committee meetings must be called by an agency officer with an agency approved agenda. FACA Section 11 provides that transcripts of advisory committee proceedings must generally be made available to any person.

The House of Representatives' Report on the FACA stated that "one of the great dangers of the unregulated use of advisory committees is that special interest groups may use their membership on such committees to promote their private concerns"; two examples of such situations were then cited. House Report No. 92-1017, 1972 U.S.C.A.A.N 3491, 3496. With respect to FACA Section 10, the Report stated "This provision has the effect of assuring openness in the operations of advisory committees. This provision, coupled with the requirement that complete and accurate minutes of committee meetings be kept serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group. Along with the provisions for balanced representation contained in §4 of the bill, this requirement of openness is a strong safeguard of the public interest". *Id.* at 3500.

In *Public Citizen v. U.S. Dept of Justice,* 491 US 440 (1989) the Supreme Court stated that the purpose of FACA was :

> ...to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards

13

and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature. § 2(b). To attain these objectives, FACA directs the Director of the Office of Management and Budget and agency heads to establish various administrative guidelines and management controls for advisory committees. It also imposes a number of requirements on advisory groups. For example, FACA requires that each advisory committee file a charter, §9 (c) and keep detailed minutes of its meetings. §10 (c). Those meetings must be chaired and attended by an officer or employee of the Federal Government who is authorized to adjourn any meeting when he or she deems its adjournment in the public interest. § 10 (e). FACA also requires advisory committees to provided advance notice of their meetings and to open them to the public, §10 (a), unless the President or the agency head to which an advisory committee reports determines that it may be closed to the public in accordance with the Government in the Sunshine Act, 5 U.S.C. § 552b( c) §10 (d). In addition, FACA stipulates that advisory committee minutes, records, and reports be made available to the public, provided they do not fall within one of the Freedom of Information Act's exemptions, see 5 U.S.C. § 552 , and the Government does not choose to withhold them. §10 (b).

*Id* at 446, footnote omitted.

In *Assoc. Of Am Physicians and Surgeons v. Clinton,* 997 F2d 898, 903 (D.C. Cir. 1993), the D.C. Circuit stated that Congress passed FACA in 1972 to control the growth and operation of the "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C. App. 2, §2(a).... The statute orders agency heads to promulgate guidelines and regulations to govern the administration and operations of advisory committees". *See also Sofamor Danek v. Gous,* 61 F3d 929 (D.C. Cir. 1995) --"The statute has two principal purposes; "to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them"; *Cummock v. Gore,* 180 F3d 282, 284-285 (D.C. Cir. 1999)-Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interest seeking to advance their own agendas....Congress aimed, in short, " 'to control the advisory committee

14

process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals'".

**B.    THE STATUS OF THE USPS UNDER THE POSTAL REORGANIZATION ACT AND APPLICATION OF FEDERAL LAW TO THE USPS**

The PRA established the USPS as an agency of the government. PRA Section 201, 39 U.S.C. §201, states that the USPS is"an independent establishment of the executive branch of the Government of the United States... ." Courts that have considered this issue have held that the USPS is indeed an agency of the Federal government. In *United States Postal Service v. Flamingo Industries*, 540 U.S. 736, 744 (2004),  the Supreme Court cited PRA Section 201 and stated that "the Postal Service is part of the Government" and that "[w]hile Congress waived the immunity of the Postal Service [from suit], Congress did not strip it of its governmental status". The D. C. Circuit has held that "despite Congress' extensive reorganization of the [USPS] in the [PRA], to permit the [USPS] to operate in a more business-like fashion, the [USPS] *clearly remains a government agency*- an independent establishment of the Government of the United States." *Carlin v. McKean*, 823 F.2d 620, 622 (D.C. Cir. 1987), emphasis added; *Pitney Bowes, Inc. v. USPS*, 27 F.Supp.2d 15, 20-21 (D.D.C. 1998).

The USPS is headed by the Postmaster General (PMG), who is the Chief Executive Officer of the Postal Service.  39 U.S.C. Section 203.  The PMG is appointed by the presidentially-appointed Board of Governors. Thus, by the plain terms of the PRA and by the structure of the USPS it is clear that it is an agency of the Government and, within the meaning of the FACA- is "an authority of the United States."

To the extent that Congress sought to generally relieve the USPS of obligations under

15

certain statutes, it did so expressly. Thus, PRA Section 410 provides that "Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5 shall apply to the exercise of the powers of the Postal Service." Section 410(b) then provides that certain statutes that would have been inapplicable to the USPS under Section 410(a), are nonetheless applicable, including several parts of title 5 (*i.e.* the Freedom of Information Act (§552) the Privacy Act (§552a) and the Open Meetings Act (§552b).[2]

The recently enacted Postal Enhancement and Accountability Act ("PEAA") did not change the status of the USPS as an "establishment of the executive branch of the Government", nor did it alter the Section 410(a) exemptions of the USPS from of certain laws or the Section 410(b) provision that certain of those laws nonetheless apply to the USPS.

## IV. STANDARDS ON MOTION TO DISMISS

It is well-established that, in considering a motion to dismiss under Rule 12(b)(6), a court should not dismiss a complaint unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief; and that the court must treat the complaint's factual allegations, including mixed questions of law and fac, as true; and must draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United*

---

[2]As is discussed more fully below, the FACA is not in Title 5 but is temporarily housed in the appendix to Title 5.

*States,* 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Dev. v. Ashcroft,* 333

F.3d 156, 165 (D.C.Cir.2003); *Depippo v. Cehertoff,* 453 F. Supp 2d 30, 32 (D.D.C. 2006).

## V. ARGUMENT

### A.    THE FEDERAL ADVISORY COMMITTEE ACT APPLIES TO THE POSTAL SERVICE

The USPS motion to dismiss begins with a discussion of PRA Section 410 provisions on

application of certain laws to the USPS from certain laws and then argues that the Postal Service

is exempt from the FACA. USPS Brief at 8-11. However, APWU and CAPS respectfully submit

that the USPS is subject to the FACA under the plain language of the statute, and that the PRA

does not exempt the Postal Service from the FACA.

#### 1. The USPS is covered by FACA

As described above, FACA applies to government agencies and it adopts the definition of

agency in 5 U.S.C. §551(a) which in turn defines agency as "...each authority of the United

States, whether or not it is within or subject to review by another agency..." other than certain

specifically excepted agencies. The PRA establishes the USPS as an agency of the government,

stating that the USPS is "an independent establishment of the executive branch of the

Government of the United States... ." 39 U.S.C. §201. *See also Flamingo Industries,* 540 U.S. at

744; *Carlin v. McKean*, 823 F.2d at 622--the USPS "clearly remains a government agency";

*Pitney Bowes, Inc. v. USPS*, 27 F.Supp.2d at 20-21.

The USPS brief contains an extended discussion of the background of, and congressional

purpose behind, the PRA, especially the goal of making the USPS run more like a business.

Based on this discussion, the USPS asserts that its new structure means that it is not an agency

subject to FACA.  Brief at 2-4, 9-11. However, regardless of this purpose, the PRA expressly

17

defines the USPS as an establishment in the executive branch, and as such it is an agency under

FACA. Morever, the fact that Congress wanted to improve efficiency of the Postal Service,

minimize political influence and allow the Service to operate in a more business-like manner

(*Mail Order Ass'n., supra* , 986 F. 2d at 519-520; *Kuzma v. USPS*, 798 F. 2d 29, 31 (2d Cir.

1986)) is not at odds with the fact that the USPS is an agency of the government. In any event

precedent in this Circuit and this Court (cited above) holds that the USPS is an agency.

Given the language of FACA Section 2 and 5 U.S.C. §551, the USPS is covered by

FACA unless it is exempted from that Act.

2.    **PRA does not exempt USPS from FACA**

The principal thrust of the USPS argument is that Section 410 of the PRA renders the

FACA inapplicable to the Postal Service. USPS Brief at 9-11.  Although the PRA was enacted

after the FACA, no provision of the PRA expressly excepts the USPS from coverage of the

FACA. The USPS relies on PRA Section 410(a) which states that: "except as provided in

subsection (b) of this section" or except as otherwise provided in Title 39 or USPS regulations,

"no Federal law dealing with public or Federal contracts, property, works, officers, employees,

budgets, or funds, including the provisions of chapters 5 and 7 of Title 5, shall apply to the

exercise of the powers of the Postal Service."  Section 410(b) then provides that certain specific

laws that would be inapplicable under Section 410(a) continue to apply to the USPS, including

the Freedom of Information Act (5 U.S.C. §552), the Privacy Act (5 U.S.C. §552a) and the Open

Meetings Act (5 U.S.C. §552b). The USPS argues that Section 410(a) excepts the USPS from the

FACA and that Section 410(b) does not identify the FACA as a law that continues to apply to the

Postal Service, so the FACA is therefore inapplicable.

18

However, APWU and CAPS submit that the FACA is not a Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds. The FACA concerns agency use and misuse of advisory committees in connection with agency decision-making; and public access to advisory committee meetings, reports and processes. The FACA does not concern contracts, property, works, budgets or funds. Nor does the FACA concern the appointment, removal, compensation of officers or employees, other personnel actions involving officers or employees, or decisions or actions of officers or employees. The USPS contends that "[b]ecause MTAC's advice and recommendations concern mailing industry issues, USPS's association with MTAC undoubtedly impacts USPS's contracting, budgeting and funding operations..." within the meaning of Section 410(a) so the USPS must be exempt under that provision. USPS Brief at 13. This is quite a leap of logic which lacks foundation in any authority. Certainly, the USPS cites no authority for this assertion; it just says it's so. Moreover, the question under Section 410(a) is whether the FACA is a law dealing with contracts, budgets and funding; not whether MTAC as an advisory committee might address an issue that could effect contracts, budgets or funding. The mere fact that MTAC might make a recommendation that the USPS might adopt, which then might have an impact on expenditures or revenues does not mean that the FACA is a law dealing with contracts, budgets and funding. Indeed, under the USPS reasoning, laws that do not actually concern budgeting and funding but might somehow affect the USPS budget or finances by imposing requirements that may cause increases or decreases in expenditures or revenues, would not be applicable to the USPS solely on that basis. In its argument under Section 410(a) the USPS has ignored the question of what kind of statute the FACA is, and instead focused on the nature of the issues that can come before the committee.

19

But absent a showing that the FACA is a statute governing the areas listed in Section 410, it cannot be said that the list of subjects in Section 410(a) exempts the USPS from the FACA.

The USPS also relies on the part of Section 410(a) that excepts the USPS from the provisions of chapters 5 and 7 of Title 5; and it cites decisions holding that the USPS is not subject to the Administrative Procedure Act. USPS Brief at 13-14. The flaw in this argument is that the FACA is not part of chapters 5 or 7 of Title 5. In enacting the FACA, Congress did not make it a part of Title 5 at all. Indeed the D.C. Circuit has expressly stated that, "FACA is not part of Title V, which was enacted six years before FACA's passage, but, instead *is only temporarily housed* [in Title V] as an appendix. Typically, when Congress wishes to add a statute to Title 5, it amends the Title," just as Congress has done for the Government in the Open Meetings Act and the Privacy Act, but it did not amend Title 5 when it enacted FACA . *Ass'n. of Amer. Physicians and Surgeons v. Clinton*, 997 F.2d at 904, rev'd on other grounds not dealing with FACA's housing in or out of Title 5, emphasis added. Thus, the USPS cannot rely on the last part of Section 410(a) as excepting the USPS from the FACA because FACA is not a part of Title 5.

Other USPS arguments against application of the FACA also lack merit. It is asserted that the FACA does not apply because it is not listed in Section 410(b) as one of the statutes that applies to the USPS despite Section 410(a). But since the FACA is not excepted under Section 410(a), there was no need to restore it to effect in Section 410(b); so its omission from that provision does not advance the USPS argument that it is not covered by FACA. The USPS has cited *National Easter Seal Society v. USPS*, 656 F. 2d 754, 766 -767( D.C. Cir. 1981), which held that the USPS is exempt from the notice and comment procedures of the APA, noting that

20

Congress enacted the PRA to improve postal efficiency and promote modernization. USPS Brief at 13-14. But *National Easter Seal Society* is inapposite because it concerned application of the APA, which, unlike the FACA, is part of Title 5. The decision in that case discussed the PRA Section 410(a) general exemption of the USPS from certain types of laws, but noted that the there was a specific exemption from the provisions of chapters 5 and 7 of Title 5, and that Section 410(b) restored applicability of several provisions of Title 5, but not the APA; and that, in the face of such specific language, it could not be said that the APA remained applicable to the USPS. *Id* at 766. Because the decision in *National Easter Seal Society* was based on an express exemption of the APA set forth in Section 410(a) it is inapposite here where there is no such express exemption of the FACA in Section 410(a).

The USPS also contends that its dealings with MTAC are exempt from the FACA because MTAC supposedly qualifies as a consultant under Section 410(c). USPS Brief at 14. In four short sentences the USPS asserts that MTAC is a consultant under PRA Section 410(c)(5), that its reports would therefore be exempt from disclosure under FOIA in the same manner as if they were internal Postal Service materials and that this would include pre-decisional materials. None of these conclusory assertions is supported by any authority whatsoever. There has been no showing that a Section 410(c)(5) exemption from the FOIA means that such an exemption necessarily applies under FACA. But even if the USPS had supported application of Section 410(c)(5) to FACA, what is the basis for describing MTAC as a "consultant"? No authority under Section 410(c)(5) regarding the term consultant has been provided. The USPS itself has described MTAC as an advisory committee formed for the purpose of sharing technical information, allowing mailers to provide advice and recommendations on mail related products

and service to enhance customer value and for mutual benefit. USPS Brief at 5-6. No compensation flows from the USPS to MTAC. Furthermore MTAC members speak on behalf of their own constituents and seek to advance their own interests as mailers. This plainly is not a consultant relationship. And the notion that the MTAC reports are like internal confidential pre-decisional materials is specious. The contents of these materials are known to MTAC members who are USPS customers–they cannot possibly be considered to be like internal confidential pre-decisional materials. Moreover, MTAC information is often reported or described to the members of the associations of mailers that provide representatives to MTAC. Furthermore MTAC and MTAC work group meetings may be attended by non-member invitees. Thus, the USPS has not put forth an actual argument that MTAC materials and information are exempt from the FACA under PRA Section 410(c)(5), it certainly has not established that such an exemption applies to MTAC.

Finally, the USPS offers an argument based on supposed statements of the USPS' own views as to the application of the FACA, citing a letter from a USPS "representative" in response to a Congressional inquiry, and an OMB report describing its understanding of the views of the USPS concerning application of the FACA to the USPS. The USPS then asserts that Congress was aware of the USPS interpretation of the statute and did nothing to effect a change, so the Court should defer to the USPS "interpretation". USPS Brief at 11-12. There are several problems with this argument. Initially, APWU and CAPS note that an agency's interpretation of a statute is afforded deference only when the agency is acting pursuant to a Congressional delegation of authority to regulate or adjudicate in the areas in question. *American Library Ass'n v. FCC*, 406 F. 3d 689, 699 (D.C. Cir. 2005). Here the USPS certainly has no authority to

22

adjudicate or regulate under the FACA. And, to the extent that the USPS seeks judicial deference

to its interpretation of the PRA, it has not shown that Congress gave it authority to

authoritatively construe or apply PRA Section 410. In any event, the USPS has not shown that

there actually was any ruling or regulation under Section 410 to which the Court should defer.

The two "interpretations" cited by the USPS are a letter (USPS Ex D) that a representative whose

title is unknown wrote to a Congressional Committee about application of Section 410 to a

proposed amendment to Title 5 (a fairly equivocal statement at that); and an OMB report on

advisory committees that reported that the USPS was excluded from that report because OMB

said that the USPS Assistant General Counsel had opined that the USPS was exempt from

FACA. Neither of these opinions is a decision or regulation of the USPS itself that could be

entitled to judicial deference. Nor can it be said that these communications to Congress are

authoritative interpretations of the PRA by a decision-maker or decision-making body of the

USPS that constitute the sort of longstanding administrative interpretations that Congress may be

presumed to know and presumed to accept by inaction. Accordingly, the "interpretations" cited

by the USPS should be afforded no weight whatsoever.

APWU and CAPS have shown that the USPS is an agency covered by FACA under the

plain language of the statute. The USPS has asserted that it is nonetheless excepted from

compliance with FACA because of Section 410 of the PRA. But, APWU and CAPS have shown

that none of the USPS arguments demonstrate that the PRA actually exempts the USPS from the

FACA. APWU and CAPS therefore respectfully submit that the Court should reject the USPS

arguments that the FACA does not apply to its relationship with MTAC.

### B.    MTAC WORK GROUPS ARE COVERED BY THE FACA

23

The USPS also contends that even if it is covered by FACA, the MTAC work groups are not. USPS Brief at 20-23. However, the FACA itself, Section 3(2), covers not only advisory committees but also advisory committee "subcommittee[s] or other subgroup[s]". MTAC work groups are plainly subcommittees or subgroups of MTAC. Indeed, the MTAC Charter description of the work groups, and the Tabbita declaration, show that the work groups are subcommittees of MTAC. The USPS errs in contending that CAPS and APWU have not sufficiently alleged that MTAC work groups are covered by FACA because the work groups are not established or utilized by the USPS. USPS Brief at 20-23.[3] However, APWU and CAPS have alleged in their complaint MTAC work groups study and report on, and make recommendations concerning various subjects involving Postal operations, and that the USPS has acted on advice, recommendations, reports and opinions of MTAC work groups. The Tabbita declaration (¶¶ 5-8) shows that the USPS has acted on specific work groups reports and recommendations. And the MTAC charter itself indicates that the principal work of MTAC is done at the work group level and that their reports and recommendations are typically endorsed by MTAC. Since a court considering a motion to dismiss must treat the plaintiff's factual allegations as true, and draw all reasonable inferences therefrom in the plaintiff's favor, APWU and CAPS submit that, for purposes of the USPS motion, the Court should accept the plaintiffs' allegations that the work groups are established and utilized by the USPS and that the work groups are utilized by the USPS such that they are covered by the FACA. Because the work groups are MTAC subcommittees or subgroups established and utilized by the USPS the USPS

---

[3] The USPS brief does not deny that work groups function as advisory committees, it only asserts, erroneously, that the Complaint in this case does not sufficiently allege that work groups do function as advisory committees. Plaintiffs contend, on the basis of available evidence, that USPS follows work groups' advice.

24

motion to dismiss the APWU and CAPS claims with respect to the work groups should not be dismissed.

### C.    APWU AND CAPS HAVE A RIGHT OF ACTION FOR ENFORCEMENT OF FACA

The USPS asserts that even if it has violated the FACA, APWU and CAPS have no private right of action for enforcement of the Act. USPS Brief at 17-19. However, numerous cases have been litigated and decided in this Circuit and other Circuits based on complaints filed by private individuals and groups. Current D.C. Circuit precedent is that private parties have a right of action for enforcement of the FACA. To the extent that the USPS relies on *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979), and *Alexander v. Sandoval*, 532 U.S. 275 (2001), with regard to standards for determining when there is an implied private right of action for enforcement of a Federal statute, APWU and CAPS respectfully submit that their complaint satisfies those standards.

In *Cummock v. Gore, supra.*, the D.C. Circuit faced the issue of whether FACA rights and duties were enforceable in the courts (180 F.3d at 290); and it held that the plaintiff in that case did have a private right of action, stating: "there is no question under our precedent that members of the public have enforceable rights to obtain information under FACA, *see Food Chem. News* 980 F. 2d at 1472." In *Food Chem News v. DHHS*, 980 F. 2d 1468 (D.C. Cir. 1992), a private organization sought production of materials prepared by an advisory committee; the Court affirmed that the agency involved was required to produce the materials and was required to produce them prior to the meeting for which they were prepared. *Id.* at 1472. In *Assoc. Of Am Physicians and Surgeons v. Clinton, supra,* 997 F.2d 898, the D.C. Circuit considered a private group's claim under FACA, but held the statute inapplicable in that case.

25

The Court of Appeals considered and accepted a FACA claim of a private entity in *Animal Legal Defense Fund v. Shalala*, 104 F, 3d 424 (D.C. Cir. 1997), that a National Academy of Sciences committee on care and use of laboratory animals was an advisory committee and its actions were covered by FACA. And in *Natural Resources Defense Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998), the D.C. Circuit considered the FACA claim of a private group, but remanded the case for consideration of certain standing issues. In that case, the Court of Appeals referred to the Supreme Court's decision in *Public Citizen*, *supra*, noting that the Supreme Court had rejected arguments that a private party lacked standing to seek redress for a FACA violation. *Id* at 1020-1021, *citing* 491 U.S. at 447-451. *See also Washington Legal Foundation v. American Bar Ass'n.*, 648 F. Supp 2d 1353, 1361 (1986), rev'd on other grounds (17 F. 3d 1446 (D.C. Cir. 1994))–"plaintiff is correct in arguing that the courts have recognized a private right of action under the Act". The Eleventh Circuit has also considered FACA claims of private parties, and found violations of the Act and that the plaintiffs had standing to obtain relief under the Act, including injunctive relief. *Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior*, 26 F. 3d1103 (11th Cir. 1994); *Miccosukee Tribe v. Southern Everglades Restoration Alliance*, 304 F. 3d 1076, 1080 (11th Cir. 2002). APWU and CAPS therefore respectfully submit that the law in this Circuit is that private parties do have the right to bring actions for enforcement of the FACA.

Despite this precedent, the USPS argues that there is no private right of action under FACA based on the Supreme Court's decision in *Sandoval*. USPS Brief at 17-18. The USPS acknowledges that in *Cummock* the D.C. Circuit held that there is a private right of action under FACA, but it dismisses *Cummock* as "based on an assumption rather than the text and structure of FACA" and asserts that "*Cummock* must be reexamined". USPS Brief at 18 n. 7. However,

not only did the *Cummock* Court extensively analyze the FACA and its legislative history (180 F.

3d at 284-285), it also specifically addressed "the question of whether Cummock possesses an

enforceable right under FACA" (*id.* at 290). The Court then reviewed specific provisions of the

Act and noted Congress' intent "'to ensure that persons or groups directly affected by the work

of a particular advisory committee would have some representation on the committee'"; and "to

protect against 'the risk that governmental officials would be unduly influenced by industry

leaders'" . *Id.* at 291, citations omitted. The Court then concluded that members of the public

have enforceable rights under FACA. *Id.* at 292. Thus, the D.C. Circuit based its decision on

analysis of the text, structure and purpose of the Act  and not assumption.  *Cummock* and

decisions relying on *Cummock* are controlling precedent in this Circuit. *See also* the decision of

this Court in *Center for Arms Control and Non-Proliferation v. Lago*, 2006 WL 3328257

(D.D.C. 2006) at *4, holding that an organization had private right of action to enforce the

FACA, citing *Public Citizen* and *Cummock.*

     APWU and CAPS further submit that a holding that FACA is enforceable by private

parties is not at odds with the Supreme Court's decision in *Sandoval*. The majority decision in

*Sandoval* stated that it was applying the standards set forth in *Cannon* and *Cort v. Ash* ( 422 U.S.

___ 19__ ) for determining when it is appropriate to imply a private right of action for

enforcement of a federal statute. 532 U.S. at 286-287.  Those standards are: 1) whether the

plaintiff is one of the class for whose especial benefit the statute was enacted, does the statute

create a federal right in favor of plaintiff ; 2) is there an indication of legislative intent, explicit or

implicit, either to create such a remedy or to deny one; 3) is it consistent with the underlying

purposes of the legislative scheme to imply such a remedy for the plaintiff; and 4) is the cause of

action one traditionally relegated to state law. *Cort*, 422 U.S. at 78; *Cannon*, 441 U.S. at 688 n.9. Under those standards, there is a private right of action for enforcement of FACA.

Based on the language and structure of the Act, and its legislative history, APWU and CAPS submit that Congress intended that FACA would be enforced by private parties whose specific interests are protected by the Act; and that APWU and CAPS are of a class for whose benefit the statute was enacted. As APWU and CAPS have shown, FACA Section 10 requires that all advisory committee meetings "shall be open to public", except in certain situations; that "all interested persons shall be permitted to attend, appear before and file statements with any advisory committee", and FACA Section 11 provides that transcripts of advisory committee proceedings must generally be made available to any person. Moreover, Congress was clear that major purposes of the FACA were to guard against the ability of special interest groups to use their membership on such committees to promote their private concerns, to assure openness in the operations of advisory committees, to require that complete and accurate minutes of committee meetings be kept and made available to interested persons, to enhance the public accountability of advisory committees and to safeguard the public interest in fair, accurate, inclusive and unbiased advisory committees. Given the express language of the FACA conferring rights of attendance at meetings and access to materials, and the purpose of the FACA to open committees to scrutiny by interested persons, it is apparent Congress intended interested persons to be able to enforce the obligations it created in the Act.

MTAC and MTAC work groups deal with issues that are important to the members of CAPS, which are relatively small but still significant mailers, and important to the APWU both as a relatively small mailer and as the representative of hundreds of thousands of postal

employees.  Worksharing activities by large mailers provide an important example.[1]
Worksharing refers to activities performed by mailers to prepare their mail for processing by the
Postal Service.  For example, very large mailers are given substantial rate discounts for
presorting and prebarcoding their mail.  This presorting and prebarcoding work takes the place of
work that postal employees would have to perform if the large mailers did not do it before
depositing their mail.[2]  Worksharing can also refer to a practice called "drop shipping" in which
the mailer transports its mail to a postal facility near its destination, thus saving the Postal
Service transportation costs.  In either case, worksharing is a form of contracting out, or
privatization, that results in a substantial portion of the Postal Service's work being performed by
the private sector.  Last year workshare discounts totaled approximately $18 billion per year.
Tabbita Dec. ¶ 19.  MTAC work groups have in the past and are preparing to again provide
advice to the Postal Service about ways of maximizing worksharing.  Tabbita Dec. ¶¶ 10.C, D;
11; 18; 19.

     Thus, in part due to recommendations from MTAC and its work groups, the USPS has
been making various technological and operational changes that benefit large mailers; and it has
been increasing discounts to large mailers, often as a result of such changes. These changes
disproportionately benefit large mailers, and put smaller mailers like CAPS members and the
APWU at a relative disadvantage.  Farrell Dec. ¶¶ 4-7.  MTAC has often been involved in

---

[1]There are many other examples.  Tabbita Dec. ¶¶ 6-14.

[2] Large mailers who prebarcode their First Class letter mail and deposit it in large
quantities presorted to the letter carrier route from which it will be delivered, for example, pay
only XX cents per letter instead of paying the full 41 cents individuals and small businesses pay
for First Class letters.

studying and has often made recommendations for such changes that benefit the members of the associations that have representation on MTAC. Indeed, the Postal Service often uses MTAC to vet ideas and proposals for changes in Postal operations and policies and to gauge industry reaction to plans under consideration; MTAC members often use MTAC to suggest changes in Postal operations and policies that are of interest to mailers and to effectively lobby for changes; and the Postal Service often relies on MTAC recommendations as supporting changes that it proposes. Tabbita Dec. ¶¶ 7-14; Farrell Dec. ¶¶ 4-7. CAPS and its members therefore have an interest in participating in, and commenting on, MTAC and MTAC work group studies and reports before proposed changes which favor large mailers are adopted by the USPS. As a small mailer in its own right ($5 million per year in postage spent), APWU has a similar interest in MTAC recommendations regarding Postal services, products and rules.[4] Guffey Dec. ¶¶ 3-8.

As the collective bargaining representative of a hundreds of thousands of Postal Workers, and as an association whose members obviously have a substantial interest in Postal operations and policy and the future of the Postal Service, the APWU plainly is an "interested person"

---

[4] The USPS has argued that the Court should dismiss CAPS' claim concerning MTAC's refusal to allow CAPS to become a member of MTAC, asserting that FACA does not confer a right to committee membership. USPS Brief at 23-24. But in *Cummock*, the D.C. Circuit stated that Congress emphasized the need to ensure that persons directly affected by a committee's work have some representation on the committee. 180 F. 3d at 291. In any event, CAPS certainly has a right to attend committee and work group meetings, submit comments and obtain documents.

under the FACA and the statute therefore affords APWU a right to attend meetings and file

statements, and a right to obtain advisory committee transcripts and reports. As is shown above

MTAC recommendations, if accepted by the USPS, can positively or negatively impact the

number of Postal employees, the conditions they work under, the quality of their work

environment and the financial viability of their employer. The USPS will often cite MTAC

recommendations and opinions as supporting or justifying changes that may adversely affect

APWU members. APWU therefore has a strong interest in learning about MTAC and MTAC

work group proceedings, studies and papers, and in  providing input to, and opinions regarding,

MTAC and MTAC work group reports before the USPS acts on them, citing MTAC support for

the changes. APWU and its members are certainly the sort of persons that Congress believed

should have a right of access to a Postal advisory committee's meetings and documents and the

opportunity to present their views to such a  committee.

As an advocacy group for nonprofit organizations that communicate with their members

by mail, CAPS and its members have substantial and direct interests in MTAC recommendations

regarding Postal services, products and rules, especially to the extent that they may favor large

mailers who have MTAC representatives, over small mailers who typically do not

Thus, APWU and CAPS and their members are persons who have direct and substantial

interests in ensuring that a Postal advisory committee is not captured by, or overly influenced by

industry insiders who have exclusive access to agency proceedings; precisely the sort of persons

that Congress sought to provide access to committee meetings and documents. As the D.C.

Circuit stated in *Cummock v. Gore,* "Congress aimed, in short, " 'to control the advisory

committee process and to open to public scrutiny the manner in which government agencies

31

obtain advice from private individuals.'" 180 F. 3d at 285, citations omitted.

APWU and CAPS recognize that some parts of FACA contain general guidelines and directives to both Congress and the executive branch, and some parts state general policy , but FACA Sections 10 and 11 confer specific rights on parties interested in an advisory committee's work; and, as described above, APWU and CAPS fall squarely within the intent of the interested persons language in those provisions. APWU and CAPS submit that the interested persons language of FACA is no less specific as to conferring rights on plaintiffs than was the language of Title IX that was found to confer an especial benefit in *Cannon*- "No person in the United States, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under...." (441 U.S. at 681), or the rights conferring language in other statutes cited in *Cannon* -e.g. "no person shall be denied the right to vote..."; "[e]mployees shall have the right to organize and bargain collectively..." (441 U.S. at 691). It must also be noted that in *Sandoval,* the plaintiff sought to enforce rights created by regulation issued pursuant to a statute; the Court thought it significant that there was no <u>statutory</u> provision in that case like the "No person..." language in *Cannon*, that the statutory provisions at issue in *Sandoval* focused more on duties placed on the regulated entity rather than rights created for the individual (532 U.S. at 288-289), and that the alleged rights-creating language was in a regulation implementing a statute, not in the statute itself (*id.* at at 291). By contrast to the plaintiffs in Sandoval, APWU and CAPS seek to enforce specific rights that Congress conferred on persons like them in Sections 10 and 11 of FACA; they therefore have a private right of action for enforcement of those provisions.

APWU and CAPS also note that, to the extent that the first *Cort/Cannon* factor looks to

whether the plaintiff is one of the class for whose especial benefit the statute was enacted, and

whether the statute creates a federal right in favor of the plaintiff, the inquiry is similar to the

elements of the historic standard for standing: whether the plaintiff has suffered an injury in fact

by invasion of a legally protected interest that is concrete and particularized (*i.e.* the injury

affects the plaintiff in a personal and individual way), that the plaintiff's complaint fall within the

zone of interests protected by the law invoked, and that the plaintiff assert a specific interest of

his/her own, not a generalized grievance of the public at large. *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560 (1992); *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Warth v. Seldin*, 422 U.S.

490, 499 (1975); *Zivotofsky v. Secretary of State*, 44 F 3d 614, 617-619 (2006). Here APWU and

CAPS assert injury by denial of legally protected rights conferred on them by FACA as persons

interested in MTAC proceedings and recommendations; their complaint falls within the zone of

interests protected by the FACA because they are persons interested in, and sure to be affected

by, MTAC recommendations; and they are concerned about the capture or domination of MTAC

by specific interests who have representation on MTAC; and they do not merely assert an

interest that the USPS comply with the law, but that it comply with the law because they will be

affected by its non-compliance. In this regard. APWU and CAPS note that in *Public Citizen,*

*supra.* the Supreme Court held that a private party had standing to bring an action for

enforcement of the FACA because of their specific demand for information guaranteed by the

FACA. 491 U.S. at 449. *See also Bensman v U.S. Forest Service*, 408 F. 3d 945, 858 (6th Cir.

2005)-- contrasting the Appeals Reform Act with the FACA. Indeed in *Center for Arms Control*

*and Non-Proliferation, supra.*, this Court referred to standing principals in holding that a private

party had private right of action to enforce the FACA, *citing Public Citizen, supra.* and

33

*Cummock supra.*, stating (2006 WL 3328257 at *4):

> Although FACA does not contain a provision providing a private right of action to enforce its provisions, it appears that the Supreme Court has essentially assumed that citizens may sue if they have been denied access to records under FACA. *See Manshard v. Fed. Judicial Qualifications Comm.*, 408 F.3d 1154, 1156 n. 3 (9th Cir.2005) (citing *Pub. Citizen*, 491 U.S. 440). Nonetheless, the Center still must show "that [it] has suffered a particularized injury to a cognizable interest, [its] injury is fairly traceable to the Government's actions, and a favorable judicial ruling will likely redress [its] injury." *Cummock*, 180 F.3d at 290 (citing *Lujan*, 504 U.S. at 560-61). There can be no doubt that "refusal to permit [the Center] to scrutinize the [Commission's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue." *Pub. Citizen*, 491 U.S. at 449.

APWU and CAPS therefore submit that they have shown that the FACA confers on them rights sufficient to satisfy the first *Cort/Cannon* criterion for finding an implied private right of action under that statute.

With respect to the second criterion: is there an indication of legislative intent to create or deny such a remedy; APWU and CAPS submit that the language and history of the FACA demonstrate a Congressional intent to create a private remedy. Congress did not merely set guidelines for the conduct of advisory committees, it created a specific rights for interested persons to attend advisory committee meetings and obtain their materials. And Congress was clearly concerned that without the rights of attendance and document access for interested persons, advisory committees could be controlled or dominated by committee members who would pursue their own interests; only other interested parties can act to prevent the sort of situation that concerned the Congress. Moreover, Congress provided no other method for enforcement of these rights. In *Sandoval*, the Court thought it significant that Congress expressly empowered agencies to enforce their own regulations issued pursuant to the statute at issue there. 532 U.S. at 289. By contrast, here Congress provided no administrative enforcement mechanism

for the rights established in FACA Sections 10 and 11; in the absence of a private right of action, there could be no enforcement of those rights.[5]

The USPS has also noted that Congress considered in 1971, but did not adopt, FACA-type legislation that would have expressly provided a cause of action for enforcement of FACA

---

[5] The USPS suggest that because FACA provides for Congressional and Executive branch oversight for advisory committees, that shows Congress considered a private right of action unnecessary. USPS Brief at 18. But the USPS offers no support for this assertion and merely states that "[e]vidently" Congress thought a private right of action unnecessary. *Id.* Furthermore, the USPS ignores the fact that different parts of the FACA may be enforced differently. *See e.g. Sandoval,* noting a private right of action for one part of Title IX, but finding no private right of action for another part. In this case, the FACA provides for Congressional and Executive oversight, but such oversight is clearly directed to parts of the Act that concern reports to Congress and the President about the number, types and funding of advisory committees, and the purpose and utility of committees (FACA Sections 5-7). That docs not mean Congress intended to deny a right of action for parts of the Act that conferred rights on individuals. The USPS has also noted Congress that considered, but did not adopt legislation that would have expressly provided a cause of action for enforcement of FACA, and therefore infers that there is no private right of action. USPS Brief at 18. But that does not mean that Congress did not intend for the Act to be enforceable by private parties. Given the state of the law at that time, Congress may have assumed that it was not necessary to expressly provide for private enforcement of the Act.

under certain specified circumstances. USPS Brief at 18, and Congressional Record excerpts appended thereto. From this, the USPS infers that Congress intended no private right of action to enforce FACA. However, the circumstances of that congressional action in 1971, and closer examination of the text of the proposed legislation that was not adopted, leads to the opposite conclusion.

Given the state of the law in 1971, Congress must be presumed to have understood that there would be a private right of action to enforce FACA. The state of the law in 1971 was concisely summarized by Mr. Justice Harlan in his concurring opinion in <u>Bivens v. Six Unknown and Unnamed Agents of the Federal Bureau of Narcotics,</u> 403 U.S. 388, 403-404 (1971). In that case, the Supreme Court held that plaintiffs' complaint alleging violations of their Fourth Amendment rights stated a cause of action for which damages were recoverable in federal court. In concurring with that result, Mr. Justice Harlan explained (<u>id</u>.):

> ...Initially, I note that it would be at least anomalous to conclude that the federal judiciary-while competent to choose among the range of traditional judicial remedies to implement statutory and common-law policies, and even to generate substantive rules governing primary behavior in further as a broadly formulated policies articulated by statute or constitution, see Textile Workers Union V. Lincoln Mills, 353 U.S. 448, 77 .Ct. 912, 923, 1 L.Ed.2d 972 (1957); United States v. Standard Oil Co., 332 U.S. 301, 304-311, 67 S.Ct. 1604, 1606-1610, 91 L.Ed. 2067 (1947); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 887 L.Ed. 838 (1943)- is powerless to accord a damages to remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will.

Thus, Congress was undoubtedly aware when it adopted the FACA in 1972, that it was not necessary to expressly provide for private enforcement of the Act.

Furthermore, the USPS misconceives the potential effect of the remedial provision

Congress did not adopt. The provision in question (USPS Brief Appendix) would have limited the right of action to cases in which the plaintiffs had been "adversely affected or aggrieved" by an action of a federal agency"; the action of the agency "had been recommended by an advisory committee; and that the affairs of the advisory committee had not been conducted in accordance with the statute. Thus, if Congress had adopted the provision in question it would have substantially narrowed the availability of relief in federal court under then-standard Supreme Court jurisprudence. Accordingly, the correct inference to draw from the 1972 action of Congress is that it knew that it was creating rights that would be enforceable in federal court.

APWU and CAPS submit that the language, structure and purpose of the Act demonstrate that Congress intended that the rights it conferred on interested persons by enforceable by such persons. For the same reasons, plaintiffs also submit that finding a private right of action for enforcement of rights the FACA conferred on interested persons is also consistent with the underlying purposes of the legislative scheme. Finally it is readily apparent that the cause of action asserted by the plaintiffs is not one traditionally relegated to state law; this case concerns a statute directed to a particular problem that developed in the Executive Branch of the Federal government; it is not a matter that has been or could be addressed under state law.

For all of these reasons, CAPS and APWU respectfully submit that their complaint satisfies the standards set forth in *Cort*, *Cannon* and *Sandoval* for determining when there is an implied private right of action for enforcement of a Federal statute.

In arguing that FACA provides no private right of action, the USPS relies heavily on the decisions in *Natural Resources Defense Council v. Abraham*, 223 F. Supp. 2d 162 (D.D.C. 2002); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp 2d 20

37

(D.D.C. 2002) ; and *International Brominated Solvents Ass'n. v. American Conference of Governmental Industrial Hygienists*, 393 F. Supp. 2d 1362 (M.D. Ga 2005) which relied on *Sandoval* for their holdings. USPS Brief at 17-18. However, as plaintiffs have shown, these decisions are contrary to the D.C. Circuit's decision in *Cummock* and the more recent decision of this Court in *Center for Arms Control.* Indeed, in both *Natural Resources Defense Council* and *Judicial Watch*, the Court acknowledged that its decisions appeared to be inconsistent with *Cummock* and the Supreme Court's decision in *Public Citizen, supra.,* but suggested that those decisions may have just implicitly assumed that FACA creates a private right of action, and that *Sandoval* required a different outcome. APWU and CAPS submit that this analysis is insufficiently deferential to current Circuit and Supreme Court precedent concerning FACA cases, and that assumptions about what those courts might have been thinking is not enough to permit a contrary decision. It should also be noted that both *Natural Resources Defense Council* and *Judicial Watch* were reversed on appeal, though on other grounds. Additionally, in *Natural Resources Defense Council,* the Court relied in part on the fact that the plaintiffs conceded that FACA did not provide a right of action, and based their claims on the APA (223 F. Supp 2d at 176);  in *Judicial Watch,* one of the two plaintiffs and an amicus also conceded that point, and the other plaintiff requested and was granted leave to amend its complaint to include claims under the APA and the Federal mandamus statute (219 F. Supp 2d at 33)-in both cases the plaintiffs were able to continue their claims by citing other bases for jurisdiction. Another problem with reliance on *Natural Resources Defense Council* and *Judicial Watch* is that while they held that *Sandoval* required a finding that there is no private of action for enforcement of FACA, they did not actually perform the *Cort/Cannon/Sandoval* four step analysis for

38

determining whether Congress intended private enforcement of a statute; and, specifically, they did not address the language of FACA Sections 10 and 11 regarding rights vested in persons interested in actions of an advisory committee. 223 F. Supp 2d at 176; 219 F. Supp at 33-34. *International Brominated* suffers similar infirmities; indeed, that Court relied heavily on *Natural Resources Defense Council* and *Judicial Watch*. 393 F. Supp 2d at 1376-1377. The Middle District of Georgia also acknowledged that its decisions seemed to conflict with Circuit precedent (*Miccosukee, supra.*) and *Public Citizen,* but also dismissed that problem by stating that the court of appeals and Supreme Court had apparently only assumed that FACA provided a private right of action. 393 F. Supp at 1377. And the *International Brominated* Court also said that its decision was required by *Sandoval,* but it too did not actually perform the *Cort/Cannon/Sandoval* four step analysis or specifically deal with the language of FACA Sections 10 and 11. For all of these reasons, APWU and CAPS respectfully submit that the decisions relied on by the USPS are not persuasive, and that this Court should follow *Cummock* and the recent decision in *Center for Arms Control.*

Plaintiffs submit that they have shown that FACA provides them with a private right of action for enforcement of their rights under that statute so their complaint should not be dismissed for lack of jurisdiction.

### D.    EVEN IF PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION UNDER THE FACA, THEY STILL HAVE A RIGHT OF ACTION FOR REVIEW OF UNLAWFUL AGENCY ACTION

Although the PRA renders the APA inapplicable to the USPS, the Postal Service's violation of the FACA renders the USPS subject to "common law" or "non-statutory" review. The postal jurisdiction statutes, 39 U.S.C. §409 and 28 U.S.C. §1339, vest the federal courts with

subject-matter jurisdiction, respectively, "over all actions brought by or against the Postal Service" and over "any civil action arising under any Act of Congress relating to the Postal Service." Indeed, the D.C. Circuit has previously relied on these jurisdictional statutes to entertain claims that the Postal Service has engaged in unlawful acts. In *Aid Association for Lutherans v. United States Postal Service*, 321 F.3d 1166, 1168 (D.C. Cir. 2003), the Court stated that "[A]ppellees may challenge actions by the Postal Service that are outside of the scope of its statutory authority. Appellees' principal claim here is that the challenged regulations emanated from an *ultra vires* action by the Postal Service. We agree. Therefore, it does not matter whether 39 U.S.C. § 410 (a) precludes traditional APA review". *See also National Association of Postal Supervisors v. United States Postal Service*, 602 F.2d 420, 429 (D.C. Cir. 1979) - postal jurisdiction statute "triggers the well-established presumption favoring judicial oversight of administrative activities". Additionally, in *T&S Products, Inc. v. United States Postal Service*, 1994 WL 1026493 (D.D.C.), this Court ruled that it had jurisdiction under 28 U.S.C. § 1331 (a) and 1339, over a suit against the Postal Service to enjoin the Postal Service from pursuing a new method of supplying retail packaging products to post offices which the plaintiff claimed violated the requirements found in the Postal Service's own procurement manual. *Id*. at *1, *2 n4.[6]

---

[6] Other circuits have come to the same conclusion. *E.g. Combined Communications v. United States Postal Service*, 891 F.2d 1221, 1227-28 (6th Cir. 1989)--"a federal district court has jurisdiction under 28 U.S.C. § 1339, 39 U.S.C. § 409(a) and the 'well-established, common-law presumption favoring judicial review of administrative action'... to entertain the question of

These decisions, endorsing the availability of non-APA or common law review in suits

brought under the postal jurisdictional statutes, are firmly rooted in precedent. Before the APA

was enacted in 1946, the Supreme Court allowed suits to be brought at common law challenging

actions taken by the Postmaster General in the absence of any statutory provision expressly

providing for such review. *See School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108

(1902); *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*, 255 U.S. 407,

412-13 (1921). *See also Stark v. Wickard*, 321 U.S. 288, 310 (1944)--"The responsibility of

determining the limits of statutory grants of authority in such instances is a judicial function

entrusted to the courts by Congress by the statutes establishing courts and marking their

jurisdiction.". The APA was merely a codification of the long established common law principle

of judicial review of administrative action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140

(1967)--the APA was found to reenforce pre-existing common law review.

Accordingly, even if the FACA does not provide the plaintiffs with a right of action for

its enforcement, plaintiffs nonetheless have a right of action under the "common law" or under

"non-statutory" review of agency action.

### E.    EVEN IF PLAINTIFFS DO NOT HAVE A PRIVATE RIGHT OF ACTION

whether a final Postal Service regulation is ultra vires"; *Peoples Gas, Light and Coke Co. v.

United States Postal Service*, 658 F.2d 1182, 1191 (7th Cir. 1981)--the Postal Service's

"exemption from the provisions of the Administrative Procedure Act does not negate the

applicability of common law review principles...We conclude that the exemptions found in

section 410 of the Postal Reorganization Act do not manifest a congressional intent to foreclose

all judicial review of alleged violations of the Postal Service's regulations".

41

**UNDER FACA, OR THE ABILITY TO CHALLENGE THE USPS ACTIONS UNDER THE COMMON LAW OF JUDICIAL REVIEW OF AGENCY ACTION, THE COURT HAS JURISDICTION TO REQUIRE THE USPS TO COMPLY   WITH THE FACA UNDER THE FEDERAL MANDAMUS ACT**

In the event that the Court nonetheless holds that the FACA itself does not provide plaintiffs with a right of action for its enforcement, and that a violation of the FACA may not be challenged under the common law right of review of agency action in violation of law, plaintiffs have a right of action under the Federal Mandamus statute, 28 U.S.C. § 1361 to compel the Postmaster General to comply with the FACA. The mandamus statute provides that "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.". According to the DC Circuit: "Pursuant to this act, a district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.'" *In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005), *quoting Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002), *quoting Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997). A writ of mandamus will not issue unless the duty owed by the government official is a ministerial, as opposed to discretionary, duty to act. "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty". *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996), internal citations omitted. "'Generally speaking, a duty is discretionary if it involves judgement, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level ....'" *Beatty v. Washington Metro.*

*Area Transit Auth.,* 860 F.2d 1117, 1127 (D.C. Cir. 1988), brackets in original, emphasis and citation omitted.

As an official appointed by the Postal Board of Governors who are, except for the PMG and Deputy PMG, appointed by the President, and as the chief executive officer of the USPS which is an "independent establishment of the executive branch of the Government of the United States" the Postmaster General is an official subject to a mandamus order. Indeed it has long been held that the Postmaster General is subject to a writ of mandamus. *Kendall v. United States*, 37 U.S. 524 (1838).

Furthermore, FACA's requirements governing the operation of advisory committees and its provision of rights to interested persons to attend meetings, submit statements and obtain documents are plainly non-discretionary and are precisely the kind of duties that give rise to a mandamus action. Again, Section 10 requires that advisory committees provide public notice of meetings "to insure that all interested persons are notified of [committee] meetings"; that "[i]nterested persons shall be permitted to attend, appear before, or file statements with any advisory committee"; that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other shall be available for public inspection and copying"; and that "detailed minutes of each meeting of each committee shall be kept and shall contain a record of the persons present". (Emphasis added). FACA Section 11 requires that "agencies and advisory committees shall make available to any person, actual cost of duplication, copies of transcripts of agency proceedings or advisory committee meetings". (Emphasis added). These are clear and direct commands that provide no discretion. Indeed in *Cummock*, the D.C. Circuit stated that "in order to give meaning to FACA's sunshine provisions, §10(b) must be read to

43

impose an affirmative obligation on the Government to, 'whenever practicable, [provide] access to the relevant materials before or at the meeting at which the materials are used and discussed'". 180 F.3d at 291 quoting *Food Chemical News, supra*. In *Food Chemical News*, the D.C. Circuit stated that "Section 10(b) contains unambiguous language that identifies certain materials, and describes in detail the methods and locations by and at which the Government must make those materials available to the public." 980 F.2d at 1472. And this Court, in *Center for Arms Control, supra.*, quoted these passages from *Cummock* and *Food Chemical News* and stated: "Any advisory committee operating under FACA has no discretion or choice in the matter". 2006 WL 3328257 at *4. In that case the Court held that it had mandamus jurisdiction to enforce FACA duties; so did the Court in *Food Chem. News,* 378 F. Supp. at 1050; and the Court in *Center for Auto Safety,* 414 F. Supp. at 217. *Cf. Washington Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d at 901-902, holding that when "the Government has a duty to the plaintiff...to allow it access to certain government records" mandamus statute allows court to take jurisdiction. Thus, the FACA provides APWU and CAPS with a clear right to relief and the USPS has a clear and non-discretionary duty to act.

Thus, even if the FACA itself does not provide a private right of action for its enforcement, this Court still has jurisdiction over plaintiff's claims that the Postal Service violated the requirements of the Act.

## CONCLUSION

For the foregoing reasons APWU and CAPS respectfully submit that the Court should find that it has jurisdiction over their complaint, and should deny the USPS motion to dismiss.

Dated September 10, 2007

Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.

By: /s/ Richard S. Etelman _____
Richard S. Etelman
Darryl J. Anderson DC Bar # 154567
Jennifer Wood
1300 L Street NW Suite 1200
Washington, DC 20005-4178
(202)898-1707/(202)682-9276 FAX

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) | |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-0990 (JR) |
| v. | ) ) | |
| UNITED STATES POSTAL SERVICE, | ) ) | |
| MAILERS TECHNICAL ADVISORY COMMITTEE, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Upon the Court's consideration of the federal defendant's motion to dismiss and the plaintiffs' opposition thereto, it is, this _____ day of _____, 2007,

ORDERED that the federal defendant's motion to dismiss shall be, and it hereby is, DENIED.


_____
The Honorable James Robertson
United States District Judge