**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
AMERICAN POSTAL WORKERS          )
UNION, AFL-CIO,                           )
                                                 )
CONSUMER ALLIANCE FOR POSTAL    )
SERVICES (CAPS),                          )
                                                 )
                    Plaintiffs,                 )
                                                 )        Civil Action No. 07-0990 (JR)
          v.                                      )
                                                 )
UNITED STATES POSTAL SERVICE,    )
                                                 )
MAILERS TECHNICAL ADVISORY       )
COMMITTEE,                                 )
                                                 )
                    Defendants.              )
_____ )

**ERRATA**

Plaintiffs, American Postal Workers Union, AFL-CIO, and Consumer Alliance for Postal

Services (CAPS), respectfully file their corrected Memorandum in Opposition to Federal

Defendant's Motion to Dismiss with exhibits. While Plaintiffs submitted the Memorandum on

September 10, 2007, they were unable to timely file the exhibits cited in the memorandum, and

so they are filing this corrected version which has the exhibits attached.  In addition, the

corrected version of the memorandum corrected the page numbering, and footnote numbering

and modified the identification of the Exhibits from numerical to alphabetical for greater clarity,

since attachments to the exhibit were numbered.  Furthermore, Plaintiffs changed some

references to paragraphs of the Declaration of Phillip Tabbita which were not correct in the

1

original memorandum.  None of the changes or corrections are substantive.

Respectfully submitted,
_____/s/_____
Richard S. Edelman (D.C. Bar No. 416348)
O'Donnell, Schwartz & Anderson, P.C.
1900 L Street, N.W., Suite 800
Washington, DC 20036
Telephone: (202) 898-1824
Facsimile: (202) 429-8928
e-mail:Redelman@odsalaw.com

Darryl J. Anderson (D.C .Bar No. 154567)
Jennifer L. Wood (D.C. Bar No. 500887)
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 898-1707
Facsimile: (202) 682-9276
e-mail: Danderson@odsalaw.com
        Jwood@odsalaw.com

Attorneys for Plaintiffs American Postal Workers
Union, AFL-CIO
and Consumer Alliance for Postal Services

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO,<br><br>CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS),<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES POSTAL SERVICE,<br><br>MAILERS TECHNICAL ADVISORY COMMITTEE,<br><br>        Defendants. | Civil Action No. 07-0990 (JR) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

_____/s/_____

Richard S. Edelman (D.C. Bar No. 416348)
O'Donnell, Schwartz & Anderson, P.C.
1900 L Street, N.W., Suite 800
Washington, DC 20036
Telephone: (202) 898-1824/Facsimile: (202) 429-8928
e-mail:Redelman@odsalaw.com

Darryl J. Anderson (D.C .Bar No. 154567)
Jennifer L. Wood (D.C. Bar No. 500887)
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 898-1707/Facsimile: (202) 682-9276
e-mail: Danderson@odsalaw.com
Jwood@odsalaw.com

Attorneys for Plaintiffs American Postal Workers Union, AFL-CIO, and Consumer Alliance for Postal Services

# Table of Contents

**Page**

TABLE OF AUTORITHIES ................................................................…...iv

I. INTRODUCTION................................................................................2

II. FACTS.......................................................................................... 2

    A. PARTIES................................................................................... 2

    B. MTAC FUNCTIONS, STRUCTURE, ACTIONS.............................…...............5

    C. ACTUAL AND POTENTIAL IMPACT OF MTAC
       RECOMMENDATIONS ON APWU AND CAPS...................................7

    D. APWU AND CAPS EFFORTS TO GANE ACCESS TO MTAC
       MEETINGS AND MATERIALS.....................................................8

III. STATUTORY BACKGROUND................................................................11

    A. THE FEDERAL ADVISORY COMMITTEE ACT............................    11

    B. THE STATUS OF THE USPS UNDER THE POSTAL
       REORGANIZATION ACT AND APPLICATION OF FEDERAL
       LAW TO THE USPS..............................................................15

IV. STANDARDS ON MOTION TO DISMISS.......................................…........ 16

V. ARGUMENT......................................................................…....17

    A. THE FEDERAL ADVISORY COMMITTEE ACT APPLIES TO THE
       POSTAL SERVICE...............................................................17

       1. The USPS is covered by the FACA.........................................17

       2. The PRA does not exempt USPS from FACA................................... 18

    B. MTAC WORK GROUPS ARE COVERED BY THE FACA....................... 24

    C. APWU AND CAPS HAVE A RIGHT OF ACTION FOR
       ENFORCEMENT OF FACA........................................................25

D.  EVEN IF PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION
    UNDER THE FACA, THEY STILL HAVE A RIGHT OF ACTION FOR
    REVIEW OF UNLAWFUL AGENCY ACTION……………………………...39

E.  IF PLAINTIFFS DO NOT HAVE A PRIVATE RIGHT OF ACTION
    UNDER FACA, OR THE ABILITY TO CHALLENGE THE USPS
    ACTIONS UNDER THE COMMON LAW OF JUDICIAL REVIW OF
    AGENCY ACTION, THE COURT HAS JURISDICTION TO REQUIRE
    THE USPS COMPLY WITH THE FACE UNDER THE FEDERAL
    MANDAMUS ACT…………………………………………………………….41

VI.  CONCLUSION……………………………………………………………….. 44

# Table of Authorities

Page

*Abbott Laboratories v. Gardner,*
387 U.S. 136 (1967)..................................................................................................41

*Aid Association for Lutherans v. United States Postal Service,*
321 F.3d 1166 (D.C. Cir. 2003)...............................................................................40

*Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior,*
26 F. 3d 1103 (11th Cir. 1994)................................................................................26

*Allen v. Wright,*
468 U.S. 737(1984)..................................................................................................33

*Alexander v. Sandoval,*
532 U.S. 275 (2001).................................................................................................36

*American Library Ass'n v. FCC,*
406 F. 3d 689 (D.C. Cir. 2005)...............................................................................22

*Animal Legal Defense Fund v. Shalala,*
104 F. 3d 424 (D.C. Cir. 1997)...............................................................................26

*Assoc. Of Am. Physicians and Surgeons v. Clinton,*
997 F.2d 898 (D.C. Cir. 1993)........................................................................14,20,25

*Beatty v. Washington Metro. Area Transit Auth.,*
860 F.2d 1117 (D.C. Cir. 1988)...............................................................................42

*Bensman v U.S. Forest Service,*
408 F. 3d 9458 (6th Cir. 2005) ...............................................................................33

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979)..................................................25,27,28,32,34,37,38,39

*Carlin v. McKean,*
823 F.2d 620 (D.C. Cir. 1987) ...........................................................................14,16

*Center for Arms Control and Non-Proliferation v. Lago*
2006 WL 3328257 (D.D. C. 2006) ..........................................................................27

*Center for Auto Safety v. Tiemann,*
414 F. Supp. 217 (D.C. C. 1976) .................................................................................................39

*Combined Communications v. United States Postal Service,*
891 F.2d 1221 (6th Cir. 1989) ....................................................................................................40

*Cort v. Ash,*
422 U.S. 66 (1975)..........................................................................................27,28,32,34,37,38,39

*\*Cummock v. Gore,*
180 F.3d 282 (D.C. Cir. 1999) ............................................................................................14,25,31

*Depippo v. Cehertoff,*
453 F. Supp. 2d 30 (D.D.C. 2006) ...............................................................................................17

*Food Chem. News v. DHHS,*
980 F. 2d 1468 (D.C. Cir. 1992)..............................................................................................25,44

*Holy Land Found for Relief & Dev. v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003) .....................................................................................................15

*International Brominated Solvents Ass'n. v. American Conference of Governmental Industrial Hygienists,*
393 F. Supp. 2d 1362 (M.D. Ga 2005) ...................................................................................33,34

*Judicial Watch, Inc. v. National Energy Policy Development Group,*
219 F. Supp. 2d 20 (D.D. C. 2002)..........................................................................................33,34

*Kendall v. United States,*
37 U.S. 524 (1838)........................................................................................................................38

*Kuzma v. United States Postal Service,*
798 F. 2d 29 (2d Cir. 1986).........................................................................................................18

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992).................................................................................................................33,34

*Macharia v. United States,*
334 F.3d 61(D.C. Cir.2003)..........................................................................................................16

*Mail Order Ass'n. Of America v USPS,*
986 F. 2d 509 (D.C. Cir. 1993).................................................................................................3,18

*Manshard v. Fed. Judicial Qualifications Comm.,*
408 F.3d 1154(9th Cir.2005) .......................................................................................................34

*Medicare Reimbursement Litigation,*
414 F.3d 7 (D.C. Cir. 2005)............................................................................................42

*Miccosukee Tribe v. Southern Everglades Restoration Alliance,*
304 F. 3d 1076 (11ᵗʰ Cir. 2002) ..................................................................................26,39

*National Easter Seal Society v. USPS,*
656 F. 2d 754( D.C. Cir. 1981)....................................................................................20,21

*National Association of Postal Supervisors v. United States Postal Service,*
602 F.2d 420, 429 (D.C. Cir. 1979)................................................................................40

*Natural Resources Defense Council v. Abraham,*
233 F. Supp. 2d 162 (D.D.C. 2002) ...............................................................................37

*Natural Resources Defense Council v. Pena,*
147 F 3d 1012 (D.C. Cir. 1998).....................................................................................26

*Northern States Power Co. v. U.S. Dep't of Energy,*
128 F.3d 754 (D.C. Cir. 1997).....................................................................................37,42

*Pitney Bowes, Inc. v. USPS,*
27 F. Supp. 2d 15(D.D.C. 1998)...................................................................................15,17

*Power v. Barnhart,*
292 F.3d 781 (D.C. Cir. 2002) .......................................................................................42

*Public Citizen v. U.S. Dept of Justice,*
491 US 440 (1989)....................................................................................13,26,27,33,38,39

*School of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902)........................................................................................................41

*Stark v. Wickard,*
321 U.S. 288 (1944)......................................................................................................41

*Sofamor Danek v. Gous,*
61 F3d 929 (D.C. Cir. 1995) ..........................................................................................14

*Swan v. Clinton,*
100 F.3d  973 (D.C. Cir. 1996).......................................................................................42

*T&S Products, Inc. v. United States Postal Service,*

1994 WL 1026493 (D.D.C.) ......................................................................................40

*United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*,
255 U.S. 407 (1921) .................................................................................................41

*United States Postal Service v. Flamingo Industries*,
540 U.S. 736 (2004) ...........................................................................................15,17

*Warth v. Seldin*,
422 U.S. 490 (1975) .................................................................................................33

*Washington Legal Foundation v. American Bar Ass'n.*,
648 F. Supp 2d 1353, 1361 (1986) ..........................................................................26

*Washington Legal Found. v. U.S. Sentencing Comm'n*,
89 F.3d 901 ..............................................................................................................44

*Zivotofsky v. Secretary of State*,
44 F. 3d 614(2006) ...................................................................................................33

| **Statues** | **Page** |
|---|---|

| 5 U.S.C. §551(a) ...................................................................................... | 11,17 |
| 5 U.S.C. §552 (a) (b) .............................................................................. | 13,14,18 |
| 28 U.S.C. § 1331 (a) and 1339 ............................................................... | 39,40 |
| 28 U.S.C. § 1361 ..................................................................................... | 42 |
| 39 U.S.C. §101 ......................................................................................... | 2 |
| 39 U.S.C. §201 ......................................................................................... | 2,15,17 |
| 39 U.S.C. § 409 ......................................................................................... | 39 |
| 39 U.S.C. §410 ......................................................................................... | 10,40 |

# I. INTRODUCTION

This brief is submitted by plaintiffs the American Postal Workers Union, AFL-CIO

("APWU"") and Consumer Alliance for Postal Services ("CAPS") in opposition to the motion of

defendant United States Postal Service ("USPS") for dismissal of the APWU/CAPS complaint

for enforcement of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 §§1-15,

with respect to the USPS-created Mailers Technical Advisory Committee ("MTAC").  APWU

and CAPS respectfully submit that the USPS has not shown that the complaint should be

dismissed. They further submit that, when the allegations of the complaint, and other facts set

forth in declarations submitted with this brief are accepted as true, and viewed in the light most

favorable to the plaintiffs, they have shown that the Court has jurisdiction over their complaint.

In particular, this brief demonstrates that the FACA applies to the USPS, that the USPS is not

exempt from the FACA, that APWU and CAPS can enforce the FACA through a private right of

action before this Court and that, alternatively, the Court has jurisdiction over their complaint for

enforcement of the FACA pursuant to a common law right of judicial review of agency actions

in violation of law, or under the Federal mandamus act.

# II. FACTS

## A.    PARTIES

Pursuant to the Postal Reorganization Act ("PRA"), 39 U.S.C. §101 et seq., the USPS

was created as "an independent establishment of the executive branch of the Government of the

United States... ." 39 U.S.C. §201. The PRA assigned to the USPS the mail processing and

delivery functions of the United States Post Office while removing certain political influences

and relieving the USPS of certain legal restraints. While the Postal Service is no longer a cabinet

agency, the USPS is still part of the executive branch; it is governed by the Postal Board of

Governors, the overwhelming majority of whom (9 of 11) are appointed by the President; and

various of its major decisions are subject to approval by the Presidentially appointed Postal Rate

Commission ("PRC"). The USPS is still managed by the Postmaster General who now is

appointed by the Board of Governors. *Mail Order Ass'n. Of America v USPS*, 986 F. 2d 509,

512-513 (D.C. Cir. 1993).

      MTAC was established by the USPS as an advisory committee to provide advice and

recommendations to the USPS. It is composed of USPS officials, mailers and mailer

associations, and other associations and organizations interested in the mail industry and postal

policies and procedures. MTAC's Charter and Bylaws describe MTAC as "a joint effort between

mailers and the US Postal Service to share technical information, advice and recommendations

on matters concerning mail-related products and services in order to enhance customer value and

expand the use of these products and services for mutual benefit". MTAC meets at least quarterly

at the USPS headquarters and has its mailing address at the USPS headquarters at 475 L'Enfant

Plaza, SW, Washington, DC  20260. Complaint ¶s 11-15; Declaration of Phillip A. Tabbita

(APWU/CAPS Exhibit A) ¶¶ 3-4 and Ex. 1.

      APWU is an unincorporated labor organization that represents approximately 300,000

employees of the Postal Service for purposes of collective bargaining and in other efforts for

their mutual aid and benefit. APWU represents Postal employees who perform various types of

work including Clerks, Mail Equipment Shop Employees, Maintenance Employees, Material

Distribution Centers Employees, Motor Vehicle Service Employees, Operating Services

Employees, and Information Technology/Administrative Assistance Center Employees. Tabbita

Dec. ¶ 2. The Union is a party to collective bargaining agreements with the Postal Service

covering those employees. APWU maintains offices and conducts business throughout the

United States and has Local affiliates in every state and territory of the United States which

provide representation to its members at Postal facilities and installations through the Nation.

Tabbita Dec. ¶ 2; Declaration of Clifford J. Guffey (APWU/CAPS Ex. B) ¶¶ 3-6. APWU has

been an active participant in proceedings before the Postal Rate Commission and now the Postal

Regulatory Commission (both referred to herein as "PRC").  APWU has appeared before the

PRC to advocate on behalf of itself, its members, individual mailers and small mailers; and to

oppose efforts by certain large mailers to alter Postal processes and operations in ways that

would increase costs and decrease services for individual mailers and small businesses, and

decrease revenue for the USPS. Tabbita Dec. ¶ 20. The APWU also sponsors a health plan that,

under contract with the U.S. Office of Personnel Management, provides health insurance

services to federal and postal employees through the Federal Employees Health Benefits

Program.  The APWU, its locals and the APWU Health Plan collectively mail more than five

million pieces of mail each year.  APWU sends mail in, and receives mail from, every U.S. State

and territory. Guffey Dec. ¶s 4-6.

CAPS was founded in 2003 to protect affordable and dependable mail service for all

Americans through participation in the legislative and regulatory process as it affects postal

services.  CAPS members are nonprofit organizations that regularly communicate with their

members by using postal services.  CAPS members and the constituents of CAPS members have

a direct interest in access to affordable and efficient postal services, and CAPS engages in

various advocacy activities to support postal services for its members and other individuals and

4

small businesses. Declaration of Richard Farrell (APWU/CAPS Ex. C) ¶¶ 2-7.

## B.    MTAC FUNCTIONS, STRUCTURE, ACTIONS

The MTAC Charter and Bylaws states that it is a "joint effort between mailers and the US

Postal Service to share technical information, advice and recommendations on matters

concerning mail-related products and services in order to enhance customer value and expand the

use of these products and services for mutual benefit".  MTAC may not meet without a

representative of the USPS and approval of the USPS, and the USPS provides administrative

support for MTAC. Meetings of the full committee are generally held on a quarterly basis each

calendar year or at the call of the Postal Service Co-Chair. The Vice President, Service & Market

Development is the MTAC Co-Chair for the Postal Service. The Postal Co-Chair appoints two

Vice-Chairs from the Postal Service. The industry Co-Chair and Vice-Chair are elected from the

MTAC industry representatives. MTAC quarterly meetings are typically attended by MTAC

members and their invitees, MTAC work group members, Postal Service officials and persons

invited by the USPS.  MTAC keeps minutes of its quarterly meetings and such minutes are

verified by the MTAC USPS representatives. MTAC also receives work group reports and

recommendations. MTAC minutes, MTAC recommendations and reports, MTAC work group

notes, and MTAC work group reports are posted on the MTAC Issue Tracking System

("MITS"). Access to MITS is restricted to MTAC members with MITS usernames and log-in

codes. Non-members may attend general session meetings of MTAC only at the specific

invitation of a member representative and with advance approval by MTAC. Complaint ¶13,

Tabbita Ex. 1.

5

MTAC functions primarily through issue-focused work groups that are chartered, established and monitored by the MTAC Steering Committee. The work groups study mail industry problems and issues, and propose actions and solutions to MTAC. MTAC has work group guidelines which provide that any MTAC representative or USPS executive can propose an issue that would require the formation of a new work group. MTAC work groups generally meet at least quarterly and often in conjunction with MTAC meetings. MTAC work groups keep notes of their meetings and make reports and recommendations to MTAC. MTAC and MTAC work groups have investigated, studied, reported-on, offered opinions on, and provided advice and recommendations to, the USPS on various subjects involving Postal operations, and they are currently investigating and studying various subjects involving Postal operations. Among other things, MTAC work groups have investigated and studied, or are investigating and studying: changes in design for flat mail, proposals for productivity improvements generally, drop shipments and "mail induction", flat sequencing system, changes in locations for regional distribution centers, optimization of mailer discounts, co-palletization of trays, adoption of vote-by-mail systems, changes in bar codes, alternative packaging, workshare discounts, Destinating Delivery Unit (DDU)) induction, pricing changes, new labeling standards, seamless acceptance programs, distribution center relocation, and service standards. Complaint ¶21, Tabbita Dec. ¶¶ 6-8.

The USPS receives and may act on MTAC and MTAC work group recommendations; and has done so in the past. Tabbita Dec. ¶¶ 7-8. The USPS has also presented issues to the PRC where the USPS position adopted MTAC recommendations or was influenced by MTAC recommendations. The PRC has held proceedings concerning matters on which MTAC has made

recommendations to the USPS, and on USPS policies, proposals and positions recommended by, or influenced by MTAC. Complaint ¶ 25, Tabbita Dec.¶¶ 7-9.

### C.    ACTUAL AND POTENTIAL IMPACT OF MTAC RECOMMENDATIONS ON APWU AND CAPS

The Postal Service has sought, and/or received recommendations from MTAC on numerous issues of major importance in postal affairs.  These issues have run the gamut from implementation of the ZIP Code to mail preparation to the forms used by the Postal Service in its daily business affairs. Tabbita Dec. ¶¶ 6-8.  The Postal Service has adopted many MTAC recommendations, including altering rules for the preparation of mail pieces and the requirements for entering the mail into the postal system and how the mail will be processed once it is entered.  Tabbita Dec. ¶ 7.  Many of these recommendations have the actual or potential effect of lowering mail processing costs for large mailers and shifting the burden of bearing some additional postal costs to individuals and other small mailers.  See Tabbita Dec. ¶¶ 11-19.

APWU and APWU members are impacted by the implementation of MTAC recommendations.  Many of the recommendations involve either a reduction in the size of the mail processing network or the reduction in postal service revenues (through an increase in discounts provided to mailers) or a reduction in the amount of work available to APWU members.  For example, by entering mail deeper into the postal system large mailers bypass certain processing facilities and functions, including mail sorting and transportation.  APWU represents the workers who would normally perform this work. Tabbita Dec. ¶ 11.  MTAC recommendations can impact the work environment of postal employees, implicating work safety and ergonomic issues of great importance to the APWU and its members. Tabbita Dec.

7

¶12. Additionally, the money mailers save as a result of the implementation of MTAC recommendations is money lost to the Postal Service. Anything that affects the Postal Service financially affects the collective bargaining position of the APWU. Tabbita Dec. ¶ 11.

The APWU, separate and apart form being a labor union, is also a mailer. The APWU spends approximately $5 million a year on postage. The APWU has approximately 20 national field offices and roughly 1400 local offices throughout the United States and territories. However, the APWU, like many small business mailers, is not a large enough mailer to take advantage of the discounts and other programs large mailers enjoy. Guffey Dec. ¶¶ 5-8. To the extent that the Postal Service provides bigger discounts to larger mailers, these actions increase the relative cost of APWU postage and adversely impact the APWU as a mailer. *Id.*

CAPS is an umbrella organization comprised primarily of small and medium size non-commercial mailers. Farrell Dec. ¶ 3. CAPS members regularly communicate with their constituents through the Postal Service and have a direct interest in efficient and affordable postal services. However, CAPS is not a large mailer organization. To the extent that large mailers benefit by the decisions and recommendations of MTAC, CAPS and its member organizations are disadvantaged because CAPS and its members are unable to take advantage of programs and policies designed by large mailers for the benefit of large mailers. Farrell Dec. ¶s 4-7.

### D.    APWU AND CAPS EFFORTS TO GAIN ACCESS TO MTAC MEETINGS AND MATERIALS

On November 16, 2006, APWU President William Burrus wrote to the Postal Service Chair of MTAC requesting information about MTAC members and MTAC work groups; descriptions of the subject areas of each work group; copies of minutes of prior MTAC and

8

workgroup meetings; copies of reports, agendas, updates and recommendations of work groups;

and an MITS username and password for access to that system. APWU also sought to make

arrangements to attend MTAC and work group meetings. The USPS responded to this letter by

letter dated December 8, 2006, requesting an explanation of the relevance of the requested

information to collective bargaining. Sometime during the last months of 2006, the MTAC

website was changed so that MTAC materials that previously had been available were no longer

available without an MITS password. Complaint ¶s 29-30; Tabbita Dec. ¶ 23.

On January 9, 2007, APWU's counsel wrote to MTAC and the USPS stating that APWU

had assumed that the Postal Service and MTAC would have no hesitation about providing the

information and documents the Union had requested but that APWU also sought the information

and documents pursuant to the Federal Advisory Committee Act.  On January 26, 2007 the

Postal Service sent another letter APWU which asserted that the FACA is inapplicable to the

Postal Service, but that the USPS would provide certain information including the members and

work groups, the subject areas of the work groups, the dates of future MTAC meetings, and

copies of minutes from some meetings. The January 26 USPS letter also stated that "Attendance

at MTAC General Session and individual work group meetings is restricted to MTAC members,

member-invited and approved MTAC guests." On February 13, 2007, counsel for the APWU

again wrote to MTAC and the USPS repeating APWU's requests for the reports, agendas,

updates and recommendations of MTAC work groups, the full materials made available to

MTAC members and others who attend MTAC meetings, and MITS access authority.  Also in

February of 2007, Phillip Tabbita, APWU Manager of Negotiation Support made e-mail requests

for information to  the MTAC Postal Chair stating that he was no longer able to access certain

MTAC information that had been publicly available in the past and requesting access to such information. An MTAC official responded to Mr. Tabbita by referring him to the USPS letter of January 26, 2007, and by advising him that access to any MTAC website materials required an MITS password. Complaint ¶¶ 31-35; Tabbita Dec. ¶¶ 24-26.

On April 2, 2007, the USPS co-chairperson of MTAC responded to the February 13, 2007 letter of APWU's counsel and stated that "[w]e are treating your letter as an informal Freedom of Information Act (FOIA) request. She then refused to produce the information sought, beyond what had already been provided, asserting that it was exempt from disclosure under certain exemptions to the FOIA. Among other things, the April 2 letter asserted that MTAC reports, agendas, updates and recommendations are exempt from disclosure under FOIA exemption 5 covering pre-decisional and deliberative process materials. The April 2 letter also asserted that the requested materials were exempt from disclosure pursuant to FOIA exemption 5, which exempts materials exempted by other statutes, 39 U.S.C. §410(c)(5) which in turn, the letter said, allows the USPS to withhold consultant reports from disclosure under the FOIA. Finally, the April 2 letter denied APWU an MITS password and ability to attend MTAC meetings on the basis that these requests were outside the scope of the FOIA. Complaint ¶ 37; Tabbita Dec. ¶ 25.

As part of its activities to support postal services for individuals and small businesses, CAPS applied for membership in MTAC, using the procedures established by MTAC for that purpose. MTAC refused to admit CAPS into membership. CAPS subsequently made a request to attend MTAC meetings and obtain MTAC documents but has received no response to these requests. Farrell Dec. ¶S 8-9 and Farrell Ex. 1. As a result of the USPS and MTAC refusal to

10

admit CAPS as a member, and as a result of their failure to permit CAPS to attend meetings and

obtain documents, CAPS and its member organizations have been deprived of knowledge of

MTAC and MTAC work group activities and plans, deprived of access to MTAC documents and

papers, and deprived of knowledge of MTAC and MTAC work group recommendations. CAPS

and its member organizations have been denied the ability to attend, appear before, and/or file

statements with MTAC and MTAC work groups on issues of interest to CAPS and its member

organizations with respect to MTAC and MTAC work group advice and recommendations to the

USPS on subjects where CAPS and its member organizations are, or are likely to be, affected by

USPS adoption of MTAC recommendations, or reliance on MTAC advice. Complaint ¶¶ 41, 53,

56.

### III. STATUTORY BACKGROUND

**A.    THE FEDERAL ADVISORY COMMITTEE ACT**

In its statement of findings and purpose in creating FACA, Congress declared, among

other things, that, "Congress and the public should be kept informed with respect to the number,

purpose, membership activities and cost of advisory committees" and that "the function of

advisory committees should be advisory only and that all matters under their consideration

should be determined, in accordance with law, by the official, agency or officer involved". 5

U.S.C.A. app. 2 § 2(5) and (6) .

By its express terms the FACA applies to government agencies. Section 3 of the FACA

states that for purposes of the Act, agency "has the same meaning as in section 551(1) of Title 5

United States Code." 5 U.S.C.A. app. 2 § 3(3).  Section 551(1) of Title V of the U.S. Code,

11

which is part of the Administrative Procedure Act ("APA"), defines "agency" as: "...each authority of the United States, whether or not it is within or subject to review by another agency, but does not include..." [certain exceptions, the USPS is not one of the identified exceptions].[1] FACA Section 4 then explicitly excludes from its coverage advisory committees established by two specific agencies: the Central Intelligence Agency and the Federal Reserve Board. FACA Section 8 makes agency heads responsible for establishing rules and regulations for advisory committees established by their agencies and directs agency heads to designate officers to control and supervise advisory committees.

FACA Section 10 establishes certain statutory mandates for advisory committee procedures, meetings, reports and disclosures of information. Among other things, FACA Section 10 requires that all advisory committee meetings "shall be open to public", except in certain situations; that "all interested persons shall be permitted to attend, appear before and file statements with any advisory committee",  subject to reasonable rules and regulations and certain

---

[1] 5 U.S.C. §551 (1) provides  (emphasis added):

"agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include - (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia; or except as to the requirements of section 552 of this Title - (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them; (F) courts martial and military commissions; (G) military authority exercised in the field in time of war or in occupied territory; or (H) functions conferred by sections [dealing with banking, mortgage insurance, war time contracts, etc.].

12

express exceptions; that advisory committee records, reports, agendas, minutes, transcripts and studies "shall be available for public inspection and copying, subject to 5 US §552 rules and exceptions; that advisory committees must keep detailed and accurate minutes; and that advisory committee meetings must be called by an agency officer with an agency approved agenda. FACA Section 11 provides that transcripts of advisory committee proceedings must generally be made available to any person.

The House of Representatives' Report on the FACA stated that "one of the great dangers of the unregulated use of advisory committees is that special interest groups may use their membership on such committees to promote their private concerns"; two examples of such situations were then cited. House Report No. 92-1017, 1972 U.S.C.A.A.N 3491, 3496. With respect to FACA Section 10, the Report stated "This provision has the effect of assuring openness in the operations of advisory committees. This provision, coupled with the requirement that complete and accurate minutes of committee meetings be kept serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group. Along with the provisions for balanced representation contained in §4 of the bill, this requirement of openness is a strong safeguard of the public interest". *Id.* at 3500.

In *Public Citizen v. U.S. Dept of Justice,* 491 US 440 (1989) the Supreme Court stated that the purpose of FACA was:

> ...to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature. § 2(b). To attain these objectives, FACA directs the Director of the Office of Management and Budget and agency heads to establish various administrative guidelines and management controls for

13

advisory committees. It also imposes a number of requirements on advisory groups. For example, FACA requires that each advisory committee file a charter, §9 (c) and keep detailed minutes of its meetings. §10 (c). Those meetings must be chaired and attended by an officer or employee of the Federal Government who is authorized to adjourn any meeting when he or she deems its adjournment in the public interest. § 10 (e). FACA also requires advisory committees to provided advance notice of their meetings and to open them to the public, §10 (a), unless the President or the agency head to which an advisory committee reports determines that it may be closed to the public in accordance with the Government in the Sunshine Act, 5 U.S.C. § 552b( c) §10 (d). In addition, FACA stipulates that advisory committee minutes, records, and reports be made available to the public, provided they do not fall within one of the Freedom of Information Act's exemptions, see 5 U.S.C. § 552 , and the Government does not choose to withhold them. §10 (b).

*Id* at 446, footnote omitted.

In *Assoc. Of Am Physicians and Surgeons v. Clinton,* 997 F2d 898, 903 (D.C. Cir. 1993), the D.C. Circuit stated that Congress passed FACA in 1972 to control the growth and operation of the "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C. App. 2, §2(a).... The statute orders agency heads to promulgate guidelines and regulations to govern the administration and operations of advisory committees". *See also Sofamor Danek v. Gous,* 61 F3d 929 (D.C. Cir. 1995) --"The statute has two principal purposes; "to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them"; *Cummock v. Gore,* 180 F3d 282, 284-285 (D.C. Cir. 1999)-Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interest seeking to advance their own agendas....Congress aimed, in short, " 'to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals.'"

14

**B.**     **THE STATUS OF THE USPS UNDER THE POSTAL REORGANIZATION ACT AND APPLICATION OF FEDERAL LAW TO THE USPS**

The PRA established the USPS as an agency of the government. PRA Section

201, 39 U.S.C. §201, states that the USPS is an independent establishment of the executive

branch of the Government of the United States... ." Courts that have considered this issue have

held that the USPS is indeed an agency of the Federal government. In *United States Postal*

*Service v. Flamingo Industries*, 540 U.S. 736, 744 (2004), the Supreme Court cited PRA Section

201 and stated that "the Postal Service is part of the Government" and that "[w]hile Congress

waived the immunity of the Postal Service [from suit], Congress did not strip it of its

governmental status". The D. C. Circuit has held that "despite Congress' extensive

reorganization of the [USPS] in the [PRA], to permit the [USPS] to operate in a more business-

like fashion, the [USPS] *clearly remains a government agency*- an independent establishment of

the Government of the United States." *Carlin v. McKean*, 823 F.2d 620, 622 (D.C. Cir. 1987),

emphasis added; *Pitney Bowes, Inc. v. USPS*, 27 F.Supp.2d 15, 20-21 (D.D.C. 1998).

The USPS is headed by the Postmaster General (PMG), who is the Chief Executive

Officer of the Postal Service.  39 U.S.C. Section 203.  The PMG is appointed by the

presidentially-appointed Board of Governors. Thus, by the plain terms of the PRA and by the

structure of the USPS it is clear that it is an agency of the Government and, within the meaning

of the FACA- is "an authority of the United States."

To the extent that Congress sought to generally relieve the USPS of obligations under

certain statutes, it did so expressly. Thus, PRA Section 410 provides that "Except as provided by

subsection (b) of this section, and except as otherwise provided in this title or insofar as such

15

laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5 shall apply to the exercise of the powers of the Postal Service." Section 410(b) then provides that certain statutes that would have been inapplicable to the USPS under Section 410(a), are nonetheless applicable, including several parts of title 5 (*i.e.* the Freedom of Information Act (§552) the Privacy Act (§552a) and the Open Meetings Act (§552b).[2]

The recently enacted Postal Enhancement and Accountability Act ("PAEA") did not change the status of the USPS as an "establishment of the executive branch of the Government", nor did it alter the Section 410(a) exemptions of the USPS from of certain laws or the Section 410(b) provision that certain of those laws nonetheless apply to the USPS.

## IV. STANDARDS ON MOTION TO DISMISS

It is well-established that, in considering a motion to dismiss under Rule 12(b)(6), a court should not dismiss a complaint unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief; and that the court must treat the complaint's factual allegations, including mixed questions of law and fact, as true; and must draw all reasonable inferences there from in the plaintiff's favor. *Macharia v. United States,* 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Dev. v. Ashcroft,* 333

---

[2] As discussed more fully below, the FACA is not in Title 5 but is temporarily housed in the appendix to Title 5.

F.3d 156, 165 (D.C.Cir.2003); *Depippo v. Cehertoff*, 453 F. Supp 2d 30, 32 (D.D.C. 2006).

## V. ARGUMENT

### A.    THE FEDERAL ADVISORY COMMITTEE ACT APPLIES TO THE POSTAL SERVICE

The USPS motion to dismiss begins with a discussion of PRA Section 410 provisions on

application of certain laws to the USPS from certain laws and then argues that the Postal Service

is exempt from the FACA. USPS Brief at 8-11. However, APWU and CAPS respectfully submit

that the USPS is subject to the FACA under the plain language of the statute, and that the PRA

does not exempt the Postal Service from the FACA.

#### 1. The USPS is covered by FACA

As described above, FACA applies to government agencies and it adopts the definition of

agency in 5 U.S.C. §551(a) which in turn defines agency as "...each authority of the United

States, whether or not it is within or subject to review by another agency..." other than certain

specifically excepted agencies. The PRA establishes the USPS as an agency of the government,

stating that the USPS is "an independent establishment of the executive branch of the

Government of the United States... ." 39 U.S.C. §201. *See also Flamingo Industries,* 540 U.S. at

744; *Carlin v. McKean*, 823 F.2d at 622--the USPS "clearly remains a government agency";

*Pitney Bowes, Inc. v. USPS*, 27 F.Supp.2d at 20-21.

The USPS brief contains an extended discussion of the background of, and congressional

purpose behind, the PRA, especially the goal of making the USPS run more like a business.

Based on this discussion, the USPS asserts that its new structure means that it is not an agency

subject to FACA.  Brief at 2-4, 9-11. However, regardless of this purpose, the PRA expressly

17

defines the USPS as an establishment in the executive branch, and as such it is an agency under

FACA. Moreover, the fact that Congress wanted to improve efficiency of the Postal Service,

minimize political influence and allow the Service to operate in a more business-like manner

(*Mail Order Ass'n., supra*, 986 F. 2d at 519-520; *Kuzma v. USPS*, 798 F. 2d 29, 31 (2d Cir.

1986)) is not at odds with the fact that the USPS is an agency of the government. In any event

precedent in this Circuit and this Court (cited above) holds that the USPS is an agency.

Given the language of FACA Section 2 and 5 U.S.C. §551, the USPS is covered by

FACA unless it is exempted from that Act.

## 2.    PRA does not exempt USPS from FACA

The principal thrust of the USPS argument is that Section 410 of the PRA renders the

FACA inapplicable to the Postal Service. USPS Brief at 9-11.  Although the PRA was enacted

after the FACA, no provision of the PRA expressly excepts the USPS from coverage of the

FACA. The USPS relies on PRA Section 410(a) which states that: "except as provided in

subsection (b) of this section" or except as otherwise provided in Title 39 or USPS regulations,

"no Federal law dealing with public or Federal contracts, property, works, officers, employees,

budgets, or funds, including the provisions of chapters 5 and 7 of Title 5, shall apply to the

exercise of the powers of the Postal Service."  Section 410(b) then provides that certain specific

laws that would be inapplicable under Section 410(a) continue to apply to the USPS, including

the Freedom of Information Act (5 U.S.C. §552), the Privacy Act (5 U.S.C. §552a) and the Open

Meetings Act (5 U.S.C. §552b). The USPS argues that Section 410(a) excepts the USPS from the

FACA and that Section 410(b) does not identify the FACA as a law that continues to apply to the

Postal Service, so the FACA is therefore inapplicable.

18

However, APWU and CAPS submit that the FACA is not a Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds. The FACA concerns agency use and misuse of advisory committees in connection with agency decision-making; and public access to advisory committee meetings, reports and processes. The FACA does not concern contracts, property, works, budgets or funds. Nor does the FACA concern the appointment, removal, compensation of officers or employees, other personnel actions involving officers or employees, or decisions or actions of officers or employees. The USPS contends that "[b]ecause MTAC's advice and recommendations concern mailing industry issues, USPS's association with MTAC undoubtedly impacts USPS's contracting, budgeting and funding operations..." within the meaning of Section 410(a) so the USPS must be exempt under that provision. USPS Brief at 13.  This is quite a leap of logic which lacks foundation in any authority. Certainly, the USPS cites no authority for this assertion; it just says it's so. Moreover, the question under Section 410(a) is whether the FACA is a law dealing with contracts, budgets and funding; not whether MTAC as an advisory committee might address an issue that could affect contracts, budgets or funding. The mere fact that MTAC might make a recommendation that the USPS might adopt, which then might have an impact on expenditures or revenues does not mean that the FACA is a law dealing with contracts, budgets and funding. Indeed, under the USPS reasoning, laws that do not actually concern budgeting and funding but might somehow affect the USPS budget or finances by imposing requirements that may cause increases or decreases in expenditures or revenues would not be applicable to the USPS solely on that basis. In its argument under Section 410(a) the USPS has ignored the question of what kind of statute the FACA is, and instead focused on the nature of the issues that can come before the committee.

But absent a showing that the FACA is a statute governing the areas listed in Section 410, it cannot be said that the list of subjects in Section 410(a) exempts the USPS from the FACA.

The USPS also relies on the part of Section 410(a) that excepts the USPS from the provisions of chapters 5 and 7 of Title 5; and it cites decisions holding that the USPS is not subject to the Administrative Procedure Act. USPS Brief at 13-14. The flaw in this argument is that the FACA is not part of chapters 5 or 7 of Title 5. In enacting the FACA, Congress did not make it a part of Title 5 at all. Indeed the D.C. Circuit has expressly stated that, "FACA is not part of Title V, which was enacted six years before FACA's passage, but, instead *is only temporarily housed* [in Title V] as an appendix. Typically, when Congress wishes to add a statute to Title 5, it amends the Title," just as Congress has done for the Government in the Open Meetings Act and the Privacy Act, but it did not amend Title 5 when it enacted FACA . *Ass'n. of Amer. Physicians and Surgeons v. Clinton*, 997 F.2d at 904, rev'd on other grounds not dealing with FACA's housing in or out of Title 5, emphasis added. Thus, the USPS cannot rely on the last part of Section 410(a) as excepting the USPS from the FACA because FACA is not a part of Title 5.

Other USPS arguments against application of the FACA also lack merit. It is asserted that the FACA does not apply because it is not listed in Section 410(b) as one of the statutes that applies to the USPS despite Section 410(a). But since the FACA is not excepted under Section 410(a), there was no need to restore it to effect in Section 410(b); so its omission from that provision does not advance the USPS argument that it is not covered by FACA. The USPS has cited *National Easter Seal Society v. USPS*, 656 F. 2d 754, 766 -767( D.C. Cir. 1981), which held that the USPS is exempt from the notice and comment procedures of the APA, noting that

20

Congress enacted the PRA to improve postal efficiency and promote modernization. USPS Brief

at 13-14. But *National Easter Seal Society* is inapposite because it concerned application of the

APA, which, unlike the FACA, is part of Title 5. The decision in that case discussed the PRA

Section 410(a) general exemption of the USPS from certain types of laws, but noted that the

there was a specific exemption from the provisions of chapters 5 and 7 of Title 5, and that

Section 410(b) restored applicability of several provisions of Title 5, but not the APA; and that,

in the face of such specific language, it could not be said that the APA remained applicable to the

USPS. *Id* at 766. Because the decision in *National Easter Seal Society* was based on an express

exemption of the APA set forth in Section 410(a) it is inapposite here where there is no such

express exemption of the FACA in Section 410(a).

The USPS also contends that its dealings with MTAC are exempt from the FACA

because MTAC supposedly qualifies as a consultant under Section 410(c). USPS Brief at 14. In

four short sentences the USPS asserts that MTAC is a consultant under PRA Section 410(c)(5),

that its reports would therefore be exempt from disclosure under FOIA in the same manner as if

they were internal Postal Service materials and that this would include pre-decisional materials.

None of these conclusory assertions is supported by any authority whatsoever. There has been no

showing that a Section 410(c)(5) exemption from the FOIA means that such an exemption

necessarily applies under FACA. But even if the USPS had supported application of Section

410(c)(5) to FACA, what is the basis for describing MTAC as a "consultant"? No authority

under Section 410(c)(5) regarding the term consultant has been provided. The USPS itself has

described MTAC as an advisory committee formed for the purpose of sharing technical

information, allowing mailers to provide advice and recommendations on mail related products

and service to enhance customer value and for mutual benefit. USPS Brief at 5-6. No

compensation flows from the USPS to MTAC. Furthermore MTAC members speak on behalf of

their own constituents and seek to advance their own interests as mailers. This plainly is not a

consultant relationship. And the notion that the MTAC reports are like internal confidential pre-

decisional materials is specious. The contents of these materials are known to MTAC members

who are USPS customers–they cannot possibly be considered to be like internal confidential pre-

decisional materials. Moreover, MTAC information is often reported or described to the

members of the associations of mailers that provide representatives to MTAC. Furthermore

MTAC and MTAC work group meetings may be attended by non-member invitees. Thus, the

USPS has not put forth an actual argument that MTAC materials and information are exempt

from the FACA under PRA Section 410(c)(5), it certainly has not established that such an

exemption applies to MTAC.

Finally, the USPS offers an argument based on supposed statements of the USPS' own

views as to the application of the FACA, citing a letter from a USPS "representative" in response

to a Congressional inquiry, and an OMB report describing its understanding of the views of the

USPS concerning application of the FACA to the USPS. The USPS then asserts that Congress

was aware of the USPS interpretation of the statute and did nothing to effect a change, so the

Court should defer to the USPS "interpretation." USPS Brief at 11-12. There are several

problems with this argument. Initially, APWU and CAPS note that an agency's interpretation of

a statute is afforded deference only when the agency is acting pursuant to a Congressional

delegation of authority to regulate or adjudicate in the areas in question. *American Library Ass'n*

*v. FCC*, 406 F. 3d 689, 699 (D.C. Cir. 2005). Here the USPS certainly has no authority to

adjudicate or regulate under the FACA. And, to the extent that the USPS seeks judicial deference

to its interpretation of the PRA, it has not shown that Congress gave it authority to

authoritatively construe or apply PRA Section 410. In any event, the USPS has not shown that

there actually was any ruling or regulation under Section 410 to which the Court should defer.

The two "interpretations" cited by the USPS are a letter (USPS Ex D) that a representative whose

title is unknown wrote to a Congressional Committee about application of Section 410 to a

proposed amendment to Title 5 (a fairly equivocal statement at that); and an OMB report on

advisory committees that reported that the USPS was excluded from that report because OMB

said that the USPS Assistant General Counsel had opined that the USPS was exempt from

FACA. Neither of these opinions is a decision or regulation of the USPS itself that could be

entitled to judicial deference. Nor can it be said that these communications to Congress are

authoritative interpretations of the PRA by a decision-maker or decision-making body of the

USPS that constitute the sort of longstanding administrative interpretations that Congress may be

presumed to know and presumed to accept by inaction. Accordingly, the "interpretations" cited

by the USPS should be afforded no weight whatsoever.

APWU and CAPS have shown that the USPS is an agency covered by FACA under the

plain language of the statute. The USPS has asserted that it is nonetheless excepted from

compliance with FACA because of Section 410 of the PRA. But, APWU and CAPS have shown

that none of the USPS arguments demonstrate that the PRA actually exempts the USPS from the

FACA. APWU and CAPS therefore respectfully submit that the Court should reject the USPS

arguments that the FACA does not apply to its relationship with MTAC.

23

### B.    MTAC WORK GROUPS ARE COVERED BY THE FACA

The USPS also contends that even if it is covered by FACA, the MTAC work groups are not. USPS Brief at 20-23. However, the FACA itself, Section 3(2), covers not only advisory committees but also advisory committee "subcommittee[s] or other subgroup[s]". MTAC work groups are plainly subcommittees or subgroups of MTAC. Indeed, the MTAC Charter description of the work groups, and the Tabbita declaration, show that the work groups are subcommittees of MTAC. The USPS errs in contending that CAPS and APWU have not sufficiently alleged that MTAC work groups are covered by FACA because the work groups are not established or utilized by the USPS.  USPS Brief at 20-23.[3]  However, APWU and CAPS have alleged in their complaint MTAC work groups study and report on, and make recommendations concerning various subjects involving Postal operations, and that the USPS has acted on advice, recommendations, reports and opinions of MTAC work groups. The Tabbita declaration (¶¶ 5-8) shows that the USPS has acted on specific work groups reports and recommendations. And the MTAC charter itself indicates that the principal work of MTAC is done at the work group level and that their reports and recommendations are typically endorsed by MTAC. Since a court considering a motion to dismiss must treat the plaintiff's factual allegations as true, and draw all reasonable inferences therefrom in the plaintiff's favor, APWU and CAPS submit that, for purposes of the USPS motion, the Court should accept the plaintiffs' allegations that the work groups are established and utilized by the USPS and that the work groups are utilized by the USPS such that they are covered by the FACA. Because the work

---

[3] The USPS brief does not deny that work groups function as advisory committees, it only asserts, erroneously, that the Complaint in this case does not sufficiently allege that work groups do function as advisory committees. Plaintiffs contend, on the basis of available evidence, that USPS follows work groups' advice.

groups are MTAC subcommittees or subgroups established and utilized by the USPS the USPS

motion to dismiss the APWU and CAPS claims with respect to the work groups should not be

dismissed.

### C.    APWU AND CAPS HAVE A RIGHT OF ACTION FOR ENFORCEMENT OF FACA

The USPS asserts that even if it has violated the FACA, APWU and CAPS have no

private right of action for enforcement of the Act. USPS Brief at 17-19. However, numerous

cases have been litigated and decided in this Circuit and other Circuits based on complaints filed

by private individuals and groups. Current D.C. Circuit precedent is that private parties have a

right of action for enforcement of the FACA. To the extent that the USPS relies on *Cannon v.*

*Univ. of Chicago*, 441 U.S. 677 (1979), and *Alexander v. Sandoval*, 532 U.S. 275 (2001), with

regard to standards for determining when there is an implied private right of action for

enforcement of a Federal statute, APWU and CAPS respectfully submit that their complaint

satisfies those standards.

In *Cummock v. Gore, supra.*, the D.C. Circuit faced the issue of whether FACA rights

and duties were enforceable in the courts (180 F.3d at 290); and it held that the plaintiff in that

case did have a private right of action, stating: "there is no question under our precedent that

members of the public have enforceable rights to obtain information under FACA, *see Food*

*Chem. News* 980 F. 2d at 1472." In *Food Chem News v. DHHS*, 980 F. 2d 1468 (D.C. Cir.

1992), a private organization sought production of materials prepared by an advisory committee;

the Court affirmed that the agency involved was required to produce the materials and was

required to produce them prior to the meeting for which they were prepared. *Id.* at 1472. In

*Assoc. Of Am Physicians and Surgeons v. Clinton, supra,* 997 F.2d 898, the D.C. Circuit

considered a private group's claim under FACA, but held the statute inapplicable in that case. The Court of Appeals considered and accepted a FACA claim of a private entity in *Animal Legal Defense Fund v. Shalala*, 104 F, 3d 424 (D.C. Cir. 1997), that a National Academy of Sciences committee on care and use of laboratory animals was an advisory committee and its actions were covered by FACA. And in *Natural Resources Defense Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998), the D.C. Circuit considered the FACA claim of a private group, but remanded the case for consideration of certain standing issues. In that case, the Court of Appeals referred to the Supreme Court's decision in *Public Citizen, supra*, noting that the Supreme Court had rejected arguments that a private party lacked standing to seek redress for a FACA violation. *Id* at 1020-1021, *citing* 491 U.S. at 447-451. *See also Washington Legal Foundation v. American Bar Ass'n.*, 648 F. Supp 2d 1353, 1361 (1986), rev'd on other grounds (17 F. 3d 1446 (D.C. Cir. 1994))–"plaintiff is correct in arguing that the courts have recognized a private right of action under the Act". The Eleventh Circuit has also considered FACA claims of private parties, and found violations of the Act and that the plaintiffs had standing to obtain relief under the Act, including injunctive relief. *Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior*, 26 F. 3d1103 (11th Cir. 1994); *Miccosukee Tribe v. Southern Everglades Restoration Alliance*, 304 F. 3d 1076, 1080 (11th Cir. 2002). APWU and CAPS therefore respectfully submit that the law in this Circuit is that private parties do have the right to bring actions for enforcement of the FACA.

Despite this precedent, the USPS argues that there is no private right of action under FACA based on the Supreme Court's decision in *Sandoval*. USPS Brief at 17-18. The USPS acknowledges that in *Cummock* the D.C. Circuit held that there is a private right of action under FACA, but it dismisses *Cummock* as "based on an assumption rather than the text and structure

26

of FACA" and asserts that "*Cummock* must be reexamined". USPS Brief at 18 n. 7. However, not only did the *Cummock* Court extensively analyze the FACA and its legislative history (180 F. 3d at 284-285), it also specifically addressed "the question of whether Cummock possesses an enforceable right under FACA" (*id.* at 290). The Court then reviewed specific provisions of the Act and noted Congress' intent "'to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee'"; and "to protect against 'the risk that governmental officials would be unduly influenced by industry leaders'" . *Id.* at 291, citations omitted. The Court then concluded that members of the public have enforceable rights under FACA. *Id.* at 292. Thus, the D.C. Circuit based its decision on analysis of the text, structure and purpose of the Act and not assumption. *Cummock* and decisions relying on *Cummock* are controlling precedent in this Circuit. *See also* the decision of this Court in *Center for Arms Control and Non-Proliferation v. Lago,* 2006 WL 3328257 (D.D.C. 2006) at *4, holding that an organization had private right of action to enforce the FACA, citing *Public Citizen* and *Cummock.*

APWU and CAPS further submit that a holding that FACA is enforceable by private parties is not at odds with the Supreme Court's decision in *Sandoval.* The majority decision in *Sandoval* stated that it was applying the standards set forth in *Cannon* and *Cort v. Ash* ( 422 U.S. 66 (1975)) for determining when it is appropriate to imply a private right of action for enforcement of a federal statute. 532 U.S. at 286-287. Those standards are: 1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted, does the statute create a federal right in favor of plaintiff ; 2) is there an indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; 3) is it consistent with the underlying

purposes of the legislative scheme to imply such a remedy for the plaintiff; and 4) is the cause of

action one traditionally relegated to state law. *Cort*, 422 U.S. at 78; *Cannon*, 441 U.S. at 688 n.9.

Under those standards, there is a private right of action for enforcement of FACA.

Based on the language and structure of the Act, and its legislative history, APWU and

CAPS submit that Congress intended that FACA would be enforced by private parties whose

specific interests are protected by the Act; and that APWU and CAPS are of a class for whose

benefit the statute was enacted. As APWU and CAPS have shown, FACA Section 10 requires

that all advisory committee meetings "shall be open to public", except in certain situations; that

"all interested persons shall be permitted to attend, appear before and file statements with any

advisory committee", and FACA Section 11 provides that transcripts of advisory committee

proceedings must generally be made available to any person. Moreover, Congress was clear that

major purposes of the FACA were to guard against the ability of special interest groups to use

their membership on such committees to promote their private concerns, to assure openness in

the operations of advisory committees, to require that complete and accurate minutes of

committee meetings be kept and made available to interested persons, to enhance the public

accountability of advisory committees and to safeguard the public interest in fair, accurate,

inclusive and unbiased advisory committees. Given the express language of the FACA

conferring rights of attendance at meetings and access to materials, and the purpose of the FACA

to open committees to scrutiny by interested persons, it is apparent Congress intended interested

persons to be able to enforce the obligations it created in the Act.

MTAC and MTAC work groups deal with issues that are important to the members of

CAPS, which are relatively small but still significant mailers, and important to the APWU both

as a relatively small mailer and as the representative of hundreds of thousands of postal employees. Worksharing activities by large mailers provide an important example.[4] Worksharing refers to activities performed by mailers to prepare their mail for processing by the Postal Service. For example, very large mailers are given substantial rate discounts for presorting and prebarcoding their mail. This presorting and prebarcoding work takes the place of work that postal employees would have to perform if the large mailers did not do it before depositing their mail.[5] Worksharing can also refer to a practice called "drop shipping" in which the mailer transports its mail to a postal facility near its destination, thus saving the Postal Service transportation costs. In either case, worksharing is a form of contracting out, or privatization that results in a substantial portion of the Postal Service's work being performed by the private sector. Last year workshare discounts totaled approximately $18 billion per year. Tabbita Dec. ¶ 19. MTAC work groups have in the past and are preparing to again provide advice to the Postal Service about ways of maximizing worksharing. Tabbita Dec. ¶¶ 10C, D; 11; 18; 19.

Thus, in part due to recommendations from MTAC and its work groups, the USPS has been making various technological and operational changes that benefit large mailers; and it has been increasing discounts to large mailers, often as a result of such changes. These changes disproportionately benefit large mailers, and put smaller mailers like CAPS members and the APWU at a relative disadvantage. Farrell Dec. ¶¶ 4-7. MTAC has often been involved in

---

[4] There are many other examples. Tabbita Dec. ¶¶ 6-14.
[5] Large mailers who prebarcode their First Class letter mail and deposit it in large quantities presorted to the letter carrier route from which it will be delivered, for example, pay only 31.2 cents per letter instead of paying the full 41 cents individuals and small businesses pay for First Class letters.

studying and has often made recommendations for such changes that benefit the members of the associations that have representation on MTAC. Indeed, the Postal Service often uses MTAC to vet ideas and proposals for changes in Postal operations and policies and to gauge industry reaction to plans under consideration; MTAC members often use MTAC to suggest changes in Postal operations and policies that are of interest to mailers and to effectively lobby for changes; and the Postal Service often relies on MTAC recommendations as supporting changes that it proposes. Tabbita Dec. ¶¶ 7-14; Farrell Dec. ¶¶ 4-7. CAPS and its members therefore have an interest in participating in, and commenting on, MTAC and MTAC work group studies and reports before proposed changes which favor large mailers are adopted by the USPS. As a small mailer in its own right ($5 million per year in postage spent), APWU has a similar interest in MTAC recommendations regarding Postal services, products and rules.[6] Guffey Dec. ¶¶ 3-8.

As the collective bargaining representative of a hundreds of thousands of Postal Workers, and as an association whose members obviously have a substantial interest in Postal operations and policy and the future of the Postal Service, the APWU plainly is an "interested person" under the FACA and the statute therefore affords APWU a right to attend meetings and file statements, and a right to obtain advisory committee transcripts and reports. As is shown above MTAC recommendations, if accepted by the USPS, can positively or negatively impact the number of Postal employees, the conditions they work under, the quality of their work

---

[6] The USPS has argued that the Court should dismiss CAPS' claim concerning MTAC's refusal to allow CAPS to become a member of MTAC, asserting that FACA does not confer a right to committee membership. USPS Brief at 23-24. But in *Cummock*, the D.C. Circuit stated that Congress emphasized the need to ensure that persons directly affected by a committee's work have some representation on the committee. 180 F. 3d at 291. In any event, CAPS certainly has a right to attend committee and work group meetings, submit comments and obtain documents.

environment and the financial viability of their employer. The USPS will often cite MTAC recommendations and opinions as supporting or justifying changes that may adversely affect APWU members. APWU therefore has a strong interest in learning about MTAC and MTAC work group proceedings, studies and papers, and in providing input to, and opinions regarding, MTAC and MTAC work group reports before the USPS acts on them, citing MTAC support for the changes. APWU and its members are certainly the sort of persons that Congress believed should have a right of access to a Postal advisory committee's meetings and documents and the opportunity to present their views to such a committee.

As an advocacy group for nonprofit organizations that communicate with their members by mail, CAPS and its members have substantial and direct interests in MTAC recommendations regarding Postal services, products and rules, especially to the extent that they may favor large mailers who have MTAC representatives, over small mailers who typically do not

Thus, APWU and CAPS and their members are persons who have direct and substantial interests in ensuring that a Postal advisory committee is not captured by, or overly influenced by industry insiders who have exclusive access to agency proceedings; precisely the sort of persons that Congress sought to provide access to committee meetings and documents. As the D.C. Circuit stated in *Cummock v. Gore,* "Congress aimed, in short, 'to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals.'" 180 F. 3d at 285, citations omitted.

31

APWU and CAPS recognize that some parts of FACA contain general guidelines and directives to both Congress and the executive branch, and some parts state general policy , but FACA Sections 10 and 11 confer specific rights on parties interested in an advisory committee's work; and, as described above, APWU and CAPS fall squarely within the intent of the interested persons language in those provisions. APWU and CAPS submit that the interested persons language of FACA is no less specific as to conferring rights on plaintiffs than was the language of Title IX that was found to confer an especial benefit in *Cannon*- "No person in the United States, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under...." (441 U.S. at 681), or the rights conferring language in other statutes cited in *Cannon* -e.g. "no person shall be denied the right to vote..."; "[e]mployees shall have the right to organize and bargain collectively..." (441 U.S. at 691). It must also be noted that in *Sandoval,* the plaintiff sought to enforce rights created by regulation issued pursuant to a statute; the Court thought it significant that there was no <u>statutory</u> provision in that case like the "No person..." language in *Cannon*, that the statutory provisions at issue in *Sandoval* focused more on duties placed on the regulated entity rather than rights created for the individual (532 U.S. at 288-289), and that the alleged rights-creating language was in a regulation implementing a statute, not in the statute itself (*Id.* at 291). By contrast to the plaintiffs in Sandoval, APWU and CAPS seek to enforce specific rights that Congress conferred on persons like them in Sections 10 and 11 of FACA; they therefore have a private right of action for enforcement of those provisions.

APWU and CAPS also note that, to the extent that the first *Cort/Cannon* factor looks to whether the plaintiff is one of the class for whose especial benefit the statute was enacted, and

32

whether the statute creates a federal right in favor of the plaintiff, the inquiry is similar to the

elements of the historic standard for standing: whether the plaintiff has suffered an injury in fact

by invasion of a legally protected interest that is concrete and particularized (*i.e.* the injury

affects the plaintiff in a personal and individual way), that the plaintiff's complaint fall within the

zone of interests protected by the law invoked, and that the plaintiff assert a specific interest of

his/her own, not a generalized grievance of the public at large. *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560 (1992); *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Warth v. Seldin*, 422 U.S.

490, 499 (1975); *Zivotofsky v. Secretary of State*, 44 F 3d 614, 617-619 (2006). Here APWU and

CAPS assert injury by denial of legally protected rights conferred on them by FACA as persons

interested in MTAC proceedings and recommendations; their complaint falls within the zone of

interests protected by the FACA because they are persons interested in, and sure to be affected

by, MTAC recommendations; and they are concerned about the capture or domination of MTAC

by specific interests who have representation on MTAC; and they do not merely assert an

interest that the USPS comply with the law, but that it comply with the law because they will be

affected by its non-compliance. In this regard. APWU and CAPS note that in *Public Citizen,*

*supra.* the Supreme Court held that a private party had standing to bring an action for

enforcement of the FACA because of their specific demand for information guaranteed by the

FACA. 491 U.S. at 449. *See also Bensman v U.S. Forest Service*, 408 F. 3d 945, 858 (6th Cir.

2005)-- contrasting the Appeals Reform Act with the FACA. Indeed in *Center for Arms Control*

*and Non-Proliferation, supra.*, this Court referred to standing principals in holding that a private

party had private right of action to enforce the FACA, *citing Public Citizen, supra.* and

*Cummock supra.*, stating (2006 WL 3328257 at *4):

Although FACA does not contain a provision providing a private right of action to enforce its provisions, it appears that the Supreme Court has essentially assumed that citizens may sue if they have been denied access to records under FACA. *See Manshard v. Fed. Judicial Qualifications Comm.,* 408 F.3d 1154, 1156 n. 3 (9th Cir.2005) (citing *Pub. Citizen,* 491 U.S. 440). Nonetheless, the Center still must show "that [it] has suffered a particularized injury to a cognizable interest, [its] injury is fairly traceable to the Government's actions, and a favorable judicial ruling will likely redress [its] injury." *Cummock,* 180 F.3d at 290 (citing *Lujan,* 504 U.S. at 560-61). There can be no doubt that "refusal to permit [the Center] to scrutinize the [Commission's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue." *Pub. Citizen,* 491 U.S. at 449.

APWU and CAPS therefore submit that they have shown that the FACA confers on them rights sufficient to satisfy the first *Cort/Cannon* criterion for finding an implied private right of action under that statute.

With respect to the second criterion: is there an indication of legislative intent to create or deny such a remedy; APWU and CAPS submit that the language and history of the FACA demonstrate a Congressional intent to create a private remedy. Congress did not merely set guidelines for the conduct of advisory committees, it created a specific right for interested persons to attend advisory committee meetings and obtain their materials. And Congress was clearly concerned that without the rights of attendance and document access for interested persons, advisory committees could be controlled or dominated by committee members who would pursue their own interests; only other interested parties can act to prevent the sort of situation that concerned the Congress. Moreover, Congress provided no other method for enforcement of these rights. In *Sandoval,* the Court thought it significant that Congress expressly empowered agencies to enforce their own regulations issued pursuant to the statute at issue there. 532 U.S. at 289. By contrast, here Congress provided no administrative enforcement mechanism for the rights established in FACA Sections 10 and 11; in the absence of a private right of action,

34

there could be no enforcement of those rights.[7]

The USPS has also noted that Congress considered in 1971, but did not adopt, FACA-type legislation that would have expressly provided a cause of action for enforcement of FACA under certain specified circumstances.  USPS Brief at 18, and Congressional Record excerpts appended thereto.

---

[7] The USPS suggest that because FACA provides for Congressional and Executive branch oversight for advisory committees, that shows Congress considered a private right of action unnecessary. USPS Brief at 18. But the USPS offers no support for this assertion and merely states that "[e]vidently" Congress thought a private right of action unnecessary. *Id.* Furthermore, the USPS ignores the fact that different parts of the FACA may be enforced differently. *See e.g. Sandoval,* noting a private right of action for one part of Title IX, but finding no private right of action for another part. In this case, the FACA provides for Congressional and Executive oversight, but such oversight is clearly directed to parts of the Act that concern reports to Congress and the President about the number, types and funding of advisory committees, and the purpose and utility of committees (FACA Sections 5-7). That does not mean Congress intended to deny a right of action for parts of the Act that conferred rights on individuals. The USPS has also noted Congress that considered, but did not adopt legislation that would have expressly provided a cause of action for enforcement of FACA, and therefore infers that there is no private right of action. USPS Brief at 18. But that does not mean that Congress did not intend for the Act to be enforceable by private parties. Given the state of the law at that time, Congress may have assumed that it was not necessary to expressly provide for private enforcement of the Act.

From this, the USPS infers that Congress intended no private right of action to enforce FACA.

However, the circumstances of that congressional action in 1971, and closer examination of the

text of the proposed legislation that was not adopted, leads to the opposite conclusion.

Given the state of the law in 1971, Congress must be presumed to have understood that

there would be a private right of action to enforce FACA.  The state of the law in 1971 was

concisely summarized by Mr. Justice Harlan in his concurring opinion in <u>Bivens v. Six Unknown</u>

<u>and Unnamed Agents of the Federal Bureau of Narcotics,</u> 403 U.S. 388, 403-404 (1971).  In that

case, the Supreme Court held that plaintiffs' complaint alleging violations of their Fourth

Amendment rights stated a cause of action for which damages were recoverable in federal court.

In concurring with that result, Mr. Justice Harlan explained (<u>id.</u>):

> ...Initially, I note that it would be at least anomalous to conclude that the federal
> judiciary-while competent to choose among the range of traditional judicial remedies to
> implement statutory and common-law policies, and even to generate substantive rules
> governing primary behavior in further as a broadly formulated policies articulated by
> statute or constitution, see Textile Workers Union V.  Lincoln Mills, 353 U.S. 448, 77
> .Ct. 912, 923, 1 L.Ed.2d 972 (1957); United States v.  Standard Oil Co.,  332 U.S. 301,
> 304-311, 67 S.Ct. 1604, 1606-1610, 91 L.Ed. 2067 (1947); Clearfield Trust Co. v. United
> States, 318 U.S. 363, 63 S.Ct. 573, 887 L.Ed. 838 (1943)- is powerless to accord a
> damages to remedy to vindicate social policies which, by virtue of their inclusion in the
> Constitution, are aimed predominantly at restraining the Government as an instrument
> of the popular will.

Thus, Congress was undoubtedly aware when it adopted the FACA in 1972, that it was not

necessary to expressly provide for private enforcement of the Act.

Furthermore, the USPS misconceives the potential effect of the remedial provision

Congress did not adopt.  The provision in question (USPS Brief Appendix) would have limited

36

the right of action to cases in which the plaintiffs had been "adversely affected or aggrieved" by

an action of a federal agency"; the action of the agency "had been recommended by an advisory

committee; and that the affairs of the advisory committee had not been conducted in accordance

with the statute. Thus, if Congress had adopted the provision in question it would have

substantially narrowed the availability of relief in federal court under then-standard Supreme

Court jurisprudence. Accordingly, the correct inference to draw from the 1972 action of

Congress is that it knew that it was creating rights that would be enforceable in federal court.

APWU and CAPS submit that the language, structure and purpose of the Act demonstrate

that Congress intended that the rights it conferred on interested persons by enforceable by such

persons. For the same reasons, plaintiffs also submit that finding a private right of action for

enforcement of rights the FACA conferred on interested persons is also consistent with the

underlying purposes of the legislative scheme. Finally it is readily apparent that the cause of

action asserted by the plaintiffs is not one traditionally relegated to state law; this case concerns a

statute directed to a particular problem that developed in the Executive Branch of the Federal

government; it is not a matter that has been or could be addressed under state law.

For all of these reasons, CAPS and APWU respectfully submit that their complaint

satisfies the standards set forth in *Cort*, *Cannon* and *Sandoval* for determining when there is an

implied private right of action for enforcement of a Federal statute.

In arguing that FACA provides no private right of action, the USPS relies heavily on the

decisions in *Natural Resources Defense Council v. Abraham*, 223 F. Supp. 2d 162 (D.D.C.

2002); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp 2d 20

(D.D.C. 2002) ; and *International Brominated Solvents Ass'n. v. American Conference of Governmental Industrial Hygienists*, 393 F. Supp. 2d 1362 (M.D. Ga 2005) which relied on *Sandoval* for their holdings. USPS Brief at 17-18. However, as plaintiffs have shown, these decisions are contrary to the D.C. Circuit's decision in *Cummock* and the more recent decision of this Court in *Center for Arms Control*. Indeed, in both *Natural Resources Defense Council* and *Judicial Watch*, the Court acknowledged that its decisions appeared to be inconsistent with *Cummock* and the Supreme Court's decision in *Public Citizen, supra.,* but suggested that those decisions may have just implicitly assumed that FACA creates a private right of action, and that *Sandoval* required a different outcome. APWU and CAPS submit that this analysis is insufficiently deferential to current Circuit and Supreme Court precedent concerning FACA cases, and that assumptions about what those courts might have been thinking is not enough to permit a contrary decision. It should also be noted that both *Natural Resources Defense Council* and *Judicial Watch* were reversed on appeal, though on other grounds. Additionally, in *Natural Resources Defense Council,* the Court relied in part on the fact that the plaintiffs conceded that FACA did not provide a right of action, and based their claims on the APA (223 F. Supp 2d at 176); in *Judicial Watch,* one of the two plaintiffs and an amicus also conceded that point, and the other plaintiff requested and was granted leave to amend its complaint to include claims under the APA and the Federal mandamus statute (219 F. Supp 2d at 33)-in both cases the plaintiffs were able to continue their claims by citing other bases for jurisdiction. Another problem with reliance on *Natural Resources Defense Council* and *Judicial Watch* is that while they held that *Sandoval* required a finding that there is no private of action for enforcement of FACA, they did not actually perform the *Cort/Cannon/Sandoval* four step analysis for

38

determining whether Congress intended private enforcement of a statute; and, specifically, they

did not address the language of FACA Sections 10 and 11 regarding rights vested in persons

interested in actions of an advisory committee. 223 F. Supp 2d at 176; 219 F. Supp at 33-34.

*International Brominated* suffers similar infirmities; indeed, that Court relied heavily on *Natural*

*Resources Defense Council* and *Judicial Watch*. 393 F. Supp 2d at 1376-1377. The Middle

District of Georgia also acknowledged that its decisions seemed to conflict with Circuit

precedent (*Miccosukee, supra.*) and *Public Citizen,* but also dismissed that problem by stating

that the court of appeals and Supreme Court had apparently only assumed that FACA provided a

private right of action. 393 F. Supp at 1377.  And the *International Brominated* Court also said

that its decision was required by *Sandoval,* but it too did not actually perform the

*Cort/Cannon/Sandoval* four step analysis or specifically deal with the language of FACA

Sections 10 and 11. For all of these reasons, APWU and CAPS respectfully submit that the

decisions relied on by the USPS are not persuasive, and that this Court should follow *Cummock*

and the recent decision in *Center for Arms Control.*

Plaintiffs submit that they have shown that FACA provides them with a private right of

action for enforcement of their rights under that statute so their complaint should not be

dismissed for lack of jurisdiction.

## D.    EVEN IF PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION UNDER THE FACA, THEY STILL HAVE A RIGHT OF ACTION FOR REVIEW OF UNLAWFUL AGENCY ACTION

Although the PRA renders the APA inapplicable to the USPS, the Postal Service's

violation of the FACA renders the USPS subject to "common law" or "non-statutory" review.

The postal jurisdiction statutes, 39 U.S.C. §409 and 28 U.S.C. §1339, vest the federal courts with

subject-matter jurisdiction, respectively, "over all actions brought by or against the Postal

Service" and over "any civil action arising under any Act of Congress relating to the Postal

Service." Indeed, the D.C. Circuit has previously relied on these jurisdictional statutes to

entertain claims that the Postal Service has engaged in unlawful acts. In *Aid Association for*

*Lutherans v. United States Postal Service*, 321 F.3d 1166, 1168 (D.C. Cir. 2003), the Court

stated that "[A]ppellees may challenge actions by the Postal Service that are outside of the scope

of its statutory authority. Appellees' principal claim here is that the challenged regulations

emanated from an *ultra vires* action by the Postal Service. We agree. Therefore, it does not

matter whether 39 U.S.C. § 410 (a) precludes traditional APA review". *See also National*

*Association of Postal Supervisors v. United States Postal Service*, 602 F.2d 420, 429 (D.C. Cir.

1979) - postal jurisdiction statute "triggers the well-established presumption favoring judicial

oversight of administrative activities". Additionally, in *T&S Products, Inc. v. United States*

*Postal Service*, 1994 WL 1026493 (D.D.C.), this Court ruled that it had jurisdiction under 28

U.S.C. § 1331 (a) and 1339, over a suit against the Postal Service to enjoin the Postal Service

from pursuing a new method of supplying retail packaging products to post offices which the

plaintiff claimed violated the requirements found in the Postal Service's own procurement

manual. *Id*. at *1, *2 n4.[8]

---

[8] Other circuits have come to the same conclusion. *E.g. Combined Communications v. United States Postal Service*, 891 F.2d 1221, 1227-28 (6th Cir. 1989)--"a federal district court has jurisdiction under 28 U.S.C. § 1339, 39 U.S.C. § 409(a) and the 'well-established, common-law presumption favoring judicial review of administrative action'... to entertain the question of whether a final Postal Service regulation is ultra vires"; *Peoples Gas, Light and Coke Co. v. United States Postal Service*, 658 F.2d 1182, 1191 (7th Cir. 1981)--the Postal Service's "exemption from the provisions of the Administrative Procedure Act does not negate the applicability of common law review principles...We conclude that the exemptions found in

40

These decisions, endorsing the availability of non-APA or common law review in suits brought under the postal jurisdictional statutes, are firmly rooted in precedent.  Before the APA was enacted in 1946, the Supreme Court allowed suits to be brought at common law challenging actions taken by the Postmaster General in the absence of any statutory provision expressly providing for such review. *See School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 412-13 (1921). *See also Stark v. Wickard*, 321 U.S. 288, 310 (1944)--"The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.".  The APA was merely a codification of the long established common law principle of judicial review of administrative action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)--the APA was found to reenforce pre-existing common law review.

Accordingly, even if the FACA does not provide the plaintiffs with a right of action for its enforcement, plaintiffs nonetheless have a right of action under the "common law" or under "non-statutory" review of agency action.

## E.    EVEN IF PLAINTIFFS DO NOT HAVE A PRIVATE RIGHT OF ACTION UNDER FACA, OR THE ABILITY TO CHALLENGE THE USPS ACTIONS UNDER THE COMMON LAW OF JUDICIAL REVIEW OF AGENCY ACTION, THE COURT HAS JURISDICTION TO REQUIRE THE USPS TO COMPLY  WITH THE FACA UNDER THE FEDERAL MANDAMUS ACT

In the event that the Court nonetheless holds that the FACA itself does not provide plaintiffs with a right of action for its enforcement, and that a violation of the FACA may not be

---

section 410 of the Postal Reorganization Act do not manifest a congressional intent to foreclose all judicial review of alleged violations of the Postal Service's regulations."

challenged under the common law right of review of agency action in violation of law, plaintiffs have a right of action under the Federal Mandamus statute, 28 U.S.C. § 1361 to compel the Postmaster General to comply with the FACA. The mandamus statute provides that "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.". According to the DC Circuit: "Pursuant to this act, a district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.'" *In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005), *quoting Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002), *quoting Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997). A writ of mandamus will not issue unless the duty owed by the government official is a ministerial, as opposed to discretionary, duty to act. "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty". *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996), internal citations omitted. "'Generally speaking, a duty is discretionary if it involves judgement, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level ....'" *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988), brackets in original, emphasis and citation omitted.

As an official appointed by the Postal Board of Governors who are, except for the PMG and Deputy PMG, appointed by the President, and as the chief executive officer of the USPS which is an "independent establishment of the executive branch of the Government of the United States" the Postmaster General is an official subject to a mandamus order. Indeed it has long been held that the Postmaster General is subject to a writ of mandamus. *Kendall v. United States*, 37 U.S. 524 (1838).

Furthermore, FACA's requirements governing the operation of advisory committees and its provision of rights to interested persons to attend meetings, submit statements and obtain documents are plainly non-discretionary and are precisely the kind of duties that give rise to a mandamus action. Again, Section 10 requires that advisory committees provide public notice of meetings "to insure that all interested persons are notified of [committee] meetings"; that "[i]nterested persons shall be permitted to attend, appear before, or file statements with any advisory committee"; that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other shall be available for public inspection and copying"; and that "detailed minutes of each meeting of each committee shall be kept and shall contain a record of the persons present". (Emphasis added). FACA Section 11 requires that "agencies and advisory committees shall make available to any person, actual cost of duplication, copies of transcripts of agency proceedings or advisory committee meetings". (Emphasis added). These are clear and direct commands that provide no discretion. Indeed in *Cummock*, the D.C. Circuit stated that "in order to give meaning to FACA's sunshine provisions, §10(b) must be read to impose an affirmative obligation on the Government to, 'whenever practicable, [provide] access to the relevant materials before or at the meeting at which the materials are used and discussed'".

43

180 F.3d at 291 quoting *Food Chemical News, supra*. In *Food Chemical News*, the D.C. Circuit

stated that "Section 10(b) contains unambiguous language that identifies certain materials, and

describes in detail the methods and locations by and at which the Government must make those

materials available to the public." 980 F.2d at 1472. And this Court, in *Center for Arms Control,*

*supra.*, quoted these passages from *Cummock* and *Food Chemical News* and stated: "Any

advisory committee operating under FACA has no discretion or choice in the matter". 2006 WL

3328257 at *4. In that case the Court held that it had mandamus jurisdiction to enforce FACA

duties; so did the Court in *Food Chem. News*, 378 F. Supp. at 1050; and the Court in *Center for*

*Auto Safety*, 414 F. Supp. at 217. *Cf. Washington Legal Found. v. U.S. Sentencing Comm'n*, 89

F.3d at 901-902, holding that when "the Government has a duty to the plaintiff...to allow it

access to certain government records" mandamus statute allows court to take jurisdiction. Thus,

the FACA provides APWU and CAPS with a clear right to relief and the USPS has a clear and

non-discretionary duty to act.

Thus, even if the FACA itself does not provide a private right of action for its

enforcement, this Court still has jurisdiction over plaintiff's claims that the Postal Service

violated the requirements of the Act.

## VII.  CONCLUSION

For the foregoing reasons APWU and CAPS respectfully submit that the Court should

find that it has jurisdiction over their complaint, and should deny the USPS motion to dismiss.

Respectfully submitted,

_____/s/_____

Richard S. Edelman (D.C. Bar No. 416348)
O'Donnell, Schwartz & Anderson, P.C.
1900 L Street, N.W., Suite 800
Washington, DC 20036
Telephone: (202) 898-1824
Facsimile: (202) 429-8928
e-mail:Redelman@odsalaw.com

Darryl J. Anderson (D.C.Bar No. 154567)
Jennifer L. Wood (D.C. Bar No. 500887)
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 898-1707
Facsimile: (202) 682-9276
e-mail: Danderson@odsalaw.com
Jwood@odsalaw.com

Attorneys for Plaintiffs American Postal Workers Union,
AFL-CIO, and Consumer Alliance for Postal Service

45

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, <br><br> CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), <br><br>        Plaintiffs, <br><br>        v. <br><br> UNITED STATES POSTAL SERVICE, <br><br> MAILERS TECHNICAL ADVISORY COMMITTEE, <br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 07-0990 (JR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF PHILLIP A. TABBITA**

I, PHILLIP A. TABBITA, declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 that the following is true and correct and based on personal knowledge:

1. I am the Manager Negotiations Support and Special Projects for the American

Postal Workers Union, AFL-CIO (APWU). I have held this position since November

2001. Prior to that, I was the Chief of Staff to APWU President Moe Biller, from 2000 to

2001. Prior to that, I was Special Assistant to the President, from 1983 to 2000. Prior to

that, I held various positions with the Detroit Area Local, from 1970 to1983. I also

actively worked for the Postal Service for 9 years as a Window and Distribution Clerk.

2. APWU is the collective bargaining representative of USPS employees in

several bargaining units: Clerks, Mail Equipment Shop Employees, Maintenance

Employees, Material Distribution Centers Employee, Motor Vehicle Service Employees,

1



EXHIBIT A

Operating Services Employees, Information Technology/Administrative Assistance

Center Employees, and Professional Postal Nurses. USPS employees in each of those

bargaining units are members of the APWU; and APWU and USPS are parties to

collective bargaining agreements covering employees in those bargaining units.

3. The Mailers Technical Advisory Committee (MTAC) was created to provide

technical information, advice and recommendations to the USPS concerning various

aspects of mail and the mailing industry. MTAC's Charter and Bylaws describe MTAC

as "a joint effort between mailers and the US Postal Service to share technical

information, advice and recommendations on matters concerning mail-related products

and services in order to enhance customer value and expand the use of these products and

services for mutual benefit." A copy of the MTAC Charter and Bylaws is attached hereto

as Tabbita Ex. 1. The Postal Service often uses MTAC to vet ideas and proposals for

changes in Postal operations and policies and to gauge industry reaction to plans under

consideration. MTAC members often use MTAC to suggest changes in Postal operations

and policies that are of interest to mailers and to effectively lobby for changes.

4. MTAC members are typically large mailers and associations of large mailers

including, but not limited to: Bank of America Corporation, Pitney Bowes, Siemens,

Major Mailers Association, Quebecor World, Capital One Services, Verizon, AT&T,

Time Customer Services, Direct Marketing Association, Discover Financial Services,

Forbes, Time, Inc. and Sprint Mailing Services.

5. MTAC functions primarily through issue-focused work groups that are

chartered, established and monitored by the MTAC Steering Committee. The Steering

Committee is composed of both industry and postal representatives and is chaired jointly by the industry and postal Co-Chairs.

6. MTAC and MTAC work groups have investigated, studied, reported-on, offered opinions on, and provided advice and recommendations to, the USPS on various subjects involving Postal operations, including:

A. In the mid 1960s then Postmaster General John Gronouski asked MTAC for advice regarding how best to implement the still relatively new ZIP Code concept;

B. MTAC 8125 Redesign Work Group studied and made recommendations on drop shipment forms. These forms are used to submit mail to a Postal Service facility that mailers transport from their plant to destination Post Offices rather than the local Postal Office. This is known as "drop shipping." Drop shipping enters mail further in the mail processing stream and therefore bypasses certain processes and postal network facilities, including the local Post Office and originating processing plant. The Postal Service gives discounts to large mailers who drop ship their mail. C. MTAC Presort Optimization Work Group was established to study and recommend changes to presort software and sortation levels to improve overall containerization of mail. The containers mail is transported in affect the efficiency of mail delivery. The Postal Service sorts mail based on location of the final delivery destination of the mail. Mailers will "presort" their mail, or sort the mail relative to the

delivery destinations typically in the order the mail will be delivered, to receive a discount from the Postal Service.

D. MTAC advised the Postal Service on the problems associated with Automated processing, including postal tabbing machines and made recommendations to alleviate the problems. Tabbing is used most often with mail that is not placed in envelopes, such as folded advertisements. Tabbing is essentially securing a piece of mail from opening while being read by postal equipment or during mailing. Tabbing mail can increase the cost of the mail processing.

E. MTAC Drop Shipment Appointment System (DSAS) work group studied and recommended changes to the drop shipment schedule; and

F. National Periodicals Service Improvement Team and the Presort Optimization Work Group studied problems associated with palletizing and traying certain types of mail. The work group made recommendations to limit these problems thereby improving the service they receive while reducing processing costs.

7. The Postal Service has acted upon recommendations, advice, reports and opinions of MTAC and MTAC work groups, including:

A. On April 29, 1998, the Postal Service proposed to revise Form 8125, Plant-Verified Drop Shipment (PVDS) Verification/Clearance, and Form 8125-C, a new Plant-Verified Drop Shipment (PVDS) Verification/Clearance - Consolidated form. These revised forms were developed by MTAC 8125 Redesign Work Group.

4

B. In 1997 MTAC Presort Optimization Work Group was established to study and recommend changes to presort software and sortation levels to improve overall containerization of mail. This work group identified two opportunities to improve the presort of palletized mail: 1) the creation of a new labeling list, and 2) the package reallocation for periodicals and standard mail flats placed on pallets. On October 29, 1998, the Postal Service proposed changes to the Domestic Mail Manual to implement the suggestions of the MTAC Presort Optimization Work Group.

C. In late 1999, the Postal Service and MTAC discussed mailer concerns about postal tabbing. As a result of this discussion, the Postal Service proposed revisions to the Domestic Mail Manual to allow mailers to choose to exclude their letter size mail from automated processing.

D. On December 22, 1999 the Postal Service proposed to amend the Domestic Mail Manual procedures for destination entry mailings for Standard Mail (A) and Standard Mail (B) by changing the frequency for standing appointment from once a month to once a week. This change was recommended by the Drop Shipment Appointment System (DSAS) work group of MTAC. By allowing standing appointments to be made once a week this made more appointments available to mailers, which ultimately reduces their costs.

E. On February 20, 2000 the Postal Service proposed changes to the Domestic Mail Manual for sacking and palletizing periodicals nonletters and Standard Mail (A) Flats, for traying First Class Flats and for labeling

5

pallets. Two MTAC work groups, the National Periodicals Service
Improvement Team and the Presort Optimization Work Group, studied the
problems of the existing DMM standards and made these recommendations
to the Postal Service. Implementations of these recommendations improve
service to the mailers and reduce processing costs.

8. MTAC and MTAC work group are currently investigating and studying
various subjects involving Postal operations, including:

A. MTAC currently has a work group dedicated to studying and making
recommendations regarding the preparation and entry of Flat Mail in the
flats sequencing system (FSS) environment;

B. MTAC has a work group studying address/barcode requirements for
FSS;

C. MTAC was asked by the Postal Service who should pay for end-to-end
visibility and a seamless process or mail acceptance and delivery;

D. MTAC and various MTAC work groups are currently working with the
Postal Service on the development of service standards required by the
Postal Accountability and Enhancement Act that must be in place by
December 2007;

E. MTAC currently has a work group working to improve the drop
shipment process;

F. MTAC currently has a work group dedicated to optimizing parcel
preparation and entry for seamless acceptance.

9. APWU has concluded that MTAC work groups provide advice directly to the
Postal Service. For example, we are aware that MTAC has created work groups designed
to make recommendations on service standards. The Postal Accountability and
Enhancement Act (PAEA) mandates that the Postal Service, in consultation with the
Postal Regulatory Committee (PRC), implement service standards for all classes of mail.
Postal Service employees and large mailers' representatives are members of the MTAC
service standards work groups, and Postal Regulatory Commission staff have been given
observer status. Although their meetings are conducted in secret, there have been
extensive work group meetings involving representatives of the USPS, the PRC, and
large mailers. There can be no doubt that PRC staff members are participating in the
discussions along with the representatives of large mailers and of the Postal Service. We
have, therefore, concluded that the mailers are providing direct advice to the PRC and the
Postal Service and that the PRC is likely to treat these secret work group meetings as part
of the consultation required under the PAEA.

10. APWU members have been and/or will be affected by USPS actions made
pursuant to MTAC and MTAC work group recommendations, advice, reports and
opinions. For example:

> A. The Address/Barcode Requirements for FSS work group desires to
> develop recommended requirements for address construction, address
> quality and barcoding for mailers of flats that will result in the maximum
> number of pieces being processed on the FSS equipment. FSS equipment
> sorts the mail to walk sequence for the letter carrier. That means that the
> more mail that is processed on FSS equipment, the less work is available

for APWU members who would normally do the sorting by alternate methods.

B. The Optimizing Parcel Preparation and Entry for Seamless Acceptance Work Group seeks to recommend seamless notification process for new preparation requirements; to recommend approaches to expand electronic verification and payment to all parcel-shaped products; and to recommend approaches to optimize parcel preparation and entry to minimize end-to-end costs and fully leverage the realigned network. These recommendations may adversely affect APWU members. Without electronic verification and payment, a Bulk Mail Acceptance Clerk was required to inspect the mail pieces and take payment. With the expansion of electronic verification and payment Bulk Mail Acceptance Clerks will no longer be required; therefore, APWU members will lose work. The realigned network may result in a reduction in the number of postal processing facilities and will likely relocate many of these facilities. This will require employees to relocate or lose their jobs.

C. Co-Palletization of Trays MTAC work group would also adversely impact APWU members. Co-palletization of trays allows for mail to be entered much deeper into the mail system. This means that mailers are able to bypass USPS transportation and different mail processing sortations. The transportation and sortation of mail is work typically performed by APWU members and those members now suffer a loss of work as a result of the MTAC work group recommendations.

D. The Pricing Flexibility Within the Current Framework MTAC work group was tasked to identify more creative worksharing opportunities. Worksharing programs provide mailers with discounts for doing work that the Postal Service would otherwise have to do. Types of work defined as work share include the sortation and transportation of mail; work normally performed by APWU members. Therefore, an increase in worksharing opportunities reduces the work available to APWU members.

E. The Vote-By-Mail Research Plan MTAC work group was tasked to create a vote-by-mail implementation plan by 2003. This type of plan would likely greatly increase the volume of mail processed by the Postal Service, thereby providing additional work for APWU members.

11. Many of the issues studied by MTAC or MTAC work groups involve either a reduction in the size of the mail processing network or the reduction in rates, usually through an increase in workshare discounts, or a reduction in the amount of work available to APWU members. Additionally, all of these areas have an impact on the USPS financially. Anything that affects the USPS financially naturally affects the collective bargaining position of the Union and the employment security of our members.

12. Some issues studied by MTAC or MTAC work groups may involve changes in the work environment. For example, changes in technology and the introduction of new mail processing machines might affect work safety or implicate ergonomic issues.

13. All of the work group decisions and recommendations require certain trade-offs, which could include, among others, balancing service quality and postal rates or speed of delivery and consistency. The APWU understands the nature of balance and

9

dealing with trade-offs. If the APWU were able to attend MTAC meetings, the APWU would be able to supply valuable input on the issues facing the Postal Service based on its unique position within the postal community.

14. The APWU, separate and apart from being a labor Union, is a person and a mailer.

15. The APWU is also an organization of approximately 300,000 individuals who send letters, cards, bills, etc...

16. The interests of the APWU are parallel to the public's interests.

17. As a mailer, the APWU is concerned that the fundamental policy of the Postal Service requiring universal service at a uniform rate is being dismantled in secret.

18. The Postal Service continues to increase discounts to large mailers for drop shipping mail. The amount of the discount is equal to the amount of cost the mailers save the Postal Service in transportation. This is known as the costs avoided. The increase in these discounts to large mailers simultaneously increases the relative cost of transporting mail which is not drop shipped. The cost of transporting mail is a fairly fixed cost. When mail is removed from the Postal Service transportation network this does not greatly impact the cost of the Postal Service transportation, but now less mail is being transported. This leads to an increase in the cost of transportation per piece of mail. Large mailers are then given discounts based on this higher level of costs avoided.

19. Pressure from mailers, expressed through MTAC, for the creation of new or larger workshare discounts implicates important areas of public policy, as Congress recognized in the Postal Accountability and Enhancement Act (PAEA), enacted

December 20, 2006. Last year, workshare discounts totaled roughly $18 billion. In enacting the PAEA Congress found that excessive discounts are uneconomical and damaging to the financial well being of the Postal Service. In the PAEA, Congress expressly reenacted the public policy provision requiring universal mail service. If the Postal Service were to provide excessive workshare discounts – those that exceed the costs avoided by the Postal Service due to the workshare activity – the loss of revenue could damage the long-term ability of the Postal Service to provide universal mail service.

20. The APWU has intervened in cases before the Postal Rate Commission (now Postal Regulatory Commission, both referred to herein as PRC) since 1981. The APWU intervenes in these cases to represent its interests as a mailer and its members' interests in their postal employment. Ordinarily, the APWU's interests result in the advocacy by the APWU of policies that would benefit individuals and small mailers, who are underrepresented in both PRC proceedings and in MTAC.

21. In 2006 the Postal Service sought a recommendation from the Postal Regulatory Commission on its proposal to increase postage rates. As part of the proposal, the Postal Service, with the support of large mailers, advocated de-linking the rates for First Class Mail from the rates for large mailers' First Class Presort Mail. The APWU argued that this proposal would unfairly increase the postal rates for single piece mailers, namely individuals and small businesses, and should be rejected by the Commission.

22. The PRC agreed with the position advocated by the APWU and refused to recommend the de-linking approach so strongly advocated by the Postal Service and numerous large mailers, many of whom are MTAC members.

23. On November 16, 2006, APWU President William Burrus wrote to the Postal Service Chair of MTAC requesting information about MTAC members and MTAC work groups; descriptions of subject areas of each work group; copies of minutes of prior MTAC and work group meetings; copies of reports, agendas, updates and recommendations of work groups; and an MITS username and password for access to that system. APWU also sought to make arrangements to attend MTAC and work group meetings. The Postal Service responded requesting an explanation of the relevance of this information to the collective bargaining agreement. Attached hereto as Tabbita Ex. 2 are copies of correspondence relating to the APWU's requests.

24. The APWU, through counsel, responded to the Postal Service on January 9, 2007, stating that we felt that this information requested would have been provided without hesitation because there was no reason to keep this information secret, but we also stated that we were requesting the information and documents pursuant to the Federal Advisory Committee Act (FACA). On January 26, 2007, the Postal Service responded, asserting that FACA was inapplicable, but the Postal Service did provide some information previously available without an MITS password.

25. On February 13, 2007, the APWU, through counsel, renewed our request for information and documents as the document provided were of limited utility. We also requested authorization to send a representative to MTAC General Session meeting and certain work group meetings scheduled for February 21 and 22, 2007. The Postal Service

treated this request as an "informal Freedom of Information Request" and refused to provide any additional information.

26. Some time toward the end of 2006, the MTAC website and MITS were changed to require a login and password to gain access to any MTAC material or information. In February of 2007, I made e-mail requests to the MTAC Postal Chair requesting access to this previously available information. I was referred to the USPS letter of January 26, 2007 and told that access to any MTAC website materials now requires a password. Recently, the MTAC website was changed to provide limited information without a login and password.

27. MTAC and MTAC work groups held meetings on or about February 21 and 22, 2007. The USPS and MTAC did not authorize an APWU representative to attend any of those meetings.

I declare under penalty of perjury that the foregoing is true and correct.


September 10, 2007                                    Phillip A. Tabbita

**MTAC**
MAILERS TECHNICAL ADVISORY COMMITTEE

# CHARTER & BY-LAWS

### I.  PURPOSE
The Mailers Technical Advisory Committee (MTAC) is a joint effort between mailers and the US Postal Service to share technical information, advice and recommendations on matters concerning mail-related products and services in order to enhance customer value and expand the use of these products and services for mutual benefit.

### II.  MAILING ADDRESS
United States Postal Service
MTAC Program Manager
Service & Market Development
475 L'Enfant Plaza SW Room 2P736
Washington DC 20260-0736

### III.  INDUSTRY MEMBERSHIP
Membership in MTAC is comprised of mailer associations and other associations/organizations related to the mailing industry.   Additional associations/organizations may be approved for membership at the discretion of the MTAC Executive Committee (See Section IX).   A current list of member associations/organizations and corresponding representatives will be published at least quarterly.   The member associations/organizations of MTAC, collectively, should reflect the mailing community in terms of:
- classes and categories of mail used,
- major industries that depend on mail service, and
- organizations with significant or unique mailing needs

### IV.  MEETINGS
Meetings of the full committee are generally held on a quarterly basis each calendar year or at the call of the Postal Service Co-Chair at locations mutually convenient to the MTAC members and the Postal Service.  General Session meetings are normally held at US Postal Service headquarters in the Ben Franklin Room (11th floor).  Meetings of the membership without a representative of the Postal Service or the approval of the Postal Service Co-Chair may not be construed as official meetings of MTAC.

Minutes will be kept of all proceedings.  Minutes will, at a minimum, contain a description of the matters discussed, any conclusions reached, presentation materials, and copies of all reports received, issued, or approved by the Committee.  The accuracy of the record must be certified by the Postal Service Co-Chair, Vice-Chair, or other USPS representative present at the meeting.  The Postal Service Co-Chair will furnish member association executives, MTAC representatives, and selected USPS officials with all meeting notices, planned agenda and the minutes of each meeting.

### V.  REPRESENTATIVES OF MEMBER ORGANIZATIONS
Each MTAC member association/organization will nominate two representatives for MTAC Executive Committee approval.  The nominees should represent the size, geographic location, classes of mail used, and nature of the member association/organization.  They must be officials of their respective companies (or mailing industry organizations).  Those companies must belong to the member association or group.  Paid staff of the member association/organization are not eligible to serve as representatives.  A representative may serve for an indefinite period provided s/he adheres to the attendance requirements established by the MTAC Executive Committee (see section XI).

EXHIBIT

1

Blumberg No. 5119

**◢MTAC.**
MAILERS TECHNICAL ADVISORY COMMITTEE

**VI.   ASSOCIATION EXECUTIVE OR KEY CONTACT**

Each MTAC member association/organization will designate an executive from its staff to act as the official liaison with the Postal Service and with MTAC. The association executive or key contact person will:

- nominate the member representatives,
- provide support to those representatives in communicating with the membership of the association/organization, and
- ensure regular attendance, reporting, and participation of member representatives

Since the member association/organization nominates representatives to attend MTAC meetings, association executives are not generally invited to these meetings. They may, however, attend and participate in MTAC work group meetings.

**VII.   LEADERSHIP**

**Postal Service Chairs**: The Vice President, Service & Market Development is the MTAC Co-Chair for the Postal Service. S/he appoints two Vice-Chairs from the Postal Service for support.

**Industry Chairs**: The industry Co-Chair and Vice-Chair are elected from the MTAC industry representatives. They each serve a two-year term beginning in January of even numbered years. In odd numbered years, elections are held for the position of Vice-Chair. At the end of a two-year term, the Vice-Chair automatically succeeds the Co-Chair for another two-year term.

In January of odd numbered years, the industry Co-Chair will appoint a committee made up of past industry chair(s) to develop a list of potential nominees for Vice-Chair when that office is vacated. No later than April of each odd numbered year, the nominating committee will provide the industry Co-Chair with the names of proposed candidates. The industry Co-Chair will provide this list to the postal Co-Chair who will solicit the approval of USPS senior management for the proposed candidates. The postal Co-Chair will advise the industry Co-Chair which nominees are acceptable to the Postal Service. Those nominees will be announced at the spring quarter general session meeting. The full industry membership of MTAC will elect a new Vice-Chair by majority vote at its summer quarter meeting in odd numbered years.

During the time served as industry Co-Chair and Vice-Chair, the incumbent serves as an officer of MTAC and not as a representative of his/her sponsoring association. The affected association may, therefore, nominate another representative to replace the officer during the term of office. At the end of the term of office, the industry Co-Chair becomes, at his/her own discretion, an automatic ex-officio member of MTAC and continues to advise the Steering Committee and the Executive Committee.

**Treasurer:** The industry Vice-Chair serves as treasurer. The treasurer serves at the pleasure of the postal Co-Chair and the industry Co-Chair. The treasurer is responsible for tracking payment of dues, disbursing of funds for MTAC expenses, and makes quarterly financial reports as part of the record of each meeting.

**MTAC Program Manager**: The postal Co-Chair appoints a MTAC Program Manager who provides administrative support for meetings and functions and serves as secretary to the MTAC Executive Committee.

**MTAC**

MAILERS TECHNICAL ADVISORY COMMITTEE

## VIII.    MTAC EXECUTIVE COMMITTEE

The Executive Committee consists of:

- the Postal Service Co-Chair and Vice-Chairs,
- the industry Co-Chair and Vice-Chair,
- the immediate past industry Co-Chair (ex officio), and
- the MTAC Postal Service Program Manager (non-voting member)

The Executive Committee meets at least once a quarter in connection with the general session. The Executive Committee may conduct business at any time and location or through any means of mutual communication deemed necessary and appropriate by the Co-Chairs. The Executive Committee acts on membership issues, determines general session meeting dates and agenda, sets the appropriate level for annual membership dues, and decides upon proposed changes in the policy, procedures, and functions of the full committee. The Executive Committee oversees the activities of the Steering Committee and determines the need for any changes in Steering Committee makeup, process and/or structure. In the event that any industry member of the Executive Committee or Steering Committee is unable or unwilling to complete his/her normal term of office, the Executive Committee will select an interim replacement, if necessary, and determine the need for a special election. All actions/decisions of the Executive Committee will be by majority vote. At least two industry members and two postal members must be present for each vote.

## IX.    ADDITION AND DELETION OF MEMBERS

The Executive Committee is responsible for making appropriate additions or deletions to the list of organizations represented on MTAC.

### Additions

In considering new members, the Executive Committee determines whether the proposed new member association/organization:

- represents a significant part of the industry which is not currently well represented;
- represents mailers who use classes of mail not used by other members; or
- is an association/organization of mailers who have unique or special needs, requirements, or problems currently not well represented.

The membership criteria require that the proposed new member provide the Postal Service and the MTAC association/organization members with the potential for significant new information, advice and recommendations not currently provided by existing member associations/organizations.

### Deletions

The Executive Committee will use the following criteria when removing a member association/organization:

- dissolution of member's association/organization;
- member's voluntary request for removal;
- member's failure to provide representative(s);
- failure of member's named representative(s) to attend on a regular basis; or
- nonpayment of member's dues after two notices.

## X.    STEERING COMMITTEE

MTAC functions primarily through issue-focused work groups that are chartered, established and monitored by the MTAC Steering Committee. The Steering Committee is composed of both industry and postal representatives and is chaired jointly by the industry and postal Co-Chairs. The Steering Committee meets at least once each quarter in connection with the general session, but work may be done at any time and utilizing any communication method that the Co-Chairs agree is necessary.

**MTAC**
MAILERS TECHNICAL ADVISORY COMMITTEE

Postal representatives to the Steering Committee are executives selected by functional Vice Presidents because of their relevant field of expertise. Industry Steering Committee members are generally elected to represent a particular product or service category for a two year term. The industry Vice-Chair will call for nominations from the industry membership for Steering Committee representatives no later than mid-September of odd numbered years. Elections will be held at the fall quarter general session and newly elected members will first participate at the winter quarter Steering Committee meeting in even numbered years. Steering Committee members may serve multiple terms as long as they are re-elected by the industry membership.

The primary responsibility of the Steering Committee is to manage the process and the activities of issue-focused workgroups. The Steering Committee will issue guidelines for workgroup formation and practice.

## XI.    RESPONSIBILITIES OF REPRESENTATIVES

MTAC representatives must communicate the major topics discussed in MTAC meetings to their member associations/organizations for general information dissemination and appropriate action. In general, the representative is expected to convey information to and solicit information from his/her association to provide the Postal Service with technical information, advice and recommendations. The representative acts as a conduit for member feedback and ideas.

Under the following circumstances the Executive Committee may ask a member organization to replace its representative:

- missing multiple consecutive meetings;
- presenting views outside of an MTAC forum as representing those of MTAC  -  this includes representations to public, private or government groups including the Postal Rate Commission or the staff of the Postal Rate Commission;
- using the representative's position improperly to seek action from postal officials or to influence the action of postal officials; or
- consistently representing his/her individual organization/company's interests rather than those of the MTAC member association/organization in MTAC proceedings

## XII.    PARTICIPATION OF NON-MTAC MEMBERS

Participation of non-members in workgroups will be governed by the workgroup guidelines issued by the Steering Committee. Non-members may attend general session meetings only at the specific invitation of a member representative and must receive clearance ahead of time from the Treasurer. Members are advised to limit the occurrence of non-member invitations. Specific approval for attendance of non-members is at the discretion of the Executive Committee.

## XIII.    ANNUAL DUES

The Executive Committee determines the annual dues for member associations/organizations. The funds collected will be used to defray administrative expenses, the cost of meeting refreshments, and other incidental committee expenses at the discretion of the Executive Committee. Membership dues are payable annually in January.

## XIV.    MTAC AWARD

The Executive Committee may propose and implement an MTAC Award program at their discretion.

**APWU**

# American Postal Workers Union, AFL-CIO

1300 L Street, NW, Washington, DC 20005

November 16, 2006

William Burrus
President
(202) 842-4246

Susan Plonkey
Vice President, Customer Service
United States Postal Service
Postal Chair of MTAC
475 L'Enfant Plaza S.W.
Washington, D.C. 20260

Dear Ms. Plonkey:

The American Postal Workers Union ("APWU") is, of course, a primary stakeholder in the United States Postal Service, and the Union's members are directly affected by changes in postal policy and mail processing requirements and procedures. For these reasons, the Union has a vital interest in the discussions and recommendations of the Mailers' Technical Advisory Committee ("MTAC") and its work groups. The APWU therefore requests that MTAC provide the Union with the following:

National Executive Board
William Burrus
President

Cliff "C.J." Guffey
Executive Vice President

Terry R. Stapleton
Secretary-Treasurer

Greg Bell
Industrial Relations Director

James "Jim" McCarthy
Director, Clerk Division

Steven G. "Steve" Raymer
Director, Maintenance Division

Robert C. "Bob" Pritchard
Director, MVS Division


Regional Coordinators
Sharyn M. Stone
Central Region

Jim Burke
Eastern Region

Elizabeth "Liz" Powell
Northeast Region

Frankie Sanders
Southern Region

Omer M. Gonzalez
Western Region

1) A list of all MTAC members;

2) A list of all MTAC work groups;

3) A description of the subject areas of each work group;

4) A list of all members of the MTAC work groups;

5) A schedule of future MTAC meetings and work group meetings;

6) Copies of minutes of prior MTAC and workgroup meetings for our review;

7) Copies of reports, agendas, updates and recommendations of work groups for our review.

APWU also requests an MITS username and password for login to that system. Additionally please advise us of the arrangements we need to make in order to attend MTAC and work group meetings.

I look forward to hearing from you promptly in response to this request. Please contact me if you have any questions.

Sincerely,

William Burrus
President

WB/bb
opelu#2, afl-cio

EXHIBIT
2

 LABOR RELATIONS

**UNITED STATES**
**POSTAL SERVICE**



December 8, 2006

Mr. William Burrus                              **Certified Mail Number:**
President                                       **7005 0390 0005 6746 0280**
American Postal Workers Union,
  AFL-CIO
1300 L Street, NW
Washington, DC  20005-4128

Dear Bill:

This is in reference to your Information Request regarding Mailers' Technical Advisory Committee
(MTAC), IR07-09.  Please provide a written explanation as to the relevance of the data you are
requesting as it pertains to the Collective Bargaining Agreement.

If you have any questions, please contact Kimber Proud of my staff at 202-268-5084.

Sincerely,

John W. Dockins
Manager
Contract Administration (APWU)

475 L'ENFANT PLAZA SW
WASHINGTON DC  20260-4100
WWW.USPS.COM

*O'Donnell, Schwartz & Anderson, P.C.*

*Counselors at Law*

DARRYL J. ANDERSON
MARTIN R. GANZGLASS
LEE W. JACKSON
ANTON G. HAJJAR*
RICHARD S. EDELMAN
PETER J. LEFF**
MELINDA K. HOLMES
DANIEL B. SMITH*
BRENDA C. ZWACK
JENNIFER L. WOOD†

*1900 L Street, N.W., Suite 800*
*Washington, D.C. 20036-5023*

(202) 898-1824
FAX (202) 429-8928

JOHN F. O'DONNELL
(1907-1993)
ASHER W. SCHWARTZ
(1911-2006)

*1300 L Street, N.W.*
*Suite 1200*
*Washington, D.C. 20005*

(202) 898-1707

* ALSO MD
**ALSO VA
† VA BAR ONLY

January 9, 2007

JAN 1 1 2007

Susan Plonkey
Vice President, Customer Service
United States Postal Service
Postal Chair of MTAC
475 L'Enfant PL S.W.
Washington, D.C. 20260

John W. Dockins
Manager
Contract Administration (APWU)
United States Postal Service
475 L'Enfant PL S.W.
Washington, D.C. 20260

> Re: Request for information and documents from Mailers' Technical
> Advisory Committee (USPS reference: Information Request 07-09)

Dear Ms. Plonkey and Mr. Dockins,

William Burrus, President of the American Postal Workers Union ("APWU"), has asked that I write to you respond to Mr. Dockins' letters of November 30, 2006 and December 8, 2006 and to renew APWU's request for information and documents from MTAC. Mr. Dockins' November 30 letter stated that the request would be processed in accordance with applicable rules, regulations and collective bargaining agreements. The December 8 letter inquired about the relevance of the requested information "as it pertains to the Collective Bargaining Agreement".

For convenient reference, the information and documents requested by President Burrus' letter dated November 16, 2006 APWU are as follows:

1) A list of all MTAC members;

2) A list of all MTAC work groups;

3) A description of the subject areas of each work group;

1

4) A list of all members of the MTAC work groups;

5) A schedule of future MTAC meetings and work group meetings;

6) Copies of minutes of prior MTAC and workgroup meetings for our review;

7) Copies of reports, agendas, updates and recommendations of work groups for our review.

APWU also requested an MITS username and password for login to that system; as well as advice as to arrangements APWU would need to make in order to attend MTAC and work group meetings.

APWU believed that the Postal Service and MTAC would have no hesitation about providing the information and documents requested by President Burrus. Presumably there is no legitimate reason for anyone to desire to keep secret the membership of MTAC and its work groups, the subject areas of the work groups and the reports of MTAC and its work groups. Similarly, there surely is no legitimate reason to conceal dates of meetings or hide MTAC agendas and reports. APWU therefore repeats its requests for information and documents and assumes that the USPS will voluntarily comply with these requests.

However, given your responses to President Burrus' requests, this letter will clarify that APWU also seeks the information and documents requested in President Burrus' November 16 letter pursuant to the Federal Advisory Committee Act. Among other things, Sections 10 of the FACA requires that advisory committees meetings be open to the public and that interested persons be permitted to attend and appear before committees. FACA Section 10 also provides that (subject to 5 U.S.C. §552), reports transcripts, working papers, agendas and other documents provided to committee members be made available for public inspection and copying. Additionally, FACA Section 10 requires that detailed minutes be kept which contain a record of persons present, matters discussed and conclusions reached. All of the information and documents sought by President Burrus fall squarely within the requirements of the FACA. If the Postal Service and MTAC choose not to voluntarily produce the information and documents because of some perceived interest in shielding them from disclosure, please treat the November 16 letter as a request under the FACA.

Since the Postal Service and MTAC have already had these requests for several months, and since we understand that there will be MTAC meetings sometime in February, we trust that information and documents will be provided to APWU quickly. Please contact me if you have any questions.

Sincerely,

Richard S. Edelman

O'Donnell, Schwartz & Anderson, P.C.

cc:    William Burrus
       Darryl Anderson

2

Labor Relations


**UNITED STATES**
**POSTAL SERVICE**


RECEIVED
JAN 31 2007
APWU
OFFICE OF THE PRESIDENT

January 26, 2007

Mr. William Burrus
President
American Postal Workers Union,
AFL-CIO
1300 L Street, N.W.
Washington, DC 20005-4128

Dear Bill:

This is in response to the letter of January 9 regarding your request for information and documents from the Mailers' Technical Advisory Committee (MTAC) – USPS reference: Information Request IR07-09. Please note that the Federal Advisory Committee Act (FACA) is inapplicable to the Postal Service. We are providing information which has been available without a MTAC Issue Tracking System (MITS) password as follows:

1) A list of all MTAC Members.

2) A list of all MTAC work groups.

3) A description of the subject areas of each work group.

4) A schedule of future MTAC meetings.

5) Copies of MTAC General Session minutes from the prior year. Earlier years' minutes can be made available to you at our cost to produce.

6) Copies of reports, agendas, updates and recommendations of work groups to the extent reported in General Session minutes from the prior year.

In response to your request for a MITS user name and password, these are provided only to MTAC members and work group participants. Attendance at MTAC General Session and individual work group meetings is restricted to MTAC members, member-invited and approved MTAC guests.

Sincerely,

John W. Dockins
Manager
Contract Administration (APWU)

Enclosures

475 L'Enfant Plaza SW
Washington DC 20260-4100
www.usps.com

Mailers' Technical Advisory Committee (MTAC)

1. Agricultural Circulation Association
2. Alliance of Nonprofit Mailers
3. American Bankers Association
4. American Business Media
5. American Forest & Paper Association
6. Association of American Publishers, Inc.
7. Association for Mail Electronic Enhancement
8. Association for Postal Commerce
9. Association of Priority Mail Users
10. CRPA c/o Associated Church Press (ACP)
11. Chamber of Commerce of US
12. Check Payment System Association (formerly Financial Stationers Assn., Inc.)
13. City & Regional Magazine Association
14. Classroom Publishers Association (TBD due to passing of Stephen Owen)
15. Continuity Shippers Association
16. Custom Publishing Council
17. Direct Marketing Association
18. DMA Nonprofit Federation
19. Edison Electric Institute
20. Envelope Manufacturers Association
21. Florida Gift Fruit Shippers Association
22. Fulfillment Management Association
23. General Services Administration
24. Gravure Association of America, Inc.
25. IDEAlliance – Formerly Graphic Communications Association
26. International Labor Communications Association
27. International Mailers' Advisory Group (IMAG)
28. Magazine Publishers of America
29. Mailing & Fulfillment Service Association
30. Mail Order Association of America
31. Mail Order Gardening Association
32. Mail Systems Management Association
33. Major Mailers Association
34. National Alliance of Standard Mailers & Logistics (NASML)
35. National Association for Printing Leadership
36. National Association of Advertising Distributors
37. National Association of County Recorders, Election Officials and Clerks (NACRC)
38. National Association of College and University Mail Services (NACUMS)
39. National Association of Perishable Shippers
40. National Association of Presort Mailers
41. National Catholic Development Conference, Inc.
42. National Industrial Transportation League
43. National Newspaper Association
44. National Postal Policy Council

-2-

45. National Retail Federation
46. National Small Business Association
47. Newspaper Association of America
48. Offering Envelope Association
49. Parcel Shippers Association
50. Periodical Publications Association, Inc.
51. PCMA Pharmaceutical Care Management Association
52. Printing Industries of America (PIA/GATF)
53. Recording Industry Association of America
54. Red Tag News Publications Association
55. Saturation Mailers Coalition
56. Specialized Information Publishers Association (SIPA)
57. Yellow Pages Association

*O'Donnell, Schwartz & Anderson, P. C.*

*Counselors at Law*

DARRYL J. ANDERSON
MARTIN R. GANZGLASS
LEE W. JACKSON
ANTON G. HAJJAR*
RICHARD S. EDELMAN
PETER J. LEFF**
MELINDA K. HOLMES
DANIEL B. SMITH*
BRENDA C. ZWACK
JENNIFER L. WOOD**
JENNIFER E. KU†

*1900 L Street, N. W., Suite 800*
*Washington, D. C. 20036-5023*

(202) 898-1824
FAX (202) 429-8928

⊛ 186-C

JOHN F. O'DONNELL
(1907-1993)
ASHER W. SCHWARTZ
(1911-2006)

*1300 L Street, N. W.*
*Suite 1200*
*Washington, D. C. 20005*
(202) 898-1707

* ALSO MD
**ALSO VA
† CA BAR ONLY

February 13, 2007

*By Express Mail*

Susan Plonkey
Vice President, Customer Service
United States Postal Service
Postal Chair of MTAC
475 L'Enfant PL S.W.
Washington, D.C. 20260

FEB 15 2007

John Dockins
Manager
Contract Administration (APWU)
United States Postal Service
475 L'Enfant PL S.W.
Washington, D.C. 20260

Re: APWU request for information from MTAC and to attend MTAC meetings
(USPS reference Information Request 07-09)

Dear Ms. Plonkey and Mr. Dockins:

The American Postal Workers Union ("APWU") appreciates the MTAC materials provided to President Burrus by the January 26 letter of Mr. Dockins. However, review of the documents reveals that they are of only limited utility since the most informative items, are merely descriptions of the subjects discussed, which in turn refer to more detailed presentations and reports that have not been produced. APWU therefore renews its requests that reports, agendas, updates and recommendations of MTAC work groups, the full materials made available to MTAC members and others who attend MTAC meetings, be made available to APWU. Additionally, because it is apparent that the truly substantive information from MTAC is only available through the MITS system APWU

1

also again requests an MITS username and password for login to that system. Finally, APWU still feels that it can best learn of, and understand, what is going on at MTAC through attendance at General Session and work group meetings. APWU therefore requests that arrangements be made for APWU Executive Vice President Cliff Guffey (or his designee) to attend the General Session meeting and certain work group meetings that are scheduled for February 21 and 22, 2007.

APWU recognizes that the USPS takes the position that it is not covered by the Federal Advisory Committee Act. The Union disagrees. But, in any event APWU cannot understand why the Union should be excluded from these meetings, why the USPS and MTAC should operate in secrecy or why the USPS and MTAC would attempt to shield MTAC's activities from examination from entities like APWU that clearly have an interest in the issues discussed and recommendations made by MTAC and its work groups. The Union looks forward to receiving MITS access and to a notification of arrangements for Executive Vice President Guffey (or his designee) to attend the upcoming General Session and work group meetings.

Sincerely,

Richard S. Edelman
O'Donnell, Schwartz & Anderson. P.C.

cc:    William Burrus
       Cliff Guffey
       Darryl Anderson

2

From:     Phil Tabbita [ptabbita@apwu.org]
Sent:     Tuesday, February 20, 2007 11:06 AM
To:       Darryl Anderson; Richard Edelman
Subject:  FW: Request for Information: RE: MTAC


FYI

-----Original Message-----
From: Harris, Ernie - Washington, DC [mailto:ernie.harris@usps.gov]
Sent: Sunday, February 18, 2007 5:07 PM
To: Phil Tabbita
Cc: Johnson, Alexandra M - Rosslyn, VA
Subject: RE: Request for Information: RE: MTAC


Phillip:


In response to your message please note that a user name and password
are now required for anyone wanting access to the MTAC website as this
is considered prudent in an age of increasing concern about protecting
information, privacy issues, etc.


Ernie Harris

-----Original Message-----
From: Phil Tabbita [mailto:ptabbita@apwu.org]
Sent: Tuesday, February 13, 2007 7:57 PM
To: Harris, Ernie - Washington, DC
Subject: RE: Request for Information: RE: MTAC

Dear Mr. Harris:

Before the MTAC site was password protected, I would journey to the site
to get materials (PowerPoint or PDF files) presented at MTAC general
sessions by senior management.  I found presentations on finances,
consolidations, network changes, automation plans, addressing and
labeling, PARS, flats, etc.  I would assume this stuff is in the public
domain.  Where would I find these materials now?

Sincerely,

Phillip Tabbita
Manager Negotiation Support
APWU
1300 L ST NW
Washington DC 20005-4128
(202) 256-9642
(202) 371-0992 fax


-----Original Message-----
From: Harris, Ernie - Washington, DC [mailto:ernie.harris@usps.gov]
Sent: Tuesday, February 13, 2007 4:06 PM
To: Phil Tabbita
Subject: Request for Information: RE: MTAC


Phillip:

1

In response to your email of Feb 9th to Susan Plonkey, please find
attached the letter of Jan 26th from John Dockins to William Burrus
Case 1:07-cv-00990-JR    Document 15-5    Filed 09/11/2007    Page 11 of 14

The enclosures to this letter contain the information which had been
available without a MTAC Issue Tracking System (MITS) password and
should satisfy your request.


In response to your request for a MITS user name and password, these are
provided only to MTAC members and work group participants.  Attendance
at MTAC General Session and individual work group meetings is restricted
to MTAC members, member-invited and approved MTAC guests.  Hope that
helps.  Thanks.


Ernie Harris 2/12/07
MTAC Program Manager
202-268-2066


-----Original Message-----
From: Plonkey, Susan M - Washington, DC
Sent: Sunday, February 11, 2007 4:17 PM
To: 'ptabbita@apwu.org'; Harris, Ernie - Washington, DC
Subject: Re: MTAC

Ernie will assist you.


-----Original Message-----
From: Phil Tabbita <ptabbita@apwu.org>
To: Plonkey, Susan M - Washington, DC
CC: jmcgarvy@crain.com <jmcgarvy@crain.com>
Sent: Fri Feb 09 17:27:34 2007
Subject: MTAC

Dear Susan Plonkey:

In anticipation of the February 21 and 22 MTAC meeting, I clicked on my
favorite places to look for some updates on issues.  I found that I can
no longer access any information without a logon ID and password.  Could
you advise me about how to obtain a logon ID, or alternatively how to
gain access to the public materials which were previously posted on this
site?

Thanking you in advance for your assistance, I remain,

Sincerely,

Phillip Tabbita
Manager Negotiation Support
APWU
1300 L ST NW
Washington DC 20005-4128
(202) 256-9642
(202) 371-0992 fax

2

 UNITED STATES
POSTAL SERVICE

April 2, 2007



RECEIVED
APR 5 2007
APWU
OFFICE OF THE PRESIDENT

Mr. William Burrus
President
American Postal Workers Union, AFL-CIO
1300 L Street, NW
Washington, DC  20005-4107

Mr. Richard S. Edelman
O'Donnell, Schwartz & Anderson, P.C.
1900 L Street, NW  Suite 800
Washington, DC  20036-5023

Re:  Request for information and documents from Mailers' Technical Advisory Committee
     (MTAC) -- USPS reference: Information Request 07-09

Dear Messrs. Burrus and Edelman:

We are in receipt of your letter dated February 13, 2007.  We are treating your letter as an informal
Freedom of Information Act (FOIA) request.  You requested "... reports, agendas, updates and
recommendations of MTAC work groups, the full materials made available to MTAC members and
others who attend MTAC meetings," and you also requested "an MITS username and password for
login to that system."

As background, in response to your earlier letter of January 9, 2007,  we provided you with the
following information, which had been made available on the web site without a MTAC Issue Tracking
System (MITS) password:

- A list of all MTAC members
- A list of all MTAC work groups
- A description of the subject areas of each work group
- A schedule of future MTAC General Session meetings
- Copies of MTAC General Session minutes from the prior year.
- Copies of reports, agendas, updates and recommendations of work groups to the extent
  reported in the General Session minutes from the prior year.

The FOIA generally requires government agencies to disclose records within their possession.
However, the FOIA contains several exemptions that permit agencies to withhold certain records.
See 5 U.S.C. § 552(b)(1)-(9).  We are withholding the information requested in your February 13
letter for the reasons set forth below, except that we will provide a list of active work group members
and currently scheduled future meetings of active work groups after consulting with the appropriate
custodians of those records.

- 2 -

We are withholding the requested reports, agendas, updates and recommendations of the MTAC work groups under Exemption 5 of the FOIA and Exemption 3 in conjunction with 39 U.S.C. § 410(c)(5).

In this case, Exemption 5 authorizes the withholding of the requested records. The purpose of this exemption is to encourage open, frank discussion on matters of policy between agency personnel, to protect against premature disclosure of proposed policies before they are finally adopted, and to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action.

The reports, agendas, updates and recommendations of the MTAC work groups are preliminary documents and are therefore "predecisional" and subject to the deliberative process privilege. Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption permits agencies to withhold records that would be privileged in the context of civil discovery. In addition to such evidentiary privileges as the attorney-client privilege, another privilege recognized under Exemption 5 is the "deliberative process" privilege. This privilege is intended to protect the free flow of ideas in the decision-making process of government agencies, and it protects internal documents that are both "predecisional" and "deliberative."

The withheld requested records consist of "intra-agency" documents. The documents are "predecisional" because they were prepared by postal employees or others engaged in the process of evaluating Postal Service operations and procedures. Even if a final decision is made, the records still retain their predecisional status unless they are expressly incorporated into the final decision. Once it is established that records are "intra-agency" and "predecisional," the records are exempt from disclosure under FOIA Exemption 5 to the extent that they contain "deliberative" information. In this case, we have concluded that the reports are "deliberative" as that term has been defined for purposes of Exemption 5. The withheld information includes the analyses, conclusions, and recommendations of the MTAC work group members who prepared the report. This type of information is clearly "deliberative" within the meaning of FOIA Exemption 5.

The documents are also being withheld pursuant to FOIA Exemption 3 in conjunction with 39 U.S.C. § 410(c)(5). Exemption 3 provides that agencies may withhold records that are exempted from disclosure by another statute which, "(B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Section 410(c)(5) of Title 39, U.S. Code, provides for reports and memoranda of consultants to be exempt from disclosure under FOIA. This section was enacted as part of the Postal Reorganization Act, 39 U.S.C. §§ 101 et seq., (1970), which established the Postal Service as an independent establishment of the executive branch and generally directed it to conduct its operations in accordance with sound business principles. Section 410(c)(5) operates both independently and as an exempting statute within the scope of Exemption 3(B).

We are also denying your request for an MITS username and password and for attendance at meetings as falling outside the scope of the FOIA. The FOIA is a document and information statute. The FOIA does not require agencies to create records in response to a request, or to comply with individual inquiries, or to grant attendance at meetings.

- 3 -

If you consider my response to be a denial of your request, you may administratively appeal by writing to the Chief Counsel, Customer Protection and Privacy, U.S. Postal Service, 475 L'Enfant Plaza SW, Washington DC 20260, within 30 days of the date of this letter. The letter of appeal should include a statement about the action or failure to act being appealed, the reasons why it is believed to be erroneous, and the relief sought, along with copies of your original request, this letter, and any other related correspondence.

Yours truly,

Susan M. Plonkey

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO<br>1300 L Street, NW<br>Washington, DC 20005 | ) ) ) ) ) ) ) | |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS)<br>1801 K Street, NW<br>suite 500<br>Washington, DC 20006<br>Plaintiffs, | ) ) ) ) ) ) ) | |
| v. | ) ) | Civil Action No. 07-0990 (JR) |
| UNITED STATES POSTAL SERVICE,<br>475 L'Enfant Plaza, SW<br>Washington, DC  20260,<br>and<br>MAILERS TECHNICAL ADVISORY COMMITTEE<br>475 L'Enfant Plaza, SW<br>Room 2P736<br>Washington, DC  20260-0736,<br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

## DECLARATION OF CLIFFORD. J. GUFFEY

I, Clifford J. Guffey, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that

the foregoing is true and correct and based on personal knowledge:

1. I am Executive Vice President of the American Postal Workers Union, AFL-CIO

1

EXHIBIT
B
Blumberg No. 5119

(APWU) and have held that office since 2001. Prior to that I was Director of the Clerk Division, APWU, from 1998 to 2001. Prior to that I was Assistant Director of the Clerk Division, APWU, from 1986 to 1998. These are elected positions within the APWU.

2. In my role as the Executive Vice President I am personally familiar with the costs of the union.

3. We have approximately 20 national field offices. A substantial cost in running these offices is postage. On mail from these offices, we pay the full First Class postage rate.

4. The APWU national headquarters spends approximately $ 5 million a year on postage.

5. While the APWU does take advantage of some workshare discounts, many cost saving programs are not available to us. For example, the co-palletization program recommended by MTAC and implemented by the Postal Service only advantages very large mailers. Although the APWU is a large mailer we are at a serious disadvantage because we do not meet the requirement for the number of mail pieces sent and so we cannot participate in the co-palletization program.

6. The APWU has approximately 1400 Local unions. The local unions are located in every state and territory in the United States.

7. The local unions are too small to qualify for workshare discounts from the Postal Service.

8. To the extent that the Postal Service institutes larger workshare discounts, including the expansion of barcodes on mail pieces and co-palletization discounts, these actions would increase the relative cost of our postage and adversely impact the APWU as a mailer.

2

I declare under penalty of perjury that the foregoing is true and correct.


Executed on September 12 2007


_____
Clifford J. Guffey

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO<br>1300 L Street, NW<br>Washington, DC 20005 | ) ) ) ) ) ) |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS)<br>1801 K Street, NW<br>suite 500<br>Washington, DC 20006<br>Plaintiffs | ) ) ) ) ) ) ) ) |
| v. | ) ) Civil Action No. 07-0990 (JR) |
| UNITED STATES POSTAL SERVICE,<br>475 L'Enfant Plaza, SW<br>Washington, DC  20260, | ) ) ) ) |
| and | ) ) |
| MAILERS TECHNICAL ADVISORY COMMITTEE<br>475 L'Enfant Plaza, SW<br>Room 2P736<br>Washington, DC  20260-0736, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF RICHARD FARRELL

I, Richard Farrell, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct and based on personal knowledge:

1.  I am Executive Director of the Consumer Alliance for Postal Services (CAPS), and have held that position since 2003.

1

EXHIBIT
C
Blumberg No. 6119

2. CAPS was founded in 2003 to advocate for affordable and dependable mail service for all Americans through participation in the legislative and regulatory process as it affects postal services.

3. CAPS functions as an umbrella organization of a diverse set of members. CAPS members include the Alliance for Retired Americans, American Diabetes Association, Americans for Democratic Action, American Postal Workers Union, AFL-CIO, A. Phillip Randolph Institute, Asian Pacific American Labor Alliance, Communications Workers of America, Congressional Black Caucus Foundation, Consumer Action, Labor Council for Latin American Advancement, Labor Heritage Foundation, Metropolitan Washington Council, National Black Caucus of State Legislators, National Committee to Preserve Social Security and Medicare, National Farmers Union, National Football Players Association, National Organization for Women, Rainbow/PUSH Coalition, Rugmark Foundation, 1199 SEIU, Transafrica, United Food & Commercial Workers, United States Hispanic Leadership Institute, Women's Research & Education Institute and the Workers Defense League. William Clay, former chairman of the House Post Office and Civil Service Committee, is chairman of CAPS.

4. CAPS members are nonprofit organizations that regularly communicate with their members by using postal services.

5. CAPS members are primarily small and medium size noncommercial mailers. CAPS and CAPS members and member constituents have a direct interest in access to affordable and efficient postal services.

6. Small and medium size mailers are disproportionately underrepresented in Mailers' Technical Advisory Committee (MTAC). Instead, MTAC is comprised of large mailers including, but not limited to: Bank of America Corporation, Pitney Bowes, Siemens, Major

Mailers Association, Quebecor World, Capital One Services, Verizon, AT&T, Time Customer Services, Direct Marketing Association, Discover Financial Services, Forbes, Time, Inc. and Sprint Mailing Services.

7. These large mailers directly influence the decisions of the Postal Service through their participation in MTAC and MTAC work groups. MTAC members often use MTAC to suggest changes in Postal operations and policies that are of interest to them and effectively lobby for changes through MTAC, smaller mailers often do not have input into these discussions and often are not even aware they are happening.

8. As part of its activities to support postal services for individuals and small businesses, CAPS applied for membership in MTAC. MTAC refused to admit CAPS into membership. Attached hereto as Farrell Ex. 1 are copies of that correspondence.

9. CAPS also requested access to certain MTAC information including a list of all MTAC work groups and a description of each work group's subject area; a schedule of future MTAC and work group meetings; copies of reports, agendas, updates and recommendations of work groups and a username and password to enable CAPS to login to the MITS computer database system that contains information regarding MTAC and MTAC work groups. CAPS also asked that a representative of CAPS be allowed to attend MTAC and work group meetings and submit comments on MTAC work group proposals. Farrell Ex. 2. To date, no response has been received.

10. To the extent that large mailers benefit by the decisions and recommendations of MTAC, CAPS and its member organizations are disadvantaged because CAPS and its members are unable to take advantage of programs and policies designed by large mailers for the benefit of large mailers.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _9_, 2007

Richard Farrell

**Consumer Alliance
for Postal Services**

1801 K Street, NW, Suite 500
Washington, DC 20006
Telephone: 202.973.3116

May 15, 2006

Mr. Ernest Harris
MTAC Program Manager
United States Postal Service
Customer Service
475 L'Enfant Plaza SW Room 2P736
Washington DC 20260-0736

Dear Mr. Harris:

The Consumer Alliance for Postal Services (CAPS) by this letter applies for membership in the Postmaster General's Technical Advisory Committee (MTAC). CAPS would bring a new and valuable perspective to the Committee through its representation of individual mailers who rely on single piece First Class Mail. Single piece First Class Mail makes up 47 percent of total First Class Mail volume, yet no other group now in MTAC speaks for the millions of Americans who rely on single piece mail. CAPS is fully prepared to participate in the full range of MTAC activities and will provide significant new information, advice and recommendations not currently provided by the existing membership.

CAPS was founded in 2003 to provide a voice for groups for whom affordable and dependable single piece mail service is essential but which have not traditionally had an active involvement in the development of policies concerning postal services. These organizations represent individuals who remain dependent on the Postal Service as a critical link for their communication. The CAPS organizations themselves are non-profit groups that rely on the mail to effectively accomplish business.

CAPS members include a broad range of consumers across the economic spectrum. Among them are Consumer Action representing low and moderate income consumers, the National Farmers Union representing rural Americans, the National Committee to Preserve Social Security and Medicare representing older Americans, the American Postal Workers Union, the AFL-CIO representing workers in all parts of the United States and its Territories, the A. Philip Randolph Institute representing African Americans, the American Diabetes Association, the National Football League Players Association, and a number of other organizations. Each of these groups is made up of individuals who must and do rely on single piece First Class Mail. The Honorable William Clay, former Chairman of the Post Office and Civil Service Committee of the U. S. House of Representatives in the Chairman of CAPS.

EXHIBIT

1

CAPS is uniquely situated to provide a range of advice and analysis to MTAC from the standpoint of the noncommercial mailer. Our members who would be actively engaged in supporting CAPS' participation can speak to the goals of enhancing customer value and expanding services with respect to such important segments of the population as individual mailers, senior citizens, agricultural and rural communities, and minorities.

I have enclosed a list of CAPS members and related materials. I look forward to your response and trust you will be in contact should you require additional information.

Sincerely,

Rick Farrell
Executive Director


Enclosures



**MAILERS TECHNICAL ADVISORY COMMITTEE**

*UNITED STATES POSTAL SERVICE TM*

August 16, 2006

Mr. Rick Farrell
Executive Director
Consumer Alliance for Postal Services
1801 K Street NW Suite 500
Washington DC 20006-1320

Dear Mr. Farrell:

This is to advise that pursuant to its Charter the Executive Committee of the Mailers' Technical Advisory Committee (MTAC) decided at its regularly scheduled quarterly meeting held this past August 1st to not approve membership of the Consumer Alliance for Postal Services (CAPS) in MTAC.

Your interest in joining MTAC and your submission of the requested information is appreciated.

Sincerely,

*Ernest Harris*

Ernest Harris
MTAC Program Manager

cc: MTAC Executive Committee



**Consumer Alliance for Postal Services**

1801 K Street, NW
Suite 500
Washington, DC 20006
Telephone: 202.973.3116

August 20, 2007

Ms. Susan Plonkey
Vice President, Customer Service
United States Postal Service
Postal Chair of MTAC
475 L'Enfant PL S.W.
Washington, D.C. 20260

Dear Ms. Plonkey:

The Consumer Alliance for Postal Services ("CAPS") is dedicated to preserving and maintaining a dependable and affordable United States Postal Services. CAPS, which functions as an umbrella organization of a diverse set of members, is uniquely situated to provide a range of advice and analysis to the Mailers' Technical Advisory Committee ("MTAC") from the standpoint of the noncommercial mailer. Accordingly, CAPS sought membership in MTAC. This request was subsequently denied. In denying CAPS membership in MTAC, MTAC did not even allow CAPS to simply attend MTAC and MTAC work group meetings and/or to have access to MTAC materials. The ability to attend meetings and see materials was at least a lesser alternative to full membership, but no such opportunity was afforded to us. Although CAPS believes that it should have been permitted to become a member of MTAC, we want to affirm that we should at least be permitted to attend meetings and see MTAC materials. CAPS therefore requests that MTAC provide it with the following:

1) A list of all MTAC work groups;

2) A description of the subject areas of each work group;

3) A schedule of future MTAC meetings and work group meetings;

4) Copies of reports, agendas, updates and recommendations of work groups for review.

CAPS also requests an MITS username and password for login to that system. Additionally please advise us of the arrangements we need to make in order to attend MTAC and work group meetings and submit comments on MTAC work group proposals.

I look forward to hearing from you promptly in response to this request. Please contact me if you have any questions.

Sincerely,

Rick Farrell
Executive Director

EXHIBIT
2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, ) | |
| ) | |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 07-0990 (JR) |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| MAILERS TECHNICAL ADVISORY COMMITTEE, ) | |
| ) | |
| Defendants. ) | |

## ORDER

Upon the Court's consideration of the federal defendant's motion to dismiss and the plaintiffs' opposition thereto, it is, this ____ day of _____, 2007,

ORDERED that the federal defendant's motion to dismiss shall be, and it hereby is, DENIED.

_____
The Honorable James Robertson
United States District Judge