## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) | |
| CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS), | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-0990 (JR) |
| v. | ) ) ) | |
| UNITED STATES POSTAL SERVICE, | ) ) | |
| MAILERS TECHNICAL ADVISORY COMMITTEE, | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANT'S MOTION TO DISMISS

Richard S. Edelman (D.C. Bar No. 414348)
O'Donnell, Schwartz & Anderson, P.C.
1900 L Street, N.W., Suite 800
Washington, DC 20036
Telephone: (202) 898-1824
Facsimile: (202) 429-8928
e-mail:REdelman@odsalaw.com

Darryl J. Anderson (D.C. Bar No. 154567)
Jennifer L. Wood (D.C. Bar No.500887)
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 898-1707
Facsimile: (202) 682-9276
e-mail: Danderson@odsalaw.com

Attorneys for Plaintiff American Postal Workers Union and Consumer Alliance for Postal Services

October 15, 2007

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................. 1

II. FACTS ......................................................................... 2

A. PARTIES ...................................................................... 2

B. MTAC FUNCTIONS, STRUCTURE, ACTIONS ................................. 5

C. ACTUAL AND POTENTIAL IMPACT OF MTAC RECOMMENDATIONS ON APWU AND CAPS ...................................................................... 6

D. APWU AND CAPS EFFORTS TO GAIN ACCESS TO MTAC MEETINGS AND MATERIALS ................................................................ 9

III. STATUTORY BACKGROUND ................................................. 11

A. THE FEDERAL ADVISORY COMMITTEE ACT ............................... 11

B. THE STATUS OF THE USPS UNDER THE POSTAL REORGANIZATION ACT AND APPLICATION OF FEDERAL LAW TO THE USPS ............................... 14

IV. STANDARDS ON MOTION TO DISMISS ..................................... 18

V. ARGUMENT .................................................................. 19

A. THE FEDERAL ADVISORY COMMITTEE ACT APPLIES TO THE POSTAL SERVICE ............................................................... 19

1. The USPS is covered by FACA ............................................. 19

2. PRA does not exempt USPS from FACA .................................. 20

B. MTAC WORK GROUPS ARE COVERED BY THE FACA ...................... 28

C. APWU AND CAPS HAVE A RIGHT OF ACTION FOR ENFORCEMENT OF FACA ... 29

D. EVEN IF PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION UNDERTHE FACA, THEY STILL HAVE A RIGHT OF ACTION FOR REVIEW OF UNLAWFUL AGENCY ACTION ......................................................................... 43

E. IF PLAINTIFFS DO NOT HAVE A PRIVATE RIGHT OF ACTION UNDER FACA, OR

THE ABILITY TO CHALLENGE THE USPS UNDER THE COMMON LAW OF JUDICIAL REVIEW OF AGENCY ACTION, THE COURT HAS JURISDICTION TO REQUIRE THE POSTMASTER TO COMPLY WITH THE FACA UNDER THE FEDERAL MANDAMUS ACT ........................................................................................................................... 45

VII. CONCLUSION ................................................................................................. 50

## TABLE OF AUTHORITIES

**Page**

*Abbot Laboratories v. Gardner,*
387 U.S. 136 (1967) .................................................................................................... 45

*Aguirre v. Meese,*
930 F. 2d 1292 (7th Cir. 1991) ................................................................................. 48,49

*Aid Association of Lutherans v. United States Postal Service,*
321 F. 3d 1166 (D.C. Cir. 2003) ................................................................................ 44

*Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior,*
26 F.3d 1103 (11th Cir. 1994) ..................................................................................... 31

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................................................................. passim

*Allen v. Wright,*
468 U.S. 737 (1984) ..................................................................................................... 40

*American Library Ass'n v. FCC,*
406 F.3d 689 ................................................................................................................ 27

*Animal Legal Defense Fund v. Shalala,*
104 F. 3d 424 (D.C. Cir. 1997) .................................................................................. 30

*Assoc. Of Am Physician and Surgeons v. Clinton,*
997 F. 2d 898 (D.C. Cir. 1993) .............................................................................. 14,30

*Beatty v. Washington Metro. Area Transit Auth.,*
860 F. 2d 1117 (D.C. Cir. 1998) ................................................................................ 46

*Bensman v. U.S. Forest Service,*
408 F.3d 945 (6th Cir. 2005) ...................................................................................... 41

*Bivens v. Six Unknown and Unnamed Agents of the Federal Bureau of Narcotics,*
403 U.S. 388 (1971) .................................................................................................... 35

*Boswell v. Skywest Airlines,*
361 F. 3d 1263 (10th Cir. 2004) ........................................................................... 32,33,34

*Cannon v. Univ. of Chicago,*
411 U.S. 677 (1979) ............................................................................................. passim

*Carlin v. McKean,* 823 F. 2d 620 (D.C. Cir. 1987) ............................................... 15,19

*Chamber of Commerce v. Reich,*
74 F. 3d 1332 (D.C. Cir. 1996) ................................................................... 48

*Center of Arms Control and Non-Proliferation v. Lago,*
2006 WL 3328257 (D.D.C 2006) .......................................................... passim

*Combined Communications v. United States Postal Service,*
891 F.2d 1221(6th Cir. 1989) ..................................................................... 44

*Cort v. Ash,*
422 U.S. 66 (1975) ............................................................................... passim

*Cummock v. Gore,*
180 F. 3d 282 (D.C. Cir. 1999) ............................................................ passim

*District Lodge No. 166, IAMAW v. TWA Services,*
731 F. 2d 711 (11th Cir. 1984) ............................................................... 48,49

*Depippo v. Chertoff,*
453 F. Supp. 2d 30 (D.D.C. 2006) ............................................................. 19

*Food Chem. News v. DHHS,*
980 F. 2d 1468 (D.C. Cir. 1992) ............................................................ 30,47

*Gonzalez v. INS,*
867 F. 2d 1108 (8th Cir. 1989) .............................................................. 48,49

*Heckler v. Ringer,*
466 U.S. 602 (1984) ................................................................................. 49

*Holy Land Found for Relief & Dev. v. Ashcroft,*
333 F. 3d 156 (D.C. Cir. 2003) ................................................................. 19

*International Brominated Solvents Ass'n v. American Conference of Governmental Industrial
Hygienists,*393 F. Supp. 2d 1362 (M.D. Ga 2005) .............................................. 42,43

*Judical Watch, Inc. v. National Energy Policy Development Group,*
219 F. Supp. 2d 20 (D.D.C. 2002) ...................................................... passim

*Kendal v. United States,*
37 U.S. 524 (1838) ................................................................................. 46

*Kuzma v. USPS,*
798 F.2d 29 (2d Cir. 1986) ...................................................................... 20

*Love v. Delta Air Lines,* 310 F. 3d 1347 (11th Cir. 2002) .......................................... 32

iv

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .................................................................................................... 40

*Macharia v. United States,*
334 F. 3d 61 (D.C. Cir. 2003) ...................................................................................... 15

*Mail Order Assn'n of America v. USPS,*
986 F. 2d 509 ........................................................................................................... 4,20

*Manshard v. Fed. Judicial Qualifications Comm.,*
408 F.3d 1154 (9th Cir. 2005) ...................................................................................... 38

*Medicare Reimbursement Litigation,*
414 F.3d 7 (D.C. Cir. 2005) ......................................................................................... 46

*Miccosukee Tribe v. Southern Everglades Restoration Alliance,*
304 F. 3d 1076 (11th Cir. 2002) .............................................................................. 31,43

*National Association of Postal Supervisors v. United States Postal Service,*
602F. 2d 420 (D.C.Cir. 1979) ...................................................................................... 44

*National Easter Seal Society v. USPS,*
656 F.2d 754 (D.C. Cir. 1981) ..................................................................................... 23

*Natural Resources Defense Council v. Abraham,*
233 F. Supp. 2d 162 (D.D.C. 2002) ....................................................................... 39, 40

*Natural Resources Defense Council v. Pena,*
147 F. 3d 1012 (D.C. Cir. 1998) .................................................................................. 27

*Northern States Power Co., v. U.S. Dep't of Energy,*
128 F. 3d 754 (D.C. Cir. 1997) .................................................................................... 46

*Peoples Gas, Light and Coke Co. v. United States Postal Service,*
658 F.2d 1182 (7th Cir. 1981) ...................................................................................... 44

*Pitney Bowes, Inc. v. USPS,*
 27 F. Supp. 2d 15 (D.D.C. 1998) ............................................................................ 15,19

*Power v. Barnhart,*
292 F.3d 781 (D.C. Cir. 2002) ..................................................................................... 46

*Public Citizen v. Kantor,*
864 Supp 208 (D.D.C. 1994) ....................................................................................... 48

*Public Citizen v. U.S. Dept. Of Justice,* 491 US 440 (1989) ............................... passim

*School of Magentic Healing v. McAnnulty,*
187 U.S. 94 (1902) ................................................................................................ 45

*Sofamor Danek v. Gous,*
61 F. 3d 929 (D.C. Cir. 1995) ................................................................................ 14

*Stark v. Wickard,*
321 U.S. 288 (1944) .............................................................................................. 45

*Swan v. Clinton,*
100 F. 3d 973 (D.C. Cir. 1996) .............................................................................. 46

*T&S Products Inc.v. United States Postal Service,*
1994 WL 1026493 (D.D.C.) ................................................................................... 44

*United States ex. Rel. Milwaukee Social Democratic Pub. Co. v. Burleson,*
255 U.S. 407 (1921) .............................................................................................. 45

*United States Postal Service v. Flamingo Industries,*
540 U.S. 736 (2004) ......................................................................................... 14,19

*Washington Legal Foundation v. American Bar Ass'n.,*
648 F. Supp. 2d 1353 (1986) ................................................................................ 31

*White v. Administrator, GSA,*
343 F. 2d 444 (9th Cir. 1965) ........................................................................... 48,49

*Wisnieweski v. Rodale, Inc.,*
406 F. Supp. 2d 550 (E.D. PA 2005) ................................................................ 32,33

*Wrath v. Seldin,*
422 U.S. 490 (1975) .............................................................................................. 40

*Zivotofsky v. Secretary of State,*
44 F. 3d 614 (2006) .............................................................................................. 40

**Statutes**                                                                    **Page**

5 U.S.C. §§551,552 ............................................................................................... 12

39 U.S.C. §101 ................................................................................................. passim

39 U.S.C §410 .................................................................................................. passim

## I. INTRODUCTION

This brief is submitted by plaintiffs the American Postal Workers Union, AFL-CIO ("APWU"") and Consumer Alliance for Postal Services ("CAPS") in opposition to the motion of defendant United States Postal Service ("USPS") for dismissal of the APWU/CAPS amended complaint for enforcement of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 §§1-15, with respect to the USPS-created Mailers Technical Advisory Committee ("MTAC"). APWU and CAPS respectfully submit that the USPS has not shown that the complaint should be dismissed. They further submit that, when the allegations of the complaint, and other facts set forth in declarations submitted by plaintiffs are accepted as true, and viewed in the light most favorable to the plaintiffs, they have shown that the Court has jurisdiction over their complaint. In particular, this brief demonstrates that the FACA applies to the USPS, that the USPS is not exempt from the FACA, that APWU and CAPS can enforce the FACA through a private right of action before this Court and that, alternatively, the Court has jurisdiction over their complaint for enforcement of the FACA pursuant to a common law right of judicial review of agency actions in violation of law, or under the Federal mandamus act.

The USPS motion for dismissal is predicated on several fundamentally erroneous descriptions of the statutes involved and precedent under those statutes. The USPS essentially ignores half of the FACA, focusing exclusively on FACA's mandates against proliferation of advisory committees, and for reduction of expenditures on such committees. The USPS disregards the other main purpose of the Act: to insure public access to advisory committee records and reports, public input into advisory committee recommendations and to prevent capture of advisory committees by special interest groups that pursue their own interests resulting in agency policies and decisions that promote the interests of committee members without regard to, and at the expense of,

1

other public interests. Additionally the USPS has mischaracterized the role and functions of MTAC. This committee does not merely convey technical information to the USPS and it is not just a vehicle for ascertaining customer wants and needs. MTAC is used by the USPS as a mechanism for the USPS to obtain feedback on planned decisions, operational changes and policies. MTAC is used by MTAC members as a device for them to seek changes in operations and policies that will benefit MTAC members; for MTAC members to provide input into policies and decisions that will affect them. Such decisions, operational changes and policies can, and do, affect a substantial body of the mailing public that is not represented on MTAC, has no access to MTAC proceedings and reports and has no opportunity to provide any input or feedback to the USPS. USPS adoption of MTAC recommendations can also have substantial impacts on management decisions that affect the day to day work lives and future employment interests of Postal employees. The USPS brief also provides an overly broad description of the Postal Reorganization Act's exemption of the USPS from statutes that <u>deal with</u> officers, employees, budgets and funds. The USPS brief essentially argues that the PRA exempts the USPS from any statute when compliance with the statute might ultimately have consequences for its budget, or its use of officers and employees, regardless how minimal. But the exemption applies to statutes dealing with officers, employees, budgets and funding. FACA is plainly not a statute that deals with or in any way regulates, controls or limits USPS decisions and actions on budgets, funding or employees. The USPS has also described operation of the Mandamus Act in a manner that is contrary to precedent in this Circuit and is fundamentally at odds with the most basic aspects of mandamus-that it provides a mechanism to require an officer to perform a clear duty when no other avenue for redress is available.

## II. FACTS

**A. PARTIES**

2

APWU is an unincorporated labor organization that represents approximately 300,000 employees of the Postal Service for purposes of collective bargaining and in other efforts for their mutual aid and benefit. APWU represents Postal employees who perform various types of work including Clerks, Mail Equipment Shop Employees, Maintenance Employees, Material Distribution Centers Employees, Motor Vehicle Service Employees, Operating Services Employees, and Information Technology/Administrative Assistance Center Employees. Declaration of Phillip A. Tabbita (APWU/CAPS Exhibit A) ¶ 2. The Union is a party to collective bargaining agreements with the Postal Service covering those employees. APWU maintains offices and conducts business throughout the United States and has Local affiliates in every state and territory of the United States which provide representation to its members at Postal facilities and installations through the Nation. Tabbita Dec. ¶ 2; Declaration of Clifford J. Guffey (APWU/CAPS Ex. B) ¶¶ 3-6. APWU has been an active participant in proceedings before the Postal Rate Commission and now the Postal Regulatory Commission (both referred to herein as "PRC"). APWU has appeared before the PRC to advocate on behalf of itself, its members, individual mailers and small mailers; and to oppose efforts by certain large mailers to alter Postal processes and operations in ways that would increase costs and decrease services for individual mailers and small businesses, and decrease revenue for the USPS. Tabbita Dec. ¶ 20. The APWU also sponsors a health plan that, under contract with the U.S. Office of Personnel Management, provides health insurance services to federal and postal employees through the Federal Employees Health Benefits Program. The APWU, its locals and the APWU Health Plan collectively mail more than five million pieces of mail each year. APWU sends mail in, and receives mail from, every U.S. State and territory. Guffey Dec. ¶s 4-6. (The Tabbita, Guffey and Farrell declarations referred to herein were filed with the APWU/CAPS opposition to the USPS motion to dismiss the original complaint).

3

CAPS was founded in 2003 to protect affordable and dependable mail service for all Americans through participation in the legislative and regulatory process as it affects postal services. CAPS members are nonprofit organizations that regularly communicate with their members by using postal services. CAPS members and the constituents of CAPS members have a direct interest in access to affordable and efficient postal services, and CAPS engages in various advocacy activities to support postal services for its members and other individuals and small businesses. Declaration of Richard Farrell (APWU/CAPS Ex. C) ¶¶ 2-7.

Pursuant to the Postal Reorganization Act ("PRA"), 39 U.S.C. §101 et seq., the USPS was created as "an independent establishment of the executive branch of the Government of the United States... ." 39 U.S.C. §201. The PRA assigned to the USPS the mail processing and delivery functions of the United States Post Office while removing certain political influences and relieving the USPS of certain legal restraints. While the Postal Service is no longer a cabinet agency, the USPS is still part of the executive branch; it is governed by the Postal Board of Governors, the overwhelming majority of whom (9 of 11) are appointed by the President; and various of its major decisions are subject to approval by the Presidentially appointed Postal Rate Commission ("PRC"). The USPS is still managed by the Postmaster General who now is appointed by the Board of Governors. *Mail Order Ass'n. Of America v USPS*, 986 F. 2d 509, 512-513 (D.C. Cir. 1993).

MTAC was established by the USPS as an advisory committee to provide advice and recommendations to the USPS. It is composed of USPS officials, mailers and mailer associations, and other associations and organizations interested in the mail industry and postal policies and procedures. MTAC's Charter and Bylaws describe MTAC as "a joint effort between mailers and the US Postal Service to share technical information, advice and recommendations on matters concerning mail-related products and services in order to enhance customer value and expand the

4

use of these products and services for mutual benefit". MTAC meets at least quarterly at the USPS headquarters and has its mailing address at the USPS headquarters at 475 L'Enfant Plaza, SW, Washington, DC 20260. Amended Complaint ¶s 11-15; Declaration of Phillip A. Tabbita (APWU/CAPS Exhibit A) ¶¶ 3-4 and Ex. 1.

**B. MTAC FUNCTIONS, STRUCTURE, ACTIONS**

The MTAC Charter and Bylaws states that it is a "joint effort between mailers and the US Postal Service to share technical information, advice and recommendations on matters concerning mail-related products and services in order to enhance customer value and expand the use of these products and services for mutual benefit". MTAC may not meet without a representative of the USPS and approval of the USPS, and the USPS provides administrative support for MTAC. Meetings of the full committee are generally held on a quarterly basis each calendar year or at the call of the Postal Service Co-Chair. The Vice President, Service & Market Development is the MTAC Co-Chair for the Postal Service. The Postal Co-Chair appoints two Vice-Chairs from the Postal Service. The industry Co-Chair and Vice-Chair are elected from the MTAC industry representatives. MTAC quarterly meetings are typically attended by MTAC members and their invitees, MTAC work group members, Postal Service officials and persons invited by the USPS. MTAC keeps minutes of its quarterly meetings and such minutes are verified by the MTAC USPS representatives. MTAC also receives work group reports and recommendations. MTAC minutes, MTAC recommendations and reports, MTAC work group notes, and MTAC work group reports are posted on the MTAC Issue Tracking System ("MITS"). Access to MITS is restricted to MTAC members with MITS usernames and log-in codes. Non-members may attend general session meetings of MTAC only at the specific invitation of a member representative and with advance approval by MTAC. Amended Complaint ¶¶14,17, Tabbita Ex. 1.

5

MTAC functions primarily through issue-focused work groups that are chartered, established and monitored by the MTAC Steering Committee. The work groups study mail industry problems and issues, and propose actions and solutions to MTAC. MTAC has work group guidelines which provide that any MTAC representative or USPS executive can propose an issue that would require the formation of a new work group. MTAC work groups generally meet at least quarterly and often in conjunction with MTAC meetings. MTAC work groups keep notes of their meetings and make reports and recommendations to MTAC. MTAC and MTAC work groups have investigated, studied, reported-on, offered opinions on, and provided advice and recommendations to, the USPS on various subjects involving Postal operations, and they are currently investigating and studying various subjects involving Postal operations. Among other things, MTAC work groups have investigated and studied, or are investigating and studying: changes in design for flat mail, proposals for productivity improvements generally, drop shipments and "mail induction", flat sequencing system, changes in locations for regional distribution centers, optimization of mailer discounts, co-palletization of trays, adoption of vote-by-mail systems, changes in bar codes, alternative packaging, workshare discounts,  Destinating Delivery Unit (DDU)) induction, pricing changes, new labeling standards, seamless acceptance programs,  distribution center relocation, and service standards. Amended Complaint ¶22, Tabbita Dec. ¶¶ 6-8.

The USPS receives and may act on MTAC and MTAC work group recommendations; and has done so in the past. Tabbita Dec. ¶¶ 7-8. The USPS has also presented issues to the PRC where the USPS position adopted MTAC recommendations or was influenced by MTAC recommendations. The PRC has held proceedings concerning matters on which MTAC has made recommendations to the USPS, and on USPS policies, proposals and positions recommended by, or influenced by MTAC. Amended Complaint ¶26, Tabbita Dec.¶¶ 7-9.

## C. ACTUAL AND POTENTIAL IMPACT OF MTAC RECOMMENDATIONS ON APWU AND CAPS

The Postal Service has sought, and/or received recommendations from MTAC on numerous issues of major importance in postal affairs. These issues have run the gamut from implementation of the ZIP Code to mail preparation to the forms used by the Postal Service in its daily business affairs. Tabbita Dec. ¶¶ 6-8. The Postal Service has adopted many MTAC recommendations, including altering rules for the preparation of mail pieces and the requirements for entering the mail into the postal system and how the mail will be processed once it is entered. Tabbita Dec. ¶ 7. Many of these recommendations have the actual or potential effect of lowering mail processing costs for large mailers and shifting the burden of bearing some additional postal costs to individuals and other small mailers. Tabbita Dec. ¶¶ 11-19.

An example of this effect is provided by the MTAC work groups on drop shipping and automation. By a combination of decisions favoring large mailers, the Postal Service has adopted policies that permit large mailers to drop ship their mail at large mail processing facilities. In concert with this strategy, postal automation is chosen, procured and located with an emphasis on large consolidated postal mail processing operations. Second Dec. of Phillip Tabbita (Tabbita 2d Dec.) ¶¶ 3, 4. Due to the concentration of mail processing equipment in these facilities, mail processing for the mail of individuals and small mailers who cannot take advantage of drop ship discounts, and who may not be able to mail at a large automated facility, becomes relatively less efficient and relatively more costly. Because discounts for drop shipping are based on the calculated cost savings of the Postal Service when mail is dropped at large automated facilities, this program creates a ratchet effect. As drop shipping leads to consolidation of mail processing, the relative costs of processing mail at smaller facilities will grow. As a result, a larger amount of the cost of the postal mail processing network will be imposed on individuals and small businesses in the form

7

on higher postal rates. Tabbita 2d Dec. ¶¶ 5, 6. As is explained by Mr. Tabbita, (Tabbita 2d Dec. ¶7) MTAC work groups on drop shipping and postal automation have been very active in urging the Postal Service to increase drop shipping and this is just one example of how MTAC "advice" or pressure on the Postal Service can lead to changes in policy that favor large mailers but degrade service or increase rates for individuals and small businesses not represented on MTAC.

The APWU, separate and apart form being a labor union, is also a mailer. The APWU spends approximately $5 million a year on postage. The APWU has approximately 20 national field offices and roughly 1400 local offices throughout the United States and territories. However, the APWU, like many small business mailers, is not a large enough mailer to take advantage of the discounts and other programs large mailers enjoy. Guffey Dec. ¶¶ 5-8. To the extent that the Postal Service provides bigger discounts to larger mailers, these actions increase the relative cost of APWU postage and adversely impact the APWU as a mailer. *Id.*

APWU and APWU members are impacted by the implementation of MTAC recommendations. Many of the recommendations involve either a reduction in the size of the mail processing network or the reduction in postal service revenues (through an increase in discounts provided to mailers) or a reduction in the amount of work available to APWU members. For example, by entering mail deeper into the postal system large mailers bypass certain processing facilities and functions, including mail sorting and transportation. APWU represents the workers who would normally perform this work. Tabbita Dec. ¶ 11. MTAC recommendations can impact the work environment of postal employees, implicating work safety and ergonomic issues of great importance to the APWU and its members. Tabbita Dec. ¶12. Additionally, the money mailers save as a result of the implementation of MTAC recommendations is money lost to the Postal Service. Anything that affects the Postal Service financially affects the collective bargaining position of the

APWU. Tabbita Dec. ¶ 11.

CAPS is an umbrella organization comprised primarily of small and medium size non-commercial mailers. Farrell Dec. ¶ 3. CAPS members regularly communicate with their constituents through the Postal Service and have a direct interest in efficient and affordable postal services. However, CAPS is not a large mailer organization. To the extent that large mailers benefit by the decisions and recommendations of MTAC, CAPS and its member organizations are disadvantaged because CAPS and its members are unable to take advantage of programs and policies designed by large mailers for the benefit of large mailers. Farrell Dec. ¶s 4-7.

## D. APWU AND CAPS EFFORTS TO GAIN ACCESS TO MTAC MEETINGS AND MATERIALS

On November 16, 2006, APWU President William Burrus wrote to the Postal Service Chair of MTAC requesting information about MTAC members and MTAC work groups; descriptions of the subject areas of each work group; copies of minutes of prior MTAC and workgroup meetings; copies of reports, agendas, updates and recommendations of work groups; and an MITS username and password for access to that system. APWU also sought to make arrangements to attend MTAC and work group meetings. The USPS responded to this letter by letter dated December 8, 2006, requesting an explanation of the relevance of the requested information to collective bargaining. Sometime during the last months of 2006, the MTAC website was changed so that MTAC materials that previously had been available were no longer available without an MITS password. Amended Complaint ¶¶32-35; Tabbita Dec. ¶ 23.

On January 9, 2007, APWU's counsel wrote to MTAC and the USPS stating that APWU had assumed that the Postal Service and MTAC would have no hesitation about providing the information and documents the Union had requested but that APWU also sought the information and documents pursuant to the Federal Advisory Committee Act. On January 26, 2007 the Postal

Service sent another letter APWU which asserted that the FACA is inapplicable to the Postal Service, but that the USPS would provide certain information including the members and work groups, the subject areas of the work groups, the dates of future MTAC meetings, and copies of minutes from some meetings. The January 26 USPS letter also stated that "Attendance at MTAC General Session and individual work group meetings is restricted to MTAC members, member-invited and approved MTAC guests." On February 13, 2007, counsel for the APWU again wrote to MTAC and the USPS repeating APWU's requests for the reports, agendas, updates and recommendations of MTAC work groups, the full materials made available to MTAC members and others who attend MTAC meetings, and MITS access authority. Also in February of 2007, Phillip Tabbita, APWU Manager of Negotiation Support made e-mail requests for information to the MTAC Postal Chair stating that he was no longer able to access certain MTAC information that had been publicly available in the past and requesting access to such information. An MTAC official responded to Mr. Tabbita by referring him to the USPS letter of January 26, 2007, and by advising him that access to any MTAC website materials required an MITS password. Amended Complaint ¶¶32-35; Tabbita Dec. ¶¶ 24-26.

On April 2, 2007, the USPS co-chairperson of MTAC responded to the February 13, 2007 letter of APWU's counsel and stated that "[w]e are treating your letter as an informal Freedom of Information Act (FOIA) request. She then refused to produce the information sought, beyond what had already been provided, asserting that it was exempt from disclosure under certain exemptions to the FOIA. Among other things, the April 2 letter asserted that MTAC reports, agendas, updates and recommendations are exempt from disclosure under FOIA exemption 5 covering pre-decisional and deliberative process materials. The April 2 letter also asserted that the requested materials were exempt from disclosure pursuant to FOIA exemption 5, which exempts materials exempted by other

statutes, 39 U.S.C. §410(c)(5) which in turn, the letter said, allows the USPS to withhold consultant reports from disclosure under the FOIA. Finally, the April 2 letter denied APWU an MITS password and ability to attend MTAC meetings on the basis that these requests were outside the scope of the FOIA. Amended Complaint ¶ 37; Tabbita Dec. ¶ 25.

As part of its activities to support postal services for individuals and small businesses, CAPS applied for membership in MTAC, using the procedures established by MTAC for that purpose. MTAC refused to admit CAPS into membership. CAPS subsequently made a request to attend MTAC meetings and obtain MTAC documents but has received no response to these requests. Farrell Dec. ¶¶8-9 and Farrell Ex. 1. As a result of the USPS and MTAC refusal to admit CAPS as a member, and as a result of their failure to permit CAPS to attend meetings and obtain documents, CAPS and its member organizations have been deprived of knowledge of MTAC and MTAC work group activities and plans, deprived of access to MTAC documents and papers, and deprived of knowledge of MTAC and MTAC work group recommendations. CAPS and its member organizations have been denied the ability to attend, appear before, and/or file statements with MTAC and MTAC work groups on issues of interest to CAPS and its member organizations with respect to MTAC and MTAC work group advice and recommendations to the USPS on subjects where CAPS and its member organizations are, or are likely to be, affected by USPS adoption of MTAC recommendations, or reliance on MTAC advice. Amended Complaint ¶¶ 41, 48, 49, 50, 58.

### III. STATUTORY BACKGROUND

**A. THE FEDERAL ADVISORY COMMITTEE ACT**

In its statement of findings and purpose in creating FACA, Congress declared, among other things, that, "Congress and the public should be kept informed with respect to the number, purpose, membership activities and cost of advisory committees" and that "the function of advisory

committees should be advisory only and that all matters under their consideration should be determined, in accordance with law, by the official, agency or officer involved". 5 U.S.C.A. app. 2 § 2(5) and (6) .

By its express terms the FACA applies to government agencies. Section 3 of the FACA states that for purposes of the Act, agency "has the same meaning as in section 551(1) of Title 5 United States Code." 5 U.S.C.A. app. 2 § 3(3). Section 551(1) of Title V of the U.S. Code, which is part of the Administrative Procedure Act ("APA"), defines "agency" as: "...each authority of the United States, whether or not it is within or subject to review by another agency, but does not include..." [certain exceptions, the USPS is not one of the identified exceptions].[1] FACA Section 4 then explicitly excludes from its coverage advisory committees established by two specific agencies: the Central Intelligence Agency and the Federal Reserve Board. FACA Section 8 makes agency heads responsible for establishing rules and regulations for advisory committees established by their agencies and directs agency heads to designate officers to control and supervise advisory committees.

FACA Section 10 establishes certain statutory mandates for advisory committee procedures, meetings, reports and disclosures of information. Among other things, FACA Section 10 requires that all advisory committee meetings "shall be open to public", except in certain situations; that "all interested persons shall be permitted to attend, appear before and file statements with any advisory

---

[1] 5 U.S.C. §551 (1) provides(emphasis added): "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include- (A) the Congress;(B) the courts of the United States;(C) the governments of the territories or possessions of the United States;(D) the government of the District of Columbia; or except as to the requirements of section 552 of this Title(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;(F) courts martial and military commissions;(G) military authority exercised in the field in time of war or in occupied territory; or (H) functions conferred by sections [of the U.S. Code dealing with banking, mortgage insurance, war time contracts]

committee", subject to reasonable rules and regulations and certain express exceptions; that advisory committee records, reports, agendas, minutes, transcripts and studies "shall be available for public inspection and copying, subject to 5 US §552 rules and exceptions; that advisory committees must keep detailed and accurate minutes; and that advisory committee meetings must be called by an agency officer with an agency approved agenda. FACA Section 11 provides that transcripts of advisory committee proceedings must generally be made available to any person.

The House of Representatives' Report on the FACA stated that "one of the great dangers of the unregulated use of advisory committees is that special interest groups may use their membership on such committees to promote their private concerns"; two examples of such situations were then cited. House Report No. 92-1017, 1972 U.S.C.A.A.N 3491, 3496. With respect to FACA Section 10, the Report stated "This provision has the effect of assuring openness in the operations of advisory committees. This provision, coupled with the requirement that complete and accurate minutes of committee meetings be kept serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group. Along with the provisions for balanced representation contained in §4 of the bill, this requirement of openness is a strong safeguard of the public interest". *Id.* at 3500.

In *Public Citizen v. U.S. Dept of Justice,* 491 US 440 (1989) the Supreme Court stated that the purpose of FACA was:

> ...to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature. § 2(b). To attain these objectives, FACA directs the Director of the Office of Management and Budget and agency heads to establish various administrative guidelines and management controls for advisory committees. It also imposes a number of requirements on advisory groups. For example, FACA requires that each advisory committee file a charter, §9 (c) and keep detailed minutes of its meetings. §10 (c). Those meetings must be chaired and attended by an officer or employee of the Federal

13

Government who is authorized to adjourn any meeting when he or she deems its adjournment in the public interest. § 10 (e). FACA also requires advisory committees to provide advance notice of their meetings and to open them to the public, §10 (a), unless the President or the agency head to which an advisory committee reports determines that it may be closed to the public in accordance with the Government in the Sunshine Act, 5 U.S.C. § 552b( c) §10 (d). In addition, FACA stipulates that advisory committee minutes, records, and reports be made available to the public, provided they do not fall within one of the Freedom of Information Act's exemptions, see 5 U.S.C. § 552 , and the Government does not choose to withhold them. §10 (b).

*Id* at 446, footnote omitted.

In *Assoc. Of Am Physicians and Surgeons v. Clinton,* 997 F2d 898, 903 (D.C. Cir. 1993), the D.C. Circuit stated that Congress passed FACA in 1972 to control the growth and operation of the "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C. App. 2, §2(a).... The statute orders agency heads to promulgate guidelines and regulations to govern the administration and operations of advisory committees". *See also  Sofamor Danek v. Gous,* 61 F3d 929 (D.C. Cir. 1995) --"The statute has two principal purposes; "to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them"; *Cummock v. Gore,* 180 F3d 282, 284-285 (D.C. Cir. 1999)-Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interest seeking to advance their own agendas....Congress aimed, in short, " 'to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals.'"

## B.THE STATUS OF THE USPS UNDER THE POSTAL REORGANIZATION ACT AND APPLICATION OF FEDERAL LAW TO THE USPS

The PRA established the USPS as an agency of the government. PRA Section  201, 39 U.S.C. §201, states that the USPS is an independent establishment of the executive branch of the Government of the United States... ." Courts that have considered this issue have held that the USPS

14

is indeed an agency of the Federal government. In *United States Postal Service v. Flamingo Industries*, 540 U.S. 736, 744 (2004), the Supreme Court cited PRA Section 201 and stated that "the Postal Service is part of the Government" and that "[w]hile Congress waived the immunity of the Postal Service [from suit], Congress did not strip it of its governmental status". The D. C. Circuit has held that "despite Congress' extensive reorganization of the [USPS] in the [PRA], to permit the [USPS] to operate in a more business-like fashion, the [USPS] *clearly remains a government agency-* an independent establishment of the Government of the United States." *Carlin v. McKean*, 823 F.2d 620, 622 (D.C. Cir. 1987), emphasis added; *Pitney Bowes, Inc. v. USPS*, 27 F.Supp.2d 15, 20-21 (D.D.C. 1998).

The USPS is headed by the Postmaster General (PMG), who is the Chief Executive Officer of the Postal Service. 39 U.S.C. Section 203. The PMG is appointed by the presidentially-appointed Board of Governors. Thus, by the plain terms of the PRA and by the structure of the USPS it is clear that it is an agency of the Government and, within the meaning of the FACA- is "an authority of the United States."

To the extent that Congress sought to generally relieve the USPS of obligations under certain statutes, it did so expressly. Thus, PRA Section 410 provides that "Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such

laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5 shall apply to the exercise of the powers of the Postal Service." Section 410(b) then provides that certain statutes that would have been inapplicable to the USPS under Section 410(a), are nonetheless applicable, including several parts of title 5 (*i.e.* the

15

Freedom of Information Act (§552) the Privacy Act (§552a) and the Open Meetings Act (§552b).[2]

The recently enacted Postal Enhancement and Accountability Act ("PAEA") did not change the status of the USPS as an "establishment of the executive branch of the Government", nor did it alter the Section 410(a) exemptions of the USPS from of certain laws or the Section 410(b) provision that certain of those laws nonetheless apply to the USPS.

In describing the ways in which the PRA and PAEA changed the Post Office to the Postal Service, the USPS has implied that the Postal Service is now run essentially like a business and has few remaining characteristics of a Federal agency. USPS Brief at 2-4, 12-13. Indeed the the USPS asserted (Brief at 3), that "[t]he one area where the PRA retained a check on USPS's independence is in connection with setting postal rates." However, even a cursory review of the PRA reveals numerous ways in which Congress has chosen to treat the Postal Service like a federal agency. Of central importance, of course, is the requirement that the Postal Service:

> maintain one class of mail for the transmission of letters sealed against inspection. The rate for each class of mail shall be uniform throughout the United States, its territories and possessions.

39 U.S.C. § 404(c). This is the requirement of universal postal service at uniform rates. It explains why it is possible to mail a letter anywhere in the country and have it delivered in any state, territory or possession for 41 cents ($.41). No private business could or would provide that service. As Congress stated in the PRA:

> The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people.

39 U.S.C. § 101(a). The 41-cent stamp is made possible by the fact that all First Class mail is included in a single rate class for purposes of setting postal rates. Thus, the Postal Service is not

---

[2] As discussed more fully below, the FACA is not in Title 5 but is temporarily housed in the appendix to Title 5.

merely checked by the Postal Regulatory Commission; the basic structure of postal rates for First

Class letter mail is established by act of Congress, in the PRA,  Much of what MTAC does concerns

the efforts of large business mailers to shift costs from themselves onto individuals and small

businesses contrary to this fundamental principle established in the PRA.[3]

Even if rates were the "one area where the PRA retained a check on USPS's independence"

as the Defendants assert, that one area is concerns a fundamental, constitutionally-based service

"provided to the people by the Government of the United States." But there are many other ways

in which the PRA treats the Postal Service as a federal agency. Section 404(d) of Title 39 places

severe restrictions on the right of the Postal Service to close any post office, and provides a right of

appeal to the PRC by any person served by such office if a decision to close is made. This, too, is

in keeping with the provision of postal services to  "the people by the Government of the United

States."

The Postal Service is subject to many other constraints. Among them are: Executive

compensation is strictly limited, even though the Postal Service has annual income of approximately

$70 billion (39 U.S.C. §1003); Postal borrowing is subject to limitations on the amount it may

borrow and on its total debt (39 U.S.C. §2005(a)); the Postal Service is required to permit its

employees to participate in federal health benefits and retirement programs, including the provision

of the same health benefits for postal retirees as are provided for federal retirees (39 U.S.C. §§1005

(d) and (f)); the Postal Service must hire its employees off a hiring register created by administering

a competitive examination (39 U.S.C. §1005(a)); the Postal Service must comply with the Veterans

---

[3]An example is provided by the most recent omnibus rate case, R2006-1. In that case the Postal
Service, supported by the large mailers, proposed to shift costs from large mailers to individuals
and small businesses. The effect would have been a 42 cent First Class stamp instead of a 41
cent First Class stamp, with many larger increases to come. But the PRC rejected that effort.
Opinion of the PRC in R2006-1, at ¶5090 (February 26, 2007).

Preference Act (39 U.S.C. §1005(a)(2); political activities of postal employees are subject to the strictures of the Hatch Political Activities Act.(5 U.S.C. §7323).

The USPS also errs in its reliance on the recently passed PAEA amendments of the PRA. Defendants' Memorandum at 20. In the PAEA, Congress not only kept the requirement of universal service at a uniform rate for First Class letter mail, they re-enacted it and moved it to a new section of the PRA, Section 404(c) of the amended PRA. Section 1010(e) of the PAEA. P.L. 104-435, Dec. 20, 2006. Furthermore, the central feature of the PAEA makes it much more difficult for the Postal Service to operate like a business. The PAEA imposed a CPI cap on postal rates, imposed on a class by class basis. To characterize this ceiling on postal rates by class as a "check on USPS's independence" would be ludicrous. For this and other reasons, the Board of Governors of the Postal Service unanimously signed letters to the principal sponsors of the PAEA opposing the legislation. For example, on January 24, 2006, the Board of Governors wrote to Senate Committee Chair Susan Collins that:

> As we have communicated through a series of letters last year, buttressing communications from previous Boards about earlier versions of the legislation, we believe there are critical elements missing from this bill, as well as numerous burdensome provisions that would make it extremely difficult for the Postal Service to function in a modern, competitive environment.

A copy of the Governors' letter is appended to this Memorandum. Thus, neither the PRA nor the PAEA turned the Postal Service into something akin to a private sector company. To the contrary, the Postal Service is a governmental agency performing an essential governmental service mandated by the Constitution of the United States.

## IV. STANDARDS ON MOTION TO DISMISS

It is well-established that, in considering a motion to dismiss under Rule 12(b)(6), a court should not dismiss a complaint unless the defendant can show beyond doubt that the plaintiff can

prove no set of facts in support of his claim that would entitle him to relief; and that the court must

treat the complaint's factual allegations, including mixed questions of law and fact, as true; and must

draw all reasonable inferences there from in the plaintiff's favor. *Macharia v. United States,* 334

F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Dev. v. Ashcroft,* 333 F.3d 156, 165

(D.C.Cir.2003); *Depippo v. Cehertoff,* 453 F. Supp 2d 30, 32 (D.D.C. 2006).

## V. ARGUMENT

### A. THE FEDERAL ADVISORY COMMITTEE ACT APPLIES TO THE POSTAL SERVICE

The USPS motion to dismiss begins with a discussion of PRA Section 410 provisions on

applying certain laws to the USPS and exempting the USPS from certain other types of laws. The

Postal Service then argues that the Postal Service is exempt from the FACA pursuant to Section 410.

USPS Brief at 11-14. However, APWU and CAPS respectfully submit that the USPS is subject to

the FACA under the plain language of the statute, and that the PRA does not exempt the Postal

Service from the FACA.

### 1. The USPS is covered by FACA

As described above, FACA applies to government agencies and it adopts the definition of

agency in 5 U.S.C. §551(a) which in turn defines agency as "...each authority of the United States,

whether or not it is within or subject to review by another agency..." other than certain specifically

excepted agencies [the USPS is not one of the expressly exempted agencies]. The PRA establishes

the USPS as an agency of the government, stating that the USPS is "an independent establishment

of the executive branch of the Government of the United States... ." 39 U.S.C. §201. *See also*

*Flamingo Industries,* 540 U.S. at 744; *Carlin v. McKean,* 823 F.2d at 622--the USPS "clearly

remains a government agency"; *Pitney Bowes, Inc. v. USPS,* 27 F.Supp.2d at 20-21.

The USPS brief contains an extended discussion of the background of, and congressional

purpose behind, the PRA, especially the goal of making the USPS run more like a business. Based on this discussion, the USPS asserts that its new structure means that it is not subject to the FACA. Brief at 2-5, 12-14. However, regardless of this purpose, the PRA expressly defines the USPS as an establishment in the executive branch, and as such it is an agency under FACA. Moreover, the fact that Congress wanted to improve efficiency of the Postal Service, minimize political influence and allow the Service to operate in a more business-like manner (*Mail Order Ass'n., supra*, 986 F. 2d at 519-520; *Kuzma v. USPS*, 798 F. 2d 29, 31 (2d Cir. 1986)) is not at odds with the fact that the USPS is an agency of the government. In any event precedent in this Circuit and this Court (cited above) holds that the USPS is an agency.

The USPS argues that it must be exempt from the FACA because it was enacted two years after the PRA and Congress did not expressly provide in the FACA that it applies to the USPS (USPS Brief at 11). This reasoning is backwards and assumes erroneously that failure to specifically state that the USPS is covered by FACA means that Congress intended for it not to be covered by FACA. The USPS fits the definition of "agency" under FACA, and it falls within the coverage of the Act under the plain language of that statute. If any assumption is applied here, it should be that the USPS is covered by FACA because that Act does not exclude the USPS from its coverage. Indeed, the FACA did expressly exempt the CIA and Federal Reserve Board from its coverage (FACA Section 4(b)); Congress could have similarly exempted the Postal Service, but it did not do so. Since the USPS is subject to the FACA under its plain language, the USPS argument that it is exempt should be rejected.

Given the language of FACA Section 2 and 5 U.S.C. §551, the USPS is covered by FACA unless it is exempted from that Act.

**2. PRA does not exempt USPS from FACA**

The principal thrust of the USPS argument is that Section 410 of the PRA renders the FACA inapplicable to the Postal Service. USPS Brief at 12-14. Although the PRA was enacted after the FACA, no provision of the PRA expressly excepts the USPS from coverage of the FACA. The USPS relies on PRA Section 410(a) which states that: "except as provided in subsection (b) of this section" or except as otherwise provided in Title 39 or USPS regulations, "no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of Title 5, shall apply to the exercise of the powers of the Postal Service." Section 410(b) then provides that certain specific laws that would be inapplicable under Section 410(a) continue to apply to the USPS, including the Freedom of Information Act (5 U.S.C. §552), the Privacy Act (5 U.S.C. §552a) and the Open Meetings Act (5 U.S.C. §552b). The USPS argues that Section 410(a) excepts the USPS from the FACA and that Section 410(b) does not identify the FACA as a law that continues to apply to the Postal Service, so the FACA is therefore inapplicable.

However, APWU and CAPS submit that the FACA is not a Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds. The FACA concerns agency use and misuse of advisory committees in connection with agency decision-making; and public access to advisory committee meetings, reports and processes. The FACA does not deal with contracts, property, works, budgets or funds. Nor does the FACA deal with the appointment, removal, compensation of officers or employees, other personnel actions involving officers or employees, or decisions or actions concerning officers or employees.

The USPS contends that because FACA requires agencies to designate officers and employees to support and supervise advisory committees, requires record keeping for funds spent by advisory committees and precludes unnecessary advisory committees as a way of avoiding waste

21

of public funds, the FACA is a law "dealing with public or Federal contracts, property, works, officers, employees budgets or funds" and is therefore not applicable to the USPS under PRA Section 410(a). USPS Brief at 16-17. But this argument is premised on a distorted interpretation of Section 410(a). That provision does not exempt the USPS from compliance with a law just because certain Postal employees and officers might have to spend a portion of their time on recordkeeping and filings necessary under that law; nor does it exempt the USPS from a law just because administrative costs are associated with compliance with that law. Section 410(a) plainly exempts the USPS from laws <u>dealing with</u> budgets, expenditures of funds, and officer and employee rights and obligations. Plaintiffs submit that the point of Section 410(a) is to exempt the USPS from laws directing, controlling and limiting the operational and management judgments of the agency, not to exempt it from laws whose operation may incidentally cause minimal expenditures of funds and minimal additional tasks for officers and employees. Furthermore, the USPS is already providing minimal operating funds and officer and employee assistance and support for MTAC. So operation of the FACA would have no impact on at all in these areas; it would merely provide public access and input as intended by that statute. Thus, the USPS has ignored the question of what kind of statute the FACA is, what subjects it <u>deals with,</u> and has focused instead on attenuated and incidental consequences of its operation. Since the FACA has not been shown to be a statute dealing with the subjects listed in Section 410(a), it cannot be said that that provision exempts the USPS from the FACA.

The USPS further asserts (USPS Brief at 18) that exempting it from the FACA does not undermine the Act's purposes, because the pressure on the agency to "maintain a self-sustaining budget provides little incentive for it to waste funds unnecessarily" and that the use of MTAC "is an exercise of business discretion, aimed at enhancing its business operations, and as such can be

22

presumed to be cost effective". These statements have no support in either fact or logic. That the USPS is directed to try to be self-sustaining, and that it has exercised discretion to enhance its business operations does not mean that its actions and decisions will not be wasteful, or that they will always be cost-effective. But besides the conclusory nature of these assertions, they also ignore one of the two main purposes of the FACA, the one that is relied upon by plaintiffs--assurance of public access to advisory committee records and reports, public input into advisory committee recommendations and preventing capture of advisory committees by special interest groups. Accordingly, even if the USPS could evade application of the FACA by showing that it has otherwise acted in accordance with the mandate to reduce waste and inefficiency, the USPS has not shown that it has complied with the other important mandate of the Act; in fact it has acted directly contrary to the Act's public access, disclosure and participation requirements.

Other USPS arguments for exemption from the FACA also lack merit. It is asserted that the FACA does not apply because it is not listed in Section 410(b) as one of the statutes that applies to the USPS despite Section 410(a). But since the FACA is not excepted under Section 410(a), there was no need to restore it to effect in Section 410(b); so its omission from that provision does not advance the USPS argument that it is not covered by FACA. The USPS has cited *National Easter Seal Society v. USPS*, 656 F. 2d 754, 766 -767( D.C. Cir. 1981), which held that the USPS is exempt from the notice and comment procedures of the APA, noting that Congress enacted the PRA to improve postal efficiency and promote modernization. USPS Brief at 18-19. But *National Easter Seal Society* is inapposite because it concerned application of the APA, which, unlike the FACA, is part of Title 5. The decision in that case discussed the PRA Section 410(a) general exemption of the USPS from certain types of laws, but noted that there was a specific exemption from the provisions of chapters 5 and 7 of Title 5, and that Section 410(b) restored applicability of several

23

provisions of Title 5, but not the APA; and that, in the face of such specific language, it could not be said that the APA remained applicable to the USPS. *Id* at 766. Because the decision in *National Easter Seal Society* was based on an express exemption of the APA set forth in Section 410(a) it is inapposite here where there is no such express exemption of the FACA in Section 410(a).[4]

The USPS also contends that its dealings with MTAC are exempt from the FACA because MTAC supposedly qualifies as a consultant under Section 410(c). USPS Brief at 17. In four short sentences the USPS asserts that MTAC is a consultant under PRA Section 410(c)(5), that its reports would therefore be exempt from disclosure under FOIA in the same manner as if they were internal Postal Service materials and that this would include pre-decisional materials. None of these conclusory assertions is supported by any authority whatsoever. There has been no showing that a Section 410(c)(5) exemption from the FOIA means that such an exemption necessarily applies under FACA. But even if the USPS had supported application of Section 410(c)(5) to FACA, what is the basis for describing MTAC as a "consultant"? No authority under Section 410(c)(5) regarding the term consultant has been provided. The USPS itself has described MTAC as an advisory committee formed for the purpose of sharing technical information, allowing mailers to provide advice and recommendations on mail related products and service to enhance customer value and for mutual benefit. USPS Brief at 8-10. No compensation flows from the USPS to MTAC. Furthermore MTAC members speak on behalf of their own constituents and seek to advance their own interests as

---

[4] APWU and CAPS also note that the part of Section 410(a) that excepts the USPS from the provisions of chapters 5 and 7 of Title 5 is also not a basis for exempting the USPS from the FACA because the FACA is not part of chapters 5 or 7 of Title 5. In enacting the FACA, Congress did not make it a part of Title 5 at all. Indeed the D.C. Circuit has expressly stated that, "FACA is not part of Title V, which was enacted six years before FACA's passage, but, instead *is only temporarily housed* [in Title V] as an appendix. Typically, when Congress wishes to add a statute to Title 5, it amends the Title," just as Congress has done for the Government in the Open Meetings Act and the Privacy Act, but it did not amend Title 5 when it enacted FACA . *Ass'n. of Amer. Physicians and Surgeons v. Clinton*, 997 F.2d at 904, rev'd on other grounds not dealing with FACA's housing in or out of Title 5, emphasis added.

mailers. This plainly is not a consultant relationship. And the notion that the MTAC reports are like internal confidential pre-decisional materials is specious. The contents of these materials are known to MTAC members who are USPS customers--they cannot possibly be considered to be like internal confidential pre-decisional materials. Moreover, MTAC information is often reported or described to the members of the associations of mailers that provide representatives to MTAC. Furthermore MTAC and MTAC work group meetings may be attended by non-member invitees. Thus, the USPS has not put forth an actual argument that MTAC materials and information are exempt from the FACA under PRA Section 410(c)(5), it certainly has not established that such an exemption applies to MTAC.

The USPS also asserts that MTAC should not be subject to the FACA because the USPS claims that only uses MTAC for gathering of technical information from users, and for enhancing customer relations, and that this is the sort of business activity that differentiates the USPS from other agencies that are subject to FACA. USPS Brief at 15-16, 19. The USPS argues (Brief at 19) that application of FACA processes would be inconsistent with effective and efficient decision making, and that the USPS is exempt public rule-making processes. However, besides the fact that the plain language of the FACA covers the USPS, the agency has described its interactions with MTAC far too narrowly, has ignored what MTAC actually does and the impact that its recommendations actually have. The Postal Service's comparison of the MTAC--USPS decision making process to private enterprise  internal decision making is specious because plaintiffs do not seek to participate in internal USPS decision making, they seek to be part of a policy deliberation process that is opened to some interested outsiders, but not others.

As is alleged in the APWU/CAPS complaint and as is shown in more detail in the first and second Tabbitta declarations and Farell declaration filed by APWU and CAPS, MTAC is not merely

25

a source of technical information and advice. MTAC is a sounding board for, and recommender of, proposals for changes in Postal operations, policies, and rules. Plaintiffs have alleged that, by adopting recommendations of MTAC, the USPS has affected the work of its employees and Postal rules and operations applicable to many mailers that are not members of FACA, are not represented on FACA and have no input into FACA recommendations. The amended complaint in this case alleges that the Postal Service has acted upon recommendations, advice, reports and opinions of MTAC and MTAC work groups by adopting and/or promulgating new rules, procedures, work practices and/or processes; altering existing procedures, rules, work practices and/or processes; purchasing or modifying equipment; and/or altering prices and/or charges. Plaintiffs have further alleged that APWU members and CAPS members have been and/or will be affected by USPS actions adopting and/or promulgating new rules, procedures, work practices and/or processes; altering existing procedures, rules, work practices and/or processes; purchasing or modifying equipment; and/or altering prices and/or charges pursuant to MTAC and MTAC work group recommendations, advice, reports and opinions. Amended complaint ¶¶22-24, 56. These allegations concerning USPS adoption of MTAC and MTAC work group recommendations the are discussed in more detail in the first Tabbita declarations, ¶¶6-12, 18-19 and in the second Tabbita declaration.

Moreover, the assertion that the MTAC-USPS relationship is a merely a routine business relationship between an enterprise and its customers ignores the facts that only certain customers can participate in MTAC, that the USPS is still a government agency and its still is obligated to provide universal service, and that changes in USPS rules and operations will affect persons who have a statutory right to USPS service. Simply put, the USPS may have a mandate to operate in a more business-like manner, but it is not a private business and its dealings with MTAC are not akin to a business' interactions with its self-selected group of customers; rather the USPS is still a

government agency obligated to provide universal service; and decisions that favor certain groups of its customers can affect the interests of other customers who are not represented on MTAC. (See discussion above about the nature of the USPS). Because of the universal service requirement and the restrictions on rate increases, discounts and other policies that favor large mailers are necessarily adverse to smaller mailers. Additionally, many policy changes that favor large shippers and discounts to large shippers impact Postal employment and the economic circumstances of the USPS as an employer.

APWU and CAPS also note that, by seeking input, feedback and recommendations from MTAC the Postal Service has already opened up its decision-making processes to persons outside the Service. What is at issue here is whether, despite the FACA, only certain outsiders can have input into decision-making and whether other outsiders can be barred from giving their views and even from access to basic information.

Finally, the USPS offers an argument based on supposed statements of the USPS' own views as to the application of the FACA, citing a letter from a USPS "representative" in response to a Congressional inquiry, and an OMB report describing its understanding of the views of the USPS concerning application of the FACA to the USPS. The USPS then asserts that Congress was aware of the USPS interpretation of the statute and did nothing to effect a change, so the Court should defer to the USPS "interpretation." USPS Brief at 12.  There are several problems with this argument. Initially, APWU and CAPS note that an agency's interpretation of a statute is afforded deference only when the agency is acting pursuant to a Congressional delegation of authority to regulate or adjudicate in the areas in question. *American Library Ass'n v. FCC*, 406 F. 3d 689, 699 (D.C. Cir. 2005). Here the USPS certainly has no authority to adjudicate or regulate under the FACA. And, to the extent that the USPS seeks judicial deference to its interpretation of the PRA,

27

it has not shown that Congress gave it authority to authoritatively construe or apply PRA Section 410. In any event, the USPS has not shown that there actually was any ruling or regulation under Section 410 to which the Court should defer. The two "interpretations" cited by the USPS are a letter (USPS Ex D) that a representative whose title is unknown wrote to a Congressional Committee about application of Section 410 to a proposed amendment to Title 5 (a fairly equivocal statement at that); and an OMB report on advisory committees that reported that the USPS was excluded from that report because OMB said that the USPS Assistant General Counsel had opined that the USPS was exempt from FACA. Neither of these opinions is a decision or regulation of the USPS itself that could be entitled to judicial deference. Nor can it be said that these communications to Congress are authoritative interpretations of the PRA by a decision-maker or decision-making body of the USPS that constitute the sort of longstanding administrative interpretations that Congress may be presumed to know and presumed to accept by inaction. Accordingly, the "interpretations" cited by the USPS should be afforded no weight whatsoever.

APWU and CAPS have shown that the USPS is an agency covered by FACA under the plain language of the statute. APWU and CAPS have also shown that none of the USPS arguments demonstrate that the PRA actually exempts the USPS from the FACA. APWU and CAPS therefore respectfully submit that the Court should reject the USPS arguments that the FACA does not apply to its relationship with MTAC.

## B. MTAC WORK GROUPS ARE COVERED BY THE FACA

The USPS also contends that even if it is covered by FACA, the MTAC work groups are not. USPS Brief at 31-34. However, the FACA itself, Section 3(2), covers not only advisory committees but also advisory committee "subcommittee[s] or other subgroup[s]". MTAC work groups are plainly subcommittees or subgroups of MTAC. Indeed, the MTAC Charter description of the work

28

groups, and the Tabbita declaration, show that the work groups are subcommittees of MTAC. The USPS errs in contending that CAPS and APWU have not sufficiently alleged that MTAC work groups are covered by FACA because the work groups are not established or utilized by the USPS. USPS Brief at 31-34.[5] However, APWU and CAPS have alleged in their complaint MTAC work groups study and report on, and make recommendations concerning various subjects involving Postal operations, and that the USPS has acted on advice, recommendations, reports and opinions of MTAC work groups. The Tabbita declaration (¶¶ 5-8) shows that the USPS has acted on specific work group reports and recommendations. And the MTAC charter itself indicates that the principal work of MTAC is done at the work group level and that their reports and recommendations are typically endorsed by MTAC. Since a court considering a motion to dismiss must treat the plaintiff's factual allegations as true, and draw all reasonable inferences therefrom in the plaintiff's favor, APWU and CAPS submit that, for purposes of the USPS motion, the Court should accept the plaintiffs' allegations that the work groups are established and utilized by the USPS and that the work groups are utilized by the USPS such that they are covered by the FACA. Because the work groups are MTAC subcommittees or subgroups established and utilized by the USPS the USPS motion to dismiss the APWU and CAPS claims with respect to the work groups should not be dismissed.[6]

## C. APWU AND CAPS HAVE A RIGHT OF ACTION FOR ENFORCEMENT OF FACA

The USPS asserts that even if it has violated the FACA, APWU and CAPS have no private

---

[5] The USPS brief does not deny that work groups function as advisory committees, it only asserts, erroneously, that the Complaint in this case does not sufficiently allege that work groups do function as advisory committees. Plaintiffs contend, on the basis of available evidence, that USPS follows work groups' advice.

[6] The USPS argues (Brief at 34-35) that APWU and CAPS have no statutory right to access to the MITS system. But that system is the device that MTAC uses to disseminate information and reports, so that is why the plaintiffs sought access to MITS. It may be that the statutorily required information can be provided by other means, but MITS is the mechanism currently in use.

right of action for enforcement of the Act. USPS Brief at 21-24. However, numerous FACA cases have been litigated and decided in this Circuit and other Circuits based on complaints filed by private individuals and groups. Current D.C. Circuit precedent is that private parties have a right of action for enforcement of the FACA. To the extent that the USPS relies on *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979), and *Alexander v. Sandoval*, 532 U.S. 275 (2001), with regard to standards for determining when there is an implied private right of action for enforcement of a Federal statute, APWU and CAPS respectfully submit that their amended complaint satisfies those standards.

In *Cummock v. Gore, supra.*, the D.C. Circuit faced the issue of whether FACA rights and duties were enforceable in the courts (180 F.3d at 290); and it held that the plaintiff in that case did have a private right of action, stating: "there is no question under our precedent that members of the public have enforceable rights to obtain information under FACA, *see Food Chem. News* 980 F. 2d at 1472." In *Food Chem News v. DHHS*, 980 F. 2d 1468 (D.C. Cir. 1992), a private organization sought production of materials prepared by an advisory committee; the Court affirmed that the agency involved was required to produce the materials and was required to produce them prior to the meeting for which they were prepared. *Id.* at 1472. In *Assoc. Of Am Physicians and Surgeons v. Clinton, supra,* 997 F.2d 898, the D.C. Circuit considered a private group's claim under FACA, but held the statute inapplicable in that case. The Court of Appeals considered and accepted a FACA claim of a private entity in *Animal Legal Defense Fund v. Shalala*, 104 F, 3d 424 (D.C. Cir. 1997), that a National Academy of Sciences committee on care and use of laboratory animals was an advisory committee and its actions were covered by FACA. And in *Natural Resources Defense Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998), the D.C. Circuit considered the FACA claim of a private group, but remanded the case for consideration of certain standing issues. In that case, the

30

Court of Appeals referred to the Supreme Court's decision in *Public Citizen*, *supra*, noting that the Supreme Court had rejected arguments that a private party lacked standing to seek redress for a FACA violation. *Id.* at 1020-1021, *citing* 491 U.S. at 447-451. *See also Washington Legal Foundation v. American Bar Ass'n.*, 648 F. Supp 2d 1353, 1361 (1986), rev'd on other grounds (17 F. 3d 1446 (D.C. Cir. 1994))—"plaintiff is correct in arguing that the courts have recognized a private right of action under the Act". The Eleventh Circuit has also considered FACA claims of private parties, and found violations of the Act and that the plaintiffs had standing to obtain relief under the Act, including injunctive relief. *Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior*, 26 F. 3d 1103 (11th Cir. 1994); *Miccosukee Tribe v. Southern Everglades Restoration Alliance*, 304 F. 3d 1076, 1080 (11th Cir. 2002). APWU and CAPS therefore respectfully submit that the law in this Circuit is that private parties do have the right to bring actions for enforcement of the FACA.

Despite this precedent, the USPS argues that there is no private right of action under FACA based on the Supreme Court's decision in *Sandoval*. USPS Brief at 22-23. The USPS acknowledges that in *Cummock* the D.C. Circuit held that there is a private right of action under FACA, but it dismisses *Cummock* as "based on an assumption rather than an analysis of the text and structure of FACA" and asserts that "*Cummock* must be reexamined". USPS Brief at 23 n. 9. However, not only did the *Cummock* Court extensively analyze the FACA and its legislative history (180 F. 3d at 284-285), it also specifically addressed "the question of whether Cummock possesses an enforceable right under FACA" (*id.* at 290). The Court then reviewed specific provisions of the Act and noted Congress' intent "'to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee'"; and "to protect against 'the risk that governmental officials would be unduly influenced by industry leaders'". *Id.* at 291, citations omitted. The Court then concluded that members of the public have enforceable rights

31

under FACA. *Id.* at 292. Thus, the D.C. Circuit based its decision on analysis of the text, structure and purpose of the Act, the intent of Congress, and not on assumption. *Cummock* and decisions relying on *Cummock* are controlling precedent in this Circuit. *See also* the decision of this Court in *Center for Arms Control and Non-Proliferation v. Lago,* 2006 WL 3328257 (D.D.C. 2006) at *4, holding that an organization had private right of action to enforce the FACA, *citing Public Citizen* and *Cummock.*

APWU and CAPS further submit that a holding that FACA is enforceable by private parties is not at odds with the Supreme Court's decision in *Sandoval.* The majority decision in *Sandoval* stated that it was applying the standards set forth in *Cannon* and *Cort v. Ash* ( 422 U.S. 66 (1975)) for determining when it is appropriate to imply a private right of action for enforcement of a federal statute. 532 U.S. at 286-287. Those standards are: whether the plaintiff is one of the class for whose especial benefit the statute was enacted-does the statute create a federal right in favor of plaintiff, whether there is an indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one, whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff, and whether the cause of action is one traditionally relegated to state law. *Cort,* 422 U.S. at 78; *Cannon,* 441 U.S. at 688 n.9.

The USPS has argued that the decision in *Sandoval* negated the holding in *Cummock,* and that the Supreme Court has shifted away from the analysis enunciated in *Cort* and *Cannon.* USPS Brief at 23 and n.9, *citing Boswell v. Skywest Airlines,* 361 F. 3d 1263 (10th Cir. 2004); *Love v. Delta Air Lines,* 310 F. 3d 1347, (11th Cir. 2002); and *Wisniewski v. Rodale, Inc.,* 406 F. Supp. 2d 550, 556 (E.D. PA 2005). However, review of *Sandoval* demonstrates that it did not overrule *Cort* and *Cannon* or eliminate the four elements of the test for determining when to imply a private right of action for enforcement of a statute. Indeed, the *Sandoval* Court cited *Cort* and *Cannon* in

32

determining whether there was a private right of action in that case, and the *Sandoval* Court cited

*Cort* as the decision that broke with prior precedent on that determination. 532 U.S. at 287-290.

Rather than reversing *Cort* and *Cannon*, the *Sandoval* Court emphasized the special importance of

indications of Congressional intent to provide for private enforcement, drawn from the text and

structure of the statute, such that if the text and structure clearly demonstrated Congressional intent,

that would be dispositive. *Id.* at 288-289. Indeed in *Wisniewski*, the Court referred to the four part

test of *Cort* and *Cannon* and stated that the test was "clarified" by *Sandoval's* holding that

Congressional intent is the focal point and can be determinative. And *Boswell* said that the four

factors had been "condensed" into a more general inquiry into Congressional intent.

APWU and CAPS submit that under the analysis described in *Sandoval*, they have a private

right of action for enforcement of the FACA. The language and structure of the Act, and its

legislative history, show that Congress intended that FACA would be enforced by private parties

whose specific interests are protected by the Act; and that APWU and CAPS are of a class for whose

benefit the statute was enacted.

As APWU and CAPS have shown, FACA Section 10 requires that all advisory committee

meetings "shall be open to public", except in certain situations; that "all interested persons shall be

permitted to attend, appear before and file statements with any advisory committee", and FACA

Section 11 provides that transcripts of advisory committee proceedings must generally be made

available to any person. Moreover, Congress was clear that major purposes of the FACA were to

guard against the ability of special interest groups to use their membership on such committees to

promote their private concerns, to assure openness in the operations of advisory committees, to

require that complete and accurate minutes of committee meetings be kept and made available to

interested persons, to enhance the public accountability of advisory committees and to safeguard

33

the public interest in fair, accurate, inclusive and unbiased advisory committees. Given the express language of the FACA conferring rights of attendance at meetings and access to materials, and the purpose of the FACA to open committees to scrutiny by interested persons, it is apparent Congress intended interested persons to be able to enforce the obligations it created in the Act. *See Cummock*, 180 F. 3d at 291.

Plaintiff further note that Congress did not merely set guidelines for the conduct of advisory committees, it created a specific right for interested persons to attend advisory committee meetings and obtain their materials. And Congress was clearly concerned that without the rights of attendance and document access for interested persons, advisory committees could be controlled or dominated by committee members who would pursue their own interests; only other interested parties can act to prevent the sort of situation that concerned the Congress. Moreover, Congress provided no other method for enforcement of these rights. In *Sandoval*, the Court thought it significant that Congress expressly empowered agencies to enforce their own regulations issued pursuant to the statute at issue there. 532 U.S. at 289. By contrast, here Congress provided no administrative enforcement mechanism for the rights established in FACA Sections 10 and 11; in the absence of a private right of action, there could be no enforcement of those rights.[7]

---

[7] The Postal Service argues that Congress could not have intended to provide a private right of action for enforcement of the FACA because it provided for Congressional and Executive branch oversight, review and reporting with respect to the number, nature, activities and expenses of advisory committees; it is suggested that the Congressional and Executive branch responsibilities were a substitute for enforcement by interested parties adversely affected by non-compliance with the Act. USPS Brief at 7, 23. But the USPS has again ignored a major purpose of the Act: public access and public input, and prevention of capture of advisory committees by special interest groups seeking to promote their own interests. Just because Congress provided for oversight, review and reporting about the number, nature, activities and expenses of advisory committees does not mean that it intended not to provide a private right of action for enforcement of the Act. There certainly is no basis for that assumption with respect to the parts of the Act dealing with public access, public input and restraint on the influence of special interest groups, when the Act provides no Congressional or Executive branch role or responsibilities with respect to those aspects of the statute. In this regard the FACA contrasts

The USPS has also noted that Congress considered in 1971, but did not adopt, FACA-type legislation that would have expressly provided a cause of action for enforcement of FACA under certain specified circumstances. USPS Brief at 23, and Congressional Record excerpts appended thereto. From this, the USPS infers that Congress intended no private right of action to enforce FACA. However, the circumstances of that congressional action in 1971, and closer examination of the text of the proposed legislation that was not adopted, leads to the opposite conclusion.

Given the state of the law in 1971, Congress must be presumed to have understood that there would be a private right of action to enforce FACA. The state of the law in 1971 was concisely summarized by Mr. Justice Harlan in his concurring opinion in *Bivens v. Six Unknown and Unnamed Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 403-404 (1971). In that case, the Supreme Court held that plaintiffs' complaint alleging violations of their Fourth Amendment rights stated a cause of action for which damages were recoverable in federal court. In concurring with that result, Mr. Justice Harlan explained (*id.*):

> ...Initially, I note that it would be at least anomalous to conclude that the federal judiciary-while competent to choose among the range of traditional judicial remedies to implement statutory and common-law policies, and even to generate substantive rules governing primary behavior in further as a broadly formulated policies articulated by statute or constitution, see Textile Workers Union V. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957); United States v. Standard Oil Co., 332 U.S. 301, 304-311, 67 S.Ct.

---

with the statute at issue in *Sandoval.* FACA also differs from the statute at issue in *Boswell v. Skywest Airlines, supra.,* 361 F. 3d at 1268-69, a case relied on by the USPS, where the statute expressly provided for administrative enforcement of complaints of violations, and that was deemed evidence of Congressional intent not to provide for judicial enforcement; no comparable administrative enforcement mechanism is provided in the FACA.

Furthermore, the USPS ignores the fact that different parts of the FACA may be enforced differently. *See e.g. Sandoval,* noting a private right of action for one part of Title IX, but finding no private right of action for another part. In this case, the FACA provides for Congressional and Executive oversight, but such oversight is clearly directed to parts of the Act that concern reports to Congress and the President about the number, types and funding of advisory committees, and the purpose and utility of committees (FACA Sections 5-7). That does not mean Congress intended to deny a right of action for parts of the Act that conferred rights on individuals.

1604, 1606-1610, 91 L.Ed. 2067 (1947); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 887 L.Ed. 838 (1943)- is powerless to accord a damages to remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will.

Thus, Congress was undoubtedly aware when it adopted the FACA in 1972, that it was not necessary to expressly provide for private enforcement of the Act.

Furthermore, the USPS misconceives the potential effect of the remedial provision Congress did not adopt. The provision in question (USPS Brief Appendix) would have limited the right of action to cases in which the plaintiffs had been "adversely affected or aggrieved" by an action of a federal agency"; the action of the agency "had been recommended by an advisory committee; and that the affairs of the advisory committee had not been conducted in accordance with the statute. Thus, if Congress had adopted the provision in question it would have substantially narrowed the availability of relief in federal court under then-standard Supreme Court jurisprudence. Accordingly, the correct inference to draw from the 1972 action of Congress is that it knew that it was creating rights that would be enforceable in federal court.

APWU and CAPS also qualify as the type of parties for whose benefit the FACA was enacted. As they have shown, the FACA provides that advisory committee meetings must be "open to public", that "all interested persons shall be permitted to attend" , appear before and file statements with any advisory committee", and that transcripts be made available to any person. Moreover, major purposes of the FACA included preventing special interest groups from using their membership to promote their private concerns, to enhance the public accountability of advisory committees and to safeguard the public interest in fair, accurate, inclusive and unbiased advisory committees. These are precisely the sort of interests APWU and CAPS have in seeking to enforce the mandates of the FACA.

MTAC and MTAC work groups deal with issues that are important to the members of CAPS,

36

which are relatively small but still significant mailers, and important to the APWU both as a relatively small mailer and as the representative of hundreds of thousands of postal employees. Worksharing activities by large mailers provide an important example.[8] Worksharing refers to activities performed by mailers to prepare their mail for processing by the Postal Service. For example, very large mailers are given substantial rate discounts for presorting and prebarcoding their mail. This presorting and prebarcoding work takes the place of work that postal employees would have to perform if the large mailers did not do it before depositing their mail.[9] Worksharing can also refer to a practice called "drop shipping" in which the mailer transports its mail to a postal facility near its destination, thus saving the Postal Service transportation costs. In either case, worksharing is a form of contracting out, or privatization that results in a substantial portion of the Postal Service's work being performed by the private sector. Last year workshare discounts totaled approximately $18 billion per year. Tabbita Dec. ¶ 19. MTAC work groups have in the past and are preparing to again provide advice to the Postal Service about ways of maximizing worksharing. Tabbita Dec. ¶¶ 10C, D; 11; 18; 19.

Thus, in part due to recommendations from MTAC and its work groups, the USPS has been making various technological and operational changes that benefit large mailers; and it has been increasing discounts to large mailers, often as a result of such changes. These changes disproportionately benefit large mailers, and put smaller mailers like CAPS members and the APWU at a relative disadvantage. Farrell Dec. ¶¶ 4-7. MTAC has often been involved in studying and has often made recommendations for such changes that benefit the members of the associations that

---

[8] There are many other examples. Tabbita Dec. ¶¶ 6-14.

[9] Large mailers who prebarcode their First Class letter mail and deposit it in large quantities presorted to the letter carrier route from which it will be delivered, for example, pay only 31.2 cents per letter instead of paying the full 41 cents individuals and small businesses pay for First Class letters.

have representation on MTAC. Indeed, the Postal Service often uses MTAC to vet ideas and proposals for changes in Postal operations and policies and to gauge industry reaction to plans under consideration; MTAC members often use MTAC to suggest changes in Postal operations and policies that are of interest to mailers and to effectively lobby for changes; and the Postal Service often relies on MTAC recommendations as supporting changes that it proposes. Amended complaint ¶¶22-23, 56; Tabbita Dec. ¶¶ 7-14; Farrell Dec. ¶¶ 4-7. CAPS and its members therefore have an interest in participating in, and commenting on, MTAC and MTAC work group studies and reports before proposed changes which favor large mailers are adopted by the USPS.[10] As a small mailer in its own right ($5 million per year in postage spent), APWU has a similar interest in MTAC recommendations regarding Postal services, products and rules Guffey Dec. ¶¶ 3-8.

As the collective bargaining representative of a hundreds of thousands of Postal Workers, and as an association whose members obviously have a substantial interest in Postal operations and policy and the future of the Postal Service, the APWU plainly is an "interested person" under the FACA and the statute therefore affords APWU a right to attend meetings and file statements, and a right to obtain advisory committee transcripts and reports. As is shown above MTAC recommendations, if accepted by the USPS, can positively or negatively impact the number of Postal employees, the conditions they work under, the quality of their work environment and the financial viability of their employer. The USPS will often cite MTAC recommendations and opinions as

---

[10] The USPS has argued that the Court should dismiss CAPS' claim concerning MTAC's refusal to allow CAPS to become a member of MTAC, asserting that FACA does not confer a right to committee membership. USPS Brief at 23-24. But in *Cummock*, the D.C. Circuit stated that Congress emphasized the need to ensure that persons directly affected by a committee's work have some representation on the committee. 180 F. 3d at 291. In any event, CAPS certainly has a right to attend committee and work group meetings, submit comments and obtain documents. So, even if the Court does not require that CAPS be granted MTAC membership, it can certainly order the lesser relief of access to meetings and materials and opportunity for input that has been denied CAPS. Amended complaint ¶¶58, 61-64.

supporting or justifying changes that may adversely affect APWU members. APWU therefore has

a strong interest in learning about MTAC and MTAC work group proceedings, studies and papers,

and in providing input to, and opinions regarding, MTAC and MTAC work group reports before the

USPS acts on them, citing MTAC support for the changes. APWU and its members are certainly the

sort of persons that Congress believed should have a right of access to a Postal advisory committee's

meetings and documents and the opportunity to present their views to such a committee.

As an advocacy group for nonprofit organizations that communicate with their members by

mail, CAPS and its members have substantial and direct interests in MTAC recommendations

regarding Postal services, products and rules, especially to the extent that they may favor large

mailers who have MTAC representatives, over small mailers who typically do not

Thus, APWU and CAPS and their members are persons who have direct and substantial

interests in ensuring that a Postal advisory committee is not captured by, or overly influenced by

industry insiders who have exclusive access to agency proceedings; precisely the sort of persons that

Congress sought to provide access to committee meetings and documents. As the D.C. Circuit stated

in *Cummock v. Gore*, "Congress aimed, in short, 'to control the advisory committee process and to

open to public scrutiny the manner in which government agencies obtain advice from private

individuals.'" 180 F. 3d at 285, citations omitted.

APWU and CAPS recognize that some parts of FACA contain general guidelines and

directives to both Congress and the executive branch, and some parts state general policy, but FACA

Sections 10 and 11 confer specific rights on parties interested in an advisory committee's work; and,

as described above, APWU and CAPS fall squarely within the intent of the interested persons

language in those provisions. APWU and CAPS submit that the interested persons language of

FACA is no less specific as to conferring rights on plaintiffs than was the language of Title IX that

39

was found to confer an especial benefit in *Cannon*- "No person in the United States, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under...." (441 U.S. at 681), or the rights conferring language in other statutes cited in *Cannon* -e.g. "no person shall be denied the right to vote..."; "[e]mployees shall have the right to organize and bargain collectively..." (441 U.S. at 691). It must also be noted that in *Sandoval,* the plaintiff sought to enforce rights created by regulation issued pursuant to a statute; the Court thought it significant that there was no <u>statutory</u> provision in that case like the "No person..." language in *Cannon*, that the statutory provisions at issue in *Sandoval* focused more on duties placed on the regulated entity rather than rights created for the individual (532 U.S. at 288-289), and that the alleged rights-creating language was in a regulation implementing a statute, not in the statute itself (*Id.* at 291). By contrast to the plaintiffs in *Sandoval*, APWU and CAPS seek to enforce specific rights that Congress conferred on persons like them in Sections 10 and 11 of FACA; they therefore have a private right of action for enforcement of those provisions.

APWU and CAPS also note that the inquiry for determining whether there is a private right of action is similar to the elements of the historic standard for standing: whether the plaintiff has suffered an injury in fact by invasion of a legally protected interest that is concrete and particularized (*i.e.* the injury affects the plaintiff in a personal and individual way), that the plaintiff's complaint fall within the zone of interests protected by the law invoked, and that the plaintiff assert a specific interest of his/her own, not a generalized grievance of the public at large. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Zivotofsky v. Secretary of State*, 44 F 3d 614, 617-619 (2006). Here APWU and CAPS assert injury by denial of legally protected rights conferred on them by FACA as persons interested in MTAC proceedings and recommendations; their complaint falls

within the zone of interests protected by the FACA because they are persons interested in, and sure to be affected by, MTAC recommendations; and they are concerned about the capture or domination of MTAC by specific interests who have representation on MTAC; and they do not merely assert an interest that the USPS comply with the law, but that it comply with the law because they will be affected by its non-compliance. APWU and CAPS are plainly the sort of parties that Congress intended would have rights under FACA and the ability to enforce those rights. In this regard. APWU and CAPS note that in *Public Citizen, supra.* the Supreme Court held that a private party had standing to bring an action for enforcement of the FACA because of their specific demand for information guaranteed by the FACA. 491 U.S. at 449. *See also Bensman v U.S. Forest Service*, 408 F. 3d 945, 858 (6th Cir. 2005)-- contrasting the Appeals Reform Act with the FACA. Indeed in *Center for Arms Control and Non-Proliferation, supra.*, this Court referred to standing principals in holding that a private party had private right of action to enforce the FACA, *citing Public Citizen, supra.* and *Cummock supra.*, stating (2006 WL 3328257 at *4):

> Although FACA does not contain a provision providing a private right of action to enforce its provisions, it appears that the Supreme Court has essentially assumed that citizens may sue if they have been denied access to records under FACA. *See Manshard v. Fed. Judicial Qualifications Comm.*, 408 F.3d 1154, 1156 n. 3 (9th Cir.2005) (citing *Pub. Citizen*, 491 U.S. 440). Nonetheless, the Center still must show "that [it] has suffered a particularized injury to a cognizable interest, [its] injury is fairly traceable to the Government's actions, and a favorable judicial ruling will likely redress [its] injury." *Cummock*, 180 F.3d at 290 (citing *Lujan*, 504 U.S. at 560-61). There can be no doubt that "refusal to permit [the Center] to scrutinize the [Commission's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue." *Pub. Citizen*, 491 U.S. at 449.

Thus APWU and CAPS they have asserted the type of claim that Congress intended to be enforced under the FACA ; and they have shown that they are the type of parties that Congress intended would be able to enforce the requirements of the FACA

APWU and CAPS therefore submit that the language, structure and purpose of the Act demonstrate that Congress intended that the rights it conferred on interested persons by enforceable

by such persons. For the same reasons, plaintiffs also submit that finding a private right of action for enforcement of rights the FACA conferred on interested persons is also consistent with the underlying purposes of the legislative scheme. Finally it is readily apparent that the cause of action asserted by the plaintiffs is not one traditionally relegated to state law; this case concerns a statute directed to a particular problem that developed in the Executive Branch of the Federal government; it is not a matter that has been or could be addressed under state law.

For all of these reasons, CAPS and APWU respectfully submit that their complaint satisfies the standards set forth in *Cort, Cannon* and *Sandoval* for determining when there is an implied private right of action for enforcement of a Federal statute.

In arguing that FACA provides no private right of action, the USPS relies heavily on the decisions in *Natural Resources Defense Council v. Abraham*, 223 F. Supp. 2d 162 (D.D.C. 2002); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp 2d 20 (D.D.C. 2002) ; and *International Brominated Solvents Ass'n. v. American Conference of Governmental Industrial Hygienists*, 393 F. Supp. 2d 1362 (M.D. Ga 2005) which relied on *Sandoval* for their holdings. USPS Brief at 22-23. However, as plaintiffs have shown, these decisions are contrary to the D.C. Circuit's decision in *Cummock* and the more recent decision of this Court in *Center for Arms Control*. Indeed, in both *Natural Resources Defense Council* and *Judicial Watch*, the Court acknowledged that its decisions appeared to be inconsistent with *Cummock* and the Supreme Court's decision in *Public Citizen, supra.*, but suggested that those decisions may have just implicitly assumed that FACA creates a private right of action, and that *Sandoval* required a different outcome. APWU and CAPS submit that this analysis is insufficiently deferential to current Circuit and Supreme Court precedent concerning FACA cases, and that assumptions about what those courts might have been thinking is not enough to permit a contrary decision. It should also be noted that

42

both *Natural Resources Defense Council* and *Judicial Watch* were reversed on appeal, though on other grounds. Additionally, in *Natural Resources Defense Council,* the Court relied in part on the fact that the plaintiffs conceded that FACA did not provide a right of action, and based their claims on the APA (223 F. Supp 2d at 176); in *Judicial Watch,* one of the two plaintiffs and an amicus also conceded that point, and the other plaintiff requested and was granted leave to amend its complaint to include claims under the APA and the Federal mandamus statute (219 F. Supp 2d at 33)-in both cases the plaintiffs were able to continue their claims by citing other bases for jurisdiction. *International Brominated* also is not persuasive authority as to whether there is a private right of action for enforcement of the FACA; indeed, that Court relied heavily on *Natural Resources Defense Council* and *Judicial Watch.* 393 F. Supp 2d at 1376-1377. The Middle District of Georgia also acknowledged that its decisions seemed to conflict with Eleventh Circuit precedent (*Miccosukee, supra.*) and *Public Citizen,* but also dismissed that problem by stating that the court of appeals and Supreme Court had apparently only assumed that FACA provided a private right of action. 393 F. Supp at 1377. For all of these reasons, APWU and CAPS respectfully submit that the decisions relied on by the USPS are not persuasive, and that this Court should follow *Cummock* and the recent decision in *Center for Arms Control.*

Plaintiffs submit that they have shown that FACA provides them with a private right of action for enforcement of their rights under that statute so their complaint should not be dismissed for lack of jurisdiction.

## D. EVEN IF PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION UNDER THE FACA, THEY STILL HAVE A RIGHT OF ACTION FOR REVIEW OF UNLAWFUL AGENCY ACTION

Although the PRA renders the APA inapplicable to the USPS, the Postal Service's violation of the FACA renders the USPS subject to "common law" or "non-statutory" review.   The postal

jurisdiction statutes, 39 U.S.C. §409 and 28 U.S.C. §1339, vest the federal courts with subject-matter jurisdiction, respectively, "over all actions brought by or against the Postal Service" and over "any civil action arising under any Act of Congress relating to the Postal Service." Indeed, the D.C. Circuit has previously relied on these jurisdictional statutes to entertain claims that the Postal Service has engaged in unlawful acts. In *Aid Association for Lutherans v. United States Postal Service*, 321 F.3d 1166, 1168 (D.C. Cir. 2003), the Court stated that "[A]ppellees may challenge actions by the Postal Service that are outside of the scope of its statutory authority. Appellees' principal claim here is that the challenged regulations emanated from an *ultra vires* action by the Postal Service. We agree. Therefore, it does not matter whether 39 U.S.C. § 410 (a) precludes traditional APA review". *See also National Association of Postal Supervisors v. United States Postal Service*, 602 F.2d 420, 429 (D.C. Cir. 1979) - postal jurisdiction statute "triggers the well-established presumption favoring judicial oversight of administrative activities". Additionally, in *T&S Products, Inc. v. United States Postal Service*, 1994 WL 1026493 (D.D.C.), this Court ruled that it had jurisdiction under 28 U.S.C. § 1331 (a) and 1339, over a suit against the Postal Service to enjoin the Postal Service from pursuing a new method of supplying retail packaging products to post offices which the plaintiff claimed violated the requirements found in the Postal Service's own procurement manual. *Id.* at *1, *2 n4.[11]

------

[11] Other circuits have come to the same conclusion. *E.g. Combined Communications v. United States Postal Service*, 891 F.2d 1221, 1227-28 (6th Cir. 1989)--"a federal district court has jurisdiction under 28 U.S.C. § 1339, 39 U.S.C. § 409(a) and the 'well-established, common-law presumption favoring judicial review of administrative action'... to entertain the question of whether a final Postal Service regulation is ultra vires"; *Peoples Gas, Light and Coke Co. v. United States Postal Service*, 658 F.2d 1182, 1191 (7th Cir. 1981)--the Postal Service's "exemption from the provisions of the Administrative Procedure Act does not negate the applicability of common law review principles...We conclude that the exemptions found in section 410 of the Postal Reorganization Act do not manifest a congressional intent to foreclose all judicial review of alleged violations of the Postal Service's regulations."

These decisions, endorsing the availability of non-APA or common law review in suits brought under the postal jurisdictional statutes, are firmly rooted in precedent. Before the APA was enacted in 1946, the Supreme Court allowed suits to be brought at common law challenging actions taken by the Postmaster General in the absence of any statutory provision expressly providing for such review. *See School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 412-13 (1921). *See also Stark v. Wickard*, 321 U.S. 288, 310 (1944)--"The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.". The APA was merely a codification of the long established common law principle of judicial review of administrative action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)--the APA was found to reenforce pre-existing common law review.

Accordingly, even if the FACA does not provide the plaintiffs with a right of action for its enforcement, plaintiffs nonetheless have a right of action under the "common law" or under "non-statutory" review of agency action.

## E. IF PLAINTIFFS DO NOT HAVE A PRIVATE RIGHT OF ACTION UNDER FACA, OR THE ABILITY TO CHALLENGE THE USPS ACTIONS UNDER THE COMMON LAW OF JUDICIAL REVIEW OF AGENCY ACTION, THE COURT HAS JURISDICTION TO REQUIRE THE POSTMASTER GENERAL TO COMPLY WITH THE FACA UNDER THE FEDERAL MANDAMUS ACT

In the event that the Court nonetheless holds that the FACA itself does not provide plaintiffs with a right of action for its enforcement, and that a violation of the FACA may not be challenged under the common law right of review of agency action in violation of law, plaintiffs have a right of action under the Federal Mandamus statute, 28 U.S.C. § 1361 to compel the Postmaster General to comply with the FACA. The mandamus statute provides that "The district courts shall have

45

original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.". According to the DC Circuit: "Pursuant to this act, a district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.'" *In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005), *quoting Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002), *quoting Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997). A writ of mandamus will not issue unless the duty owed by the government official is a ministerial, as opposed to discretionary, duty to act. "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty". *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996), internal citations omitted. "'Generally speaking, a duty is discretionary if it involves judgement, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level ....'" *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988), brackets in original, emphasis and citation omitted.

As an official appointed by the Postal Board of Governors who are, except for the PMG and Deputy PMG, appointed by the President, and as the chief executive officer of the USPS which is an "independent establishment of the executive branch of the Government of the United States" the Postmaster General is an official subject to a mandamus order. Indeed it has long been held that the Postmaster General is subject to a writ of mandamus. *Kendall v. United States*, 37 U.S. 524 (1838).

Furthermore, FACA Section 8 makes each agency head responsible for insuring agency compliance with FACA requirements. And FACA's requirements governing the operation of advisory committees and its provision of rights to interested persons to attend meetings, submit

46

statements and obtain documents are plainly non-discretionary and are precisely the kind of duties that give rise to a mandamus action. Again, Section 10 requires that advisory committees provide public notice of meetings "to insure that all interested persons are notified of [committee] meetings"; that "[i]nterested persons shall be permitted to attend, appear before, or file statements with any advisory committee"; that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other shall be available for public inspection and copying"; and that "detailed minutes of each meeting of each committee shall be kept and shall contain a record of the persons present". (Emphasis added). FACA Section 11 requires that "agencies and advisory committees shall make available to any person, actual cost of duplication, copies of transcripts of agency proceedings or advisory committee meetings". (Emphasis added). These are clear and direct commands that provide no discretion. Indeed in *Cummock*, the D.C. Circuit stated that "in order to give meaning to FACA's sunshine provisions, §10(b) must be read to impose an affirmative obligation on the Government to, 'whenever practicable, [provide] access to the relevant materials before or at the meeting at which the materials are used and discussed'". 180 F.3d at 291 quoting *Food Chemical News, supra*. In *Food Chemical News*, the D.C. Circuit stated that "Section 10(b) contains unambiguous language that identifies certain materials, and describes in detail the methods and locations by and at which the Government must make those materials available to the public." 980 F.2d at 1472. And this Court, in *Center for Arms Control, supra.*, quoted these passages from *Cummock* and *Food Chemical News* and stated: "Any advisory committee operating under FACA has no discretion or choice in the matter". 2006 WL 3328257 at *4. In that case the Court held that it had mandamus jurisdiction to enforce FACA duties; so did the Court in *Food Chem. News,* 378 F. Supp. at 1050; and the Court in *Center for Auto Safety,* 414 F. Supp. at 217. *Cf. Washington Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d at 901-902, holding that when "the Government has a

47

duty to the plaintiff...to allow it access to certain government records" mandamus statute allows

court to take jurisdiction.*See also Judicial Watch, supra.* 219 F. Supp 2d at 41. Thus, the FACA

provides APWU and CAPS with a clear right to relief and the USPS has a clear and non-

discretionary duty to act.[12]

The USPS also argues that a party may obtain relief under the Mandamus Act only if that

party already has a right of action under the statute claimed to impose a duty that the official in

question has failed to perform. USPS Brief at 26-27, citing cases from other Circuit's such as *White

v. Administrator, GSA*, 343 F. 2d 444, 447 (9th Cir. 1965); *Aguirre v. Meese*, 930 F. 2d 1292, 1293

(7th Cir. 1991); *Gonzalez v. INS*, 867 F. 2d 1108, 1109-1110 (8th Cir. 1989); and *District Lodge No.

166, IAMAW v. TWA Services*, 731 F. 2d 711, 717 (11th Cir. 1984). However, as is demonstrated

above, precedent in this Court and in this Circuit holds that a party has a right of action under the

Mandamus Act to seek to compel an officer to perform his/her duty under the FACA; and a number

---

[12] The USPS argues against reliance on these decisions, asserting that a prior decision of this Court held that the Mandamus Act does not provide a cause of action when Congress has foreclosed other avenues of relief. USPS Brief at 26-27, *citing Public Citizen v. Kantor*, 864 F Supp 208, 211 (D.D.C. 1994). Of course, in *Kantor*, the Court's mains concerns were whether the underlying statute actually created a clear duty that could be enforced, whether the matter at issue involved exercise of discretion, whether sovereign immunity had been waived, and whether the plaintiffs had standing. *Id.* at 213. In any event, a subsequent D.C. Circuit decision held that when a plaintiff can not bring an action based on a general statutory review provision, the plaintiff can still bring an action for "non-statutory review", i.e. a mandamus action. *Chamber of Commerce v. Reich*, 74 F. 3d 1322, 1327 (D.C. Cir. 1996), *citing* the Mandamus Act and a treatise concerning mandamus actions. *See also Washington Legal Foundation, supra.*, noting that *Reich* held that a plaintiff could bring a mandamus action without a waiver of sovereign immunity (89 F. 3d at 901). *And see Judicial Watch, supra.*, holding that *Reich* overruled *Kantor* (219 F. Supp 2d at 41). [The USPS asserts (Brief at 27 n. 11) that this part of *Judicial Watch* should be ignored because *Judicial Watch* was vacated by the Supreme Court on other grounds, even though the USPS relies on the vacated *Judicial Watch* decision in asserting that there is no private right of action for enforcement of FACA. The USPS also asserts that *Judicial Watch* erroneously held that *Kantor* had been overruled by *Reich* because *Reich* never referred to the Mandamus Act; however, as the Court noted in *Judicial Watch* (219 F. Supp. 2d at 41 and n. 10), and as is noted above, *Reich* explicitly cited mandamus cases and a treatise on mandamus actions (74 F. 3d at 1327).]

of those decisions post-dated the decisions cited by the USPS. APWU and CAPS also note that *White* did not hold that a party could not bring an action for mandamus unless the underlying statute already provided an independent cause of action; rather, *White* held that the statute at issue there did not create the substantive right that the plaintiff sought to enforce, and that the Mandamus Act could not be used to create a substantive right that did not already exist. 343 F. 2d at 447. An analogous situation in this case would be if the FACA did not require agencies to maintain and permit inspection or records and reports and did not require that advisory committee meetings be open to interested parties. But the FACA did create such rights, so *White* is plainly inapposite. *Gonzalez* and *Aguirre* both involved findings that the underlying statute did not vest the plaintiff aliens with rights to expeditious deportation hearings, but only imposed duties on the Attorney General to expedite hearings in order to reduce prison overcrowding; in those cases it could not be said that the plaintiffs had a clear right under the statute and that the Attorney General had a clear duty to respond to that right. And in *District Lodge No. 166*, the Court found that there was neither a clear right of the plaintiff nor a clear duty for the officer at issue. Accordingly, the denials of mandamus relief in those cases do not support denial of mandamus relief in this case. Furthermore, besides being factually distinguishable from the instant case, the decisions cited by the USPS do not set forth a broad principle that mandamus relief is unavailable unless the underlying statute already provides an independent cause of action for its enforcement. In this regard, APWU and CAPS also note that the USPS argument is fundamentally inconsistent with one of the most basic features of mandamus actions: that they are available only when no other form of relief is available to the plaintiff. *See e.g. Heckler v. Ringer*, 466 U.S. 602, 616 (1984). The USPS argument would render the Mandamus Act meaningless and create an intolerable "Catch-22" for plaintiffs--mandamus relief would be available only when no other form of relief was available, but a party could not bring a mandamus action

49

unless it already had an independent cause of action for enforcement of the duty at issue. This is not the law, and an independent cause of action for enforcement of the underlying statutory duty at issue is not a prerequisite for a mandamus action. Thus, under Circuit precedent and general law concerning mandamus actions, if APWU and CAPS have no cause of action for enforcement of FACA under that statute, they have a right to a mandamus action to compel the Postmaster General to perform the duties imposed by the Act.

Thus, even if the FACA itself does not provide a private right of action for its enforcement, this Court still has jurisdiction over plaintiff's claims that the Postal Service violated the requirements of the Act.

### VII. CONCLUSION

For the foregoing reasons APWU and CAPS respectfully submit that the Court should find that it has jurisdiction over their amended complaint, and should deny the USPS motion to dismiss.

Respectfully submitted,

/s/

Richard S. Edelman (D.C. Bar No. 414348)
O'Donnell, Schwartz & Anderson, P.C.
1900 L Street, N.W., Suite 800
Washington, DC 20036
Telephone: (202) 898-1824
Facsimile: (202) 429-8928
e-mail:REdelman@odsalaw.com

Darryl J. Anderson (D.C. Bar No. 154567)
Jennifer L. Wood (D.C. Bar No.500887)
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 898-1707
Facsimile: (202) 682-9276
e-mail: Danderson@odsalaw.com

October 15, 2007

Attorneys for Plaintiff American Postal Workers Union and Consumer Alliance for Postal Services


**UNITED STATES**
**POSTAL SERVICE**

January 24, 2006

The Honorable Susan M. Collins
United States Senate
Washington, DC 20510-6250

Dear Senator Collins:

Since we appreciate very much the efforts of the Homeland Security and Governmental Affairs Committee in crafting postal reform legislation, it is with regret that we must oppose the bill, even with the manager's amendments.

As we have communicated through a series of letters last year, buttressing communications from previous Boards about earlier versions of the legislation, we believe there are critical elements missing from this bill, as well as numerous burdensome provisions that would make it extremely difficult for the Postal Service to function in a modern, competitive environment.

We note, in particular, serious discrepancies between the bill's provisions and recommendations of the President's Commission, and while the bills do return responsibility for military retirement expense to the U.S. Treasury, this violates the Statement of Administration Policy and invites a Presidential veto. We also note that issues raised in the Statement of Administration Policy are not dealt with at all in these bills.

-2-

Again, it is with regret that, in carrying out our fiduciary responsibilities and in keeping with our concerns that the Postal Service be able to provide the quality of service and reasonable rates to which the American people have become accustomed, we must oppose the passage of this bill.

Sincerely yours,

James C. Miller III
Chairman

Alan C. Kessler
Vice Chairman

Carolyn Lewis Gallagher
Governor

John S. Gardner
Governor

Louis J. Giuliano
Governor

John E. Potter
Postmaster General
  and Chief Executive Officer

Patrick R. Donahoe
Deputy Postmaster General
  and Chief Operating Officer

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-

FAX:

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO,<br><br>CONSUMER ALLIANCE FOR POSTAL SERVICES (CAPS),<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES POSTAL SERVICE,<br><br>MAILERS TECHNICAL ADVISORY COMMITTEE,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 07-0990 (JR) |

## SECOND DECLARATION OF PHILLIP TABBITA

I Phillip A. Tabbita, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct and based on personal knowledge:

1. I have reviewed my Declaration filed in the above-captioned matter. I hereby incorporate my statements in that Declaration by reference and reiterate them as if set forth in this Second Declaration.

2. In paragraphs 14 through 19 of my Declaration, I explained that decisions made by the Postal Service as a result of MTAC workgroup recommendations can adversely affect the APWU as a small business mailer. Those statements apply as well to all individuals and small businesses that use the United States Postal Service to send their mail.

3. An example of how MTAC workgroup decisions can adversely affect

1

individuals and small businesses is provided by the efforts of MTAC and the Postal Service to increase the amount of drop shipping. Drop shipping means mailing large volumes of mail at entry points near the destination for the mail. This practice saves the Postal Service transportation costs, and some other costs. Large mailers who are able to drop ship are therefore given discounted postal rates. Drop shipping can affect the design of postal networks and the location of postal facilities. It allows the possibility that the Postal Service will have fewer but larger facilities rather than providing smaller and more numerous facilities.

4. Another effect of drop shipping is on the type and location of postal mail processing equipment. Just as drop shipping might encourage a network of fewer and larger facilities, it might also encourage the use of fewer and larger pieces of postal automation equipment, to process the large volumes of mail drop shipped or otherwise arriving at large postal facilities.

5. There is an inherent tension between postal policies that lead to consolidation of mail at fewer and larger facilities, to be processed by fewer and larger pieces of mail processing equipment, and alternative strategies that would rely on more numerous facilities more widely dispersed and using smaller mail processing equipment. The former strategy would favor large mailers by providing them with lower postage rates and continued highly efficient mail processing and disadvantage individuals and small businesses that do not have enough mail to transport it themselves to large consolidated postal facilities. Thus, individuals and small businesses could end up paying higher postage rates and receiving less effective mail processing service if postal service networks and automation strategies were designed primarily to accommodate large

2

mailers.

6.  MTAC work groups on drop shipping and postal automation have been very active in urging the Postal Service to adopt strategies that best accommodate their needs. This is an example of how MTAC "advice" or pressure on the Postal Service can lead to changes that favor large mailers over small mailers.  MTAC advice or pressure affects how the Postal Service conducts business by influencing the Postal Service to adopt policies that favor large mailers even though the effect of those policies may be to degrade service or increase rates for individuals and small businesses not represented on MTAC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2007

Phillip A. Tabbita